Exhibit B

Person Filing: Carl A. Wescott
Address (if not protected): 7017 E McDowell #214
City, State, Zip Code: Scottsdale, AZ 85257
Telephone:    415 335 5000
Email Address: carlwescott2020@gmail.com
Lawyer's Bar Number:    n/a

Representing ☒ Self, without a Lawyer or ☐ Attorney for ☐ Plaintiff OR ☐ Defendant

# SUPERIOR COURT OF ARIZONA
# IN MARICOPA COUNTY

CV2020-006252

Carl A. Wescott
Name of Plaintiff

Case No.: _____

And

**SUMMONS**

If you would take some advice from a lawyer,
contact the Lawyer Referral Service at
602-257-4434
or
www.maricopalawyers.org
Sponsored by the
Maricopa County Bar Association

Thomas Madden
Name of Defendant

---

**WARNING: This is an official document from the court that affects your rights. Read this carefully.
If you do not understand it, contact a lawyer for help.**

---

## FROM THE STATE OF ARIZONA TO: Thomas Madden

Name of Defendant

1. A lawsuit has been filed against you.  A copy of the lawsuit and other court papers are served on you with this *"Summons."*

2. If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court, and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint. To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to the:

   - Office of the Clerk of the Superior Court, 201 West Jefferson Street, Phoenix, Arizona 85003-2205 *OR*

   - Office of the Clerk of the Superior Court, 18380 North 40th Street, Phoenix, Arizona 85032 *OR*

   - Office of the Clerk of Superior Court,  222 East Javelina Avenue, Mesa, Arizona  85210-6201 *OR*

   - Office of the Clerk of Superior Court, 14264 West Tierra Buena Lane, Surprise, Arizona, 85374.

   Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons.

Case Number: _____

3. If this *"Summons"* and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your *"Response"* or *"Answer"* must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served. If this *"Summons"* and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

4. You can get a copy of the court papers filed in this case from the Petitioner at the address listed at the top of the preceding page, from the Clerk of the Superior Court's Customer Service Center at:

   - 601 West Jackson, Phoenix, Arizona 85003
   - 18380 North 40th Street, Phoenix, Arizona 85032
   - 222 East Javelina Avenue, Mesa, Arizona 85210
   - 14264 West Tierra Buena Lane, Surprise, Arizona 85374.

5. Requests for reasonable accommodation for persons with disabilities must be made to the division assigned to the case by the party needing accommodation or his/her counsel at least three (3) judicial days in advance of a scheduled proceeding.

6. Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

7. Eviction Actions/Forcible Detainers: If you want to request a telephonic hearing, please contact the judge assigned to your case. If you do not know your assigned judge, or have not been assigned a judge, please contact Civil Court Administration at 602-506-1497.

COPY

MAY 2 7 2020

SIGNED AND SEALED this date

CLERK OF THE SUPERIOR COURT
B. BARRETT
CLERK OF SUPERIOR COURT CLERK

By_____
                    Deputy Clerk

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED

CV11f 031820

COPY

Person Filing: Carl A. Wescott
Address (if not protected): 7017 E McDowell #214
City, State, Zip Code: Scottsdale, AZ 85257
Telephone: 415 335 5000
Email Address: carlwescott2020@gmail.com
Lawyer's Bar Number:_____ n/a

MAY 2 7 2020

CLERK OF THE SUPERIOR COURT
B. BARRETT
DEPUTY CLERK

Representing  ☒ Self, without a Lawyer  or  ☐ Attorney for  ☐ Plaintiff   OR  ☐ Defendant

# SUPERIOR COURT OF ARIZONA
# IN MARICOPA COUNTY

CV2020-006232

Carl A. Wescott
Name of Plaintiff

David Crowe et al
Name of Defendant

Case Number: _____

Title:    **PLAINTIFF'S DEMAND for JURY TRIAL**

Plaintiff, Carl A. Wescott _____, demands a trial by jury in this case. If this
        *(Name of Plaintiff)*

case is sent to compulsory arbitration, Plaintiff demands a trial by jury if there is an appeal

from that compulsory arbitration.

Dated this  _MAY 27, 2020_
        *(Date of signature)*

_____
(Signature of Plaintiff or Plaintiff's Attorney)

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED

CVC11f 050718

COPY

MAY 2 7 2020

CLERK OF THE SUPERIOR COURT
B. BARRETT
DEPUTY CLERK

1  CARL A. WESCOTT
   7017 E. MCDOWELL #214
2  SCOTTSDALE AZ 85257
3  *in propria persona*
   CARLWESCOTT2020@GMAIL.COM
4  +1 415 335 5000

5

6  ## SUPERIOR COURT OF THE STATE OF ARIZONA

7  ## MARICOPA COUNTY SUPERIOR COURT
   CV2020-006232

8  | CARL A. WESCOTT, | Civil Action No. _____ |
   | --- | --- |
9  | Plaintiff, | **PLAINTIFF'S COMPLAINT FOR BREACH OF CONTRACT, PROMISSORY FRAUD; & NEGLIGENT MISREPRESENTATION;** |
10 | vs. | |
11 | DAVID CROWE; | |
12 | ROBERT CROWE; MIKE LYONETTE; | **JURY TRIAL REQUESTED** |
13 | THOMAS MADDEN; TAYLOR COLLINS; | |
14 | JEFF RAU; | |
15 | DARRELL BUSHNELL; AMY BUSHNELL; | |
16 | PETER TIERNEY; KATHY FETTKE; | |
17 | SUSIE YEE; | |
18 | NORMAN DAVIES; CLAIRE DAVIES; | |
19 | BERNADETTE BROWN; SANDRA WINFREY; | |
20 | COLIN ROSS; | |
21 | BRAD MALCOLM; MICHAEL JIMENEZ; | |
22 | GUSTAVO VARELA; | |
23 | Defendants. | |
24 | + DOES 1 through 50 | |
25

26  ## COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; AND NEGLIGENT MISREPRESENTATION

1

Plaintiff Carl A. Wescott, proceeding *pro se,* complains of Defendants David Crowe, Robert Crowe, Mike Lyonette; Thomas Madden; Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Bernadette Brown; Sandra Winfrey; Colin Ross, Brad Malcolm, Michael Jimenez, and Gustavo Varela, and in support of his Complaint, the Plaintiff states as follows.

**PARTIES**

1. The Plaintiff is a resident of Scottsdale, Arizona.

2. The Plaintiff is currently unaware of the exact location and legal domicile of each of the individual Defendants: David Crowe, Robert Crowe, Mike Lyonette; Thomas Madden; Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Bernadette Brown; Sandra Winfrey; Colin Ross, Brad Malcolm, Michael Jimenez, and Gustavo Varela

**VENUE**

**3.** Venue is appropriate in this Court as the provisions of the relevant contract were orally agreed in Maricopa County, and the initial signed version of the relevant contract was written, formed, and signed in Maricopa County.

**FURTHER ALLEGATIONS REGARDING CONSPIRACY**

4. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, David Crowe, Robert Crowe, Mike Lyonette; Thomas Madden; Taylor Collins; Jeff Rau;

Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Bernadette Brown; Sandra Winfrey; Colin Ross, Brad Malcolm, Michael Jimenez, and Gustavo Varela, as individuals, in addition to acting for himself/herself and on his/her own behalf individually, as well as for the benefit of his or her marital community (if any), is and was acting as the agent, servant, employee, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the other Defendants (individual and entities) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

5. Plaintiff further alleges on information and belief that the acts and non-acts of each of the Defendants were fully ratified by each and all of the other Defendants. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

6. In addition, upon information and belief, there exist one or more nefarious corporate, trust, SAs, SRLs, IBCs, and/or foundations and other entity type Defendants involved in these conspiracies, currently unknown to Plaintiff. They shall emerge with the benefit of legal discovery.

7. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, any and all such corporate entities, in addition to acting for itself and for its own behalf, was acting as the agent, servant, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants (entity and individual) and

within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

8. Plaintiff further alleges on information and belief that the acts of each of the Defendants were fully ratified by each and all of the Defendants. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

## BACKGROUND NARRATIVE INCLUDING THE PARTIES' CONTRACT

9. The Plaintiff was an experienced international real estate developer focusing on residential developments in Latin America. The Plaintiff is now gaining some insight into the distressed asset markets, especially in the cases of projects that had significant economic viability but have foundered for reasons unrelated to that viability, often involving politics, personalities or fraud.

10. The Plaintiff was reasonably successful until the global meltdown and credit crunch of 9/2008. With the global impact of said credit crunch and the leverage the Plaintiff had applied to his real estate holdings, the Plaintiff eventually succumbed to those forces and declared chapter 7 bankruptcy.

11. Post-bankruptcy, the Plaintiff searched for distressed real estate assets that he could acquire and turn around. He was familiar with Seaside Mariana ("SM"), an ambitious development on approximately 1000 acres on the Montelimar coast west of Managua, Nicaragua. Seaside

Mariana had at one point featured a Jack Nicklaus designed golf course and a Wyndham hotel in its plans before the wheels fell off Seaside Mariana as well due to the same global pressures.

12. SM was an attractive investment and development opportunity for the original developer, Kevin Fleming, for at least the following reasons:

       (i)     The real estate was prime in terms of location and amenities;

       (ii)    At the time of initial investment, the market was rising faster than linearly;

       (iii)   Costa Rica to the South had already surfed a 20-year wave of real estate equity appreciation, and for some product types there was an order of magnitude difference in pricing;

       (iv)   Nicaragua was attractive for American retirees in particular because of its low cost of living, level of safety, accessibility (including airlift), and desirable climate.

13. Most of those reasons were relevant more recently to the Plaintiff as well for his investment consideration.

14. Further, the intangible assets associated with SM were sound and mostly in place, including plans, permits, designs, and marketing material.

15. The value of the project was, to a material degree, artificially depressed by more recent market conditions and bad word of mouth and internet postings concerning the lack of infrastructure put in by the original developer, leading to further relevant issues.

16. The Plaintiff blushes to admit he has entered contract to purchase SM three (3) times. The first time he entered contract, the Plaintiff saw an opportunity to buy SM for a highly attractive price

(US $500,000), solve the issues, and complete the development, and had a backer who would provide financial support for the project.

17. Most recently, the Plaintiff entered in to contract to purchase SM (either the Sociedad itself or the real estate, at his option) in 2018, with an anticipated close date (after some revisions, addenda, and extensions) of October 15th, 2018.

18. Lacking in capital, the Plaintiff entered discussions with several investors to back the purchase.

19. More recently, in August 2018, the Plaintiff entered in a contract with investors who were familiar with the relevant properties who agreed to fund 100% of the costs of the purchase in exchange for certain land owned by SM (the Sociedad Anonima).

