CARL A. WESCOTT
MOVENPICK APARTMENTS/HOTEL #509
BUR DUBAI, 19ᵀᴴ STREET, OUD METHA
ACROSS AMERICAN HOSPITAL
DUBAI, UAE (UNITED ARAB EMIRATES)
*in propria persona*
CARLWSOJ@GMAIL.COM
+971 4 336 6000

**FILED**

NOV 03 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CALIFORNIA
## NORTHERN DISTRICT

| | |
|---|---|
| CARL A. WESCOTT,<br><br>                Plaintiff,<br><br>    vs.<br><br>JEFF RAU, DAVID CROWE,<br>MIKE LYONETTE, et al.,<br><br>                Defendants | Case No. 3:20-cv-06456-JD<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Hearing Date: Thurs., Dec 3, 2020<br>Hearing Time: 10:00 am<br>Courtroom: 11<br>Judge: Hon. James Donato |

Plaintiff Carl A. Wescott, proceeding *pro se,* hereby responds to Defendant Jeff Rau's Motion for Judgment on the Pleadings, brought pursuant to Federal Rules of Civil Procedure Rule 12(c) and filed on October 22ⁿᵈ, 2020. Mr. Rau was served on Monday, June 1ˢᵗ, 2020, and then filed an Answer to the Plaintiff's legal complaint in Maricopa County Superior Court on Tuesday, June 30ᵗʰ, 2020 (case CV2020-006232). Mr. Rau filed an almost identical previous Motion for Judgment on the Pleadings on July 23ʳᵈ, 2020, when this case was in District Court in the District of Arizona (case 2:20-cv-01383-PHX-SPL), with the biggest difference in the newer version being the addition of Mr. Rau's request for the legal complaint to be dismissed under Cal. Civ. Proc. § 391. Mr. Troy Romero, esq., attorney for Mr. Rau, further requests that this Court order the Plaintiff to post a bond as security, in the alternative, if the legal complaint is not dismissed, citing Cal. Civ. Proc. § 391.3(a). Though

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S**
**MOTION FOR JUDGMENT ON THE PLEADINGS**

1

Mr. Rau does not mention it in the summaries of his Rule 12(c) Motion in the Notice of Motion nor in the Introduction, on the final page of the text of his motion, as his last thought on a possible reason he can move for a dismissal of the Plaintiff's legal complaint, Mr. Rau also argues that the Plaintiff's complaint should be dismissed because it violates Rule 8.

After summarizing the relevant legal standards of review (Rule 12(c), Rule 12(b)(6), and state and federal law on vexatious litigants) the Plaintiff will further summarize Defendant Rau's arguments in his Memorandum of Points and Authorities, and the Plaintiff will address those arguments in turn, correcting factually incorrect statements by Mr. Romero on behalf of his client along the way. *Nota bene*, however, that the Plaintiff does not object to a Judgment on the Pleadings; he too would like a Judgment on the Pleadings, but one in his favor. As shall be further elucidated below, the Plaintiff believes that the facts as pled are enough for the Court to enter a judgment in favor of Plaintiff and against Mr. Jeff Rau for US $334,000 based on the breach of contract cause of action, plus interest, costs, and fees. In the alternative, should the Court not enter judgment in favor of the Plaintiff based on the pleadings, the Plaintiff will close by moving to amend his legal complaint to conform with federal standards and those of this Court. (Even with a judgment entered in his favor against Mr. Rau, the Plaintiff would like to amend his legal complaint for the remaining Defendants Crowe, Lyonette, Ross, Malcolm, and Jimenez, and the Plaintiff will make that request in his response, to be served tomorrow, to the Motion to Dismiss filed in parallel to Mr. Rau's Motion for Judgment on the Pleadings).

### Legal Standard of Review – Rule 12(c)

When reviewing a Rule 12(c) motion, the Court applies the same standard as a Rule 12(b)(6) motion (next section, below), as the motions are "functionally identical." *Cafasso, U.S. ex rel v.*

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

*General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011). In evaluating a Rule 12(c) motion, a court may consider the complaint, the answer, and matters of public record whose authenticity is not in dispute. *Id.* "It is axiomatic, as it is for motions under Rule 12(b)(6) . . . that for purposes of the court's consideration of the Rule 12(c) motion, all of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false." *5C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1368* (3d. ed. April 2018 Update). Judgment on the pleadings is proper when "there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (citation omitted).

### Legal Standard of Review - Rule 12(b)(6)

A plaintiff's burden at the pleading stage is relatively light, in a Court's analysis of a Rule 12(b)(6) motion as to whether colorable claims are made. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)*. The court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party," *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995), including making all reasonable inferences in favor of the non-moving party. *Rhodes v. Robinson*, 408 F.3d 559, 563 (9th 2005). A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984). Claims must be "'plausible on [their] face,'" meaning that the plaintiff must plead sufficient factual allegations to "allow[] the

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

3

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

Pro se pleadings are held to a less stringent standard than those drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). *Pro se* complaints are construed liberally and may only be dismissed if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Nordstrom v. Ryan*, 762 F.3d 903, 908 (9th Cir. 2014). A *pro se* litigant is entitled to notice of the deficiencies in the complaint and an opportunity to amend, unless the complaint's deficiencies could not be cured by amendment. See *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987).

### Legal Standard of Review – Vexatious Litigants

The *All Writs Act*, 28 U.S.C. § 1651, gives the Court the inherent power to enter prefiling orders against vexatious litigants. *De Long v. Hennessey*, 912 F.2d 1144, 1147 (9th Cir. 1990); *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1057 (9th Cir. 2007). However, such pre-filing orders are an extreme remedy and should rarely be used since such sanctions can tread on a litigant's due process right of access to the courts. *Molski,* 500 F.3d at 1057. Under California law, a vexatious litigant is one who "[i]n the immediately preceding seven-year period has commenced, prosecuted, or maintained in propria persona at least five litigations other than in small claims court that have been… finally determined adversely to the person…" Cal. Civ. Proc. Code § 391. Under the law of the State of California, "a defendant may move the court, upon notice and hearing, for an order requiring the plaintiff to furnish security." Cal. Civ. Proc. Code § 391.1. That, however, is in State Court (Superior Court), and the state Court and federal Court have different standards,

1 separate lists, and different procedures to designate a litigant to be vexatious (Cal. Civ. Proc. Code §

2 391 ("CCP § 391") and 28 U.S.C. § 1651).

3          Restricting access to the courts is, however, a serious matter. "[T]he right of access to the

4 courts is a fundamental right protected by the Constitution." *Delew v. Wagner*, 143 F.3d 1219, 1222

5 (9th Cir. 1998). The First Amendment "right of the people . . . to petition the Government for a

6 redress of grievances," which secures the right to access the courts, has been termed "one of the

7 most precious of the liberties safeguarded by the Bill of Rights." *BE & K Const. Co. v. NLRB*, 536

8 U.S. 516, 524–25 (2002) (internal quotation marks omitted, alteration in original); see also

9 *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (noting that the Supreme Court has located

10 the court access right in the Privileges and Immunities clause, the First Amendment petition clause,

11 the Fifth Amendment due process clause, and the Fourteenth Amendment equal protection clause).

12 Profligate use of pre-filing orders could infringe this important right, *Molski v. Evergreen Dynasty*

13 *Corp.*, 500 F.3d 1047, 1057 (9th Cir. 2007) (*per curiam*), as the pre-clearance requirement imposes

14 a substantial burden on the free-access guarantee.  Out of regard for the constitutional

15 underpinnings of the right to court access, "pre-filing orders should rarely be filed," and only if

16 courts comply with certain procedural and substantive requirements. *De Long v. Hennessey*, 912

17 F.2d at 1147 (9th Cir. 1990). When district courts seek to impose pre-filing restrictions, they must:

18 (1) give litigants notice and "an opportunity to oppose the order before it [is] entered"; (2) compile

19 an adequate record for appellate review, including "a listing of all the cases and motions that led the

20 district court to conclude that a vexatious litigant order was needed"; (3) make substantive findings

21 of frivolousness or harassment; and (4) tailor the order narrowly so as "to closely fit the specific

22 vice encountered." *Id.* at 1147–48.

26

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S**
**MOTION FOR JUDGMENT ON THE PLEADINGS**

5

Under federal law, litigiousness alone is insufficient to support a finding of vexatiousness. See *Moy v. United States*, 906 F.2d 467, 470 (9th Cir. 1990) (the plaintiff's claims must not only be numerous, but also be patently without merit). The focus is on the number of suits that were frivolous or harassing in nature rather than on the number of suits that were simply adversely decided. See *De Long v. Hennessey*, 912 F.2d at 1147-48 (before a district court issues a pre-filing injunction against a pro se litigant, it is incumbent on the court to make substantive findings as to the frivolous or harassing nature of the litigant's actions). The Ninth Circuit has defined vexatious litigation as "without reasonable or probable cause or excuse, harassing, or annoying." *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 886 (9th Cir. 2012).

## ARGUMENT

The Plaintiff regards the Vexatious Litigant argument and the Rule 8 argument as threshold issues to dispose of, and thus he will address those issues first, in that order, before moving on to the more substantive issues in the actual Rule 12(c) Motion for Judgment on the Pleadings.

