

1  CARL A. WESCOTT
   MOVENPICK APARTMENTS/HOTEL #509
2  BUR DUBAI, 19TH STREET, OUD METHA
   ACROSS AMERICAN HOSPITAL
3  DUBAI, UAE (UNITED ARAB EMIRATES)
   *in propria persona*
4  CARLWSOJ@GMAIL.COM
   +971 4 336 6000
5

6            **UNITED STATES DISTRICT COURT**
7            **FOR THE DISTRICT OF CALIFORNIA**
                    **NORTHERN DISTRICT**
8

9  CARL A. WESCOTT,                    Case No. 3:20-cv-06456-JD
                Plaintiff,
10                                     **PLAINTIFF'S RESPONSE TO**
       vs.                             **DEFENDANTS' MOTION TO DISMISS**
11
   DAVID CROWE, MIKE LYONETTE;         Hearing Date: Thurs., Dec 3, 2020
12 COLIN ROSS; BRAD MALCOLM;           Hearing Time: 10:00 am
   MICHAEL JIMENEZ, et al.             Courtroom: 11
13              Defendants             Judge: Hon. James Donato

14        Plaintiff Carl A. Wescott, proceeding *pro se,* hereby responds to Defendants' Motion to

15 Dismiss, brought pursuant to Federal Rules of Civil Procedure 12(b)(6) and under FRCP Rule 8 for

16 Romero Park, P.S. clients David Crowe, Mike Lyonette, Colin Ross, Brad Malcolm, and Michael

17 Jimenez, filed on October 22nd, 2020 by Mr. Troy Romero, esq. The Defendants attempt to utilize

18 Cal. Civ. Proc. Code § 391 as a third justification to dismiss the Plaintiff's legal complaint, or, in the

19 alternative, for the Plaintiff to post a bond.

20

21        The Plaintiff will summarize the Defendants' arguments in his Memorandum of Points and

22 Authorities, and then will address those arguments, correcting factually incorrect statements by Mr.

23 Romero on behalf of his clients along the way. The Plaintiff will provide the reasons the Motion to

24 Dismiss should not be granted and will then close with a request to amend his legal complaint to

25 improve it and to conform with federal standards and those of this Court.

26

                                                                                         1

### Memorandum of Points and Authorities

### LEGAL STANDARDS - 12(b)(6)

A plaintiff's burden at the pleading stage is relatively light, in a Court's analysis of a Rule 12(b)(6) motion as to whether colorable claims are made.  Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a).*  The court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party," *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995), including making all reasonable inferences in favor of the non-moving party *Rhodes v. Robinson*, 408 F.3d 559, 563 (9th 2005), and resolving all doubts in the plaintiffs' favor. See *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984).  Claims must be "plausible on [their] face," meaning that the plaintiff must plead sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

Pro se pleadings are held to a less stringent standard than those drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). *Pro se* complaints are construed liberally and may only be dismissed if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Nordstrom v. Ryan*, 762 F.3d 903, 908 (9th Cir. 2014). A *pro se* litigant is entitled to notice of the deficiencies in the complaint and an opportunity to amend,

2

unless the complaint's deficiencies could not be cured by amendment. See *Noll v. Carlson*, 809 F.2d

1446, 1448 (9th Cir. 1987).

<u>**LEGAL STANDARDS – Vexatious Litigants**</u>

The *All Writs Act*, 28 U.S.C. § 1651, gives the Court the inherent power to enter prefiling

orders against vexatious litigants. *De Long v. Hennessey*, 912 F.2d 1144, 1147 (9th Cir. 1990);

*Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1057 (9th Cir. 2007). However, such pre-filing

orders are an extreme remedy and should rarely be used since such sanctions can tread on a litigant's

due process right of access to the courts. *Molski*, 500 F.3d at 1057. Under California law, a

vexatious litigant is one who "[i]n the immediately preceding seven-year period has commenced,

prosecuted, or maintained in propria persona at least five litigations other than in small claims court

that have been… finally determined adversely to the person…" Cal. Civ. Proc. Code § 391.  Under

the law of the State of California, "a defendant may move the court, upon notice and hearing, for an

order requiring the plaintiff to furnish security." Cal. Civ. Proc. Code § 391.1.  That, however, is in

State Court (Superior Court), and the state Court and federal Court have different standards,

separate lists, and different procedures to designate a litigant to be vexatious (Cal. Civ. Proc. Code §

391 ("CCP § 391") and 28 U.S.C. § 1651).

Restricting access to the courts is, however, a serious matter. "[T]he right of access to the

courts is a fundamental right protected by the Constitution." *Delew v. Wagner*, 143 F.3d 1219, 1222

(9th Cir. 1998). The First Amendment "right of the people . . . to petition the Government for a

redress of grievances," which secures the right to access the courts, has been termed "one of the

most precious of the liberties safeguarded by the Bill of Rights." *BE & K Const. Co. v. NLRB*, 536

U.S. 516, 524–25 (2002) (internal quotation marks omitted, alteration in original); see also

*Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (noting that the Supreme Court has located

3

the court access right in the Privileges and Immunities clause, the First Amendment petition clause, the Fifth Amendment due process clause, and the Fourteenth Amendment equal protection clause). Profligate use of pre-filing orders could infringe this important right, *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1057 (9th Cir. 2007) (per curiam), as the pre-clearance requirement imposes a substantial burden on the free-access guarantee. Out of regard for the constitutional underpinnings of the right to court access, "pre-filing orders should rarely be filed," and only if courts comply with certain procedural and substantive requirements. *De Long v. Hennessey*, 912 F.2d at 1147 (9th Cir. 1990). When district courts seek to impose pre-filing restrictions, they must: (1) give litigants notice and "an opportunity to oppose the order before it [is] entered"; (2) compile an adequate record for appellate review, including "a listing of all the cases and motions that led the district court to conclude that a vexatious litigant order was needed"; (3) make substantive findings of frivolousness or harassment; and (4) tailor the order narrowly so as "to closely fit the specific vice encountered." *Id.* at 1147–48.

Under federal law, litigiousness alone is insufficient to support a finding of vexatiousness. See *Moy v. United States*, 906 F.2d 467, 470 (9th Cir. 1990) (the plaintiff's claims must not only be numerous, but also be patently without merit). The focus is on the number of suits that were frivolous or harassing in nature rather than on the number of suits that were simply adversely decided. See *De Long v. Hennessey*, 912 F.2d at 1147-48 (before a district court issues a pre-filing injunction against a pro se litigant, it is incumbent on the court to make substantive findings as to the frivolous or harassing nature of the litigant's actions). The Ninth Circuit has defined vexatious litigation as "without reasonable or probable cause or excuse, harassing, or annoying." *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 886 (9th Cir. 2012).

4

## ARGUMENT

The Plaintiff regards the Vexatious Litigant argument and the Rule 8 argument as threshold issues to dispose of, and thus he will address those issues first, in that order, before moving on to the substantive issues in the body of Defendants' Rule 12(b)(6) Motion to Dismiss Amended Complaint.

### Complaint Should Not Be Dismissed Due to Plaintiff being a California Vexatious Litigant

The Plaintiff admits that he is on the California Vexatious Litigant list, an order issued mostly due to his filings in his San Francisco family law case FDI-14-781666 between September 2014 and April 2015 (the Vexatious Litigant order was on May 1st, 2017). If the Plaintiff had filed this case in California Superior Court, he would have had to seek pre-approval under CCP 391.7 prior to filing. The Plaintiff used to be a California resident, and indeed, in the past, the Plaintiff has gone through the 391.7 procedure eleven (11) times, with judges concurring ten (10) of eleven (11) times that his legal complaints/filings had merit (Exhibit C). The Plaintiff will further admit that he had California cases dismissed against him in the past, but those cases were not without merit. The main reason most or all the Plaintiff's California cases that were active a few years ago were eventually dismissed is that the Plaintiff was rendered homeless and his possessions stolen. Without a computer or an address, the Plaintiff was unable to receive updates from the Court nor make filings to pursue his cases. The Plaintiff then focused on survival instead, and more immediate ways of accumulating resources (Exhibit C, Sworn Statement of Carl Wescott).

The Plaintiff further confirms that he filed seventeen (17) cases in Arizona when he resided in Arizona, including the *Wescott versus Crowe, Malcolm, Lyonette, Ross, Jimenez et al.* legal complaint that is now before this Court. The reason this legal complaint was originally filed in Arizona is that the Plaintiff signed three relevant contracts with these Defendants. The first contract

5

had a forum selection clause of Phoenix, Arizona; hence the filing in that venue seeking a Court to assert jurisdiction over these Defendants.  The second and third relevant contracts had a forum selection clause of San Francisco, California (Exhibit B, second contract of August 11th, 2018, and Exhibit C, Sworn Affidavit).  Given that the Plaintiff had forum selection clauses of Phoenix, Arizona and San Francisco, California to choose from, the Plaintiff chose to file in Maricopa County Superior Court for his convenience (Exhibit C).