20. That contract ("the Sales Contract") is attached in Exhibit A.

21. To dispel any confusion over identities in the contract, the Plaintiff, Carl Wescott is sometimes referred to by his Finnish name "Kalle", or the combination Carl "Kalle" Wescott.

22. Nineteen investors (the named Defendants) all agreed to collectively fund the Sales Contract, but two of them, David Crowe and Mike Lyonnette, agreed to manage their group and, for expediency, communications with the Plaintiff.

23. For a variety of reasons, David Crowe was usually the sole communicator and conduit on behalf of the group of 19 investors.

24. Because the Plaintiff was purchasing the development for US $500,000 and selling the land to the investors backing him for US $834,000, the Plaintiff was going to make US $334,000 in short-term cash profit in closing his purchase of SM and flipping the land to his investors.

25. In addition, as shall be proven at trial, the Plaintiff expected to make a much larger sum monetizing the intangible assets he was acquiring as part of this deal.

6

26. For stylistic purposes and economy of phrase, the above Defendants, who acted in concert to fund the Plaintiff's purchase of SM, will be described as "the Crowe Group" unless the context requires otherwise.

27. The Crowe Group performed its due diligence on the deal and agreed to move forward to a close.

28. After the Crowe Group's due diligence, those investors agreed in August 2018 to close on the purchase within 60 days.

29. The Crowe Group then remitted $25,000 to finance the closing process.

## DEFENDANTS' BREACH

30. The Sales Contract called for a closing date in mid-October-2018, as did the Plaintiff's purchase contract of Seaside Mariana.

31. The parties retained attorneys to prepare closing documents.

32. The parties worked out the logistics of closing in a "simultaneous close", which is well-understood to mean two successive closings.

33. In the agreed logistics, the Plaintiff would acquire the entity Seaside Mariana Golf and Spa Resorts, SA, which owned all the land, using another US $475,000 of the Crowe Group's money for said close. Then, the Plaintiff would transfer the lands in the Sales Contract to the entity of the Crowe Group's choice. Then, the Plaintiff or his designees would get the other US $334,000 in a series of payments.

34. However, with the Plaintiff about to fly to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group, informed the Plaintiff that he

1    and the rest of his investor group refused to close and would not be closing, breaching the Sales

2    Contract.

3    35. The Defendants' breach and false promises and assurances have caused significant damages to

4    Plaintiff, in an amount to be proven at trial.

5

6    36. The Plaintiff worked to try to remedy the Defendants' breach, but to no avail.

7    37. The Plaintiff was left with no choice but to file this legal complaint so that the scales of justice

8    may balance appropriately.

9

10    **Count I – Breach of Contract**

11

12    38. The Plaintiff realleges paragraphs 1-37 as if fully set out herein.

13

14    39. The Defendants' refusal to close breached the Sales Contract.

15    40. As a direct and proximate result of the Defendants' breach, the Plaintiff lost $334,000 in near

16    term profits and (as specifically acknowledged in NDAs signed by members of the Crowe

17    Group) the potential to recover in excess of $10,000,000 (ten million dollars) in other pre-tax

18    value over time, as shall be further proven at trial.

19

20

21    **Count II – Promissory Fraud**

22

23    41. The Plaintiff realleges paragraphs 1-37 as if fully set out herein.

24    42. Pleading alternatively, the Defendants never intended to close on the Sales Contract.

25

26

43. As one plausible explanation for said behavior, the Crowe Group, long-term adversaries of Fleming, planned to use the Plaintiff's efforts to discover valuable strategic information concerning Fleming's resources, price-points, and confidential plans (collectively "Fleming's Secrets").

44. Indeed, the Plaintiff had negotiated a deal which was over a million dollars better in price than the Crowe Group had previously offered for the same assets, which is why they were willing to pay US $334,000 more than the Plaintiff's price for Seaside Mariana land.

45. The Defendants' promise to close on the Sales Contract ("the Crowe Group Promise") was false when made, as part of a scheme to induce the Plaintiff to uncover and communicate Fleming's Secrets which they in turn planned to misuse in a series of further strategic moves, in and out of Court.

46. The Defendants intended that the Plaintiff rely on the Crowe Group Promise.

47. The Plaintiff did in fact reasonably rely on the Crowe Group Promise.

48. The Plaintiff was damaged by his reliance on the Crowe Group promise by losing $334,00 in near term profits and (as specifically acknowledged in NDAs signed by members of the Crowe Group, and as shall be fully proven at trial) the potential to recover in excess of $10,000,000 (ten million dollars) of further pre-tax value from intangible assets that the Plaintiff was acquiring as part of the deal.

## Count III – Negligent Misrepresentation

49. The Plaintiff realleges paragraphs 1-37 as if fully set out herein.

50. Pleading in the alternative, at the time David Crowe made the Crowe Group Promise (aka "the Representation"), Mr. Crowe was acting in his professional capacity and had a pecuniary interest in the underlying transaction.

51. Crowe failed to exercise due care in making the Representation that he and the Crowe Group would close on the Sales Contract ("the Crowe Group Promise")

52. The Plaintiff justifiably relied on the Representation.

53. The Plaintiff was injured by Crowe's lack of due care in making the Representation by losing $334,000 in short-term profits as well as a much larger sum to be proven at trial.

[rest of this page blank; Prayer for Relief follows on the next page]

1    WHEREFORE, Plaintiff prays

2        (a) As to Count I for all direct and consequential damages the Plaintiff incurred as a proximate

3             result of the Defendants' breach of contract;

4        (b) As to Count II for all direct and consequential damages the Plaintiff incurred as a

5             proximate result of David Crowe's (and the Crowe Group's) promissory fraud along with

6             the imposition of exemplary damages to deter the Defendants from committing such acts

7

8             of fraud in the future;

9        (c) As to Count III for all direct and consequential damages the Plaintiff incurred as a

10            proximate result of Crowe's negligent misrepresentations along with the imposition of

11            exemplary damages to deter Defendants from committing such acts of fraud in the future

12

13

14   RESPECTFULLY SUBMITTED on May 27th, 2020

15                                                                      CARL A. WESCOTT

16

17

18

19

20

21

22

23

24

25

26

                                                       11



This Settlement Agreement dated as of August 11th, 2018, is entered into by and among:

## "THE SETTLER"

Carl (aka Kalle) Wescott

And

## "THE LITIGATORS"

## RECITALS

Between the undersigned, to wit: On one hand, Kalle Wescott (hereafter called the "Settler") and on the other hand, David Crowe and Mike Lyonette (hereafter called "The Litigators"). Mike Lyonette ("the Mortgage Holder") previously provided loans to Seaside Mariana, and has a mortgage (hipoteca) on a subset of the Seaside Mariana land. The Litigators are part of the Litigating Group, which is a group of persons, represented by Federico A. Gurdián Sacasa (attorney-at-law), who bought or invested in lots, condominiums and bungalows at Seaside Mariana (hereafter called the "*Litigating Group*") that have a Nicaraguan lawsuit together have agreed to execute a legally-binding Settlement Agreement, (hereafter called the "**Agreement**").

**WHEREAS**, the Settler is currently purchasing 100% of the shares of Seaside Mariana Spa & Golf Resort S.A. (hereafter "SM" or "Seaside Mariana"), which is all ten thousand (10,000) shares, (hereafter called the "**Stock**"),

**WHEREAS**, the Parties (the Litigators and the Settler) wish to settle all claims of the Litigating Group and have agreed-upon terms to do so;

**WHEREAS**, the Parties (the Litigators and the Settler) hereby define three terms:  "SM Closing" shall be when the Settler owns SM and has all the endorsed shares. "Land Closing" shall be when the Settler has transferred the SM land and the Horizontal Property Regime that is the major asset of the settlement to the Litigating Group or to the entity of their choice. "Full Settlement Closing" shall be when this Settlement is fully effectuated, including all items in Article I, sections 4 through 7 having been paid and transferred.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises made by the Parties hereto, covenant and agree as follows:

## Article I

1.  When the Litigators have completed basic due diligence, the Litigators shall pay a non-refundable deposit of **Twenty-Five Thousand United States Dollars 00/100 (USD $25,000.00)** to a party designated by the Settler. This must occur by August 13th, 2018 or else this contract unwinds, with parties still respecting signed NDA agreements.

2.  In the next 30 days, the Settler will sign a new agreement with the Litigating Group (as opposed to the Litigators), which will bind members of the group, which will further clarify the power of attorney(s) that Settler shall be providing, breaches of contract, that Settler does not personally owe monies owed to the Mortgage Holder and remedies and/or damages for the breaches.

3.  The Parties shall have up to 60 days from now to close the settlement – through October 10th, 2018.

4.  The high level terms of the settlement are that the Litigating Group will be providing US $834,000 in 4 tranches to the Settler, as further detailed below, while the Settler will be transferring to the Litigating Group almost all assets owned by Seaside Mariana, including all unencumbered lands, operating assets (including all tangible and almost all intangible assets), domains, web content, equipment, leases, contract rights, intellectual property rights used in the business of Seaside Mariana, together with all documents and entities relating to the HOA. Once all monies and land (along with the assets identified in Article I, section 6) have properly changed hands, the Parties shall indemnify each other by mutual agreement.

5.  One of two exceptions to the transfers that are occurring as set out in Article I, section 4, is that Seaside Mariana will retain insurance policies and any other intangible asset that is either not transferrable, or for the benefit of SM only, or both.

6.  The second of two exceptions concerns customer and mailing lists and mailing campaigns. The Settler **shall** be transferring to the Litigating Group all customer and prospect mailing lists (including all contact information) and mailing campaigns, both digital and analog (email, web, and snailmail). However, the parties shall co-own these assets. Settler shall assign his part of the co-ownership to a Sociedad Anonima after the close.

7.  The $834,000 consists of four parts: (1) the $25,000 by August 10th, 2018; (2) $475,000 within 60 days of the first tranche, to be transferred to the named party of Settler's choice **only** after SM Closing, with Settler having full ownership of, and authority over, Seaside Mariana; (3) $234,000 as follows, to the Settler: $56,000 at the Land Closing when Litigating Group receive all their expected land as settlement, and 20% of SM land sales achieved by Litigating Group until fully paid, with a minimum of $12,000 per quarter (3 months), paid within a week or so of the end of each quarter, with the first payment beginning at the end of the second quarter after SM Closing, and then a quarterly payment every 3 months from that point onwards until the $234,000 has been paid in full and (4) then, another $100,000 to an entity of the Settler to be formed later. After the $234,000 to Settler has been paid, the Litigating Group shall continue to pay under the same quarterly program (20% of sales, but a minimum of $12,000 per quarter) to the entity until the $100,000 is fully paid.