### Complaint Should Not Be Dismissed Due to Plaintiff being a California Vexatious Litigant

The Plaintiff admits that he is on the California Vexatious Litigant list, an order issued mostly due to his filings in his San Francisco family law case FDI-14-781666 between September 2014 and April 2015 (the Vexatious Litigant order was on May 1st, 2017). If the Plaintiff had filed this case in California Superior Court, he would have had to seek pre-approval under CCP 391.7 prior to filing. The Plaintiff used to be a California resident, and indeed, in the past, the Plaintiff has gone through this procedure 11 times, with judges concurring 10 of 11 times that his legal complaints had merit. (Exhibit C). The Plaintiff will further admit that he had California cases dismissed against him in the past, but those cases were not without merit. The main reason most or

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

all the Plaintiff's California cases that were active a few years ago were dismissed is that the Plaintiff was rendered homeless and his possessions stolen. Without a computer or an address, the Plaintiff was unable to receive updates from the Court nor make filings. The Plaintiff then focused on survival, getting a laptop and a place to work instead (Exhibit C, Sworn Statement of Carl Wescott).

The Plaintiff further confirms that he filed 17 cases in Arizona when he resided in Arizona, including the *Wescott versus Crowe, Rau, Lyonette, et al.* legal complaint that is now before this Court. The reason this legal complaint was originally filed in Arizona is that the Plaintiff signed three relevant contracts with some or all of these Defendants. The first contract had a forum selection clause of Maricopa County, Arizona; hence the filing in that venue seeking a Court to assert jurisdiction over these Defendants. The second and third relevant contracts had a forum selection clause of San Francisco, California (Exhibit B, second contract of August 11th, 2018, and Exhibit C, Sworn Affidavit).

The Plaintiff is not a Vexatious Litigant in District Court, including in this Court (Exhibit C). This legal complaint was not filed for the purposes of harassment or delay. Rather, these Defendants entered in to binding contracts with the Plaintiff and then, after six months of working together, a few days before the final close of the deal the Plaintiff had put together, the Defendants breached their contract, costing the Plaintiff US $334,000 in payments the Defendants were obligated to make to the Plaintiff and larger sums he would have earned had they closed. The Defendants later repudiated the contract and committed numerous tortious acts that they should be embarrassed by. The Plaintiff seeks redress in Court so that these Defendants will be required to

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

7

pay for the damages their breaches, repudiation, and other tortious acts and non-acts have caused the Plaintiff (Exhibit C).

The Plaintiff and these Defendants are now in District Court, where the Federal Rules of Civil Procedure apply.  Thus, the Plaintiff was not required to seek pre-filing approval under CCP § 391.  CCP § 391.3(b) is not relevant for several reasons, namely because the Plaintiff did not file in California Superior Court and did not file with the help of an attorney and later substitute himself in place of the attorney.  These arguments made by an experienced attorney may verge upon the sanctionable.

In the interest of judicial efficiency, in case this helps avert a future losing motion by Defendant Rau, the Plaintiff will note that under federal law, as cited in Legal Standards above, the mere fact that a plaintiff has had numerous suits dismissed against him is and would be insufficient grounds upon which to make a finding of vexatiousness in District Court.

The Defendants argue that many of Plaintiff's California Superior Court cases were dismissed as meritless, which is factually incorrect (Exhibit C), and that therefore, under CCP § 391.3(a), the Plaintiff should be required to post a bond.  Had the Plaintiff filed in California Superior Court, Defendant Rau would certainly have the option of seeking a bond under CCP § 391.3(a), by following the procedures outlined in the law.  We are not in California Superior Court, and Mr. Rau and his attorney have not followed the outlined procedure.  Mr. Romero does not properly cite (on behalf of his client Mr. Rau) nor address the federal substantive law requirements to show bad faith or willful disobedience of a court's order by Plaintiff.  Finally, Defendant Rau's cited case, in support on his desired bond, *Taliaferro v. Hoogs* (Cal. App. 1st Dist. Sept. 15, 1965), was a dispute over $360 (but claiming $10,000 of exemplary damages) originally filed in California

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S**
**MOTION FOR JUDGMENT ON THE PLEADINGS**

8

Municipal Court, and then California Superior Court, before the appeal. By way of contrast, this District Court case seeks substantial damages backed by the included contract (Exhibit B) that Mr. Rau breached.

## Complaint Should Not Be Dismissed Due to Rule 8

The Plaintiff is confused as to how Mr. Rau's citing Rule 8 could lead to a dismissal (with prejudice, and no leave to amend, no less) at this stage, or perhaps it is Mr. Rau who is confused. Procedurally, Mr. Rau was served with the legal complaint on Monday, June 1st, 2020 (Exhibit C), and then Mr. Rau answered on Tuesday June 30th, 2020), citing four affirmative defenses. Two of those four cited affirmative defenses were alleged lack of personal jurisdiction in Arizona Courts and incorrect venue (Answer of Mr. Jeffrey Rau, June 30th, 2020; Exhibit C, Sworn Declaration), both of which have been remedied by the move to Mr. Rau's cited and requested venue of choice, in this Court. After his Answer, Mr. Rau filed a previous Motion for Judgment on the Pleadings, on July 23rd, 2020, that did not result in the complaint being dismissed.

Mr. Rau has therefore already exhausted his remedies to dismiss the legal complaint, as he did not file a Rule 12(b) Motion to Dismiss and did file an answer. An affirmative defense to a claim for relief must be asserted in the answer (or in a motion) or it will be waived. *Fed. R. Civ. P. 12(b), (h)(1); John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008). Thus, the Plaintiff doubts that from a procedural standpoint, just like with Mr. Rau's attempt to dismiss with the Vexatious Litigant argument, that at this point, Mr. Rau can move to dismiss the Plaintiff's legal complaint under Rule 8, either.

Nevertheless, the Plaintiff will point out that if the Plaintiff's pleadings are truly so vague, ambiguous, and verbose, that they lack clarity, as Mr. Rau now alleges, he likely should have filed a

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S MOTION FOR JUDGMENT ON THE PLEADINGS**

9

Rule 12(e) Motion for a More Definitive Statement. However, having Answered already, the Plaintiff believes that Defendant Rau has now waived his right for a Rule 12(e) Motion as well. Had Mr. Rau made such a request, he would have been required to point out the specific defects complained of and the details desired. *Fed. R. Civ. P. 12(e)*. Whether in a Motion to Strike (to handle alleged redundancy), a Motion for a more Definitive Statement, or in this example of desired relief under Rule 8, the Plaintiff would hope and expect that the moving party could cite one or more specific examples of ambiguity, verbosity, and/or redundancy resulting in lack of clarity. Ironically, the Plaintiff believes that Mr. Rau's motion itself is the one that not only lacks clarity, but also incorrectly cites the facts and law, and includes no factual evidence to support its allegations where those would be expected and required.

The Plaintiff emailed Mr. Romero last week to give him an opportunity to cite specific examples (Exhibit E; Exhibit C). In closing on this threshold issue, the Plaintiff will simply avow his willingness to fix and improve any identified sections that any party wishes to point out. The Plaintiff will be the first to admit that the legal complaint could be more artfully pled, and indeed, he seeks to amend it for several reasons for the benefit of all, including the remaining Defendants, in both of his parallel responses to Mr. Romero's filings on behalf of his clients.

### Mr. Rau's Allegations in his Judgment on the Pleadings

Mr. Rau, in his MfJoP, alleges that he was not a party to the Sales Contract (original Complaint, Exhibit A; also attached hereto as Exhibit B), that the seller terminated the contract with the Plaintiff to buy Seaside Mariana prior to Mr. Rau's and his co-Defendants' breach and pulling out of the contract, that the Amended Complaint does not establish elements for its Breach of Contact cause of action, and that the Plaintiff fails to state facts sufficient to support his causes of action for

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

Promissory Fraud, Negligent Misrepresentation, Intentional Interference with Contract, Negligent Interference with Economic Advantage, and Breach of the Covenant of Good Faith and Fair Dealing. Mr. Rau then asks for a Judgment on the Pleadings in his favor, indeed a dismissal with prejudice.

What Mr. Romero is claiming (that Mr. Rau is not a party to the contract) is factually incorrect, despite the ethical strictures he is supposed to be bound by, including BP&C 6068(d) and BP&C 6128(a). Under BP&C 6128(a), it's a crime (a misdemeanor) for Mr. Romero to lie to this Court. Mr. Romero should know better (both the facts of the case, or at least the contract at hand, and his duties to this and every Court). Mr. Rau is a party to the contract (Exhibit B and Exhibit C). The contract clearly states that the Plaintiff is one of the parties to the contract, and that the other party is the group of litigators in the litigating group that purchased lots, condominiums, and bungalows at Seaside Mariana, that "have a Nicaraguan lawsuit together". The identities of those twenty-two people were provided by David Crowe at the time of the contract signing, and the identities are also a matter of public record. The twenty-two people are David Crowe, Mike Lyonette, Thomas P. Madden, Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Sandra Winfrey; Brian Putze; Colin Ross; Brad Malcolm; Michael Jimenez; Gustavo Varela, Robert Crowe, Bernadette Brown, Federico Gurdian, and Terencio Garcia. Mr. Rau is one of them. The twenty-two are bound together in a partnership for that litigation and for the contract with Plaintiff. Through agency (and further allegations of conspiracy), the individuals involved and the partnership are all liable. (Exhibit C).