The Plaintiff is not a Vexatious Litigant in District Court, including in this Court, in which these Defendants specifically requested this case be heard.  This legal complaint was not filed for the purposes of harassment or delay.  Rather, these Defendants entered in to binding contracts with the Plaintiff and then, after six months of working together, a few days before the final close of the deal the Plaintiff had put together, the Defendants breached their contract, costing the Plaintiff US $334,000 in payments the Defendants were obligated to make to the Plaintiff and larger sums he would have earned had they closed.  The Defendants later repudiated the contract and committed numerous tortious acts that they should be embarrassed by.  The purpose for the filing of the legal complaint being filed was so that the Plaintiff could seek redress and obtain judgments against these Defendants so that they will be required to pay for the damages caused by their breaches and other tortious acts.

The Plaintiff and these Defendants are now in District Court, where the Federal Rules of Civil Procedure apply.  Thus, the Plaintiff was not required to seek pre-filing approval under CCP § 391.  CCP § 391.3(b) is not binding and relevant for this Court and these parties because the Plaintiff did not file in California Superior Court with the help of an attorney and later substitute himself in place of the attorney.  These arguments made by an experienced attorney may verge upon the sanctionable.

In the interest of judicial efficiency, in case this helps avert a future losing motion by Defendants, the Plaintiff will note that under federal law, as cited in Legal Standards above, the mere fact that a plaintiff has had numerous suits dismissed against him is and would be insufficient grounds upon which to make a finding of vexatiousness in District Court.

The Defendants argue that many of Plaintiff's California Superior Court cases were dismissed as meritless, which is factually incorrect (Exhibit C), and that therefore, under CCP § 391.3(a), the Plaintiff should be required to post a bond. Had the Plaintiff filed in California Superior Court, Defendants would certainly have the option of seeking a bond under CCP § 391.3(a), by following the procedures outlined in the law. We are not in California Superior Court; Defendants and their attorney have not followed the outlined procedure. Mr. Romero does not properly cite (on behalf of Defendants) nor address the substantive federal law requirements to show bad faith or willful disobedience of a court's order by Plaintiff. Finally, Defendants' cited case, in support of their desired bond, *Taliaferro v. Hoogs* (Cal. App. 1st Dist. Sept. 15, 1965), was a dispute over $360 (but claiming $10,000 of exemplary damages) originally filed in California Municipal Court, and then California Superior Court, before the appeal. By way of contrast, this District Court case seeks substantial damages backed by the included contract (Exhibit B) that Defendants breached, beginning with contractual payments owed, three (3) orders of magnitude higher.

### Complaint Should Not Be Dismissed Due to Rule 8

The Defendants also cite Rule 8 and make allegations about the legal complaint, requesting a dismissal (with prejudice, and no leave to amend), due to the complaint being ambiguous, vague, verbose, and redundant, therefore lacking in clarity from their viewpoint. Procedurally, a Motion to Strike (to handle alleged redundancy) and/or a Motion for a More Definitive Statement (for more

detail to handle vagueness and lack of clarity) may have been better suited to handle those issues. As with those motions, for these Rule 8 issues, the Plaintiff would hope and expect that the moving party could cite one or more specific examples of ambiguity, verbosity, and/or redundancy resulting in lack of clarity. Ironically, the Plaintiff believes that Defendants' motion itself also lacks some clarity, also incorrectly cites the facts and law, and includes no factual evidence to support its allegations where those would be expected and required. The Plaintiff emailed Mr. Romero last week to give him an opportunity to cite specific examples (Exhibit D; Exhibit C).

The Plaintiff will be the first to admit that the legal complaint could be more artfully pled, and indeed, he seeks to amend it for several reasons for the benefit of all. The Plaintiff will look carefully at these issues and attempt to eliminate redundancy and ambiguity and infuse more clarity in his proposed amendment. The Plaintiff agrees even more with some of the points made in the main body of Defendants Rule 12(b)(6) Motion to Dismiss, namely that the legal complaint could state the Plaintiff's claims more clearly, including pleading fraud and misrepresentation with particularity and specificity. The Plaintiff will address those points next, but to do so, the Plaintiff must first identify and then correct allegedly factual misinformation propagated by the Defendants in the foundation of their relevant arguments.

**Defendants' Allegations (including Factually Incorrect ones) in their Motion to Dismiss**

Three of the Defendants, Mr. Jimenez, Mr. Ross, and Mr. Malcolm, allege that they were not a party to the Sales Contract (attached hereto as Exhibit B). All five Defendants that filed this Motion collectively allege that the sellers of Seaside Mariana terminated the contract with the Plaintiff prior to the their breach (pulling out of the contracted deal); that the Amended Complaint does not establish elements for its Breach of Contact cause of action, and that the Plaintiff fails to state facts sufficient to support his causes of action for Promissory Fraud, Negligent Misrepresentation, Intentional

8

Interference with Contract, Negligent Interference with Economic Advantage, and Breach of the Covenant of Good Faith and Fair Dealing.

Putting aside the legal arguments for a moment to focus on the facts, what Mr. Romero is claiming (that Mr. Jimenez, Mr. Ross, and Mr. Malcolm are not parties to the contract) is factually incorrect. Given that his clients know the truth, and the ethical strictures Mr. Romero is supposed to be bound by, including BP&C 6068(d) and BP&C 6128(a), the Plaintiff will assume that these are inferences on the part of Mr. Romero, who apparently has not yet had time to read the contract nor research the facts. Mr. Jimenez, Mr. Ross, and Mr. Malcolm are all parties to the contracts (including the one in Exhibit B; Exhibit C). That contract clearly states that the Plaintiff is one of the parties to the contract, and that the other party is the group of litigators in the litigating group that purchased lots, condominiums, and bungalows at Seaside Mariana, that "have a Nicaraguan lawsuit together". The identities of those twenty-two people were provided by David Crowe at the time of the contract signing, and the identities are also a matter of public record. The twenty-two people are David Crowe, Mike Lyonette, Thomas P. Madden, Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Sandra Winfrey; Brian Putze; Colin Ross; Brad Malcolm; Michael Jimenez; Gustavo Varela, Robert Crowe, Bernadette Brown, Federico Gurdian, and Terencio Garcia. Mr. Jimenez, Mr. Ross, and Mr. Malcolm are all part of that group and parties to both Sales Contracts with the Plaintiff (Exhibit C). The litigators are bound together in a partnership for that litigation and for the contract with Plaintiff. Through agency (and further allegations of conspiracy), the named individuals and the partnership are liable for the breaches and related tortious acts alleged in this legal complaint.

9

Mr. Romero also seeks to mislead this Court, on behalf of Defendants, about the sequence of events. Defendants allege (with no supporting evidence) that the sellers of Seaside Mariana terminated the contract prior to their October 2018 breach (Mr. Crowe, on behalf of and along with all Defendants, pulling out of their contractual commitment to fund and close the purchase of Seaside Mariana. Quite the contrary; Mr. Romero's assertions are not true (Exhibit C).

The Plaintiff will next address the legal arguments in the Rule 12(b)(6) Motion to Dismiss. The Plaintiff will first show that there is at least one cause of action that features the required elements as pled (and the facts to support the elements). In doing so, the Plaintiff is supporting his argument that he has colorable and plausible claims wherein he could be entitled to relief. Further, if his allegations are indeed true, the Plaintiff further avers that he has demonstrated at least one legal theory by which the Defendants would be liable for their misconduct. Thus, the Plaintiff's legal complaint is not entirely without merit. Therefore, by pleading stages, the Plaintiff's legal complaint should not be dismissed.

### Elements of Breach of Contract (and Facts as pled supporting those Elements)

The Plaintiff accepts Defendants' elements for breach of contract: "(1) the existence of a contact; (2) Plaintiff's performance of the contract or excuse for non-performance; (3) Defendant's breach of the contract; and (4) the resulting damages to Plaintiff." (Motion to Dismiss, p. 5, and hornbook law).The elements for breach of contract are in the complaint as pled, with facts to support them (shown in Exhibit A):

(1) The existence of a contract. It is undisputed that the contract, the "Sales Contract" existed (Amended Complaint or "AC" ¶21, ¶22, ¶24, and Exhibit A to original Complaint). Mr. Romero, on behalf of three of the Defendants, disputes that they are parties to the contract. However, those three Defendants were named as the parties in

10

the contract, were in conspiracy with the other twenty-one defendants, and agreed to be bound by the terms of the "Sales Contract." (AC ¶6, ¶24, and ¶25).