8.  These (Article I, sections 4 through 7) are the only sums and items owed to each other, and when fully transferred and paid the parties shall fully release liability to each other with regard to Seaside Mariana.

9.  SM has not filed taxes since 2011, and thus Settler will work with the current owner to get all taxes filed and current through the tax year that ends June 2018. This is a necessity prior to any closing including SM Closing.

10. The Settler has bound the sellers of SM in a contract that ensures that Settler and the Litigating Group will get everything they need by or at closing, including the filed taxes. The Litigators have approved the language of this Closing Contract.

11. The Settler shall pay the costs related to the SM stock transfer. The Litigating Group shall pay the costs of the land transfer including what's necessary on property taxes to do the transfers. The parties shall pay their own attorneys.

12. The one sub-parcel that will not go to the Litigating Group is the parcel with a mortgage provided by one of the Litigating Group (the "Mortgage Holder"), also represented by Federico A. Gurdián Sacasa (attorney-at-law), unless it is most efficient to transfer it in bulk with the other land for the Litigating Group and then to the Mortgage Holder. At or just after the SM Closing, Settler shall work with the Mortgage Holder to transfer that land to the Mortgage Holder at the Mortgage Holder's expense.

13. Both Parties have entered this deal in good faith and with a lot of trust, but the Parties have offered each other mechanisms such that they do not have to rely solely on trust at each step. The Parties will work out the final details of each such step to their mutual satisfaction at each step. For example, because the $475,000 needs to go in to escrow prior to land transfer, the Settler has offered and will continue to offer any mechanism the Litigating Group desire to ensure that they will get the land, including issue by Settler of an irrevocable power of attorney to a Nicaragua attorney of the Litigating Group' choice. For the payments that will come with sales or paid each quarter, Settler does not necessarily require a mortgage on SM, and is open to Personally Guaranteed Promissory Notes.

14. Settler will continue to provide all due diligence information requested by Litigating Group, and can provide a complete package of written documents at or just after the close. 

15. Confidentiality is extremely important to complete this settlement, including the purchase aspect. The Settler has already executed NDAs (Non-Disclosure Agreements) with the Litigators. The Litigators plan to solicit funding from several more members of the group of Litigating Group. The Litigators shall ensure that those several members, as well as Federico A. Gurdián Sacasa, all sign NDAs with the Settler similar to the one provided by the Settler on Saturday August 4th, 2018, prior to disclosing information related to this settlement or other confidential information. Subsequently, all confidential information and all information relating to this deal shall be shared ONLY with the Settler, the Litigators, Senor Gurdián, and the members of the Litigating Group that have signed NDAs in the past week or that shall sign NDAs shortly.

16. Settler already has digital files of the following categories and these will be provided to Litigating Group prior to closing:   Legal, Financials, Sales, Vendors, Marketing, Engineering and Design, Permits, Employees, HOA documentation and entities, Communication, Maps, Cash Liabilities, Contractual Liabilities, Pictures and Digital Collateral. Settler shall transfer all of these to the Litigating Group prior to SM Closing.

17. Ownership of the land: Except for the registered mortgage lien held by Mortgage Holder on the lots identified, Settler represents and warrants (a) that Seaside Mariana Spa & Golf Resort S.A. has clear and unencumbered title[1] to all of the aforementioned lands and (b) that, once Settler's acquisition of Seaside Mariana has been finalized (aka SM Closing), Settler will be in a position to fully execute and deliver on all of the agreements and obligations set out in this Settlement Agreement. The Parties attach the most recent Libertad de Gravamen for the lands as Exhibit A. The Libertad de Gravamen shows property that is formally Registered and thus not able to be transferred to Litigating Group.

18. Liabilities of Seaside Mariana: Settler represents and warrants that, except for the liabilities to the Litigation Group members settled by this Agreement, all existing liabilities of Seaside Mariana, including Seaside Mariana's obligation to deliver 10 Beach Front lots to a previous shareholder of Seaside Mariana, remain with the Seaside Mariana entities owned by Settler and shall not pass to Claimants or to the Litigation Group. Settler shall indemnify the Litigation Group and its members against any such claims that may arise from these obligations.

19. Settler shall ensure

    (1) that the current beneficial owners of Seaside Mariana (Kevin Fleming and Maria Rueda) disclose to the buyer of the shares (i.e. the Settler) any and all transactions that have been made, specially land transactions made, and that are pending registration in public record, and the Settler shall ensure that this information is passed on to the Litigating Group in its entirety; and

    (2) that the current owners of Seaside Mariana are prohibited from taking any further action relating to these transactions and pending transactions on behalf of any of the Seaside Mariana entities and that all Powers of Attorney issued by the current owners of Seaside Mariana are revoked with effect immediately upon SM Closing.

## Article II

1. Notices. All notices, demands and payments required or permitted to be given hereunder shall be in writing and may be delivered personally, by e-mail to the addresses of the Parties as set out and agreed separately between the parties. Any notice personally delivered or sent by e-mail shall be deemed to have been given and received at the time of delivery, unless otherwise proven. All Parties shall be entitled to designate new contact information by giving notice thereof to the other Parties in accordance with the terms hereof.

2. Assignment/Successors. This Agreement shall be binding upon all successor, assigns, heirs, agents and representatives of each of the Parties.

3. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of San Francisco, California in the United States of America, and thus that shall be the jurisdiction and venue for this contract. (Spanish documents, which will follow Nicaraguan law, will be utilized to effectuate the land transfer).

---

[1] "clear and unencumbered" from a mortgage standpoint, in other words, there is no mortgage debt on the lands. Property taxes are owed, and there are various liens on the lands as per the most recent Libertad de Gravamen, dated April 2018, which is an Exhibit to this contract.

4. <u>Entire Agreement.</u> This Agreement may not be amended or modified, and no provisions hereof may be waived, without the written consent of the Parties.

5. <u>Severability.</u> If any provision of this Agreement shall be declared void or unenforceable by any judicial or administrative authority, the validity of any other provision and of the entire Agreement shall not be affected thereby.

6. <u>Titles and Subtitles.</u> The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting any term or provision of this Agreement.

7. <u>Execution.</u> This Agreement may be executed in counterparts and all of such counterparts taken together shall be deemed to constitute one and the same Agreement. The Parties may execute this Agreement via facsimile transmission or electronic communication and such execution and delivery shall be full, binding and proper execution and delivery without the need for the exchange of originally executed copies of this Agreement between the Parties.

8. The parties agree they are sophisticated in business matters and have access to counsel. They also have collaborated on the drafting and editing of this contract. Accordingly this contract will not be construed in favor or against either party including the original drafter.

[Signature page follows]

IN WITNESS WHEREOF, the Parties hereby state that they are fully empowered to act and agree to the obligations contained in this Agreement and that consequently, each one accepts each and every clause contained herein in the terms and under the conditions hereby stated.

IN WITNESS WHEREOF **CARL (KALLE) WESCOTT** has executed this Agreement on this (Day) 11 of August 2018 in the city of San Francisco, California; United States of America.

**PRINT NAME(S):**

Carl (Kalle) Wescott                    CLKWescott

(Settler Print Name)                    (Settler Signature)

IN WITNESS WHEREOF David Crowe has executed this Agreement on this (Day) 11 of August 2018.

_____                 _____

(Print Name)                            (Signature)

IN WITNESS WHEREOF Mike Lyonette has executed this Agreement on this (Day) 11 of August 2018.

_____                 _____

(Mortgage Holder Print Name)            (Mortgage Holder Print Name)

**Exhibit:**

The following exhibit is an integral part of this Settlement Agreement

A.    Most recent Libertad de Gravamen



EXHIBIT A

SEÑOR (A) REGISTRADOR (A) PÚBLICO DE LA PROPIEDAD INMUEBLE Y MERCANTIL

DE LA CIUDAD DE MANAGUA. YO, JAIRO JOSÉ MALTEZ VIGIL, MAYOR DE EDAD,

ABOGADO Y NOTARIO PUBLICO DE ESTE DOMICILIO, Y PORTADOR DEL CARNE DE

IDENTIDAD DE LA CORTE SUPREMA DE JUSTICIA NUMERO 11516, LE SOLICITO A USTED ME CERTIFIQUE LIBERTAD

DE GRAVAMEN DE PROPIEDAD HORIZONTAL DE LA FINCA NÚMERO CUATRO MIL DOSCIENTOS CINCUENTA Y UNO

(4251) PH, TOMO NUMERO CUARENTA Y SIETE PLECA CUARENTA Y NUEVE (47/49) PH, FOLIOS NÚMERO TREINTA Y

UNO PLECA TRESCIENTOS GUIÓN UNO PLECA SESENTA Y SEIS (31/300- / 1/66) ASIENTO PRIMERO (1) DE LA

COLUMNA DE INSCRIPCIONES DE LA SECCIÓN DE DERECHOS REALES

Managua, viernes 21 de julio del 2017

AÑO 2017

Abogado y Notario Público

Carné No 11516

LA SUSCRITA REGISTRADORA AUXILIAR DEL DEPARTAMENTO DE MANAGUA CERTIFICA: Que

la finca inscrita bajo el No. 4251-PH; Tomo 47-PH; Folios 31 al 300; Tomo 49-PH; Folios 1 al 66;

Tomo 136-PH, Folios 91 al 104, Asiento 1 y 2, Columna de Inscripciones, sección de Derechos

Reales, Libro de Propiedades Horizontales de este Registro Publico. Pertenece el resto a: Seaside

Marina Spa & Golf Resort Sociedad Anónima. Y tiene hipoteca a favor de Michael Francis

Lyonette, tan solo por lo que hace a los Módulos Nos. 18, 19, 29, 30, 31, por las siguientes sumas: 1)

Trescientos sesenta y tres mil ochocientos cincuenta y dos dolares equivalente a siete millones

ochocientos noventa y cinco mil quinientos ochenta y ocho córdobas con cuarenta centavos de

córdobas; 2) Cuatrocientos tres mil seiscientos noventa y tres dolares equivalente a ocho millones

setecientos sesenta mil ciento treinta y ocho córdobas con diez centavos de córdobas, para un monto

total de Dieciséis millones seiscientos cincuenta y cinco mil setecientos veintiséis córdobas equivalente a

setecientos sesenta y siete mil quinientos cuarenta y cinco dolares, posteriormente se amplio dicho

crédito hasta la suma de veintiséis millones setecientos ochenta y nueve mil seiscientos setenta y tres

córdobas con treintiun centavos equivalente a un millón ciento cuarenta y un mil trescientos cuarenta

seis dolares. En asientos 1 y 2 ***** También tiene inscritas Provisionalmente venta de los

siguientes lotes indivisos: 1) A favor de Thomas Edward Austin, identificado como lote GB, con un