Mr. Romero also seeks to mislead this Court, on behalf of Mr. Rau, about the sequence of events. Mr. Rau alleges (with no supporting evidence) that the seller terminated the contract prior to the October 2018 breach of Mr. Rau and his co-Defendants, which is also untrue (Exhibit C).

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S MOTION FOR JUDGMENT ON THE PLEADINGS**

The Plaintiff will first address the Motion for Judgment on the Pleadings itself and ask for a judgment in his favor and against Defendant Rau for US $334,000 plus costs, fees, and interest, based on his Breach of Contract cause of action. In the alternative, if the Court does not order the Plaintiff's requested judgment against Mr. Rau, the Plaintiff addresses alleged deficiencies in his Complaint, especially with regard to his last five (5) causes of action pled, by asking leave of this Court to amend his Pleadings.

## Facts as Pled Supporting the Breach of Contract

The facts as pled supporting the Breach of Contract, as well as further facts as pled supporting a breach of the contract based on two repudiation events, are in Exhibit A, and the Elements required for a judgment in favor of Plaintiff in Exhibit D.

## Plaintiff's Request for a Judgment on the Pleadings in his Favor Against Defendant Jeff Rau

The Plaintiff respectfully disagrees with Mr. Rau with respect to the issue of whether the Plaintiff has successfully stated a claim. With regard to the Plaintiff's Cause of Action for Breach of Contract, the Plaintiff avers that the facts (Exhibit A) and elements (Exhibit D) for a judgment based on Breach of Contract are established and in place. The Plaintiff accepts Mr. Rau's elements for breach of contract, which are the same for California and more generally in the 9th Circuit: "(1) the existence of a contact; (2) Plaintiff's performance of the contract or excuse for non-performance; (3) Defendant's breach of the contract; and (4) the resulting damages to Plaintiff." (MfJoP, p. 5, and hornbook law)

The elements for a judgment in Plaintiff's favor against Mr. Rau are all here in the pled facts (for at least the US $334,000 of payments that Mr. Rau and the rest of his Defendants were required to make to the Plaintiff after the closing in October 2018, plus interest and costs). The Plaintiff

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

12

1  would have received those payments had Mr. Rau and his co-Defendants honored the signed closing

2  Contract. Given that the twenty-two defendants all collectively breached (including Mr. Rau) he

3  must pay the resulting damages. In Exhibit D, the Plaintiff further demonstrates that the required

4  elements for breach of contract are there as pled (Exhibit A).

5

6         The Plaintiff could also argue that the October 2018 actions of Mr. Rau, Mr. Crowe, and

7  their co-defendants were a repudiation of the contract, and that the March 2019 and April 2019

8  actions of Mr. Madden, Mr. Rau, Mr. Crowe et al. (AC ¶47, ¶48, ¶49, and ¶50) were a further

9  repudiation of the contract, but the Plaintiff believes that the vanilla breach of contract argument is

10  the most clear and persuasive.

11

12         Therefore, for the reasons stated above, the Plaintiff respectfully requests that this Court

13  order a judgment in his favor and against Defendant Mr. Rau for the US $334,000 in the contract,

14  plus pre-judgment interest and fees. "A judgment on the pleadings is properly granted when, taking

15  all the allegations in the pleadings as true, [a] party is entitled to judgment as a matter of law." *Lyon*

16  *v. Chase Bank USA, N.A.*, 656 F.3d 877, 883 (9th Cir. 2011) (quoting *Dunlap v. Credit Prot. Ass'n,*

17  *L.P.*, 419 F.3d 1011, 1012 n.1 (9th Cir. 2005); *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d

18  708, 713 (9th Cir. 2001)). The Plaintiff will email his requested draft order to the Clerk of the

19  Court, cc-ing Mr. Rau's attorneys, later this week when this response arrives at the Court and is

20  docketed, in the hopes that it is useful for the Court. Mr. Rau should not be in any way surprised by

21  this award, since he was aware of the contract and a party to it, promising to pay the Plaintiff that

22  sum in 2019 and 2020 (AC ¶6, ¶21, ¶22, ¶24, ¶25, Exhibit A to original Complaint).

23

24

25

26
                    **PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S**              13
                    **MOTION FOR JUDGMENT ON THE PLEADINGS**

**Plaintiff's Response to Mr. Rau's Allegations re the 2nd, 3rd, 4th, 5th, and 6th Causes of Action**

As to Mr. Rau's points about the Plaintiff's 2nd, 3rd, 4th, 5th, and 6th Causes of Action, the Plaintiff agrees that his legal complaint could be improved – and should be improved.  The Plaintiff could plead promissory fraud, for example, on the part of the Defendants, through their main spokesperson Mr. David Crowe, with more specificity.  If the Court does not grants the Plaintiff's request for a Judgment on the Pleadings in his favor for US $334,000 (plus interests, costs, and fees), then he moves to amend his pleadings (as he does in his response to the Motion to Dismiss, for the other Defendants).

## Summary and Conclusion

In summary, for the procedural and legal reasons stated above (citing California laws and procedures that this Court is not bound by, and having waived affirmative defenses not cited in his Answer), the Plaintiff had respectfully asked the Court to deny the relief requested by Mr. Rau (dismissal of the complaint or the posting of a bond as security).  The Plaintiff also illustrated how the facts as pled are also sufficient to establish that he has colorable claims against Mr. Rau and his co-Defendants, especially under the fairly light requirements of Fed R. Civ. P. Rule 8(a), and this provides further foundation for said request.

The Plaintiff was not opposed to a Judgment on the Pleadings, though, if one could be established in his favor.  The Plaintiff demonstrated that the pled facts (Exhibit A), logic, and the laws of this district support a judgment in his favor, as the four legally-required elements for breach of contract are all present (Exhibit D) and properly pled.  The Plaintiff presented detailed support from the pled facts, which the parties have agreed to accept for the purposes of the Court's decision

on the Pleadings, to prove that a judgment in his favor is just and warranted.  Therefore, the Plaintiff respectfully requested that the Court order such a judgment against Mr. Rau and in his favor.

In the alternative, should the Plaintiff not be awarded the requested judgment at this point, the Plaintiff hereby moves to amend his pleadings.  They were drafted for Superior Court and Arizona law, and need to be updated and amended for District Court, including following this Court's local rules (where, for example, the Plaintiff has not followed the requirements for his requested jury trial).  The Plaintiff had previous cited in the legal standards of review that a *pro se* litigant is entitled to notice of the deficiencies in the complaint and an opportunity to amend, unless the complaint's deficiencies could not be cured by amendment. *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987).  The Plaintiff thanks Mr. Rau for pointing out further deficiencies that he would like to cure via the requested amendment.

RESPECTFULLY SUBMITTED on November 2nd, 2020

CARL A. WESCOTT, *pro se*

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

15

1

## Exhibit A - Facts as Pled Supporting the Breach of Contract

2

The facts, as pled in the Amended Complaint ("AC") that support a judgment against Mr.

3

Rau (cut and pasted) are:

4

5   • Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint,
      David Crowe, Robert Crowe, Mike Lyonette; Thomas Madden; Taylor Collins; Jeff Rau;
6     Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies;
      Claire Davies; Bernadette Brown; Sandra Winfrey; Brian Putze, Colin Ross, Brad Malcolm,
7     Michael Jimenez, Federico Gurdian, Terencio Garcia, and Gustavo Varela, as individuals, in
      addition to acting for himself/herself and on his/her own behalf individually, as well as for the
8     benefit of his or her marital community (if any), is and was acting as the agent, servant,
      employee, and/or representative of, and with the knowledge, consent, and permission of, and in
9     conspiracy with, each and all of the other Defendants (individual and entities) and within the
      course, scope, and authority of that agency, service, employment, representation, and
10    conspiracy. (AC, ¶6)

11  • Most recently, the Plaintiff entered in to contract to purchase SM (either the Sociedad itself or
      the real estate, at his option) in 2018, with an anticipated close date (after some revisions,
12    addenda, and extensions) of October 15th, 2018 (AC, ¶19)

13  • More recently, in August 2018, the Plaintiff entered in to a final version of a contract with
      investors, after their due diligence, who were familiar with the relevant properties who agreed to
14    fund 100% of the costs of the purchase in exchange for certain land owned by SM (AC, ¶21)

15  • That contract shall be referred to as the "Sales Contract." (AC, ¶22)
    • A group of 22 investors (the named Defendants) all agreed to collectively be bound by the Sales
16    Contract and to fund the payments in the Sales Contract. (AC, ¶24)