(2) <u>Plaintiff's performance of the contract.</u>  The Plaintiff got the sellers of SM into contract, and after more than six (6) months of work, got the parties essentially to the closing table in October 2018, ready to close, just before flights to the actual closing table.  The parties had even hired attorneys to prepare closing documents (AC ¶19, ¶38 through ¶45).

(3) <u>Defendant's initial breach of the contract.</u>  "[W]ith the Plaintiff about to fly to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group, informed the Plaintiff that he and the rest of his investor group refused to close and would not be closing, breaching the Sales Contract." (AC, ¶46).  Setting aside the conclusory but true language at the end ("breaching the Sales Contract"), Mr. Crowe and his co-Defendants had expressly and contractually promised to close on their purchase and investment.  Defendants had also expressly and contractually promised to fund said closing (AC ¶21, ¶22, ¶24, ¶38 through ¶45, and Sales Contract, Exhibit A to original Complaint, attached hereto as Exhibit B).  Defendants, through Mr. Crowe, informed the Plaintiff that "he and the rest of his investor group refused to close and would not be closing" (AC, ¶46).  Though they had had a period of due diligence earlier, from June through August, once they signed the final, definitive closing Contract, there were no longer any contingencies, no provision to terminate the contract, and no liquidated damages clause (AC ¶39, ¶40, and ¶42).  Thus, Defendants breached the contract.

(4) <u>The resulting damages to Plaintiff</u>. The contract called for Defendants to pay the Plaintiff US $334,000 in a series of payments upon the close (AC, ¶35 and ¶45). Admittedly, the Plaintiff would have had to transfer the SM land to Defendants to get the payments, but it is reasonable to assume that an indigent man who had honored and performed all other aspects of the contract would indeed make that transfer. This level of detail is not pled in the legal complaint, but the Plaintiff had offered to the Defendants, through David Crowe, that he sign a limited power-of-attorney in favor of Mr. Crowe's wife as part of the closing documents for SM, so that Mrs. Crowe could handle that transfer of land (recording signed grant deeds) on behalf of the Plaintiff, as soon as practicable after the SM close (Exhibit C). Given that the whole reason Defendants were funding the purchase of SM was to get the land, it is also reasonable to assume that Mrs. Crowe would indeed have done so, especially as the land was and is worth an order of magnitude more than the Defendants' promised investment (Exhibit C). Given that Defendants did not close, and pulled out of the deal (AC, ¶46) the absence of the US $334,000 that the Plaintiff would have received by now are the base damages. The Plaintiff will prove these allegations and further damages at trial.

The Plaintiff believes he has demonstrated a viable legal theory with all necessary material elements in which the Defendants have liability with the facts as pled. His claims are plausible and colorable. The Plaintiff respectfully requests that this Court deny the Defendants their requested relief of a dismissal with prejudice.

**Plaintiff's Response to Defendants Allegations re the 2nd, 3rd, 4th, 5th, and 6th Causes of Action**

As to Defendants' points about the Plaintiff's 2nd, 3rd, 4th, 5th, and 6th Causes of Action, the Plaintiff agrees that his legal complaint could be improved – and should be improved. The Plaintiff could plead fraud and misrepresentation, for example, on the part of the Defendants, through their main spokesperson Mr. David Crowe, with more specificity. The Plaintiff hereby moves this Court for permission to amend his pleadings to cure the noted deficiencies.

In further support of his moving this Court to grant him leave to amend his legal complaint, the Plaintiff notes that his pleadings were drafted for another jurisdiction and venue (Maricopa County Superior Court). The pleadings need to be updated and amended for District Court in California and federal law and standards, as well as this Court's local rules (where, for example, the Plaintiff has not followed the full requirements for his requested jury trial in this Court). Though the Plaintiff corrected his initial Superior Court pleadings in June, noticing some errors, before Defendants responded, he has not yet previously had the opportunity to amend by request and Court order.

Defendants have correctly pointed out some issues in the way the Plaintiff has pled his facts, claims, and causes of actions in his initial legal complaint. The deficiencies pointed out by Defendants can be solved with a permitted amendment. The resulting clarity will benefit all parties including this Court and a future jury, should we make it to a jury trial. The Plaintiff had previously cited in the legal standards of review that a *pro se* litigant, even more so than represented parties, is entitled to notice of the deficiencies in the complaint and an opportunity to amend, unless the complaint's deficiencies could not be cured by amendment. *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987).

13

The Plaintiff thanks the Defendants for giving him notice of the deficiencies that he plans to cure via his requested amendment.

RESPECTFULLY SUBMITTED on November 3rd, 2020

CARL A. WESCOTT, *pro se*

1

## <u>Exhibit A - Facts as Pled Supporting the Breach of Contract</u>

2

The facts, as pled in the Amended Complaint ("AC") that support a breach of contract are:

3

4
- Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, David Crowe, Robert Crowe, Mike Lyonette; Thomas Madden; Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Bernadette Brown; Sandra Winfrey; Brian Putze, Colin Ross, Brad Malcolm, Michael Jimenez, Federico Gurdian, Terencio Garcia, and Gustavo Varela, as individuals, in addition to acting for himself/herself and on his/her own behalf individually, as well as for the benefit of his or her marital community (if any), is and was acting as the agent, servant, employee, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the other Defendants (individual and entities) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy. (AC, ¶6)

5

6

7

8

9

10
- Most recently, the Plaintiff entered in to contract to purchase SM (either the Sociedad itself or the real estate, at his option) in 2018, with an anticipated close date (after some revisions, addenda, and extensions) of October 15th, 2018 (AC, ¶19)

11

12
- More recently, in August 2018, the Plaintiff entered in to a final version of a contract with investors, after their due diligence, who were familiar with the relevant properties who agreed to fund 100% of the costs of the purchase in exchange for certain land owned by SM (AC, ¶21)

13
- That contract shall be referred to as the "Sales Contract." (AC, ¶22)

14
- A group of 22 investors (the named Defendants) all agreed to collectively be bound by the Sales Contract and to fund the payments in the Sales Contract. (AC, ¶24)

15
- Two of the Defendants, David Crowe and Mike Lyonette, agreed to manage their group and, for expediency, communications with the Plaintiff. David Crowe named and provided documentation as to the identities of the twenty-two people (including himself) who had agreed to be bound by the Sales Contract. (AC, ¶25)

16

17
- In August 2018, David Crowe and Mike Lyonette signed NCNDs with the Plaintiff in August 2018, and pledged not to share any information about the Plaintiff or the Sales Contract with any of the rest of their group of 20+ investors unless an individual group member signed a NDA (Non-Disclosure). (AC, ¶28)

18

19

20
- Approximately 10 of the 20+ investors signed NDAs with the Plaintiff, and thus, if Mr. Crowe, Mr. Lyonette, and others were honoring the Sales Contract and their NDAs, the Plaintiff believes only the dozen or so of them would have gotten information related to the Sales Contract and its progress towards a closing after that point. (AC, ¶29)

21

22
- The NDAs granted jurisdiction of the Plaintiff's choice, had a non-disclosure provision, and in the majority of the NDAs signed, specifically acknowledged that violating the non-disclosure provision, given the Plaintiff's deals, would like cost him over US $10 million, with the Defendants signing up for damages in that amount for that scenario. (AC, ¶30)

23

24

25

26

**EXHIBIT A to PLAINTIFF'S RESPONSE TO DEFENDANTS'**
**RULE 12(B)(6) MOTION TO DISMISS COMPLAINT**

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

- Because the Plaintiff was purchasing the development for US $500,000 (plus capped deferred payments) and selling the land to the investors backing him for US $834,000, the Plaintiff was going to make US $334,000 in short-term cash profit in closing his purchase of SM and flipping the land to his investors. (AC, ¶35)
- For stylistic purposes and economy of phrase, the above Defendants, who acted in concert to fund the Plaintiff's purchase of SM, will be described as "the Crowe Group" unless the context requires otherwise. (AC, ¶37)
- The Crowe Group performed its due diligence on the deal and agreed to move forward to a close. (AC, ¶38)
- After the Crowe Group's due diligence, those investors agreed in August 2018 to close on the purchase within 60 days. The parties signed a new definitive contract in August 2018 for a closing in October 2018. (AC, ¶39)
- There was no contingency or liquidated damages in the contract, as the Crowe Group was quite familiar with the assets being purchased, their current state, and had done their due diligence. (AC, ¶40)
- The Sales Contract called for a closing date in mid-October-2018, as did the Plaintiff's purchase contract of Seaside Mariana. (AC, ¶42)
- The parties retained attorneys to prepare closing documents. (AC, ¶43)
- The parties worked out the logistics of closing in a "simultaneous close", which is well-understood to mean two successive closings. (AC, ¶44)
- In the agreed logistics, the Plaintiff would acquire the entity Seaside Mariana Golf and Spa Resorts, SA, which owned all the land, using another US $475,000 of the Crowe Group's money for said close. Then, the Plaintiff would transfer the lands in the Sales Contract to the entity of the Crowe Group's choice. Then, the Plaintiff or his designees would get the other US $334,000 in a series of payments. (AC, ¶45)
- However, with the Plaintiff about to fly to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group, informed the Plaintiff that he and the rest of his investor group refused to close and would not be closing, breaching the Sales Contract. (AC, ¶46)