área de mil trescientos veinticuatro punto novecientos cinco metros cuadrados; 2) A favor de Trevin

Martín Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto

novecientos sesenta y dos metros cuadrados; 3) A favor de Robert Daniel Madgett y Judith Gail Madgett,

identificado como lote GQ, con un área de novecientos cincuenta y uno punto ciento veinticuatro metros

cuadrados; 4) A favor de Judith Gail Madgett y Robert Daniel Madgett, identificado como lote GBU, con

un área de ochocientos cincuenta y siete punto seiscientos ochenta y uno metros cuadrados, inscrito el

22-05-2012, pero se encuentra pendiente la firma del registrador; 5) A favor de Thomas Edward Austin,

identificado como lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro

metros cuadrados; 6) A favor de Thomas Edward Austin, identificado como lote OVL, con un área de un

mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados; 7) A favor de Thomas

Edward Austin, identificado como lote RM, con un área de un mil setecientos ochenta y ocho punto cero

noventa y cuatro metros cuadrados; 8) A favor de Zachary Taylor Collings y Taylor Collings, identificado

como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros

cuadrados; 9) A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil

trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 10) A favor de James

Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos

once punto quinientos veinticuatro metros cuadrados, 11) A favor de Robert Daniel Madgett y Judith Gail

Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos

setenta y un metros cuadrados,  Inscrita el 22-05-2012, pero se encuentra pendiente de firma del

registrador, 12) A favor de Thomas Edward Austin, identificado como lote GAL, con un área de

ochocientos veintiún punto setecientos veinticinco metros cuadrados; 13) A favor de Zachary Taylor

Collings y Taylor Collings, identificado como lote OVA, con un área de un mil ochocientos sesenta y seis

punto setecientos setenta y tres metros cuadrados; 14) A favor de Zachary Taylor Collings y Taylor

Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos

cincuenta y nueve metros cuadrados, 15) A favor de Zachary Taylor Collings y Taylor Collings, identificado

como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros

cuadrados; 16) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GST,

con un área de un mil trescientos treinta y ocho punto cuatrocientos trece metros cuadrados; 17) A favor

de Anthony David Bowman y Carol Anne Bowman, identificado como lote GCR, con un área de un mil



ciento diecisiete punto quinientos setenta y tres metros cuadrados, inscrita el 22-05-2012, pero se encuentra pendiente de la firma del Registrador; **18)** A favor de Anthony David Bowman y Carol Anne Bowman, identificado como lote GCR, con un área mil ciento diecisiete punto quinientos setenta y tres metros cuadrados; **19)** A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, **20)** A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GBV, con un área de ochocientos cincuenta y siete punto seiscientos ochenta y un metros cuadrados; **21)** A favor de Thomas Edward Austin, identificado como Lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro metros cuadrados, **22)** A favor de Thomas Edward Austin, identificado como lote OVL, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados, **23)** A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GQ, con un área de novecientos cincuenta y uno punto ciento veinticuatro metros cuadrados; **24)** A favor de Thomas Edward Austin, identificado como lote GB, con un área de un mil trescientos veinticuatro punto novecientos cinco metros cuadrados; **25)** A favor de Trevin Martín Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto novecientos sesenta y dos metros cuadrados; **26)** A favor de Thomas Edward Austin, identificado como lote RM, con un área un mil setecientos ochenta y ocho punto cero noventa y cuatro metros cuadrados; **27)** A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; **28)** A favor de Thomas Edward Austin, identificado como lote GAL, con un área de ochocientos veintiuno punto setecientos veinticinco metros cuadrados, **29)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVA, con un área de un mil ochocientos sesenta y seis punto setecientos setenta y tres metros cuadrados, **30)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos cincuenta y nueve metros cuadrados; **31)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, **32)** A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados; **33)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros cuadrados; **34)** A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GST, con un área de un mil trescientos treinta y ocho punto cuatrocientos trece

metros cuadrados; **35)** Tiene inscrito provisionalmente Dacion en pago a favor Desarrollos Inmobiliarios

Tejas, Sociedad Anónima sobre los siguientes lotes indivisos: **1) Lote Nº 20,** con un área de diecinueve

mil doscientos setenta y cinco punto novecientos veintitrés metros cuadrados; **2) Lote Nº 28,** con un

área de ciento noventa y dos mil novecientos sesenta y cuatro punto ciento ochenta y cinco metros

cuadrados; **3) Lote Nº 21,** con un área de treinta y nueve mil quinientos ochenta punto cero noventa y

seis metros cuadrados; 4) **Lote Nº 22** , con un área de nueve mil cincuenta y seis punto seiscientos

setenta y nueve metros cuadrados; **5) Lote Nº 23,** con un área de cuatro mil setecientos sesenta y uno

punto doscientos cuarenta y tres metros cuadrados; **6) Lote Nº 25,** con un  área de sesenta y un mil

quinientos treinta punto setecientos setenta y cinco metros cuadrados, inscrita con fecha veinte de junio

del año dos mil trece, pero se encuentra pendiente la firma y sello del registrador. **36)** Tiene anotada

demanda en la vía ordinaria con acción de pago de daños y perjuicios, a solicitud de Edward Albert Cole

por la suma de cuarenta y ocho millones ochocientos treinta y tres mil setenta y nueve córdobas con

catorce centavos equivalente a dos millones setenta y tres mil diez dólares con cincuenta centavos. **37)**

Tiene anotada **Dacion en Pago** a favor de los señores: **Edward Albert Cole,** los siguientes lotes. 1) Lote

GSA, con un área de: un mil ciento treinta y siete punto setecientos noventa y tres metros cuadrados, 2)

Lote GSB, con un área de: un mil  ochenta y  siete punto diecisiete  metros  cuadrados,  3) Lote GSC,

con un área de:  un mil ciento cincuenta y seis punto ochocientos un metros cuadrados, 4) Lote GSD,

con un área de: un mil ciento setenta y siete punto doscientos noventa y seis metros cuadrados, 5) Lote

GSE, con un área de un mil ciento cincuenta y tres punto seiscientos diez metros cuadrados, 6) Lote

GSF, con un área de un mil ciento veinticinco punto setecientos cinco metros cuadrados, 7) Lote GSG,

con un área de un mil noventa y siete punto ochocientos metros cuadrados, 8) Lote GSH, con un área de

un mil setenta y uno punto trescientos setenta y tres metros cuadrados, 9) Lote GSI, con un área de un

mil ciento cuarenta y un punto noventa y tres metros cuadrados, 10) Lote GSI, con un área de un mil

trescientos setenta y dos punto cero cero seis metros cuadrados, 11) lote GSK, con área de un mil

ochocientos treinta y uno punto cuatrocientos cincuenta y uno metros cuadrados, 12) Lote GSL, con un

área de un mil ochocientos veintidós punto novecientos setenta y ocho metros cuadrados, 13) Lote GSM,

con un área de un mil trescientos sesenta y ocho punto novecientos treinta y uno metros cuadrados, 14)

Lote GSN, con un área de un mil ciento diez punto novecientos cincuenta y ocho metros cuadrados, 15)

Lote GSO, con un área de un mil ciento cuarenta y nueve punto cuatrocientos cinco metros cuadrados,

16) Lote GSP, con un área de un mil doscientos cincuenta y nueve punto setecientos noventa y cinco

metros cuadrados, 17) Lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados, 18) Lote GSV, con un área de un mil trescientos veintiséis punto sesenta y seis metros cuadrados, 19) Lote SSW, con un área de un mil trescientos setenta punto quinientos dieciocho metros cuadrados, 20) Lote GSX, con un área de un mil cuatrocientos cuarenta y uno punto cuatrocientos seis metros cuadrados, 21) Lote GSY, con un área de un mil seiscientos noventa y dos punto ciento cincuenta y uno metros cuadrados, 22) Lote GS2, con un área de un mil novecientos sesenta y cinco punto cuatrocientos dieciocho metros cuadrados, 23) Lote GSAA, con un área de dos mil doscientos veintisiete punto setecientos cincuenta y cinco metros cuadrados, 24) Lote GSAB, con un área de dos mil quinientos dieciocho punto doscientos noventa y uno metros cuadrados, 25) Lote GSAC, con un área de cuatro mil doscientos treinta punto trescientos cincuenta y dos metros cuadrados, 26) Lote GSDA, con un área de cuatro mil cuatrocientos treinta y seis punto ciento treinta y un metros cuadrados, 27) Lote GSAE, con un área de tres mil novecientos setenta y cuatro punto novecientos veinticinco metros cuadrados, 28) Lote GSAF, con un área de cuatro mil ciento cuarenta punto ciento cuarenta y dos metros cuadrados, 29) Lote GSAG, con un área de cuatro mil seiscientos cuarenta y dos punto trescientos sesenta y cinco metros cuadrados, 30) Lote GCA, con un área de tres mil sesenta y ocho punto ciento doce metros cuadrados, 31) Lote GCB, con un área de tres mil novecientos cincuenta y nueve punto doscientos ochenta y tres metros cuadrados, 32) Lote GCC, con un área de cuatro mil seiscientos veintiséis punto setecientos veinte metros cuadrados, 33) Lote GCD, con un área de cuatro mil doscientos veintiún punto seiscientos treinta y dos metros cuadrados, 34) Lote GCS, con un área de tres mil setecientos veintiséis punto seiscientos cincuenta y cinco metros cuadrados. 35) Lote GCF, con un área de tres mil ciento cincuenta y seis punto doscientos cuarenta y tres metros cuadrados, 36) Lote GCG, con un área de dos mil seiscientos ochenta y cuatro punto setecientos cuarenta y siete metros cuadrados, 37) Lote GCH, con un área de dos mil cuatrocientos noventa y nueve punto quinientos treinta metros cuadrados, 38) Lote GCI, con un área de dos mil seiscientos treinta y siete punto trescientos ochenta metros cuadrados, 39) Lote GCI, con un área de dos mil quinientos noventa y dos punto novecientos veinte metros cuadrados, 40) Lote GCK, con un área de dos mil cuatrocientos dieciséis punto ochocientos cuarenta y dos metros cuadrados, 41) Lote GCL, con un área de dos mil seiscientos cincuenta y dos punto cuatrocientos setenta y cuatro metros cuadrados, 42) Lote GCM, con un área de dos mil cuatrocientos treinta y seis punto novecientos veinte metros cuadrados. 43) Lote GCN, con un área de dos mil nueve punto quinientos setenta y uno metros cuadrados, 44) Lote No.27, con un área de