17  • Two of the Defendants, David Crowe and Mike Lyonnette, agreed to manage their group and,
      for expediency, communications with the Plaintiff. David Crowe named and provided
18    documentation as to the identities of the twenty-two people (including himself) who had agreed
      to be bound by the Sales Contract. (AC, ¶25)

19  • In August 2018, David Crowe and Mike Lyonette signed NCNDs with the Plaintiff in August
      2018, and pledged not to share any information about the Plaintiff or the Sales Contract with
20    any of the rest of their group of 20+ investors unless an individual group member signed a NDA
      (Non-Disclosure). (AC, ¶28)

21  • Approximately 10 of the 20+ investors signed NDAs with the Plaintiff, and thus, if Mr. Crowe,
      Mr. Lyonette, and others were honoring the Sales Contract and their NDAs, the Plaintiff
22    believes only the dozen or so of them would have gotten information related to the Sales
      Contract and its progress towards a closing after that point. (AC, ¶29)

23  • The NDAs granted jurisdiction of the Plaintiff's choice, had a non-disclosure provision, and in
      the majority of the NDAs signed, specifically acknowledged that violating the non-disclosure
24    provision, given the Plaintiff's deals, would like cost him over US $10 million, with the
      Defendants signing up for damages in that amount for that scenario. (AC, ¶30)

25

26
                    **PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S**                              16
                        **MOTION FOR JUDGMENT ON THE PLEADINGS**

- Because the Plaintiff was purchasing the development for US $500,000 (plus capped deferred payments) and selling the land to the investors backing him for US $834,000, the Plaintiff was going to make US $334,000 in short-term cash profit in closing his purchase of SM and flipping the land to his investors. (AC, ¶35)
- For stylistic purposes and economy of phrase, the above Defendants, who acted in concert to fund the Plaintiff's purchase of SM, will be described as "the Crowe Group" unless the context requires otherwise. (AC, ¶37)
- The Crowe Group performed its due diligence on the deal and agreed to move forward to a close. (AC, ¶38)
- After the Crowe Group's due diligence, those investors agreed in August 2018 to close on the purchase within 60 days. The parties signed a new definitive contract in August 2018 for a closing in October 2018. (AC, ¶39)
- There was no contingency or liquidated damages in the contract, as the Crowe Group was quite familiar with the assets being purchased, their current state, and had done their due diligence. (AC, ¶40)
- The Sales Contract called for a closing date in mid-October-2018, as did the Plaintiff's purchase contract of Seaside Mariana. (AC, ¶42)
- The parties retained attorneys to prepare closing documents. (AC, ¶43)
- The parties worked out the logistics of closing in a "simultaneous close", which is well-understood to mean two successive closings. (AC, ¶44)
- In the agreed logistics, the Plaintiff would acquire the entity Seaside Mariana Golf and Spa Resorts, SA, which owned all the land, using another US $475,000 of the Crowe Group's money for said close. Then, the Plaintiff would transfer the lands in the Sales Contract to the entity of the Crowe Group's choice. Then, the Plaintiff or his designees would get the other US $334,000 in a series of payments. (AC, ¶45)
- However, with the Plaintiff about to fly to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group, informed the Plaintiff that he and the rest of his investor group refused to close and would not be closing, breaching the Sales Contract. (AC, ¶46)

### Further Facts as Pled Supporting the Breach of Contract based on Repudiation

- David Crowe assured the Plaintiff that SM was no longer attractive to any of his investment group. (This is not a valid reason to breach a contract but is interesting in light of his and the group's further actions, below). (AC, ¶47)
- In March 2019, Defendant Thomas P. Madden contacted Kevin Fleming, with the following email (Exhibit B). (AC, ¶48, and Exhibit B)
- In April 2019, Defendant David Crowe contacted Kevin Fleming, following up on communications from Thomas Madden and David Crowe, in email. (AC, ¶49)
- In doing so, it is clear Crowe and all Defendants fully ratified the first Crowe breach as well as the Madden breaches and repudiation of the Sales Contract. (AC, ¶50)

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

*EXHIBIT B*

This Settlement Agreement dated as of August 11ᵗʰ, 2018, is entered into by and among:

### "THE SETTLER"

Carl (aka Kalle) Wescott

And

### "THE LITIGATORS"

### RECITALS

Between the undersigned, to wit: On one hand, Kalle Wescott (hereafter called the "Settler") and on the other hand, David Crowe and Mike Lyonette (hereafter called "The Litigators"). Mike Lyonette ("the Mortgage Holder") previously provided loans to Seaside Mariana, and has a mortgage (hipoteca) on a subset of the Seaside Mariana land. The Litigators are part of the Litigating Group, which is a group of persons, represented by Federico A. Gurdián Sacasa (attorney-at-law), who bought or invested in lots, condominiums and bungalows at Seaside Mariana (hereafter called the "*Litigating Group*") that have a Nicaraguan lawsuit together have agreed to execute a legally-binding Settlement Agreement, (hereafter called the "**Agreement**").

**WHEREAS**, the Settler is currently purchasing 100% of the shares of Seaside Mariana Spa & Golf Resort S.A. (hereafter "SM" or "Seaside Mariana"), which is all ten thousand (10,000) shares, (hereafter called the "**Stock**"),

**WHEREAS**, the Parties (the Litigators and the Settler) wish to settle all claims of the Litigating Group and have agreed-upon terms to do so;

**WHEREAS**, the Parties (the Litigators and the Settler) hereby define three terms: "SM Closing" shall be when the Settler owns SM and has all the endorsed shares. "Land Closing" shall be when the Settler has transferred the SM land and the Horizontal Property Regime that is the major asset of the settlement to the Litigating Group or to the entity of their choice. "Full Settlement Closing" shall be when this Settlement is fully effectuated, including all items in Article I, sections 4 through 7 having been paid and transferred. 

**NOW, THEREFORE**, in consideration of the mutual covenants and promises made by the Parties hereto, covenant and agree as follows:

### Article I

1.  When the Litigators have completed basic due diligence, the Litigators shall pay a non-refundable deposit of **Twenty-Five Thousand United States Dollars 00/100 (USD $25,000.00)** to a party designated by the Settler. This must occur by August 13ᵗʰ, 2018 or else this contract unwinds, with parties still respecting signed NDA agreements.

2.  In the next 30 days, the Settler will sign a new agreement with the Litigating Group (as opposed to the Litigators), which will bind members of the group, which will further clarify the power of attorney(s) that Settler shall be providing, breaches of contract, that Settler does not personally owe monies owed to the Mortgage Holder and remedies and/or damages for the breaches.

3. The Parties shall have up to 60 days from now to close the settlement – through October 10th, 2018.

4. The high level terms of the settlement are that the Litigating Group will be providing US $834,000 in 4 tranches to the Settler, as further detailed below, while the Settler will be transferring to the Litigating Group almost all assets owned by Seaside Mariana, including all unencumbered lands, operating assets (including all tangible and almost all intangible assets), domains, web content, equipment, leases, contract rights, intellectual property rights used in the business of Seaside Mariana, together with all documents and entities relating to the HOA. Once all monies and land (along with the assets identified in Article I, section 6) have properly changed hands, the Parties shall indemnify each other by mutual agreement.

5. One of two exceptions to the transfers that are occurring as set out in Article I, section 4, is that Seaside Mariana will retain insurance policies and any other intangible asset that is either not transferrable, or for the benefit of SM only, or both.

6. The second of two exceptions concerns customer and mailing lists and mailing campaigns. The Settler shall be transferring to the Litigating Group all customer and prospect mailing lists (including all contact information) and mailing campaigns, both digital and analog (email, web, and snailmail). However, the parties shall co-own these assets. Settler shall assign his part of the co-ownership to a Sociedad Anonima after the close.

7. The $834,000 consists of four parts: (1) the $25,000 by August 10th, 2018; (2) $475,000 within 60 days of the first tranche, to be transferred to the named party of Settler's choice only after SM Closing, with Settler having full ownership of, and authority over, Seaside Mariana; (3) $234,000 as follows, to the Settler: $56,000 at the Land Closing when Litigating Group receive all their expected land as settlement, and 20% of SM land sales achieved by Litigating Group until fully paid, with a minimum of $12,000 per quarter (3 months), paid within a week or so of the end of each quarter, with the first payment beginning at the end of the second quarter after SM Closing, and then a quarterly payment every 3 months from that point onwards until the $234,000 has been paid in full and (4) then, another $100,000 to an entity of the Settler to be formed later. After the $234,000 to Settler has been paid, the Litigating Group shall continue to pay under the same quarterly program (20% of sales, but a minimum of $12,000 per quarter) to the entity until the $100,000 is fully paid.

8. These (Article I, sections 4 through 7) are the only sums and items owed to each other, and when fully transferred and paid the parties shall fully release liability to each other with regard to Seaside Mariana.

9. SM has not filed taxes since 2011, and thus Settler will work with the current owner to get all taxes filed and current through the tax year that ends June 2018. This is a necessity prior to any closing including SM Closing.

10. The Settler has bound the sellers of SM in a contract that ensures that Settler and the Litigating Group will get everything they need by or at closing, including the filed taxes. The Litigators have approved the language of this Closing Contract.