**Further Facts as Pled Supporting the Breach of Contract based on Repudiation**

- David Crowe assured the Plaintiff that SM was no longer attractive to any of his investment group. (This is not a valid reason to breach a contract but is interesting in light of his and the group's further actions, below). (AC, ¶47)
- In March 2019, Defendant Thomas P. Madden contacted Kevin Fleming, with the following email (Exhibit B). (AC, ¶48, and Exhibit B)
- In April 2019, Defendant David Crowe contacted Kevin Fleming, following up on communications from Thomas Madden and David Crowe, in email. (AC, ¶49)
- In doing so, it is clear Crowe and all Defendants fully ratified the first Crowe breach as well as the Madden breaches and repudiation of the Sales Contract. (AC, ¶50)

**EXHIBIT A to PLAINTIFF'S RESPONSE TO DEFENDANTS'
RULE 12(B)(6) MOTION TO DISMISS COMPLAINT**

2



This Settlement Agreement dated as of August 11th, 2018, is entered into by and among:

### "THE SETTLER"

Carl (aka Kalle) Wescott

And

### "THE LITIGATORS"

---

### RECITALS

Between the undersigned, to wit: On one hand, Kalle Wescott (hereafter called the "Settler") and on the other hand, David Crowe and Mike Lyonette (hereafter called "The Litigators"). Mike Lyonette ("the Mortgage Holder") previously provided loans to Seaside Mariana, and has a mortgage (hipoteca) on a subset of the Seaside Mariana land. The Litigators are part of the Litigating Group, which is a group of persons, represented by Federico A. Gurdián Sacasa (attorney-at-law), who bought or invested in lots, condominiums and bungalows at Seaside Mariana (hereafter called the "*Litigating Group*") that have a Nicaraguan lawsuit together have agreed to execute a legally-binding Settlement Agreement, (hereafter called the "**Agreement**").

**WHEREAS**, the Settler is currently purchasing 100% of the shares of Seaside Mariana Spa & Golf Resort S.A. (hereafter "SM" or "Seaside Mariana"), which is all ten thousand (10,000) shares, (hereafter called the "Stock"),

**WHEREAS**, the Parties (the Litigators and the Settler) wish to settle all claims of the Litigating Group and have agreed-upon terms to do so;

**WHEREAS**, the Parties (the Litigators and the Settler) hereby define three terms: "SM Closing" shall be when the Settler owns SM and has all the endorsed shares. "Land Closing" shall be when the Settler has transferred the SM land and the Horizontal Property Regime that is the major asset of the settlement to the Litigating Group or to the entity of their choice. "Full Settlement Closing" shall be when this Settlement is fully effectuated, including all items in Article I, sections 4 through 7 having been paid and transferred.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises made by the Parties hereto, covenant and agree as follows:

### Article I

1. When the Litigators have completed basic due diligence, the Litigators shall pay a non-refundable deposit of **Twenty-Five Thousand United States Dollars 00/100 (USD $25,000.00)** to a party designated by the Settler. This must occur by August 13th, 2018 or else this contract unwinds, with parties still respecting signed NDA agreements.

2. In the next 30 days, the Settler will sign a new agreement with the Litigating Group (as opposed to the Litigators), which will bind members of the group, which will further clarify the power of attorney(s) that Settler shall be providing, breaches of contract, that Settler does not personally owe monies owed to the Mortgage Holder and remedies and/or damages for the breaches.

3. The Parties shall have up to 60 days from now to close the settlement – through October 10th, 2018.

4. The high level terms of the settlement are that the Litigating Group will be providing US $834,000 in 4 tranches to the Settler, as further detailed below, while the Settler will be transferring to the Litigating Group almost all assets owned by Seaside Mariana, including all unencumbered lands, operating assets (including all tangible and almost all intangible assets), domains, web content, equipment, leases, contract rights, intellectual property rights used in the business of Seaside Mariana, together with all documents and entities relating to the HOA. Once all monies and land (along with the assets identified in Article I, section 6) have properly changed hands, the Parties shall indemnify each other by mutual agreement.

5. One of two exceptions to the transfers that are occurring as set out in Article I, section 4, is that Seaside Mariana will retain insurance policies and any other intangible asset that is either not transferrable, or for the benefit of SM only, or both.

6. The second of two exceptions concerns customer and mailing lists and mailing campaigns. The Settler shall be transferring to the Litigating Group all customer and prospect mailing lists (including all contact information) and mailing campaigns, both digital and analog (email, web, and snailmail). However, the parties shall co-own these assets. Settler shall assign his part of the co-ownership to a Sociedad Anonima after the close.

7. The $834,000 consists of four parts: (1) the $25,000 by August 10th, 2018; (2) $475,000 within 60 days of the first tranche, to be transferred to the named party of Settler's choice **only** after SM Closing, with Settler having full ownership of, and authority over, Seaside Mariana; (3) $234,000 as follows, to the Settler: $56,000 at the Land Closing when Litigating Group receive all their expected land as settlement, and 20% of SM land sales achieved by Litigating Group until fully paid, with a minimum of $12,000 per quarter (3 months), paid within a week or so of the end of each quarter, with the first payment beginning at the end of the second quarter after SM Closing, and then a quarterly payment every 3 months from that point onwards until the $234,000 has been paid in full and (4) then, another $100,000 to an entity of the Settler to be formed later. After the $234,000 to Settler has been paid, the Litigating Group shall continue to pay under the same quarterly program (20% of sales, but a minimum of $12,000 per quarter) to the entity until the $100,000 is fully paid.

8. These (Article I, sections 4 through 7) are the only sums and items owed to each other, and when fully transferred and paid the parties shall fully release liability to each other with regard to Seaside Mariana.

9. SM has not filed taxes since 2011, and thus Settler will work with the current owner to get all taxes filed and current through the tax year that ends June 2018. This is a necessity prior to any closing including SM Closing.

10. The Settler has bound the sellers of SM in a contract that ensures that Settler and the Litigating Group will get everything they need by or at closing, including the filed taxes. The Litigators have approved the language of this Closing Contract.

11. The Settler shall pay the costs related to the SM stock transfer. The Litigating Group shall pay the costs of the land transfer including what's necessary on property taxes to do the transfers. The parties shall pay their own attorneys.

12. The one sub-parcel that will not go to the Litigating Group is the parcel with a mortgage provided by one of the Litigating Group (the "Mortgage Holder"), also represented by Federico A. Gurdián Sacasa (attorney-at-law), unless it is most efficient to transfer it in bulk with the other land for the Litigating Group and then to the Mortgage Holder. At or just after the SM Closing, Settler shall work with the Mortgage Holder to transfer that land to the Mortgage Holder at the Mortgage Holder's expense.

13. Both Parties have entered this deal in good faith and with a lot of trust, but the Parties have offered each other mechanisms such that they do not have to rely solely on trust at each step. The Parties will work out the final details of each such step to their mutual satisfaction at each step. For example, because the $475,000 needs to go in to escrow prior to land transfer, the Settler has offered and will continue to offer any mechanism the Litigating Group desire to ensure that they will get the land, including issue by Settler of an irrevocable power of attorney to a Nicaragua attorney of the Litigating Group' choice. For the payments that will come with sales or paid each quarter, Settler does not necessarily require a mortgage on SM, and is open to Personally Guaranteed Promissory Notes.

14. Settler will continue to provide all due diligence information requested by Litigating Group, and can provide a complete package of written documents at or just after the close. 