doscientos cuarenta y dos mil ochocientos setenta y cinco punto seiscientos ochenta y seis metros cuadrados, 45) Lote No. 24, con un área de doce mil ochocientos cuarenta y dos punto doscientos veintiuno metros cuadrados, 46) Lote No. 26, con un área de cincuenta y siete mil seiscientos diecinueve punto seiscientos sesenta y ocho metros cuadrados, *** **38) Promesa de venta,** a favor de PKR Holding, Sociedad Anonima, sobre los siguientes lotes, a) lote OVK, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados, b) lote GAY, con un área de un mil cuatrocientos treinta punto setecientos treinta y siete metros cuadrados, c) lote GAX, con u na rea de un mil cuatrocientos veintinueve punto seiscientos sesenta y tres metros cuadrados, por la suma de tres millones seiscientos treinta y un mil seiscientos ochenta y cinco córdobas con sesenta centavos de córdobas. *** **39) promesa de venta,** a favor de Advantage Ventures LLC, un lote con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, por la suma de dos millones ochocientos noventa y nueve mil setecientos dos córdobas con treinta y cinco centavos, equivalente a ciento nueve mil quinientos dolares. *** **40) Promesa de venta** a favor de Paul Brian Ciceri, un lote de terreno identificado como GAV, con un area de un mil cuatrocientos siete punto ochocientos setenta y ocho metros cuadrados, por la suma de setecientos ochenta y dos mil treinta y cuatro córdobas equivalente a veintinueve mil trescientos ochenta y dos dolares, *** **41) Demanda,** ordinaria con acción de resolución de contrato, para que por sentencia firme y declare, lo siguiente: a) que se deje sin efecto el contrato de oferta de compra sobre el lote OVGG, b) que se deje sin efecto el contrato de oferta de compra sobre el lote NGJ, c) devolución de precio mas intereses, d) pago de los costos daños y perjuicios ocasionados por el incumplimiento, *** **42) Demanda** en la vía ordinaria con acción de resolución de contrato por incumplimiento para que por sentencia se declare lo siguiente: a) disuelto el contrato de promesa de venta , b) devolución de precio mas intereses, c) pago de los costos daños y perjuicios ocasionados por el incumplimiento. ***43) Demanda** ordinaria con acción de resolución de contrato por incumplimineto, promovida por Darrell Lee y Bushnell y Amy Bushnell, *** **44) Demanda** ordinaria con acción de resolución de contrato en consecuencia de conformidad al articulo 1061 y 1063 Pr. Declareseles rebeldes para todos los efectos de la presente demanda. **En asientos 1 al 42, 41 y 43** A solicitud de parte interesada extiendo el presente certificado en la ciudad de Managua a **veintisiete** dia del mes de **Julio** del dos mil **diecisiete**.

**COPY**



JUN **1 2** 2020

CLERK OF THE SUPERIOR COURT
F. FOWLER
DEPUTY CLERK

1  CARL A. WESCOTT
2  409 N. SCOTTSDALE ROAD #223
   SCOTTSDALE AZ 85257
3  *in propria persona*
   CARLWESCOTT2020@GMAIL.COM
4  +1 415 335 5000

5

6               **SUPERIOR COURT OF THE STATE OF ARIZONA**

7               **MARICOPA COUNTY SUPERIOR COURT**

8  CARL A. WESCOTT,                    Civil Action No. **CV2020-006232**____

9               Plaintiff,             **PLAINTIFF'S [CORRECTED]
                                       COMPLAINT FOR BREACH OF
10      vs.                            CONTRACT, PROMISSORY
                                       FRAUD; NEGLIGENT
11                                     MISREPRESENTATION;
   DAVID CROWE;                        INTENTIONAL INTERFERENCE
12 MIKE LYONETTE;                      WITH CONTRACT;
   THOMAS P. MADDEN;                   NEGLIGENT INTERFERENCE
13 TAYLOR COLLINS;                     WITH ECONOMNIC ADVANTAGE;
   JEFF RAU;                           & BREACH OF THE COVENANT
14 DARRELL BUSHNELL;                   OF GOOD FAITH AND FAIR
   AMY BUSHNELL;                       DEALING
15
   PETER TIERNEY;
16 KATHY FETTKE;                       **JURY TRIAL REQUESTED**
   SUSIE YEE;
17 NORMAN DAVIES;
18 CLAIRE DAVIES;
   SANDRA WINFREY;
19 BRIAN PUTZE;
   COLIN ROSS;
20 BRAD MALCOLM;
21 MICHAEL JIMENEZ;
   GUSTAVO VARELA;
22 ROBERT CROWE;
23 BERNADETTE BROWN;

24
                   COMPLAINT FOR BREACH OF CONTRACT;                        1
25      PROMISSORY FRAUD; NEGLIGENT MISREPRESENTATION
        INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS;
26  NEGLIGENT INTERFERENCE WITH ECONOMNIC ADVANTAGE;
      BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

1
2
3
4
5

FEDERICO GURDIAN;
TERENCIO GARCIA

Defendants.

+ DOES 1 through 50

6
7
8
9
10
11
12
13

Plaintiff Carl A. Wescott, proceeding *pro se,* complains of Defendants David Crowe, Robert Crowe, Mike Lyonette; Thomas P Madden ("Thomas Madden"); Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Bernadette Brown; Sandra Winfrey; Brian Putze Colin Ross, Brad Malcolm, Michael Jimenez, Federico Gurdian, Terencio Garcia, and Gustavo Varela, and in support of his Complaint, the Plaintiff states as follows.

14
15
16

**PARTIES**

1. The Plaintiff is a resident of Scottsdale, Arizona.

17
18
19
20
21
22
23

2. The Plaintiff is currently unaware of the exact location and legal domicile of each of the individual Defendants, except for Thomas P Madden. The rest of the Defendants, with unknown residences and legal domiciles, are David Crowe, Robert Crowe, Mike Lyonette Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Bernadette Brown; Sandra Winfrey; Brian Putze, Colin Ross, Brad Malcolm, Michael Jimenez, Federico Gurdian, Terencio Garcia, and Gustavo Varela

24

3. Thomas Madden is an "investment banker" who is apparently unlicensed.

25
26

2

4. Mr. Madden was censured by the State of Washington Department of Financial Institutions Securities Division in 2016 (Exhibit A) and then, upon information and belief, moved to St. George, Utah. Mr. Madden now sells securities in Utah, Arizona, Nevada, and Colorado.

## VENUE

5. Venue is appropriate in this Court as the provisions of the relevant contract were orally agreed in Maricopa County, and the initial signed version of the relevant contract was written, formed, and signed in Maricopa County.

## FURTHER ALLEGATIONS REGARDING CONSPIRACY

6. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, David Crowe, Robert Crowe, Mike Lyonette; Thomas Madden; Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Bernadette Brown; Sandra Winfrey; Brian Putze, Colin Ross, Brad Malcolm, Michael Jimenez, Federico Gurdian, Terencio Garcia, and Gustavo Varela, as individuals, in addition to acting for himself/herself and on his/her own behalf individually, as well as for the benefit of his or her marital community (if any), is and was acting as the agent, servant, employee, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the other Defendants (individual and entities) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

7.  Plaintiff further alleges on information and belief that the acts and non-acts of each of the Defendants were fully ratified by each and all of the other Defendants.  Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved,  ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

8.  In addition, upon information and belief, there exist one or more nefarious corporate, trust, SAs, SRLs, IBCs, and/or foundations and other entity type Defendants involved in these conspiracies, currently unknown to Plaintiff.   They shall emerge with the benefit of legal discovery.

9.  Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, any and all such corporate entities, in addition to acting for itself and for its own behalf, was acting as the agent, servant, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants (entity and individual) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

10. Plaintiff further alleges on information and belief that the acts of each of the Defendants were fully ratified by each and all of the Defendants.  Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

## BACKGROUND NARRATIVE INCLUDING THE PARTIES' CONTRACT

11. The Plaintiff was an experienced international real estate developer focusing on residential developments in Latin America. The Plaintiff is now gaining some insight into the distressed asset markets, especially in the cases of projects that had significant economic viability but have foundered for reasons unrelated to that viability, often involving politics, personalities or fraud.

12. The Plaintiff was reasonably successful until the global meltdown and credit crunch of 9/2008. With the global impact of said credit crunch and the leverage the Plaintiff had applied to his real estate holdings, the Plaintiff eventually succumbed to those forces and declared chapter 7 bankruptcy.

13. Post-bankruptcy, the Plaintiff searched for distressed real estate assets that he could acquire and turn around. He was familiar with Seaside Mariana ("SM"), an ambitious development on approximately 1000 acres on the Montelimar coast west of Managua, Nicaragua. Seaside Mariana had at one point featured a Jack Nicklaus designed golf course and a Wyndham hotel in its plans before the wheels fell off Seaside Mariana as well due to the same global pressures.

14. SM was an attractive investment and development opportunity for the original developer, Kevin Fleming, for at least the following reasons:

     (i)     The real estate was prime in terms of location and amenities;

     (ii)    At the time of initial investment, the market was rising faster than linearly;

     (iii)   Costa Rica to the South had already surfed a 20-year wave of real estate equity appreciation, and for some product types there was an order of magnitude difference in pricing;

(iv)    Nicaragua was attractive for American retirees in particular because of its low cost of living, level of safety, accessibility (including airlift), and desirable climate.

15. Most of those reasons were relevant more recently to the Plaintiff as well for his investment consideration.

16. Further, the intangible assets associated with SM were sound and mostly in place, including plans, permits, designs, and marketing material.

17. The value of the project was, to a material degree, artificially depressed by more recent market conditions and bad word of mouth and internet postings concerning the lack of infrastructure put in by the original developer, leading to further relevant issues.

18. The Plaintiff blushes to admit he has entered contract to purchase SM three (3) times.  The first time he entered contract, the Plaintiff saw an opportunity to buy SM for a highly attractive price (US $500,000, plus some capped deferred payments), solve the issues, and complete the development, and had a backer who would provide financial support for the project.

19. Most recently, the Plaintiff entered in to contract to purchase SM (either the Sociedad itself or the real estate, at his option) in 2018, with an anticipated close date (after some revisions, addenda, and extensions) of October 15th, 2018.