11. The Settler shall pay the costs related to the SM stock transfer. The Litigating Group shall pay the costs of the land transfer including what's necessary on property taxes to do the transfers. The parties shall pay their own attorneys.

12. The one sub-parcel that will not go to the Litigating Group is the parcel with a mortgage provided by one of the Litigating Group (the "Mortgage Holder"), also represented by Federico A. Gurdián Sacasa (attorney-at-law), unless it is most efficient to transfer it in bulk with the other land for the Litigating Group and then to the Mortgage Holder. At or just after the SM Closing, Settler shall work with the Mortgage Holder to transfer that land to the Mortgage Holder at the Mortgage Holder's expense.

13. Both Parties have entered this deal in good faith and with a lot of trust, but the Parties have offered each other mechanisms such that they do not have to rely solely on trust at each step. The Parties will work out the final details of each such step to their mutual satisfaction at each step. For example, because the $475,000 needs to go in to escrow prior to land transfer, the Settler has offered and will continue to offer any mechanism the Litigating Group desire to ensure that they will get the land, including issue by Settler of an irrevocable power of attorney to a Nicaragua attorney of the Litigating Group' choice. For the payments that will come with sales or paid each quarter, Settler does not necessarily require a mortgage on SM, and is open to Personally Guaranteed Promissory Notes.

14. Settler will continue to provide all due diligence information requested by Litigating Group, and can provide a complete package of written documents at or just after the close. 

15. Confidentiality is extremely important to complete this settlement, including the purchase aspect. The Settler has already executed NDAs (Non-Disclosure Agreements) with the Litigators. The Litigators plan to solicit funding from several more members of the group of Litigating Group. The Litigators shall ensure that those several members, as well as Federico A. Gurdián Sacasa, all sign NDAs with the Settler similar to the one provided by the Settler on Saturday August 4th, 2018, prior to disclosing information related to this settlement or other confidential information. Subsequently, all confidential information and all information relating to this deal shall be shared ONLY with the Settler, the Litigators, Senor Gurdián, and the members of the Litigating Group that have signed NDAs in the past week or that shall sign NDAs shortly.

16. Settler already has digital files of the following categories and these will be provided to Litigating Group prior to closing: Legal, Financials, Sales, Vendors, Marketing, Engineering and Design, Permits, Employees, HOA documentation and entities, Communication, Maps, Cash Liabilities, Contractual Liabilities, Pictures and Digital Collateral. Settler shall transfer all of these to the Litigating Group prior to SM Closing.

17. Ownership of the land: Except for the registered mortgage lien held by Mortgage Holder on the lots identified, Settler represents and warrants (a) that Seaside Mariana Spa & Golf Resort S.A. has clear and unencumbered title[1] to all of the aforementioned lands and (b) that, once Settler's acquisition of Seaside Mariana has been finalized (aka SM Closing), Settler will be in a position to fully execute and deliver on all of the agreements and obligations set out in this Settlement Agreement. The Parties attach the most recent Libertad de Gravamen for the lands as Exhibit A. The Libertad de Gravamen shows property that is formally Registered and thus not able to be transferred to Litigating Group.

18. Liabilities of Seaside Mariana: Settler represents and warrants that, except for the liabilities to the Litigation Group members settled by this Agreement, all existing liabilities of Seaside Mariana, including Seaside Mariana's obligation to deliver 10 Beach Front lots to a previous shareholder of Seaside Mariana, remain with the Seaside Mariana entities owned by Settler and shall not pass to Claimants or to the Litigation Group. Settler shall indemnify the Litigation Group and its members against any such claims that may arise from these obligations.

19. Settler shall ensure

   (1) that the current beneficial owners of Seaside Mariana (Kevin Fleming and Maria Rueda) disclose to the buyer of the shares (i.e. the Settler) any and all transactions that have been made, specially land transactions made, and that are pending registration in public record, and the Settler shall ensure that this information is passed on to the Litigating Group in its entirety; and

   (2) that the current owners of Seaside Mariana are prohibited from taking any further action relating to these transactions and pending transactions on behalf of any of the Seaside Mariana entities and that all Powers of Attorney issued by the current owners of Seaside Mariana are revoked with effect immediately upon SM Closing.

## Article II

1. <u>Notices.</u> All notices, demands and payments required or permitted to be given hereunder shall be in writing and may be delivered personally, by e-mail to the addresses of the Parties as set out and agreed separately between the parties. Any notice personally delivered or sent by e-mail shall be deemed to have been given and received at the time of delivery, unless otherwise proven. All Parties shall be entitled to designate new contact information by giving notice thereof to the other Parties in accordance with the terms hereof.

2. <u>Assignment/Successors.</u> This Agreement shall be binding upon all successor, assigns, heirs, agents and representatives of each of the Parties.

3. <u>Governing Law.</u> This Agreement shall be governed by and construed in accordance with the laws of San Francisco, California in the United States of America, and thus that shall be the jurisdiction and venue for this contract. (Spanish documents, which will follow Nicaraguan law, will be utilized to effectuate the land transfer).

---

[1] "clear and unencumbered" from a mortgage standpoint, in other words, there is no mortgage debt on the lands. Property taxes are owed, and there are various liens on the lands as per the most recent Libertad de Gravamen, dated April 2018, which is an Exhibit to this contract.

4. <u>Entire Agreement.</u> This Agreement may not be amended or modified, and no provisions hereof may be waived, without the written consent of the Parties.

5. <u>Severability.</u> If any provision of this Agreement shall be declared void or unenforceable by any judicial or administrative authority, the validity of any other provision and of the entire Agreement shall not be affected thereby.

6. <u>Titles and Subtitles.</u> The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting any term or provision of this Agreement.

7. <u>Execution.</u> This Agreement may be executed in counterparts and all of such counterparts taken together shall be deemed to constitute one and the same Agreement. The Parties may execute this Agreement via facsimile transmission or electronic communication and such execution and delivery shall be full, binding and proper execution and delivery without the need for the exchange of originally executed copies of this Agreement between the Parties.

8. The parties agree they are sophisticated in business matters and have access to counsel. They also have collaborated on the drafting and editing of this contract. Accordingly this contract will not be construed in favor or against either party including the original drafter.

[Signature page follows]

IN WITNESS WHEREOF, the Parties hereby state that they are fully empowered to act and agree to the obligations contained in this Agreement and that consequently, each one accepts each and every clause contained herein in the terms and under the conditions hereby stated.

IN WITNESS WHEREOF **CARL (KALLE) WESCOTT** has executed this Agreement on this (Day) 11 of August 2018 in the city of San Francisco, California; United States of America.

**PRINT NAME(S):**

_Carl (Kalle) Wescott_ _____     _CKWescott_ _____
(Settler Print Name)                          (Settler Signature)

IN WITNESS WHEREOF David Crowe has executed this Agreement on this (Day) 11 of August 2018.

_____        _____
(Print Name)                              (Signature)

IN WITNESS WHEREOF Mike Lyonette has executed this Agreement on this (Day) 11 of August 2018.

_____        _____
(Mortgage Holder Print Name)              (Mortgage Holder Print Name)

**Exhibit:**

The following exhibit is an integral part of this Settlement Agreement

A.       Most recent Libertad de Gravamen



EXHIBIT A

DIEZ CÓRDOBAS

SEÑOR (A) REGISTRADOR (A) PUBLICO DE LA PROPIEDAD INMUEBLE Y MERCANTIL DE LA CIUDAD DE MANAGUA, YO, JAIRO JOSÉ MALTEZ MEDAL, MAYOR DE EDAD, ABOGADO Y NOTARIO PUBLICO DE ESTE DOMICILIO, Y PORTADOR DEL CARNE DE IDENTIDAD DE LA CORTE SUPREMA DE JUSTICIA NUMERO 11516, LE SOLICITO A USTED ME CERTIFIQUE LIBERTAD DE GRAVAMEN DE PROPIEDAD HORIZONTAL DE LA FINCA NUMERO CUATRO MIL DOSCIENTOS CINCUENTA Y UNO (4251) PH, TOMO NUMERO CUARENTA Y SIETE PLECA CUARENTA Y NUEVE (47/49) PH, FOLIOS NÚMERO TREINTA Y UNO PLECA TRESCIENTOS GUION UNO PLECA SESENTA Y SEIS (31/300 Y 1/66) ASIENTO PRIMERO (1) DE LA COLUMNA DE INSCRIPCIONES DE LA SECCIÓN DE DERECHOS REALES.