15. Confidentiality is extremely important to complete this settlement, including the purchase aspect. The Settler has already executed NDAs (Non-Disclosure Agreements) with the Litigators. The Litigators plan to solicit funding from several more members of the group of Litigating Group. The Litigators shall ensure that those several members, as well as Federico A. Gurdián Sacasa, all sign NDAs with the Settler similar to the one provided by the Settler on Saturday August 4th, 2018, prior to disclosing information related to this settlement or other confidential information. Subsequently, all confidential information and all information relating to this deal shall be shared ONLY with the Settler, the Litigators, Senor Gurdián, and the members of the Litigating Group that have signed NDAs in the past week or that shall sign NDAs shortly.

16. Settler already has digital files of the following categories and these will be provided to Litigating Group prior to closing: Legal, Financials, Sales, Vendors, Marketing, Engineering and Design, Permits, Employees, HOA documentation and entities, Communication, Maps, Cash Liabilities, Contractual Liabilities, Pictures and Digital Collateral. Settler shall transfer all of these to the Litigating Group prior to SM Closing.

17. Ownership of the land: Except for the registered mortgage lien held by Mortgage Holder on the lots identified, Settler represents and warrants (a) that Seaside Mariana Spa & Golf Resort S.A. has clear and unencumbered title[1] to all of the aforementioned lands and (b) that, once Settler's acquisition of Seaside Mariana has been finalized (aka SM Closing), Settler will be in a position to fully execute and deliver on all of the agreements and obligations set out in this Settlement Agreement. The Parties attach the most recent Libertad de Gravamen for the lands as Exhibit A. The Libertad de Gravamen shows property that is formally Registered and thus not able to be transferred to Litigating Group.

18. Liabilities of Seaside Mariana: Settler represents and warrants that, except for the liabilities to the Litigation Group members settled by this Agreement, all existing liabilities of Seaside Mariana, including Seaside Mariana's obligation to deliver 10 Beach Front lots to a previous shareholder of Seaside Mariana, remain with the Seaside Mariana entities owned by Settler and shall not pass to Claimants or to the Litigation Group. Settler shall indemnify the Litigation Group and its members against any such claims that may arise from these obligations.

19. Settler shall ensure

    (1) that the current beneficial owners of Seaside Mariana (Kevin Fleming and Maria Rueda) disclose to the buyer of the shares (i.e. the Settler) any and all transactions that have been made, specially land transactions made, and that are pending registration in public record, and the Settler shall ensure that this information is passed on to the Litigating Group in its entirety; and

    (2) that the current owners of Seaside Mariana are prohibited from taking any further action relating to these transactions and pending transactions on behalf of any of the Seaside Mariana entities and that all Powers of Attorney issued by the current owners of Seaside Mariana are revoked with effect immediately upon SM Closing.

## Article II

1. <u>Notices</u>. All notices, demands and payments required or permitted to be given hereunder shall be in writing and may be delivered personally, by e-mail to the addresses of the Parties as set out and agreed separately between the parties. Any notice personally delivered or sent by e-mail shall be deemed to have been given and received at the time of delivery, unless otherwise proven. All Parties shall be entitled to designate new contact information by giving notice thereof to the other Parties in accordance with the terms hereof.

2. <u>Assignment/Successors.</u> This Agreement shall be binding upon all successor, assigns, heirs, agents and representatives of each of the Parties.

3. <u>Governing Law.</u> This Agreement shall be governed by and construed in accordance with the laws of San Francisco, California in the United States of America, and thus that shall be the jurisdiction and venue for this contract. (Spanish documents, which will follow Nicaraguan law, will be utilized to effectuate the land transfer).

---

[1] "clear and unencumbered" from a mortgage standpoint, in other words, there is no mortgage debt on the lands. Property taxes are owed, and there are various liens on the lands as per the most recent Libertad de Gravamen, dated April 2018, which is an Exhibit to this contract.

4.   Entire Agreement.   This Agreement may not be amended or modified, and no provisions hereof may be waived, without the written consent of the Parties.

5.   Severability.   If any provision of this Agreement shall be declared void or unenforceable by any judicial or administrative authority, the validity of any other provision and of the entire Agreement shall not be affected thereby.

6.   Titles and Subtitles.   The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting any term or provision of this Agreement.

7.   Execution.   This Agreement may be executed in counterparts and all of such counterparts taken together shall be deemed to constitute one and the same Agreement. The Parties may execute this Agreement via facsimile transmission or electronic communication and such execution and delivery shall be full, binding and proper execution and delivery without the need for the exchange of originally executed copies of this Agreement between the Parties.

8.   The parties agree they are sophisticated in business matters and have access to counsel. They also have collaborated on the drafting and editing of this contract.  Accordingly this contract will not be construed in favor or against either party including the original drafter.

[Signature page follows]

IN WITNESS WHEREOF, the Parties hereby state that they are fully empowered to act and agree to the obligations contained in this Agreement and that consequently, each one accepts each and every clause contained herein in the terms and under the conditions hereby stated.

IN WITNESS WHEREOF **CARL (KALLE) WESCOTT** has executed this Agreement on this (Day) 11 of August 2018 in the city of San Francisco, California; United States of America.

**PRINT NAME(S):**

_____Carl (Kalle) Wescott_____     _____CQKWescutt_____
(Settler Print Name)                     (Settler Signature)

.IN WITNESS WHEREOF David Crowe has executed this Agreement on this (Day) 11 of August 2018.

_____     _____
(Print Name)                          (Signature)

IN WITNESS WHEREOF Mike Lyonette has executed this Agreement on this (Day) 11 of August 2018.

_____     _____
(Mortgage Holder Print Name)          (Mortgage Holder Print Name)

**Exhibit:**

The following exhibit is an integral part of this Settlement Agreement

A.      Most recent Libertad de Gravamen



EXHIBIT A

SERIE "P"

VEINTE DIEZ CÓRDOBAS DIEZ

SEÑOR (A) REGISTRADOR (A) PÚBLICO DE LA PROPIEDAD INMUEBLE Y MERCANTIL

DE LA CIUDAD DE MANAGUA, YO, JAIRO JOSÉ MALTEZ MEDAL, MAYOR DE EDAD,

ABOGADO Y NOTARIO PÚBLICO, DE ESTE DOMICILIO, Y PORTADOR DEL CARNÉ DE

IDENTIDAD DE LA CORTE SUPREMA DE JUSTICIA NÚMERO 11516, LE SOLICITO A USTED ME CERTIFIQUE LIBERTAD

DE GRAVAMEN DE PROPIEDAD HORIZONTAL DE LA FINCA NÚMERO CUATRO MIL DOSCIENTOS CINCUENTA Y UNO

(4251) PH, TOMO NÚMERO CUARENTA Y SIETE PLECA CUARENTA Y NUEVE (47/49) PH, FOLIOS NÚMERO TREINTA Y

UNO PLECA TRESCIENTOS GUIÓN UNO PLECA SESENTA Y SEIS (31/300 Y 1/66) ASIENTO PRIMERO (1) DE LA

COLUMNA DE INSCRIPCIONES DE LA SECCIÓN DE DERECHOS REALES

Managua, viernes 21 de julio del 2017

Abogado y Notario Público

Carné No 11516

LA SUSCRITA REGISTRADORA AUXILIAR DEL DEPARTAMENTO DE MANAGUA CERTIFICA: Que

la finca inscrita bajo el No. 4251-PH; Tomo 47-PH; Folios 31 al 300; Tomo 49-PH; Folios 1 al 66;

Tomo 138-PH, Folios 91 al 104, Asiento 1 y 2, Columna de Inscripciones, sección de Derechos

Reales, Libro de Propiedades Horizontales, de este Registro Público. Pertenece el resto a: Seaside

Marina Spa & Golf Resort Sociedad Anónima. Y tiene hipoteca a favor de Michael Francis

Lyonette, tan solo por lo que hace a los Módulos Nos. 18, 19, 29, 30, 31, por las siguientes sumas: (1)