20. Lacking in capital, the Plaintiff entered discussions with several investors to back the purchase.

21. More recently, in August 2018, the Plaintiff entered in a final version of a contract with investors, after their due diligence, who were familiar with the relevant properties who agreed to fund 100% of the costs of the purchase in exchange for certain land owned by SM (the Sociedad Anonima).

6

22. That contract shall be referred to as the "Sales Contract".

23. To dispel any confusion over identities in the contract, the Plaintiff, Carl Wescott is sometimes referred to by his Finnish name "Kalle", or the combination Carl "Kalle" Wescott.

24. A group of 22 investors (the named Defendants) all agreed to collectively be bound by the Sales Contract and to fund the payments in the Sales Contract.

25. Two of the Defendants, David Crowe and Mike Lyonnette, agreed to manage their group and, for expediency, communications with the Plaintiff. David Crowe named and provided documentation as to the identities of the twenty-two people (including himself) who had agreed to be bound by the Sales Contract.

26. The Sales Contract contained provisions that that group would also drop its litigation in Nicaragua against Kevin Fleming, which would be unnecessary once the Crowe Group owned the SM land.

27. For a variety of reasons, David Crowe was usually the sole communicator and conduit on behalf of the group of 22 investors.

28. In August 2018, David Crowe and Mike Lyonette signed NCNDs with the Plaintiff in August 2018, and pledged not to share any information about the Plaintiff or the Sales Contract with any of the rest of their group of 20+ investors unless an individual group member signed a NDA (Non-Disclosure).

29. Approximately 10 of the 20+ investors signed NDAs with the Plaintiff, and thus, if Mr. Crowe, Mr. Lyonette, and others were honoring the Sales Contract and their NDAs, the Plaintiff believes only the dozen or so of them would have gotten information related to the Sales Contract and its progress towards a closing after that point.

30. The NDAs granted jurisdiction of the Plaintiff's choice, had a non-disclosure provision, and in the majority of the NDAs signed, specifically acknowledged that violating the non-disclosure provision, given the Plaintiff's deals, would like cost him over US $10 million, with the Defendants signing up for damages in that amount for that scenario.

## PLAINTIFF'S OTHER DEALS WITH KEVIN FLEMING

31. After the Sales Contract was signed, the Plaintiff signed more contracts with Kevin Fleming, to purchase Isla Mariana, to purchase seven more Panamanian and Nicaraguan companies, and to purchase the legal claims of Kevin Fleming, Maria Rueda, and the relevant entities.

32. Outside of Seaside Mariana, and as shall be proven in court, the Plaintiff expected to make on the order of US $4,000,000 to US $5,000,000 more with the completion of the other deals, and would have made that much more, minimum, with the completion of the other related Fleming deals.

## NDA BREACHES UPON INFORMATION AND BELIEF

33. Upon information and belief, David Crowe and Mike Lyonette violated the terms of the NDA and shared deal information with other parties that had not signed the NDA.

34. Upon information and belief, many other individual Defendants violated the terms of their NDA and shared deal information with other parties.

35. Because the Plaintiff was purchasing the development for US $500,000 (plus capped deferred payments) and selling the land to the investors backing him for US $834,000, the Plaintiff was going to make US $334,000 in short-term cash profit in closing his purchase of SM and flipping the land to his investors.

36. In addition, as shall be proven at trial, the Plaintiff expected to make a much larger sum monetizing the intangible assets he was acquiring as part of this deal.

37. For stylistic purposes and economy of phrase, the above Defendants, who acted in concert to fund the Plaintiff's purchase of SM, will be described as "the Crowe Group" unless the context requires otherwise.

38. The Crowe Group performed its due diligence on the deal and agreed to move forward to a close.

39. After the Crowe Group's due diligence, those investors agreed in August 2018 to close on the purchase within 60 days.  The parties signed a new definitive contract in August 2018 for a closing in October 2018.

40. There was no contingency or liquidated damages in the contract, as the Crowe Group was quite familiar with the assets being purchased, their current state, and had done their due diligence.

41. The Crowe Group then remitted $25,000 to finance the closing process.

**DEFENDANTS' INITIAL BREACH**

42. The Sales Contract called for a closing date in mid-October-2018, as did the Plaintiff's purchase contract of Seaside Mariana.

43. The parties retained attorneys to prepare closing documents.

44. The parties worked out the logistics of closing in a "simultaneous close", which is well-understood to mean two successive closings.

45. In the agreed logistics, the Plaintiff would acquire the entity Seaside Mariana Golf and Spa Resorts, SA, which owned all the land, using another US $475,000 of the Crowe Group's

9

money for said close.  Then, the Plaintiff would transfer the lands in the Sales Contract to the entity of the Crowe Group's choice.  Then, the Plaintiff or his designees would get the other US $334,000 in a series of payments.

46. However, with the Plaintiff about to fly to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group, informed the Plaintiff that he and the rest of his investor group refused to close and would not be closing, breaching the Sales Contract.

47. David Crowe assured the Plaintiff that SM was no longer attractive to any of his investment group.  (This is not a valid reason to breach a contract but is interesting in light of his and the group's further actions, below).

**THE MADDEN BREACH AND REPUDIATION (ON BEHALF OF ALL DEFENDANTS)**

48. In March 2019, Defendant Thomas P. Madden contacted Kevin Fleming, with the following email (Exhibit B).

**THE SECOND CROWE BREACH/REPUDIATION (ON BEHALF OF ALL DEFENDANTS)**

49. In April 2019, Defendant David Crowe contacted Kevin Fleming, following up on communications from Thomas Madden and David Crowe, in email.

50. In doing so, it is clear Crowe and all Defendants fully ratified the first Crowe breach as well as the Madden breaches and repudiation of the Sales Contract.

**FURTHER RAMIFICATIONS OF THE CROWE GROUP BREACHES**

51. In and after March 2019, once Thomas Madden contacted Kevin Fleming to negotiate with him directly, on behalf of the Crowe Group, and once David Crowe followed through and continued those negotiations on behalf of all Crowe Group members and all Defendants, Kevin Fleming stopped returning the Plaintiff's phone calls.

52. Fleming refused to honor any of the rest of the Plaintiff's contracts with him or his entities.

53. As a result, the Plaintiff has lost another US $4 million or more, as shall be further proven at trial.

**CONCLUSION**

54. The Defendants' breach and false promises and assurances have caused significant damages to Plaintiff, in an amount to be proven at trial.

55. The Plaintiff worked to try to remedy the Defendants' breach, but to no avail.

56. The Plaintiff was left with no choice but to file this legal complaint so that the scales of justice may balance appropriately.

**Count I – Breach of Contract**

57. The Plaintiff realleges paragraphs 1-55 as if fully set out herein.

58. The Defendants' refusal to close breached the Sales Contract.

59. As a direct and proximate result of the Defendants' breach, the Plaintiff lost $334,000 in near term profits and (as specifically acknowledged in NDAs signed by members of the Crowe

11

Group) the potential to recover in excess of $10,000,000 (ten million dollars) in other pre-tax value over time, as shall be further proven at trial.

## Count II – Promissory Fraud

60. The Plaintiff realleges paragraphs 1-55 as if fully set out herein.

61. Pleading alternatively, the Defendants never intended to close on the Sales Contract.

62. As one plausible explanation for said behavior, the Crowe Group, long-term adversaries of Fleming, planned to use the Plaintiff's efforts to discover valuable strategic information concerning Fleming's resources, price-points, and confidential plans (collectively "Fleming's Secrets").

63. Indeed, the Plaintiff had negotiated a deal which was over a million dollars better in price than the Crowe Group had previously offered for the same assets, which is why they were willing to pay US $334,000 more than the Plaintiff's price for Seaside Mariana land.

64. The Defendants' promise to close on the Sales Contract ("the Crowe Group Promise") was false when made, as part of a scheme to induce the Plaintiff to uncover and communicate Fleming's Secrets which they in turn planned to misuse in a series of further strategic moves, in and out of Court.

65. The Defendants intended that the Plaintiff rely on the Crowe Group Promise.

66. The Plaintiff did in fact reasonably rely on the Crowe Group Promise.

67. The Plaintiff was damaged by his reliance on the Crowe Group promise by losing $334,00 in near term profits and (as specifically acknowledged in NDAs signed by members of the Crowe

12

Group, and as shall be fully proven at trial) the potential to recover in excess of $10,000,000 (ten million dollars) of further pre-tax value from intangible assets that the Plaintiff was acquiring as part of the deal.

## Count III – Negligent Misrepresentation

63. The Plaintiff realleges paragraphs 1-55 as if fully set out herein.

64. Pleading in the alternative, at the time David Crowe made the Crowe Group Promise (aka "the Representation"), Mr. Crowe was acting in his professional capacity and had a pecuniary interest in the underlying transaction.

65. Crowe failed to exercise due care in making the Representation that he and the Crowe Group would close on the Sales Contract ("the Crowe Group Promise")

66. The Plaintiff justifiably relied on the Representation.

67. The Plaintiff was injured by Crowe's lack of due care in making the Representation by losing $334,000 in short-term profits as well as a much larger sum to be proven at trial.

## Count IV - Intentional Interference with Contract

68. The Plaintiff realleges paragraphs 1-55 as if fully set out herein.

69. At all relevant times, the Plaintiff was in an economically advantageous relationship with Fleming ("the Relationship") that was likely to confer substantial benefits, especially given the parties' complimentary expertise and interest in Central American development.

70. Indeed, the Plaintiff had entered into numerous other contracts to Purchase assets, companies, land, and legal claims from Fleming, his wife Maria Rueda, and eight of their companies.

71. The Defendants were aware of the Relationship both generally and specifically. The Plaintiff made David Crowe, agent for the other Defendants, specifically aware of the contracts and what he expected to make on them.

72. The Defendants were aware that their refusal to close on the Sales Contract would burden the Relationship.

73. The Defendants' refusal to close on the Sales Contract foreseeably and substantially interfered with and disrupted the Relationship.

74. The Plaintiff was harmed by the Defendants' intentional acts of interference with the Relationship by the consequential loss of profits in future Central American transactions with Fleming and his associates.

**Count V Negligent Interference with Economic Advantage**

75. The Plaintiff realleges paragraphs 1-55 as if fully set out herein.

76. At all relevant times, the Plaintiff was in an economically advantageous relationship with Fleming ("the Relationship") that was likely to confer substantial benefits especially given the parties' complimentary expertise and interest in Central American development.

77. The Defendants were aware or should have been aware of the Relationship both generally and specifically.

14

78. The Defendants knew that the Relationships would be disrupted if they failed to act with due care.

79. By breaching and repudiating the Sales Contract the Defendants failed to act with due care and substantially interfered with and disrupted the Relationship.