Managua, viernes 21 de julio del 2017

Jairo José Maltez Medal
Abogado y Notario Publico
Carné No 11516

LA SUSCRITA REGISTRADORA AUXILIAR DEL DEPARTAMENTO DE MANAGUA CERTIFICA: Que la finca inscrita bajo el No. 4251-PH, Tomo 47-PH, Folios 31 al 300; Tomo 49-PH, Folios 1 al 66; Tomo 136-PH, Folios 91 al 104, Asiento 1 y 2, Columna de Inscripciones, sección de Derechos Reales, Libro de Propiedades Horizontales, de este Registro Publico. Pertenece el resto a: Seaside Marina Spa & Golf Resort Sociedad Anónima. Y tiene hipoteca a favor de Michael Francis Lyonette, tan solo por lo que hace a los Módulos Nos. 18, 19, 29, 30, 31, por las siguientes sumas: (1) Trescientos sesenta y tres mil ochocientos cincuenta y dos dolares equivalente a siete millones ochocientos noventa y cinco mil quinientos ochenta y ocho córdobas con cuarenta centavos de córdobas; (2). Cuatrocientos tres mil seiscientos noventa y tres dolares equivalente a ocho millones setecientos sesenta mil ciento treinta y ocho córdobas con diez centavos de córdobas, para un monto total de Diecisiete millones seiscientos cincuenta y cinco mil setecientos veintiséis córdobas equivalente a setecientos sesenta y siete mil quinientos cuarenta y cinco dolares, posteriormente se amplio dicho crédito hasta la suma de veintiseis millones setecientos ochenta y nueve mil seiscientos setenta y tres córdobas con treintiun centavos equivalente a un millón ciento cuarenta y un mil trescientos cuarenta seis dolares. En asientos 1 y 2 ***** También tiene inscritas Provisionalmente venta de los

1  siguientes lotes indivisos: 1) A favor de Thomas Edward Austin, identificado como lote GB, con un

2  área de mil trescientos veinticuatro punto novecientos cinco metros cuadrados; 2) A favor de Trevin

3  Martín Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto

4  novecientos sesenta y dos metros cuadrados; 3) A favor de Robert Daniel Madgett y Judith Gail Madgett,

5  identificado como lote GQ, con un área de novecientos cincuenta y uno punto ciento veinticuatro metros

6  cuadrados; 4) A favor de Judith Gail Madgett y Robert Daniel Madgett, identificado como lote GBU, con

7  un área de ochocientos cincuenta y siete punto seiscientos ochenta y uno metros cuadrados, inscrito el

8  22-05-2012, pero se encuentra pendiente la firma del registrador; 5) A favor de Thomas Edward Austin,

9  identificado como lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro

10  metros cuadrados; 6) A favor de Thomas Edward Austin, identificado como lote OVL, con un área de un

11  mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados; 7) A favor de Thomas

12  Edward Austin, identificado como lote RM, con un área de un mil setecientos ochenta y ocho punto cero

13  noventa y cuatro metros cuadrados; 8) A favor de Zachary Taylor Collings y Taylor Collings, identificado

14  como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros

15  cuadrados; 9) A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil

16  trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 10) A favor de James

17  Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos

18  once punto quinientos veinticuatro metros cuadrados; 11) A favor de Robert Daniel Madgett y Judith Gail

19  Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos

20  setenta y un metros cuadrados, inscrita el 22-05-2012, pero se encuentra pendiente de firma del

21  registrador; 12) A favor de Thomas Edward Austin, identificado como lote GAL, con un área de

22  ochocientos veintiún punto setecientos veinticinco metros cuadrados; 13) A favor de Zachary Taylor

23  Collings y Taylor Collings, identificado como lote OVA, con un área de un mil ochocientos sesenta y seis

24  punto setecientos setenta y tres metros cuadrados; 14) A favor de Zachary Taylor Collings y Taylor

25  Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos

26  cincuenta y nueve metros cuadrados, 15) A favor de Zachary Taylor Collings y Taylor Collings, identificado

27  como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros

28  cuadrados; 16) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GST,

29  con un área de un mil trescientos treinta y ocho punto cuatrocientos trece metros cuadrados; 17) A favor

30  de Anthony David Bowman y Carol Anne Bowman, identificado como lote GCR, con un área de un mil

ciento diecisiete punto quinientos setenta y tres metros cuadrados, inscrita el 22-05-2012, pero se encuentra pendiente de la firma del Registrador; 18) A favor de Anthony David Bowman y Carol Anne Bowman, identificado como lote GCR, con un área un mil ciento dieciste punto quinientos setenta y tres metros cuadrados; 19) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, 20) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GBV, con un área de ochocientos cincuenta y siete punto seiscientos ochenta y un metros cuadrados; 21) A favor de Thomas Edward Austin, identificado como Lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro metros cuadrados; 22) A favor de Thomas Edward Austin, identificado como lote OVL, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados, 23) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GQ, con un área de novecientos cincuenta y uno punto ciento veinticuatro metros cuadrados; 24) A favor de Thomas Edward Austin, identificado como lote GB, con un área de un mil trescientos veinticuatro punto novecientos cinco metros cuadrados; 25) A favor de Trevin Martin Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto novecientos sesenta y dos metros cuadrados; 26) A favor de Thomas Edward Austin, identificado como lote RM, con un área un mil setecientos ochenta y ocho punto cero noventa y cuatro metros cuadrados; 27) A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 28) A favor de Thomas Edward Austin, identificado como lote GAL, con un área de ochocientos veintiuno punto setecientos veinticinco metros cuadrados; 29) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVA, con un área de un mil ochocientos sesenta y seis punto setecientos setenta y tres metros cuadrados; 30) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos cincuenta y nueve metros cuadrados; 31) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, 32) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados; 33) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros cuadrados; 34) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GST, con un área de un mil trescientos treinta y ocho punto cuatrocientos trece

metros cuadrados; **35)** Tiene inscrito provisionalmente Dacion en pago a favor Desarrollos Inmobiliarios Tejas, Sociedad Anónima sobre los siguientes lotes indivisos: **1) Lote Nº 20,** con un área de diecinueve mil doscientos setenta y cinco punto novecientos veintitrés metros cuadrados;  **2) Lote Nº 28,** con un área de ciento noventa y dos mil novecientos sesenta y cuatro punto ciento ochenta y cinco metros cuadrados;  **3) Lote Nº 21,** con un área de treinta y nueve mil quinientos ochenta punto cero noventa y seis metros cuadrados; **4) Lote Nº 22** , con un área de nueve mil cincuenta y seis punto seiscientos setenta y nueve metros cuadrados; **5) Lote Nº 23,** con un área de cuatro mil setecientos sesenta y uno punto doscientos cuarenta y tres metros cuadrados; **6) Lote Nº 26,** con un  área de sesenta y un mil quinientos treinta punto setecientos setenta y cinco metros cuadrados, inscrita con fecha veinte de junio del año dos mil trece, pero se encuentra pendiente la firma y sello del registrador. **36)** Tiene anotada demanda en la vía ordinaria con acción de pago de daños y perjuicios, a solicitud de Edward Albert Cole por la suma de cuarenta y ocho millones ochocientos treinta y tres mil setenta y nueve córdobas con catorce centavos equivalente a dos millones setenta y tres mil diez dólares con cincuenta centavos. **37)** Tiene anotada **Dacion en Pago** a favor de los señores: **Edward Albert Cole,** los siguientes lotes. 1) Lote GSA, con un área de: un mil ciento treinta y siete punto setecientos noventa y tres metros cuadrados, 2) Lote GSB, con un área de: un mil  ochenta y  siete punto diecisiete  metros  cuadrados,  3) Lote GSC, con un área de:  un mil ciento cincuenta y seis punto ochocientos un metros cuadrados, 4) Lote GSD, con un área de: un mil ciento setenta y siete punto doscientos noventa y seis metros cuadrados, 5) Lote GSE, con un área de un mil ciento cincuenta y tres punto seiscientos diez metros cuadrados, 6) Lote GSF, con un área de un mil ciento veinticinco punto setecientos cinco metros cuadrados, 7) Lote GSG, con un área de un mil noventa y siete punto ochocientos metros cuadrados, 8) Lote GSH, con un área de un mil setenta y uno punto trescientos setenta y tres metros cuadrados, 9) Lote GSI, con un área de un mil ciento cuarenta y un punto noventa y tres metros cuadrados, 10) Lote GSJ, con un área de un mil trescientos setenta y dos punto cero cero seis metros cuadrados, 11) lote GSK, con área de un mil ochocientos treinta y uno punto cuatrocientos cincuenta y uno metros cuadrados, 12) Lote GSL, con un área de un mil ochocientos veintidós punto novecientos setenta y ocho metros cuadrados, 13) Lote GSM, con un área de un mil trescientos sesenta y ocho punto novecientos treinta y uno metros cuadrados, 14) Lote GSN, con un área de un mil ciento diez punto novecientos cincuenta y ocho metros cuadrados, 15) Lote GSO, con un área de un mil ciento cuarenta y nueve punto cuatrocientos cinco metros cuadrados, 16) Lote GSP, con un área de un mil doscientos cincuenta y nueve punto setecientos noventa y cinco