Trescientos sesenta y tres mil ochocientos cincuenta y dos dólares equivalente a siete millones

ochocientos noventa y cinco mil quinientos ochenta y ocho córdobas con cuarenta centavos de

córdobas; (2). Cuatrocientos tres mil setecientos noventa y tres dólares equivalente a ocho millones

setecientos sesenta mil ciento treinta y ocho córdobas con diez centavos de córdobas, para un monto

total de Dieciséis millones seiscientos cincuenta y cinco mil setecientos veintiséis córdobas equivalente a

setecientos sesenta y siete mil quinientos cuarenta y cinco dólares, posteriormente se amplió dicho

crédito hasta la suma de veintiséis millones setecientos ochenta y nueve mil seiscientos setenta y tres

córdobas con treintiún centavos equivalente a un millón ciento cuarenta y un mil trescientos cuarenta

seis dólares. En asientos 1 y 2 ***** También tiene Inscritas Provisionalmente venta de los

siguientes lotes indivisos: 1) A favor de Thomas Edward Austin, identificado como lote GB, con un área de mil trescientos veinticuatro punto novecientos cinco metros cuadrados; 2) A favor de Trevin Martin Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto novecientos sesenta y dos metros cuadrados; 3) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GQ, con un área de novecientos cincuenta y uno punto ciento veinticuatro metros cuadrados; 4) A favor de Judith Gail Madgett y Robert Daniel Madgett, identificado como lote GBU, con un área de ochocientos cincuenta y siete punto seiscientos ochenta y uno metros cuadrados, inscrito el 22-05-2012, pero se encuentra pendiente la firma del registrador; 5) A favor de Thomas Edward Austin, identificado como lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro metros cuadrados; 6) A favor de Thomas Edward Austin, identificado como lote OVL, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados; 7) A favor de Thomas Edward Austin, identificado como lote RM, con un área de un mil setecientos ochenta y ocho punto cero noventa y cuatro metros cuadrados; 8) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros cuadrados; 9) A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 10) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados; 11) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, inscrita el 22-05-2012, pero se encuentra pendiente de firma del registrador; 12) A favor de Thomas Edward Austin, identificado como lote GAL, con un área de ochocientos veintiún punto setecientos veinticinco metros cuadrados; 13) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVA, con un área de un mil ochocientos sesenta y seis punto setecientos setenta y tres metros cuadrados; 14) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos cincuenta y nueve metros cuadrados; 15) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 16) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GST, con un área de un mil trescientos treinta y ocho punto cuatrocientos trece metros cuadrados; 17) A favor de Anthony David Bowman y Carol Anne Bowman, identificado como lote GCR, con un área de un mil

ciento diecisiete punto quinientos setenta y tres metros cuadrados, inscrita el 22-05-2012, pero se encuentra pendiente de la firma del Registrador; 18) A favor de Anthony David Bowman y Carol Anne Bowman, identificado como lote GCR, con un área un mil ciento diecisiete punto quinientos setenta y tres metros cuadrados; 19) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, 20) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GBV, con un área de ochocientos cincuenta y siete punto seiscientos ochenta y un metros cuadrados; 21) A favor de Thomas Edward Austin, identificado como Lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro metros cuadrados; 22) A favor de Thomas Edward Austin, identificado como lote OVL, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados, 23) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GQ, con un área de novecientos cincuenta y uno punto ciento veinticuatro metros cuadrados; 24) A favor de Thomas Edward Austin, identificado como lote GB, con un área de un mil trescientos veinticuatro punto novecientos cinco metros cuadrados; 25) A favor de Trevin Martin Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto novecientos sesenta y dos metros cuadrados; 26) A favor de Thomas Edward Austin, identificado como lote RM, con un área un mil setecientos ochenta y ocho punto cero noventa y cuatro metros cuadrados; 27) A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 28) A favor de Thomas Edward Austin, identificado como lote GAL, con un área de ochocientos veintiuno punto setecientos veinticinco metros cuadrados; 29) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVA, con un área de un mil ochocientos sesenta y seis punto setecientos setenta y tres metros cuadrados; 30) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos cincuenta y nueve metros cuadrados; 31) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, 32) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados; 33) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros cuadrados; 34) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GST, con un área de un mil trescientos treinta y ocho punto cuatrocientos trece

metros cuadrados; **35)** Tiene inscrito provisionalmente Dacion en pago a favor Desarrollos Inmobiliarios Tejas, Sociedad Anónima sobre los siguientes lotes indivisos: **1) Lote Nº 20**, con un área de diecinueve mil doscientos setenta y cinco punto novecientos veintitrés metros cuadrados; **2) Lote Nº 28**, con un área de ciento noventa y dos mil novecientos sesenta y cuatro punto ciento ochenta y cinco metros cuadrados; **3) Lote Nº 21**, con un área de treinta y nueve mil quinientos ochenta punto cero noventa y seis metros cuadrados; **4) Lote Nº 22**, con un área de nueve mil cincuenta y seis punto seiscientos setenta y nueve metros cuadrados; **5) Lote Nº 23**, con un área de cuatro mil setecientos sesenta y uno punto doscientos cuarenta y tres metros cuadrados; **6) Lote Nº 25**, con un área de sesenta y un mil quinientos treinta punto setecientos setenta y cinco metros cuadrados, inscrita con fecha veinte de junio del año dos mil trece, pero se encuentra pendiente la firma y sello del registrador. **36)** Tiene anotada demanda en la vía ordinaria con acción de pago de daños y perjuicios, a solicitud de Edward Albert Cole por la suma de cuarenta y ocho millones ochocientos treinta y tres mil setenta y nueve córdobas con catorce centavos equivalente a dos millones setenta y tres mil diez dólares con cincuenta centavos. **37)** Tiene anotada **Dacion en Pago a** favor de los señores: **Edward Albert Cole**, los siguientes lotes. 1) Lote GSA, con un área de: un mil ciento treinta y siete punto setecientos noventa y tres metros cuadrados, 2) Lote GSB, con un área de: un mil ochenta y siete punto diecisiete metros cuadrados, 3) Lote GSC, con un área de: un mil ciento cincuenta y seis punto ochocientos un metros cuadrados, 4) Lote GSD, con un área de: un mil ciento setenta y siete punto doscientos noventa y seis metros cuadrados, 5) Lote GSE, con un área de un mil ciento cincuenta y tres punto seiscientos diez metros cuadrados, 6) Lote GSF, con un área de un mil ciento veinticinco punto setecientos cinco metros cuadrados, 7) Lote GSG, con un área de un mil noventa y siete punto ochocientos metros cuadrados, 8) Lote GSH, con un área de un mil setenta y uno punto trescientos setenta y tres metros cuadrados, 9) Lote GSI, con un área de un mil ciento cuarenta y un punto noventa y tres metros cuadrados, 10) Lote GSI, con un área de un mil trescientos setenta y dos punto cero cero seis metros cuadrados, 11) lote GSK, con área de un mil ochocientos treinta y uno punto cuatrocientos cincuenta y uno metros cuadrados, 12) Lote GSL, con un área de un mil ochocientos veintidós punto novecientos setenta y ocho metros cuadrados, 13) Lote GSM, con un área de un mil trescientos sesenta y ocho punto novecientos treinta y uno metros cuadrados, 14) Lote GSN, con un área de un mil ciento diez punto novecientos cincuenta y ocho metros cuadrados, 15) Lote GSO, con un área de un mil ciento cuarenta y nueve punto cuatrocientos cinco metros cuadrados, 16) Lote GSP, con un área de un mil doscientos cincuenta y nueve punto setecientos noventa y cinco

metros cuadrados, 17) Lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados, 18) Lote GSV, con un área de un mil trescientos veintiséis punto sesenta y seis metros cuadrados, 19) Lote SSW, con un área de un mil trescientos setenta punto quinientos dieciocho metros cuadrados, 20) Lote GSX, con un área de un mil cuatrocientos cuarenta y uno punto cuatrocientos seis metros cuadrados, 21) Lote GSY, con un área de un mil seiscientos noventa y dos punto ciento cincuenta y uno metros cuadrados, 22) Lote GS2, con un área de un mil novecientos sesenta y cinco punto cuatrocientos dieciocho metros cuadrados, 23) Lote GSAA, con un área de dos mil doscientos veintisiete punto setecientos cincuenta y cinco metros cuadrados, 24) Lote GSAB, con un área de dos mil quinientos dieciocho punto doscientos noventa y uno metros cuadrados, 25) Lote GSAC, con un área de cuatro mil doscientos treinta punto trescientos cincuenta y dos metros cuadrados, 26) Lote GSDA, con un área de cuatro mil cuatrocientos treinta y seis punto ciento treinta y uno metros cuadrados, 27) Lote GSAE, con un área de tres mil novecientos setenta y cuatro punto novecientos veinticinco metros cuadrados, 28) Lote GSAF, con un área de cuatro mil ciento cuarenta punto ciento cuarenta y dos metros cuadrados, 29) Lote GSAG, con un área de cuatro mil seiscientos cuarenta y dos punto trescientos sesenta y cinco metros cuadrados, 30) Lote GCA, con un área de tres mil sesenta y ocho punto ciento doce metros cuadrados, 31) Lote GCB, con un área de tres mil novecientos cincuenta y nueve punto doscientos ochenta y tres metros cuadrados, 32) Lote GCC, con un área de cuatro mil seiscientos veintiséis punto setecientos veinte metros cuadrados, 33) Lote GCD, con un área de cuatro mil doscientos veintiún punto seiscientos treinta y dos metros cuadrados, 34) Lote GCS, con un área de tres mil setecientos veintiséis punto seiscientos cincuenta y cinco metros cuadrados, 35) Lote GCF, con un área de tres mil ciento cincuenta y seis punto doscientos cuarenta y tres metros cuadrados, 36) Lote GCG, con un área de dos mil seiscientos ochenta y cuatro punto setecientos cuarenta y siete metros cuadrados, 37) Lote GCH, con un área de dos mil cuatrocientos noventa y nueve punto quinientos treinta metros cuadrados, 38) Lote GCI, con un área de dos mil seiscientos treinta y siete punto trescientos ochenta metros cuadrados, 39) Lote GCI, con un área de dos mil quinientos noventa y dos punto novecientos veinte metros cuadrados, 40) Lote GCK, con un área de dos mil cuatrocientos dieciséis punto ochocientos cuarenta y dos metros cuadrados, 41) Lote GCL, con un área de dos mil seiscientos cincuenta y dos punto cuatrocientos setenta y cuatro metros cuadrados, 42) Lote GCM, con un área de dos mil cuatrocientos treinta y seis punto novecientos veinte metros cuadrados, 43) Lote GCN, con un área de dos mil nueve punto quinientos setenta y uno metros cuadrados, 44) Lote No.27, con un área de