80. The Plaintiff was harmed by the Defendants' acts of negligent interference with the Relationship by the consequential loss of profits in the other transactions and contacts Plaintiff had formed with Fleming, his wife, and his companies.

**Count VI – Breach of the Covenant of Good Faith & Fair Dealing**

81. The Plaintiff realleges paragraphs 1-55 as if fully set out herein.

82. The Plaintiff performed all conditions required of him by the contract.

83. The Defendants interfered with the Plaintiff's right to receive the benefits of the contract.

84. As a direct and proximate result of the Defendants' breach of the covenant of good faith and fair dealing, implied in law in every contract including the Sales Contract, the Plaintiff lost $334,000 in near term profits and (as specifically acknowledged in NDAs signed by members of the Crowe Group, potential recoveries in excess of $10,000,000 (ten million dollars) in legal claims.

[rest of this page blank; Prayer for Relief follows on the next page]

WHEREFORE, Plaintiff prays

(a) As to Count I for all direct and consequential damages the Plaintiff incurred as a proximate result of the Defendants' breach of contract;

(b) As to Count II for all direct and consequential damages the Plaintiff incurred as a proximate result of David Crowe's (and the Crowe Group's) promissory fraud along with the imposition of exemplary damages to deter the Defendants from committing such acts of fraud in the future;

(c) As to Count III for all direct and consequential damages the Plaintiff incurred as a proximate result of Crowe's negligent misrepresentations along with the imposition of exemplary damages to deter Defendants from committing such acts of fraud in the future.

(d) As to Count IV for an award of damages sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' intentional interference with the Plaintiff's Contracts as well as the imposition of exemplary damages in amount sufficient to punish and deter the Defendants from committing similar acts of interference in the future.

(e) As to Count V for an award of damages sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' negligent interference with the Plaintiff's Economic Relations.

(f) As to Count VI for an award of damages, in an amount sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' breach of the covenant of good faith and fair dealing and for the imposition of exemplary damages in

an amount sufficient to punish and deter the Defendants from engaging in acts of bad faith

in the future.

(g) For such other and further relief as the Court deems just.

RESPECTFULLY SUBMITTED on June 12th, 2020

CARL A. WESCOTT

17

EXHIBIT A

**STATE OF WASHINGTON**
**DEPARTMENT OF FINANCIAL INSTITUTIONS**
**SECURITIES DIVISION**

| | |
|---|---|
| IN THE MATTER OF DETERMINING<br>Whether there has been a violation of the<br>Securities Act of Washington by:<br><br>Thomas Madden;<br><br>Respondent. | )  Order No.: S-14-1463-16-CO01<br>)<br>)  CONSENT ORDER<br>)<br>)<br>)<br>)<br>)<br>) |

## INTRODUCTION

On May 23, 2016, the Securities Administrator of the Securities Division of the Department of Financial Institutions (Securities Division) issued a Statement of Charges and Notice of Intent to Enter Order to Cease and Desist, to Impose Fines, and to Charge Costs (Statement of Charges), Order Number S-14-1463-15-SC01, against Respondent Thomas Madden.

Pursuant to the Securities Act of Washington, the Securities Division and Respondent Thomas Madden enter into this Consent Order to settle the allegations described in the Statement of Charges.

Respondent Thomas Madden admits to the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### Respondent

1.    Thomas Madden, a Washington resident, earns income through the sale of stock in companies that he consults for. Thomas Madden lived in Washington, until approximately 2012, when he moved to Arizona for work. Thomas Madden holds a Washington driver's license and maintains a home in Washington, which he frequently visits.

### Related Parties

2.    Madden Consulting, Inc. was a Washington corporation through which Thomas Madden offered business consulting services, which included helping companies raise capital. The company was formed in 1993 and is no longer active. Thomas Madden acted as the principal of Madden Consulting, Inc.

3.    Investor Relations International, Inc. was a Delaware corporation through which Thomas Madden offered business consulting services, which included helping companies raise capital. The company was formed in 1998 and is no longer active. Thomas Madden acted as the principal of Investor Relations International, Inc.

4.    Madcon Company, Inc. was a Washington corporation through which Thomas Madden offered business consulting services, which included helping companies raise capital. The company was formed in 1999 and is no longer active. Thomas Madden acted as the principal of Madcon Company, Inc.

5.      Nascent Value, LLC was a Delaware limited liability company through which Thomas Madden offered business consulting services, which included helping companies raise capital. The company was formed in 2008 and is no longer active. Thomas Madden acted as the principal of Nascent Value, LLC.

6.      Summit Capital USA, Inc. is an Arizona corporation formed in 2010 for the purpose of providing business consulting services, which include helping companies raise capital. Gregg C. Johnson acts as the principal of Summit Capital USA, and operates a similar Canadian company named, Summit Capital Corp. Thomas Madden served as an officer of the Summit Capital USA until March 2015, when the other officers of the company removed him as a result of the Securities Division's investigation. Thomas Madden continued to work for the company.

Overview

7.      Since 1993, Thomas Madden has acted as a consultant, either independently or through Summit Capital USA, helping client companies, among other things, raise capital. Rather than receive money as compensation for these services, Thomas Madden mostly receives shares in his client companies in exchange for his work. To earn income, Thomas Madden has to sell these shares, which he often does, both here in Washington and outside the state, to members of his church and to his acquaintances. The stock is typically penny stock or high-risk stock.

8.      In effecting these sales of stock, Thomas Madden acts as a securities broker-dealer, an activity he is not registered for. And in the course of earning approximately $383,000 from 2011 to 2015 from his securities sales to at least 16 Washington investors, the Securities Division asserts that Thomas Madden both misrepresented and omitted material information. To date, most all of these investors have yet to receive a return on their investment.

Thomas Madden's Broker-Dealer Activity

*Introduction*

9.      From approximately 1993 to 2010, Thomas Madden worked as a business consultant, providing his services through four separate companies he owned: Madden Consulting, Inc.; Investor Relations International, Inc.; Madcon Company, Inc.; and Nascent Value , LLC. In approximately 2010, Thomas Madden began working for Summit Capital USA, Inc.

10.     Thomas Madden's work through or at each of these companies mostly involved helping client companies raise capital. He typically consulted for newly publicly registered companies with limited operating or financial history.

*Client Services Rendered*

11.     Part of Summit Capital USA's business model includes using publicly registered shell companies and helping effectuate their merger with private companies, which seek to have their shares of stock publicly traded.[1] Examples of

---

[1] In the past, at times, Thomas Madden and Summit Capital USA used Donald Stoecklein's services to execute their business plan. In 1995, the SEC entered into a consent order with Donald Stoecklein to resolve the SEC's allegations of Donald Stoecklein's fraudulent sale of stock. Donald Stoecklein failed to pay the disgorgement provided for in the consent order, and in 2015, the SEC filed a lawsuit against Donald Stoecklein, to require Donald Stoecklein to pay the disgorgement.

this strategy include their facilitation of Highland Business Corporation's merger with a private company to form Elevate, Inc., a company that purported to sell home security systems; MyOtherCountryClub.com's merger with a private company to form Star Mountain Resources, Inc., a mining company; and Dignyte, Inc.'s merger with a private company to form eWellness Healthcare Corporation, a company that provides telemedicine services.

12.    Summit Capital USA also helps client companies maintain their registration status with the Securities and Exchange Commission and works with client companies to have shares of the client companies' stock traded on the over-the-counter market. Stock traded on the over-the-counter market is commonly called penny stock. The price per share of this stock is typically less than $5.00. These stocks are usually thinly-traded and have a low market-capitalization.

13.    Summit Capital USA relies on Thomas Madden to help these client companies raise capital.

### Compensation from Client Companies

14.    As compensation for their work, Thomas Madden and the principals of Summit Capital USA, receive shares in their client companies. Additionally, the shares that they, in some instances, owned in the publicly registered shell companies that they worked with are often converted into stock in the surviving company of the merger. Thus, Thomas Madden can typically have two sources of shares in his client companies.

15.    To earn income from his work, Thomas Madden personally sells the shares that he owns or claims to own in client companies, rather than selling the shares through a registered broker-dealer. The money that he earns from these sales has been the sole source of Thomas Madden's income.

### Method and Solicitation of Sales

16.    Thomas Madden has solicited his shares of stock to members of his church, his acquaintances, and friends of his acquaintances.[2] He typically meets with prospective investors in person or speaks with them over the phone. As part of his sales pitch, Thomas Madden explains that he consults for the company, briefly describes the company's business, and provides investors with instructions on how to purchase his shares.

### Stock Purchase Agreements

17.    To effectuate these secondary sales of stock, Thomas Madden enters into stock purchase agreements with investors. In these stock purchase agreements, Thomas Madden represents that he owns the shares of stock to be sold, that, in most instances, the shares of stock are unrestricted, and that he will transfer the stock to the investor upon receiving the investor's payment. Thomas Madden instructs investors to make their payments for the stock to him.

---

[2] Summit Capital USA's business model creates a conflict of interest between its principals and its client company: Summit Capital USA's principals have an incentive to sell the shares of stock they own in a client company, rather than a client company's new issue shares. Summit Capital USA's principals can also sell their shares in a client company at a lower price per-share than the subscription price per-share of a client company's new issue stock. Both of these factors limit a client company's ability to raise capital through the public sale of its stock.

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia WA  98507-9033
360-902-8760

18.    From approximately 2011 to 2015, Thomas Madden sold stock in this fashion to 16 known Washington residents. Some of the Washington residents to whom Thomas Madden sold stock had never directly purchased stock that was either privately held or that was traded on the over-the-counter market.

19.    At least two investors were eighty years old at the time they purchased stock from Thomas Madden and another maxed out his home equity line of credit and took out a personal loan to help finance the purchase of stock from Thomas Madden. Thomas Madden raised approximately $383,000 from his sale of stock to these Washington residents, and the Securities Division asserts that in the course of doing so, he engaged in the following fraudulent conduct:

*Representations About Ownership of Client Company Stock*

20.    Although Thomas Madden received shares of stock in client companies, at times, he often did not own any or enough of the stock he purported to sell.

21.    Corporate records indicate that Thomas Madden never owned shares in Elevate, Inc., Dignyte, Inc., and eWellness Healthcare Corporation at the time that he entered into stock purchase agreements and received payment from at least five Elevate, Inc. investors, two Dignyte, Inc. investors, and four eWellness Healthcare Corporation investors.