metros cuadrados, 17) Lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados, 18) Lote GSV, con un área de un mil trescientos veintiséis punto sesenta y seis metros cuadrados, 19) Lote SSW, con un área de un mil trescientos setenta punto quinientos dieciocho metros cuadrados, 20) Lote GSX, con un área de un mil cuatrocientos cuarenta y uno punto cuatrocientos seis metros cuadrados, 21) Lote GSY, con un área de un mil seiscientos noventa y dos punto ciento cincuenta y uno metros cuadrados, 22) Lote GS2, con un área de un mil novecientos sesenta y cinco punto cuatrocientos dieciocho metros cuadrados, 23) Lote GSAA, con un área de dos mil doscientos veintisiete punto setecientos cincuenta y cinco metros cuadrados, 24) Lote GSAB, con un área de dos mil quinientos dieciocho punto doscientos noventa y uno metros cuadrados, 25) Lote GSAC, con un área de cuatro mil doscientos treinta punto trescientos cincuenta y dos metros cuadrados, 26) Lote GSDA, con un área de cuatro mil cuatrocientos treinta y seis punto ciento treinta y un metros cuadrados, 27) Lote GSAE, con un área de tres mil novecientos setenta y cuatro punto novecientos veinticinco metros cuadrados, 28) Lote GSAF, con un área de cuatro mil ciento cuarenta punto ciento cuarenta y dos metros cuadrados, 29) Lote GSAG, con un área de cuatro mil seiscientos cuarenta y dos punto trescientos sesenta y cinco metros cuadrados, 30) Lote GCA, con un área de tres mil sesenta y ocho punto ciento doce metros cuadrados, 31) Lote GCB, con un área de tres mil novecientos cincuenta y nueve punto doscientos ochenta y tres metros cuadrados, 32) Lote GCC, con un área de cuatro mil seiscientos veintiséis punto setecientos veinte metros cuadrados, 33) Lote GCD, con un área de cuatro mil doscientos veintiún punto seiscientos treinta y dos metros cuadrados, 34) Lote GCS, con un área de tres mil setecientos veintiséis punto seiscientos cincuenta y cinco metros cuadrados, 35) Lote GCF, con un área de tres mil ciento cincuenta y seis punto doscientos cuarenta y tres metros cuadrados, 36) Lote GCG, con un área de dos mil seiscientos ochenta y cuatro punto setecientos cuarenta y siete metros cuadrados, 37) Lote GCH, con un área de dos mil cuatrocientos noventa y nueve punto quinientos treinta metros cuadrados, 38) Lote GCI, con un área de dos mil seiscientos treinta y siete punto trescientos ochenta metros cuadrados, 39) Lote GCJ, con un área de dos mil quinientos noventa y dos punto novecientos veinte metros cuadrados, 40) Lote GCK, con un área de dos mil cuatrocientos dieciséis punto ochocientos cuarenta y dos metros cuadrados, 41) Lote GCL, con un área de dos mil seiscientos cincuenta y dos punto cuatrocientos setenta y cuatro metros cuadrados, 42) Lote GCM, con un área de dos mil cuatrocientos treinta y seis punto novecientos veinte metros cuadrados, 43) Lote GCN, con un área de dos mil nueve punto quinientos setenta y uno metros cuadrados, 44) Lote No.27, con un área de

doscientos cuarenta y dos mil ochocientos setenta y cinco punto seiscientos ochenta y seis metros

cuadradas, 45) Lote No.24, con un área de doce mil ochocientos cuarenta y dos  punto doscientos

veintiún metros cuadrados, 46) Lote No. 25, con un área de cincuenta y siete mil seiscientos diecinueve

punto seiscientos sesenta y ocho metros cuadrados, *** 38) **Promesa de venta**, a favor de PKR

Holding, Sociedad Anónima, sobre los siguientes lotes, a) lote OVK, con un área de un mil trescientos

noventa y dos punto novecientos ochenta y un metros cuadrados, b) lote GAY, con un área de un mil

cuatrocientos treinta punto seiscientos treinta y siete metros cuadrados, c) lote GAX, con u na rea de un

mil cuatrocientos veintinueve punto seiscientos sesenta y tres metros cuadrados, por la suma de tres

millones seiscientos treinta y un mil seiscientos ochenta y cuatro córdobas con sesenta centavos de

córdobas, *** 38) **promesa de venta**, a favor de Advantage Ventures LLC, un lote con un área de un mil

trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, por la suma de dos

millones ochocientos noventa y nueve mil setecientos dos córdobas con treinta y cinco centavos,

equivalente a ciento nueve mil quinientos dólares, *** 40) **Promesa de venta** a favor de Paul Brian Ciceri,

un lote de terreno identificado como GAY, con un área de un mil cuatrocientos siete punto ochocientos

setenta y ocho metros cuadrados, por la suma de setecientos ochenta y dos mil treinta y cuatro córdobas

equivalente a veintinueve mil trescientos ochenta y dos dólares, *** 41) **Demanda**, ordinaria con acción

de resolución de contrato, para que por sentencia firme y declare, lo siguiente: a) que  se deje sin efecto

el contrato de oferta de compra sobre el lote OVGG, b) que  se deje sin efecto el contrato de oferta de

compra sobre el  lote NGJ, c) devolución de precio mas intereses, d) pago  de los costos daños y

perjuicios ocasionados por el incumplimiento, *** 42) **Demanda** en la vía ordinaria con acción de

resolución de contrato por incumplimiento, para que por sentencia se declara lo siguiente: a) disuelto el

contrato de promesa de venta , b) devolución de precio mas intereses, c) pago de los costos daños y

perjuicios ocasionados por el incumplimiento, ***43) **Demanda** ordinaria con acción de resolución de

contrato por incumplimiento, promovida por Darnell Lee y Bushnell y Amy Bushnell, *** 44) **Demanda**

ordinaria con acción de resolución de contrato en consecuencia de conformidad al artículo 1061 y 1083

Pr. Declaráreseles rebeldes para todos los efectos de la presente demanda. En asientos 1 al 42, 41 y 43

A solicitud de parte Interesada extiendo el presente certificado en la ciudad de Managua a veintisiete

día del mes de julio del dos mil diecisiete.

CARL A. WESCOTT
MOVENPICK APARTMENTS/HOTEL #509
BUR DUBAI, 19TH STREET, OUD METHA
ACROSS AMERICAN HOSPITAL
DUBAI, UAE (UNITED ARAB EMIRATES)
*in propria persona*
CARLWSOJ@GMAIL.COM
+971 4 336 6000

# UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF CALIFORNIA
## NORTHERN DISTRICT

| | |
|---|---|
| CARL A. WESCOTT,<br><br>                    Plaintiff,<br><br>vs.<br><br>DAVID CROWE, JEFF RAU,<br>MIKE LYONETTE, et al.<br><br>                    Defendants | Case No. 3:20-cv-06456-JD<br><br>**EXHIBIT C: SWORN DECLARATION OF CARL A. WESCOTT** |

I, Carl A. Wescott, hereby swear under penalty of perjury of the laws of California and of the

United States of America, that the following facts are true, to the best of my memory, recollection,

and belief:

1. I am the Plaintiff in the above-captioned case at Bar.

2. I am quite familiar with all of the circumstances of this case from my own viewpoint (obviously,

    I do not yet know what internal communications occurred between the Defendants).

3. I am 53 years old, and a U.S. citizen.

4. I am competent to testify. Were I to be called to testify in this matter, my testimony would be as

    follows, and until that point, my written testimony is as such:

a. The facts cited in my legal complaint and in my Response to Mr. Rau's Motion for a Judgment on the Pleadings are all true.

b. I am indeed on the California Vexatious Litigant list.

c. When I first had to represent myself in my family law case for marital dissolution (as I had no money for an attorney) I made many filings over denied visitations with my children, and didn't make it clear enough that each filing (Orders to Show Cause, for example, because the denied visitations violated a Court order) were for a different denied visitation, and thus it was perceived that I was re-filing Requests for Orders and Orders to Show Cause that I had already lost.

d. I have great respect for our Courts and follow Court orders to the best of my ability.

e. Though I am not an attorney, I have learned a lot about the law and civil procedure, which is important as I still cannot afford an attorney.

f. I used to be a California resident.

g. I filed 11 cases in California Superior Court under 391.7 in 2017 and 2018 and 2019 and was approved to file the first time 10 of 11 times.

h. I had many California cases dismissed against me in the past, but those cases were not without merit.

i. For the relevant California cases (as alluded to above), I've survived 90%+ of the 391.7s as well as 90%+ of the Motions to Dismiss filed against my cases, as one indicator of merit, or at least perceived merit.

j. I was rendered homeless and my possessions stolen, twice, during the relevant timeframes.

k. Without a computer or an address, I was unable to receive updates from the Court nor make filings.

l.  That's the main reason my California cases were dismissed in 2018 and 2019; I was simply unable to continue with the cases.

m.  I focused on survival instead of the legal cases, as continuing to eat and finding places to work and sleep were more important to me.

n.  Just like in Maslow's hierarchy of needs, one needs the basics as the foundation for many activities.

o.  I have a laptop now and the ability to print and scan which makes a significant difference in my ability to perform many tasks that are important in my life.

p.  I did file 17 cases in Arizona when I resided in Arizona from March through July 2020, including the *Wescott versus Crowe, Rau, Lyonette, et al.* legal complaint that is now before this Court.

q.  The reason this legal complaint was originally filed in Arizona is that the there were three signed contracts with these Defendants, and one of them had a choice of venue clause indicating Arizona Courts.

r.  The first contract had a forum selection clause of Maricopa County, Arizona; hence the filing in that venue seeking the Court to assert jurisdiction over these Defendants.