doscientos cuarenta y dos mil ochocientos setenta y cinco punto seiscientos ochenta y seis metros cuadrados, 45) Lote No.24, con un área de doce mil ochocientos cuarenta y dos punto doscientos veintiuno metros cuadrados, 46) Lote No. 26, con un área de cincuenta y siete mil seiscientos diecinueve punto seiscientos sesenta y ocho metros cuadrados. *** 38) Promesa de venta, a favor de PKR Holding, Sociedad Anonima, sobre los siguientes lotes, a) lote OVK, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados, b) lote GAY, con un área de un mil cuatrocientos treinta punto setecientos treinta y siete metros cuadrados, c) lote GAX, con una rea de un mil cuatrocientos veintinueve punto seiscientos sesenta y tres metros cuadrados, por la suma de tres millones seiscientos treinta y un mil seiscientos ochenta y cinco córdobas con sesenta centavos de córdobas. *** 39) promesa de venta, a favor de Advantage Ventures LLC, un lote con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, por la suma de dos millones ochocientos noventa y nueve mil setecientos dos córdobas con treinta y cinco centavos, equivalente a ciento nueve mil quinientos dolares. *** 40) Promesa de venta a favor de Paul Brian Ciceri, un lote de terreno identificado como GAV, con un área de un mil cuatrocientos siete punto ochocientos setenta y ocho metros cuadrados, por la suma de setecientos ochenta y dos mil treinta y cuatro córdobas equivalente a veintinueve mil trescientos ochenta y dos dolares. *** 41) Demanda, ordinaria con acción de resolución de contrato, para que por sentencia firme y declare, lo siguiente: a) que se deje sin efecto el contrato de oferta de compra sobre el lote OVGG, b) que se deje sin efecto el contrato de oferta de compra sobre el lote NGJ, c) devolución de precio mas intereses, d) pago de los costos daños y perjuicios ocasionados por el incumplimiento. *** 42) Demanda en la via ordinaria con acción de resolución de contrato por incumplimiento para que por sentencia se declare lo siguiente: a) disuelto el contrato de promesa de venta , b) devolución de precio mas intereses, c) pago de los costos daños y perjuicios ocasionados por el incumplimiento. ***43) Demanda ordinaria con acción de resolución de contrato por incumplimineto, promovida por Darrell Lee y Bushnell y Amy Bushnell, *** 44) Demanda ordinaria con acción de resolución de contrato en consecuencia de conformidad al artículo 1061 y 1063 Pr. Declareseles rebeldes para todos los efectos de la presente demanda. En asientos 1 al 42, 41 y 43 A solicitud de parte interesada extiendo el presente certificado en la ciudad de Managua a veintisiete dia del mes de Julio del dos mil diecisiete.

CARL A. WESCOTT
MOVENPICK APARTMENTS/HOTEL #509
BUR DUBAI, 19TH STREET, OUD METHA
ACROSS AMERICAN HOSPITAL
DUBAI, UAE (UNITED ARAB EMIRATES)
*in propria persona*
CARLWSOJ@GMAIL.COM
+971 4 336 6000

## UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF CALIFORNIA
## NORTHERN DISTRICT

| | |
|---|---|
| CARL A. WESCOTT, | Case No. 3:20-cv-06456-JD |
| Plaintiff, | |
| vs. | **EXHIBIT C: SWORN DECLARATION OF CARL A. WESCOTT** |
| DAVID CROWE, BRAD MALCOLM, MIKE LYONETTE, COLIN ROSS, MICHAEL JIMENEZ, et al. | |
| Defendants | |

I, Carl A. Wescott, hereby swear under penalty of perjury of the laws of California and of the United States of America, that the following facts are true, to the best of my memory, recollection, and belief:

1. I am the Plaintiff in the above-captioned case at Bar.

2. I am quite familiar with all of the circumstances of this case from my own viewpoint (obviously, I do not yet know what internal communications occurred between the Defendants).

3. I am 53 years old, and a U.S. citizen.

4. I am competent to testify. Were I to be called to testify in this matter, my testimony would be as follows, and until that point, my written testimony is such:

a.  The facts cited in my legal complaint and in my Response to Defendants' Motion to Dismiss are all true.

b.  I am indeed on the California Vexatious Litigant list.

c.  When I first had to represent myself in my family law case for marital dissolution (as I had no money for an attorney) I made many filings over denied visitations with my children, and didn't make it clear enough that each filing (Orders to Show Cause, for example, because the denied visitations violated a Court order) were for a different denied visitation, and thus it was perceived that I was re-filing Requests for Orders and Orders to Show Cause that I had already lost.

d.  I have great respect for our Courts and follow Court orders to the best of my ability.

e.  Though I am not an attorney, I have learned a lot about the law and civil procedure, which is important as I still cannot afford an attorney.

f.  I used to be a California resident.

g.  I filed 11 cases in California Superior Court under CCP 391.7 in 2017 and 2018 and 2019 and was approved to file the first time 10 of 11 times.

h.  I had many California cases dismissed against me in the past, but those cases were not without merit.

i.  For the relevant California cases (as alluded to above), I've survived 90%+ of the 391.7s as well as 90%+ of the Motions to Dismiss filed against my cases, as one indicator of merit, or at least perceived merit.

j.  I was rendered homeless and my possessions stolen, twice, during the relevant timeframes.

k.  Without a computer or an address, I was unable to receive updates from the Court nor make filings.

l.  That is the main reason my California cases were dismissed in 2018 and 2019; I was simply unable to continue with the cases, without a laptop or a place to receive mail.

m.  I tried working in the public libraries of San Francisco, which restrict you to two hours of library time on their computers, and it wasn't enough.

n.  I focused on survival instead of the legal cases, as continuing to eat and finding places to work and sleep were more important to me.

o.  Just like in Maslow's hierarchy of needs, one needs the basics as the foundation for many activities.

p.  I have a laptop now and the ability to print and scan which makes a significant difference in my ability to perform many tasks that are important in my life.

q.  I did file 17 cases in Arizona when I resided in Arizona from March through July 2020, including the *Wescott versus Crowe, Malcolm, Lyonette, et al.* legal complaint that is now before this Court.

r.  The reason this legal complaint was originally filed in Arizona is that there were three signed contracts with these Defendants, and one of them had a choice of venue clause indicating Arizona Courts (more specifically it stated "Phoenix, Arizona").

s.  The first contract had a forum selection clause of the Courts of "Phoenix, Arizona"; hence the filing in that Maricopa County (the County that much of Phoenix is in) venue seeking the Court to assert jurisdiction over these Defendants.

t.  The second and third relevant contracts had a forum selection clause of San Francisco, California (Exhibit B, second contract of August 11th, 2018).

u.  I figured that I could thus file this case in either Arizona or California and filed in Arizona for my convenience at the time.

v. I am not a Vexatious Litigant in any District Court, including this Court.

w. This legal complaint was not filed for the purposes of harassment or delay.

x. Rather, these Defendants entered in to binding contracts with me, and then, after six months of working together, a few days before the final close of the deal I had put together, the Defendants breached their contract, costing the me US $334,000 in payments the Defendants were obligated to make to me and larger sums I would have earned had they closed.