22.    Thomas Madden took money from these investors, but did not have any stock to transfer to them.

*Failure to Execute Orders in Timely Fashion*

23.    Registered broker-dealers are required to promptly deliver purchased securities. Thomas Madden entered into most all of the Dignyte, Inc. and eWellness Healthcare Corporation stock purchase agreements in 2014, but did not submit the Dignyte, Inc. and eWellness Healthcare Corporation stock purchase agreements to the companies' transfer agent until May 2015, days before his testimony before the Securities Division.

24.    For over a year, Dignyte, Inc. and eWellness Healthcare Corporation did not have record that these investors were shareholders in the company. During this period, these investors did not have legal title to shares of stock in either company and did not have the ability to resell any shares they may have owned.

25.    Thomas Madden falsely represented to Washington investors that he would transfer their stock upon receiving their payment, and he failed to disclose to these investors the risks associated with significant delays in executing their transactions.

*Restricted Status of Stock Sold*

26.    In the stock purchase agreements that Thomas Madden enters into, he represents that the stock he will transfer to investors is "free trading," or clear of any restrictions on resale.

27.    However, the transfer agent for Dignyte, Inc. and eWellness Healthcare Corporation listed all of the shares that Thomas Madden owned in both companies as restricted at the time he entered into stock purchase agreements with the Washington residents described above. Owners of restricted stock have limitations on their ability to resell their stock.

28.    Thomas Madden falsely represented to these Washington investors that the shares he would sell them were unrestricted.

*Arbitrary Pricing of Sales*

29.    The Washington investors who signed stock purchase agreements with Thomas Madden did not negotiate the price per share that they paid. Rather, Thomas Madden presented the investors with price per share at which they could purchase the shares.

30.    Registered broker-dealers are required to enter into securities transactions for investors at a price reasonably related to the market price of the security, but Thomas Madden denied investors in the following sales of this protection.

31.    Star Mountain Resource, Inc.'s stock traded on the over-the-counter market during the time period that Thomas Madden sold his shares in Star Mountain Resources, Inc. to Washington investors. Thomas Madden sold his shares in in the company to one Washington investor for $0.65 per share, more than double the market price of the stock.

32.    In 2014 and 2015, Dignyte, Inc.'s and eWellness Healthcare Corporation's stock was not traded on any public exchange. Thomas Madden sold his purported shares in the company to Washington investors from anywhere between $0.30 to $1.00 per share, but purchased shares from eWellness Healthcare Corporation at one point during this period, for $0.13 per share. Notably, on the same day in 2014, Thomas Madden sold one investor shares in Dignyte, Inc. for $0.50 per share and sold another investor shares in the same shell company for $1.00 per share.

*Further Representations in Connection with Brokerage Sales*

33.    Thomas Madden sold shares he claimed to own in Elevate, Inc. to a Washington resident. Prior to this sale, Thomas Madden represented that he would be able to double or triple the Washington resident's investment. Thomas Madden explained that 30 days after the Washington resident's purchase of the purported stock, Thomas Madden could then resell the Washington resident's stock for an anticipated two to three times the price that the Washington resident paid for the stock. Thomas Madden failed to disclose to the Washington resident any details about the market for resale of Elevate, Inc. stock, his ability to resell any Elevate, Inc. stock, and the bases and assumptions underlying his claim that the stock would sell for double or triple the price paid for by the Washington resident. The Washington resident lost the full value of his investment. Thomas Madden, however, personally repaid the Washington resident after a number of years.

34.    In the course of selling shares he owned or claimed to own in Dignyte, Inc., Thomas Madden represented that the company would soon merge with eWellness Healthcare Corporation. Although this later happened, at the time that Thomas Madden entered into stock purchase agreements to sell shares of stock in Dignyte, Inc., Dignyte, Inc. was a blank check shell company with limited assets. The company did not sell any products, provide any services, or have any operations. The company, further, had no clear means to provide investors a return on their investment. Thomas

Madden failed to disclose to these Washington investors the risks associated with investing in a blank check shell company and that such investments are high-risk and speculative.

35.    Thomas Madden represented to prospective Dignyte, Inc. and eWellness Healthcare Corporation investors that shares of each company's stock would soon be publicly traded, but he failed to provide investors with any information supporting these representations. Additionally, Thomas Madden failed to disclose that a liquid public market for shares of stock in these companies may never develop.

36.    Thomas Madden further failed to disclose to investors specific risks associated with investing in penny stock or thinly-traded stock, namely that Summit Capital USA owned a beneficial interest in Star Mountain Resources, Inc., Dignyte, Inc., and eWellness Healthcare Corporation, and its sale of stock in either company could dramatically affect shares of the price of the company's stock.

*Omissions About Past Business Failures and Lawsuits*

37.    Since Thomas Madden began his consulting work, of his known clients, the stock of six of these companies realized some short-term gains while traded in the over-the-counter market, but their values all ultimately crashed. Two companies that Thomas Madden consulted for where the subject of legal action by the Securities and Exchange Commission, the principals of two other companies misappropriated investor funds, and another company failed.

38.    In 2007, a Washington resident sued Thomas Madden for defaulting on a promissory note for funds loaned to Thomas Madden for his consulting work. Thomas Madden and Nascent Value, LLC were sued in 2009 over money they owed to investors. And, in approximately 2012, Thomas Madden was the subject of another lawsuit for failing to repay an investor. In each of these three cases, the plaintiffs obtained a judgment against Thomas Madden.

39.    Thomas Madden failed to disclose to Washington investors that many of his prior stock sales had failed and that he has been sued in connection with his prior sales of stock.

<u>Registration Status</u>

40.    Thomas Madden was previously registered to sell securities in Washington as a broker-dealer representative from 1991 to 1993, but he has not since been registered to sell securities in any capacity in Washington.

Based on the above Findings of Fact, the following Conclusions of Law are made:

## CONCLUSIONS OF LAW

1.    The entry into the stock purchase agreements and the sale of stock, as described above, constitutes the offer and sale of securities as defined in RCW 21.20.005(14) and (17).

2.    Thomas Madden has violated RCW 21.20.040 by offering and selling securities while not registered as a securities broker-dealer in Washington.

3.    The offer and sale of these securities were in violation of RCW 21.20.010 because Thomas Madden made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

**CONSENT ORDER**

Based on the foregoing and finding it in the public interest:

IT IS AGREED AND ORDERED that Respondent Thomas Madden shall cease and desist from violating RCW 21.20.040, the securities broker-dealer registration section of the Securities Act of Washington.

IT IS FURTHER AGREED AND ORDERED that Respondent Thomas Madden shall cease and desist from violating RCW 21.20.010, the anti-fraud section of the Securities Act of Washington.

IT IS FURTHER AGREED AND ORDERED that Respondent Thomas Madden shall be liable for and shall pay a fine in the amount of $4,000.

IT IS FURTHER AGREED AND ORDERED that Respondent Thomas Madden shall be liable for and shall pay investigative costs in the amount of $8,000.

IT IS FURTHER AGREED AND ORDERED that the payment of these fines and costs as described above shall be made as follows: Respondent Thomas Madden shall pay investigative costs of $4,000 prior to the entry of this Consent Order, $4,000 in investigative costs by the close of business on February 1, 2017, and $4,000 in fines by close of business on June 1, 2017.

IT IS FURTHER AGREED that if Respondent Thomas Madden fails to make any of the scheduled payments described above, the $4,000 in fines and $8,000 in costs shall become immediately due and payable, and the Securities Division may seek enforcement of this Consent Order pursuant to RCW 21.20.395.

IT IS FURTHER AGREED that the Securities Division has jurisdiction to enter this Consent Order.

IT IS FURTHER AGREED that Respondent Thomas Madden entered into this Consent Order freely and voluntarily and with a full understanding of its terms and significance.

IT IS FURTHER AGREED that in consideration of the foregoing, Respondent Thomas Madden waives his right to a hearing and to judicial review of this matter pursuant to RCW 21.20.440 and Chapter 34.05 RCW.

**WILLFUL VIOLATION OF THIS ORDER IN THE STATE OF WASHINGTON IS A CRIMINAL OFFENSE.**

Signed this ___18th___ day of _____October_____ 2016.

_____/s/_____
Thomas Madden

CONSENT ORDER                                     7

SIGNED and ENTERED this ___21st___ day of _____October_____ 2016.

William M. Beatty
Securities Administrator

Approved by:                                    Presented by:

Suzanne Sarason                                 Eric Palosaari
Chief of Enforcement                            Financial Legal Examiner

Reviewed by:

Jack McClellan
Financial Legal Examiner Supervisor

CONSENT ORDER                    8    DEPARTMENT OF FINANCIAL INSTITUTIONS
                                         Securities Division
                                         PO Box 9033
                                         Olympia WA  98507-9033
                                         360-902-8760



EXHIBIT B

From: thomaspmadden@gmail.com
Subject: Fwd: lawsuit settlement
Date: March 17, 2019 at 1:32:52 AM PDT
To: editorial@kevinifleming.com

Subject: lawsuit settlement

This is a compilation of much thought and possibly the only solution Kevin that I have gathered in hours of discussion w those in a position financially to conclude a very complicated situation-here goes ...

To defeat Cole's attempt to seize all the remaining SM lands from SM/Fleming, we think a settlement of the Lyonette claims and our LG claims could be made on the following terms. This settlement would take legal precedence over Cole's lawsuit annotation on the Public Registry. So, we would receive certain SM lands consisting of : 1) all remaining unregistered oceanfront land extending to a distance of 1,000 feet inland parallel to the SM oceanfront boundary line. 2) all remaining unregistered land laying within a line parallel to, and at a distance of 1,000 feet, from the North boundary line, with one end of such line beginning at the public road, and ending 1,000 feet from the oceanfront boundary line. The settlement parcel(s) must include the water well site.
Together with receiving this land and us tendering a payment of $ 250,000 cash to SM, we would agree to settle all our legal claims against SM and Flemings, and we would remove all related encumbrances from the Public Registry.

In addition, we would agree to buy all SM lands remaining in Managua province after the above settlement, and after the Cole lawsuit annotation has been removed from the Public Registry. For this land we would pay 150,000 cash to SM.

Lastly, we would agree to fund the purchase of all SM stock shares by a 3rd party not part of the present litigation between SM and the Crowe/Lyonette groups for the sum of 100,000 upon the settlement of all legal claims and enforcement actions which may be in place against SM by the various Nicaragua government agencies, to include filing of all overdue tax reports.

Adding ...

It may be that Carl Wescott is still interested in buying the stock shares, even
though Fleming informed him that he has terminated their Stock Purchase
Agreement.
I understand  Wescott disputes the validity of Flemings termination effort.

With that Kevin -I'll be available to discuss w you by tomorrow ... this could move
quickly -

Thomas