s.  The second and third relevant contracts had a forum selection clause of San Francisco, California (Exhibit B, second contract of August 11th, 2018).

t.  I figured that I could thus file this case in either Arizona or California, and filed in Arizona for my convenience at the time.

u.  I am not a Vexatious Litigant in any District Court, including this Court

v.  This legal complaint was not filed for the purposes of harassment or delay.

w. Rather, these Defendants entered in to binding contracts with me, and then, after six months of working together, a few days before the final close of the deal I had put together, the Defendants breached their contract, costing the me US $334,000 in payments the Defendants were obligated to make to me and larger sums I would have earned had they closed.

x. The Defendants later repudiated the contract and committed numerous tortious acts that they should be embarrassed by.

y. I seeks redress in Court so that these Defendants will be required to pay for the damages they've caused.

z. That will change my financial situation considerably.

aa. My California legal complaints (that were filed in 2017, 2018, and 2019 – I haven't filed any in 2020) have not been dismissed due to a lack of merit; quite the contrary.

bb. Mr. Rau was served with the legal complaint on Monday, June 1st, 2020, and then Mr. Rau answered on Tuesday June 30th, 2020), citing four affirmative defenses. Two of those four cited affirmative defenses were alleged lack of personal jurisdiction in Arizona Courts and incorrect venue.

cc. I emailed Mr. Romero last week to give him an opportunity to cite specific examples of my alleged Rule 8 violations in the legal complaint. A true and correct copy of that email is in Exhibit E.

dd. What Mr. Romero is claiming (that Mr. Rau is not a party to the contract) is factually incorrect.

ee. Mr. Rau is a party to all three contracts (the second, which replaced the first, is in Exhibit B; the third contract is the NDA Mr. Rau signed).

ff. The second/final contract clearly states that I am one of the parties to the contract, and that the other party is the group of litigators in the litigating group that purchased lots, condominiums, and bungalows at Seaside Mariana, that "have a Nicaraguan lawsuit together".

gg. The identities of those twenty-two people were provided by David Crowe at the time of the contract signing, and the identities are also a matter of public record.

hh. The twenty-two people are David Crowe, Mike Lyonette, Thomas P. Madden, Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Sandra Winfrey; Brian Putze; Colin Ross; Brad Malcolm; Michael Jimenez; Gustavo Varela, Robert Crowe, Bernadette Brown, Federico Gurdian, and Terencio Garcia.  Mr. Rau is one of them.

ii. The twenty-two are bound together in a partnership for that litigation and for the contract with me in Exhibit B.  (The NDAs were signed individually)

jj. Mr. Romero is also incorrect about the sequence of events.

kk. He alleges (with no supporting evidence) that the seller terminated the contract prior to the October 2018 breach of Mr. Rau and his co-Defendants.

ll. The Defendants' initial breach was in October when we were at the closing table (figuratively; I was about to fly to the closing).

mm.    The sellers very much needed the US $475,000 they would have received.

nn. It's true that later (I believe it was December) the seller sent me an email terminating the contract, though the seller does not have the contractual right to do so, without one other thing the seller is required to do in my Closing Contract with the seller.

oo. In our discussions for closing logistics with Mr. Crowe, I had offered a limited power of attorney, or special power of attorney, in favor of his wife, for her to do the transfer of Seaside Mariana ("SM") land right after the SM purchase/close.

pp. That land, hundreds of acres with 2 kilometers of beachfront, was part of the consideration for the Sales Contract on my side of the set of contractual obligations.

qq. That land is also worth quite a bit more than US $334,000.

rr. Kevin Fleming had paid US $4 million for the original SM parcel, raw, before getting entitlements, twelve years ago.

ss. The cited reason for the Defendants to breach the contract was that Mr. Ted Cole had filed a lawsuit against Seaside Mariana just before our close of the Seaside Mariana purchase. Mr. Cole's lawsuit was filed in September 2018.

tt. I did not find out about the Cole lawsuit until October 2018 – David Crowe was the person who initially informed me of its existence, in citing his reason, on behalf of Mr. Rau and the other twenty-one (21) defendants, for why they were breaching the contract and closing that they had expressly and contractually committed to.

uu. The first contract we signed had a contingency for the Defendants due diligence.

vv. When the Defendants completed their due diligence, they passed US $25,000 through (which went to the sellers), and they signed and committed to the new, second contact (in Exhibit B), which committed them to the investment, funding and closing with no contingency.

FURTHER AFFIANT SAYETH NAUGHT

CARL A. WESCOTT
November 2nd, 2020

## **Exhibit D – Breach of Contract Elements**

(1) <u>The existence of a contract.</u> It is undisputed that the contract, the "Sales Contract" existed (Amended Complaint or "AC" ¶21, ¶22, ¶24, and Exhibit A to original Complaint). Mr. Rau only disputes that he was a party to the contract. However, he was named as one of the parties in the contract, was in conspiracy with the other twenty-one defendants, and agreed to be bound by the terms of the "Sales Contract." (AC ¶6, ¶24, and ¶25).

(2) <u>Plaintiff's performance of the contract.</u> The Plaintiff got the sellers of SM in to contract, and after more than six (6) months of work, got the parties essentially to the closing table in October 2018, ready to close, just before flights to the actual closing table. The parties had even hired attorneys to prepare closing documents. (AC ¶19, ¶38 through ¶45).

(3) <u>Defendant's initial breach of the contract.</u> "[W]ith the Plaintiff about to fly to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group, informed the Plaintiff that he and the rest of his investor group refused to close and would not be closing, breaching the Sales Contract." (AC, ¶46). Setting aside the conclusory but true language at the end ("breaching the Sales Contract"), Mr. Rau and his co-Defendants had expressly and contractually promised to close on their purchase and investment. Mr. Rau and his co-Defendants had also expressly and contractually promised to fund said closing. (AC ¶21, ¶22, ¶24, ¶38 through ¶45, and Sales Contract, Exhibit A to original Complaint). Mr. Rau and his co-Defendants, through Mr. Crowe, informed the Plaintiff that "he and the rest of his investor group refused to close and would not be closing" (AC, ¶46). Though they had had a period of due diligence earlier, from June through August, once they signed the final, definitive closing Contract, there were no longer any contingencies, no provision to terminate the contract, and no

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

1

liquidated damages clause.  (AC ¶39, ¶40, and ¶42).  Thus, Mr. Rau and his co-defendants breached.

(4) <u>The resulting damages to Plaintiff</u>. The contract called for Mr. Rau and his co-Defendants to pay the Plaintiff US $334,000 in a series of payments upon the close.  (AC, ¶35 and ¶45). Admittedly, the Plaintiff would have had to transfer the SM land to Mr. Rau and his co-Defendants to get the payments, but it's reasonable to assume that an indigent man who had honored and performed all other aspects of the contract would indeed make that transfer.  This level of detail is not pled in the legal complaint, but the Plaintiff had offered to the Defendants, through David Crowe, that he sign a limited power-of-attorney in favor of Mr. Crowe's wife as part of the closing documents for SM, so that Mrs. Crowe could handle that transfer of land (recording signed grant deeds) on behalf of the Plaintiff, as soon as practicable after the SM close. (Exhibit C).  Given that the whole reason Mr. Rau and his co-defendants were funding the purchase of SM was to get the land, it is also reasonable to assume that Mrs. Crowe would indeed have done so.  Given that Mr. Rau and his co-Defendants did not close, and pulled out of the deal (AC, ¶46) the absence of the US $334,000 that the Plaintiff would have received by now are the base damages.  The Plaintiff acknowledges that he has not proved out, nor do the facts as pled support the significantly larger damages he hopes to prove at trial, but the contractually-provided US $334,000 is crystal clear, as is the prejudgment interest to be added, as provided by the law of this district.

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

2

**M** Gmail

EXHIBIT E

## alleged Rule 8 issues
1 message

**Carl Wescott** <carlwsoj@gmail.com>
To: Troy Romero <TRomero@romeropark.com>
Cc: Kathy Koback <kkoback@romeropark.com>
Bcc: Carl Wescott <carlwsoj@gmail.com>, Carl Wescott <carlwescott2020@gmail.com>

Tue, Oct 27, 2020 at 1:57 PM

Mr. Romero, I'm working on my response to your Motion to Dismiss.

You claim that I make "verbose and redundant allegations" and that I fail to "follow the rules." You also state that my legal complaint should be dismissed due to "immaterial verbiage."

While I'm not an attorney, I re-read the complaint and could not find the redundant allegations nor the "immaterial verbiage", unless that's the background I provided to set the context. I'm also not seeing any places where I've broken any rules that I could find (though of course the complaint was drafted for Superior Court and thus needs some changes to conform to District Court standards.

I do agree that the Complaint could have been more artfully pled to show (as much as possible before discovery) that the elements for each cause of action are indeed there.

Would you be so kind as to point to:

* any particular allegation that is too verbose

* the redundant allegations

* the immaterial verbiage

* any place where a rule is broken, and what that rule is?

Thank you.

--CAW  +971 4 336 6000  x509