y. The Defendants later repudiated the contract and committed numerous tortious acts that they should be embarrassed by.

z. I seek redress in Court so that these Defendants will be required to pay for the damages they've caused.

aa. That will change my financial situation considerably.

bb. My California legal complaints (that were filed in 2017, 2018, and 2019 – I did not file any in 2020) have not been dismissed due to a lack of merit; quite the contrary.

cc. I emailed Mr. Romero last week to give him an opportunity to cite specific examples of my alleged Rule 8 violations in the legal complaint. A true and correct copy of that email is in Exhibit D.

dd. What Mr. Romero is claiming (that these defendants are not a party to the contract) is factually incorrect.

ee. David Crowe and Mike Lyonette are parties to all three contracts (the second, which replaced the first, is in Exhibit B; the third contract are the Non-Disclosure Agreements Mr. Crowe and Mr. Lyonette each signed).

ff. Mr. Malcolm, Mr. Ross, and Mr. Jimenez are parties to the first and second contracts. I believe all three of them also signed Non-Disclosure Agreements, too (the third contract).

gg. The second/final Sales Contract (Exhibit B) clearly states that I am one of the parties to the contract, and that the other party is the group of litigators in the litigating group that purchased lots, condominiums, and bungalows at Seaside Mariana, that "have a Nicaraguan lawsuit together".

hh. The identities of those twenty-two people were provided by David Crowe at the time of the contract signing, and the identities are also a matter of public record.

ii. The twenty-two people are David Crowe, Mike Lyonette, Thomas P. Madden, Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Sandra Winfrey; Brian Putze; Colin Ross; Brad Malcolm; Michael Jimenez; Gustavo Varela, Robert Crowe, Bernadette Brown, Federico Gurdian, and Terencio Garcia. Mr. Rau is one of them.

jj. The twenty-two are bound together in a partnership for that litigation and for the contract with me in Exhibit B (The NDAs were signed individually).

kk. Incidentally, the contract attached to Exhibit B is signed just by me, but Mr. Crowe and Mr. Lyonnette signed that contract on behalf of the twenty-two litigators that are their partners in the litigation against Seaside Mariana and its owner (listed in section ii above).

ll. David Crowe, Mike Lyonette, and I created the contract in Exhibit B. In retrospect, I wish I had had an attorney involved, as this issue would have been made more clear in the contract itself rather than in other documents (including ones that are a matter of public record) that the contract refers and alludes to.

mm.    To further dispel any confusion, my mother is from Finland and the name Kalle (that is referenced in the Sales Contract – Carl "Kalle" Wescott) is the equivalent name as Carl. I use both names (like Carl/Carlos for English/Spanish or Karl in Germany).

nn. Mr. Romero is also incorrect about the sequence of events.

oo. He alleges (with no supporting evidence) that the seller terminated the contract prior to the October 2018 breach of Crowe, Lyonette, Malcolm, Ross, Jimeneze, and their co-Defendants.

pp. The Defendants' initial breach was in October when we were at the closing table (figuratively; I was about to fly to the closing).

qq. The sellers very much needed the US $475,000 they would have received.

rr. It is true that later (I believe it was December 2018, two months later) Kevin Fleming sent me an email stating that he was terminating my purchase contract, though Mr. Fleming did not have the contractual right to do so, without one other thing he would have been required to do first, as per my Closing Contract with the Fleming and the other sellers of Seaside Mariana.

ss. In our discussions for closing logistics with Mr. Crowe, I had offered a limited power of attorney, or special power of attorney before the closing, in favor of his wife, for her to do the transfer of Seaside Mariana ("SM") land right after the SM purchase/close.

tt. That land, hundreds of acres with 2 kilometers of beachfront, was part of the consideration for the Sales Contract on my side of the set of contractual obligations.

uu. That land is also worth quite a bit more than US $334,000.

vv. Kevin Fleming had paid US $4 million for the original SM parcel, raw, before getting entitlements, twelve years ago.

ww.     The cited reason (as stated to me by David Crowe) for the Defendants to breach the contract was that Mr. Ted Cole had filed a lawsuit against Seaside Mariana just before our close of the Seaside Mariana purchase. Mr. Cole's lawsuit was filed in September 2018.

xx. I did not find out about the Cole lawsuit until October 2018 – David Crowe was the person who initially informed me of its existence, in citing his reason, on behalf of Mr. Rau and the other twenty-one (21) defendants, for why they were breaching the contract and closing that they had expressly and contractually committed to.

yy. The first contract we signed had a contingency for the Defendants' due diligence.

zz. When the Defendants completed their due diligence, they passed US $25,000 through (which went to the sellers), and they signed and committed to the new, second contact (in Exhibit B), which committed them to the investment, funding and closing with no contingency.


FURTHER AFFIANT SAYETH NAUGHT

CARL A. WESCOTT
November 3rd, 2020

 Gmail                    Carl Wescott <carlwsoj@gmail.com>

## alleged Rule 8 issues

1 message

**Carl Wescott** <carlwsoj@gmail.com>                                    Tue, Oct 27, 2020 at 1:57 PM
To: Troy Romero <TRomero@romeropark.com>
Cc: Kathy Koback <kkoback@romeropark.com>
Bcc: Carl Wescott <carlwsoj@gmail.com>, Carl Wescott <carlwescott2020@gmail.com>

Mr. Romero, I'm working on my response to your Motion to Dismiss.

You claim that I make "verbose and redundant allegations" and that I fail to "follow the rules." You also state that my legal complaint should be dismissed due to "immaterial verbiage."

While I'm not an attorney, I re-read the complaint and could not find the redundant allegations nor the "immaterial verbiage", unless that's the background I provided to set the context. I'm also not seeing any places where I've broken any rules that I could find (though of course the complaint was drafted for Superior Court and thus needs some changes to conform to District Court standards.

I do agree that the Complaint could have been more artfully pled to show (as much as possible before discovery) that the elements for each cause of action are indeed there.

Would you be so kind as to point to:

* any particular allegation that is too verbose

* the redundant allegations

* the immaterial verbiage

* any place where a rule is broken, and what that rule is?

Thank you.

--CAW  +971 4 336 6000  x509

## PROOF AND CERTIFICATE OF SERVICE BY ELECTRONIC MAIL

I, the undersigned, Carl A. Wescott, certify and declare as follows:

I am a citizen of the United States; that I am over the age of eighteen (18) years.

While I am a party to the case, I have an agreement for bilateral electronic service with the Defendants' attorneys at the law firm of Romero Park, P. S.

On November 3rd, 2020, pursuant to said electronic service agreement, I emailed the attached document (Plaintiff's Response to Defendants' Motion to Dismiss) via electronic mail addressed to Ms. Kathy Koback and Mr. Troy Romero at Romero Park, P.S., utilizing their email addresses through which they regularly communicate with me.

I certify and declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

CARL A. WESCOTT
November 3rd, 2020

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

**PRIORITY MAIL**
**FLAT RATE ENVELOPE**
POSTAGE REQUIRED



**UNITED STATES**
**POSTAL SERVICE.**

Retail

**US POSTAGE PAID**
**$7.75**

Origin: 85281
11/03/20
0384370811-06

**PRIORITY MAIL 2-DAY®**

1 Lb 3.70 Oz

**1006**

EXPECTED DELIVERY DAY: 11/06/20

C004

SHIP
TO:
450 GOLDEN GATE AVE
FL 16
San Francisco CA 94102-3426

**USPS TRACKING® NUMBER**



9505 5137 7551 0308 3759 46

**UNITED S**
**POSTAL S**

■ Expected delivery date speci
■ Most domestic shipments inc
■ USPS Tracking® included for
■ Limited international insuranc
■ When used internationally, a

*Insurance does not cover certain item
Domestic Mail Manual at http://pe.usps
** See International Mail Manual at http

**FLAT RATE EN**
ONE RATE ■ ANY WEIGHT

**TRACKED ■ INSURED**


PS00001000014

EP14F May 2020
OD: 12 1/2 x 9 1/2

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

**FROM:**

Carl Wescott
c/o David Entz
1519 E Cedar St
Tempe, AZ 85281

**RECEIVED**
TO
NOV 05 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DIST. OF CALIFORNIA

Clerk of the Court
US District Court for the
District Court of California
(Northern District)
450 Golden Gate Avenue, 16th Floor
San Francisco, CA 94002
United States of America

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; May 2020; All rights reserved.



## FLAT RATE ENVELOPE

ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

## TRACKED ■ INSURED



PS00001000014

EP14F May 2020
OD: 12 1/2 x 9 1/2

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 20 lbs.