**FILED**

**FEB 17 2021**

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

1   CARL A. WESCOTT
2   8210 E. VIA DE LA ESCUELA
    SCOTTSDALE AZ 85258
3   *in propria persona*
    CARLWSOJ@GMAIL.COM
4   +1 936 937 2688

5

6              **UNITED STATES DISTRICT COURT**

7              **NORTHERN DISTRICT OF CALIFORNIA**

8   CARL A. WESCOTT,                    Civil Action No. 3:20-cv-06456-JD

9                   Plaintiff,          **PLAINTIFF'S [AMENDED]**
                                        **COMPLAINT FOR BREACH OF**
10          vs.                         **CONTRACT, PROMISSORY**
                                        **FRAUD; PROMISSORY**
11                                      **ESTOPPEL; NEGLIGENT**
    DAVID CROWE;                        **MISREPRESENTATION;**
12  MIKE LYONETTE;                      **TORTIOUS INTERFERENCE**
    JEFF RAU;                           **WITH CONTRACTUAL**
13  COLIN ROSS;                         **RELATIONS; NEGLIGENT**
    BRAD MALCOLM;                       **INTERFERENCE WITH**
14  MICHAEL JIMENEZ;                    **CONTRACTUAL RELATIONS;**
                                        **INTENTIONAL**
15                                      **INTERFERENCE WITH**
                    Defendants.        **PROSPECTIVE ECONOMIC**
16                                      **ADVANTAGE; NEGLIGENT**
                                        **INTERFERENCE WITH**
17  + DOES 1 through 50                 **PROSPECTIVE ECONOMIC**
                                        **ADVANTAGE; BREACH OF THE**
18                                      **COVENANT OF GOOD FAITH AND**
                                        **FAIR DEALING; & NEGLIGENT**
19                                      **INFLICTION OF EMOTIONAL**
                                        **DISTRESS**
20
                                        JURY TRIAL REQUESTED
21

22
                                                                          1
23  **PLAINTIFF'S [AMENDED] COMPLAINT FOR BREACH OF CONTRACT;**
    **PROMISSORY FRAUD; PROMISSORY ESTOPPEL; NEGLIGENT**
24  **MISREPRESENTATION; TORTIOUS INTERFERENCE WITH**
    **CONTRACTUAL RELATIONS; NEGLIGENT INTERFERENCE WITH**
25  **CONTRACTUAL RELATIONS; INTENTIONAL INTERFERENCE WITH**
    **PROSPECTIVE ECONOMIC ADVANTAGE; NEGLIGENT**
26  **INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**
    **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; &**
    **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

Plaintiff Carl A. Wescott, proceeding *pro se,* complains of Defendants David Crowe, Mike Lyonette; Jeff Rau; Colin Ross, Brad Malcolm, and Michael Jimenez, and in support of his Complaint, the Plaintiff states as follows.

**PARTIES**

1. The Plaintiff is a resident of Scottsdale, Arizona.

2. The Defendants are a set of individuals (David Crowe, Mike Lyonette; Jeff Rau; Colin Ross; Brad Malcolm, Michael Jimenez) who are a subset of the twenty-two positively identified and confirmed individuals (partners) who entered in to a contract with the Plaintiff to fund his US $500,000 purchase of a company ("Seaside Mariana") and pay him an additional $334,000 in exchange for the Plaintiff transferring the 1000 acres of beach land owned by that company to them. (The full name of the company was and is Seaside Mariana Spa and Golf Resort, but in this legal complaint the company and the development project shall be referred to the same way the parties refer to it, as "Seaside Mariana" or "SM")

3. Thomas Madden is an investment banker who is apparently unlicensed, who is one of the group of twenty-two (22) individuals.

4. Mr. Madden, a former Washington resident, was censured by the State of Washington Department of Financial Institutions Securities Division in 2016 (Exhibit A), for violations of the Securities Act of Washington RCW 21.20.010 and RCW 21.20.040, including through Madden's company Madcon Company, Inc. The name "Mad Con" is telling. Mr. Madden moved from Washington to Chandler, Arizona. Mr. Madden and his wife Leslie then were charged with fraud and further securities fraud violations in 2018 (violations of the Securities

Act of Arizona A.R.S. §§ 44-1801 through 44-2126) by the Arizona Corporation Commission (Exhibit B).

5. On December 18th, 2020, the Commission ordered Mr. Madden to pay $3,284,792 in restitution and a $75,000 administrative penalty for defrauding at least 79 people in connection with selling them stock in start-up companies (Order S-21042A-18-0059.)

6. Mr. Madden played a key role in a further repudiation of the Plaintiff's contract after the group of partners breached the contract by pulling out of the deal relatively last-minute, just a few days before the scheduled closing.  Just five months after Defendants pulled out of the deal with Plaintiff, breaching their contract, stating they were not interested in the Seaside Mariana land, Mr. Madden secretly contacted Kevin Fleming, one of the sellers of Seaside Mariana, wishing to purchase the Seaside Mariana company and the land, attempting to circumvent the Plaintiff despite the contracts and agreements with the Plaintiff, including a non-circumvent.

7. Mr. Madden has settled with the Plaintiff and was dismissed from this legal complaint with prejudice.

## VENUE

8. Venue is appropriate in this Court as the relevant contract had a forum selection clause naming San Francisco as the venue for litigation.  Furthermore, the Defendants requested a change of venue to this Court.  This Court can therefore assert personal jurisdiction over these Defendants.

## FURTHER ALLEGATIONS REGARDING CONSPIRACY

9. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, David Crowe, Robert Crowe, Mike Lyonette; Thomas Madden; Taylor Collins; Jeff Rau;

Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Bernadette Brown; Sandra Winfrey; Brian Putze, Colin Ross, Brad Malcolm, Michael Jimenez, Federico Gurdian, Terencio Garcia, and Gustavo Varela, as individuals, in addition to acting for himself/herself and on his/her own behalf individually, as well as for the benefit of his or her marital community (if any), is and was acting as the agent, servant, employee, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the other Defendants (individual and entities) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

10. Plaintiff further alleges on information and belief that the acts and non-acts of each of the Defendants were fully ratified by each and all of the other Defendants.  Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

11. In addition, upon information and belief, there exist one or more nefarious corporate, trust, LLC and/or other entity type Defendants involved in these conspiracies, currently unknown to Plaintiff.   They shall emerge with the benefit of legal discovery.

12. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, any and all such corporate entities, in addition to acting for itself and for its own behalf, was acting as the agent, servant, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants (entity and individual) and

4

1    within the course, scope, and authority of that agency, service, employment, representation, and

2    conspiracy.

3  13. Plaintiff further alleges on information and belief that the acts of each of the Defendants were

4    fully ratified by each and all of the Defendants.  Specifically, and without limitation, Plaintiff

5    alleges on information and belief that the tortious actions, failures to act, breaches, and

6    negligence alleged herein and attributed to one or more of the specific Defendants were

7    approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy

8    with all other Defendants (individual and corporate).

## CASE SUMMARY

The Plaintiff has included a brief case summary in plain language as Exhibit C (Sworn to be true in Exhibit F, Sworn Affidavit of Carl A. Wescott).

## BACKGROUND NARRATIVE INCLUDING THE PARTIES' CONTRACT

14. The Plaintiff was an experienced international real estate developer focusing on residential developments in Latin America.  The Plaintiff is now gaining some insight into the distressed asset markets, especially in the cases of projects that had significant economic viability but have foundered for reasons unrelated to that viability, often involving politics, personalities or fraud. (Sworn to be true, as is each successive paragraph, in Exhibit F, Sworn Affidavit of Carl A. Wescott).

15. The Plaintiff was reasonably successful until the global meltdown and credit crunch of 9/2008. With the global impact of said credit crunch and the leverage the Plaintiff had applied to his real

estate holdings, the Plaintiff eventually succumbed to those forces and declared chapter 7

bankruptcy.

16. Post-bankruptcy, the Plaintiff searched for distressed real estate assets that he could acquire and

turn around. He was familiar with Seaside Mariana ("SM"), an ambitious development on

approximately 1000 acres on the Montelimar coast west of Managua, Nicaragua. Seaside

Mariana had at one point featured a Jack Nicklaus designed golf course and a Wyndham hotel in

its plans before the wheels fell off Seaside Mariana as well due to the same global pressures.

17. SM was an attractive investment and development opportunity for the original developer, Kevin

Fleming, for at least the following reasons:

      (i)      The real estate was prime in terms of location and amenities;

      (ii)     At the time of initial investment, the market was rising faster than linearly;

      (iii)    Costa Rica to the South had already surfed a 20-year wave of real estate

                  equity appreciation, and for some product types there was an order of

                  magnitude difference in pricing;

      (iv)    Nicaragua was attractive for American retirees in particular because of its

                  low cost of living, level of safety, accessibility (including airlift), and

                  desirable climate.

18. Most of those reasons were relevant more recently to the Plaintiff as well for his investment

consideration.

19. Further, the intangible assets associated with SM were sound and mostly in place, including

plans, permits, designs, and marketing material.

20. There were a few other intangible assets owned by SM that the Plaintiff found particularly interesting and compelling.

21. The value of the project was, to a material degree, artificially depressed by more recent market conditions and bad word of mouth and internet postings concerning the lack of infrastructure put in by the original developer, leading to further relevant issues.

22. The Plaintiff blushes to admit he has entered contract to purchase SM three (3) times. The first time he entered contract, the Plaintiff saw an opportunity to buy SM for a highly attractive price (US $500,000, plus some capped deferred payments), solve the issues, and complete the development, and had a backer who would provide financial support for the project.

23. Most recently, the Plaintiff entered into contract ("the SM Purchase Contract") to purchase SM (either the company itself or the real estate, at his option) in 2018, with an anticipated close date (after some revisions, addenda, and extensions) of October 15th, 2018.

24. The Plaintiff planned to purchase the SM company.

25. Lacking in capital, the Plaintiff entered discussions with several investors to back the purchase.

26. More recently, in August 2018, the Plaintiff entered in to a contract with investors, who were familiar with the relevant properties who agreed to fund 100% of the costs of the purchase in exchange for certain land owned by SM (the Sociedad Anonima).

27. That contract shall be referred to as the "Funding Contract", and is attached hereto as Exhibit D.

28. To dispel any confusion over identities in the contract, the Plaintiff, Carl Wescott, is sometimes referred to by his Finnish name "Kalle", or the combination Carl "Kalle" Wescott.

29. To further dispel any potential confusion over the language of the funding contract or its meaning, the investors who were parties to the Funding Contract had filed litigation against

7

Seaside Mariana, the company that the Plaintiff was purchasing. Therefore, the group of twenty-two investors (the same set of people who were the initial twenty-two (22) Defendants in Maricopa County Superior Court case CV2020-006232) who were the parties to that litigation are referred to as the "Litigating Group."

30. The Plaintiff did not want ongoing litigation against the company he was purchasing, and he had worked out a deal with the Litigating Group, and thus the thought was that he (aka "the Settler") would immediately settle with the Litigating Group upon closing the purchase of the Seaside Mariana company, by transferring all of its land to them.

31. They, in turn, had already agreed to fund all US $500,000 the Plaintiff (and "Settler") needed to purchase the SM company, plus most of the closing costs.

32. Once the Plaintiff effectuated the transfer of the SM land (via the Seaside Mariana company, which he would then own and control) to the Litigating Group, they would then pay the Plaintiff/Settler, and his company, another US $334,000 in quarterly payments.

33. That group of twenty-two (22) investors (the named Defendants in CV2020-006232, aka "the Litigating Group) all agreed to collectively be bound by the Funding Contract and to fund the payments in the Funding Contract.

34. Two of the Defendants, David Crowe and Mike Lyonette, agreed to manage their group and, for expediency, communications with the Plaintiff.

35. David Crowe named and provided documentation as to the identities of the twenty-two people (including himself) who agreed to be bound by the Funding Contract: David Crowe; Mike Lyonette; Thomas P. Madden; Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Sandra Winfrey; Brian Putze;

Colin Ross; Brad Malcolm; Michael Jimenez; Gustavo Varela; Robert Crowe; Bernadette Brown; Federico Gurdian; and Terencio Garcia.

36. For a variety of reasons, David Crowe was usually the sole communicator and conduit on behalf of the group of twenty-two (22) investors.

37. For stylistic purposes and economy of phrase, the above twenty-two (22) Defendants, who acted in concert to fund the Plaintiff's purchase of SM, will also be described as "the Crowe Group" – this is the descriptive phrase that the parties all used colloquially, before the need for the litigation in the case at bar.

38. In August 2018, David Crowe and Mike Lyonette signed NCNDs with the Plaintiff.

39. Mr. Crowe and Mr. Lyonette also pledged not to share any information about the Plaintiff or the Funding Contract with any of the rest of their group of 20+ investors unless an individual group member signed a NDA (Non-Disclosure).

40. Approximately 10 of the 20+ investors signed NDAs with the Plaintiff, and thus, if Mr. Crowe, Mr. Lyonette, and others were honoring the Funding Contract and their NDAs, the Plaintiff believes only the dozen or so of them would have gotten information related to the Funding Contract and its progress towards a closing after that point.

41. The NDAs granted jurisdiction of the Plaintiff's choice, had a non-disclosure provision, and in the majority of the NDAs signed, specifically acknowledged that violating the non-disclosure provision, given the Plaintiff's deals, would likely cost the Plaintiff over US $10 million in damages.

42. The Plaintiff shared information with Mr. David Crowe in strict confidence on how he expected to monetize the intangible assets of the Seaside Mariana company, with an expected US $8 million post-tax profit.

## PLAINTIFF'S OTHER DEALS WITH KEVIN FLEMING

43. After the Funding Contract was signed, the Plaintiff signed more contracts with Kevin Fleming, to purchase Isla Mariana (another real estate development) and to purchase seven more Panamanian and Nicaraguan companies.

44. The Plaintiff also purchased all of the legal claims of Kevin Fleming, Maria Rueda, and the relevant entities.

45. Outside of Seaside Mariana, and as shall be proven in court, the Plaintiff expected to possibly make as much as on the order of US $4,000,000 to US $5,000,000 more with the completion of the other deals.

46. The Plaintiff disclosed the existence of his other deals with Kevin Fleming to the Crowe Group via Mr. David Crowe (and another deal he was working on in Jamaica).

47. One particular reason the Plaintiff and Mr. Crowe shared information on the Plaintiff's other contracts with Kevin Fleming et al. was to ensure that both purchasing parties (the Plaintiff, buying another residential development called Isla Mariana from its owners; and the Crowe Group, essentially purchasing ~1000 acres of Seaside Mariana via the Plaintiff) were getting the land that they expected to get.

48. Because the Plaintiff was also purchasing Mr. Fleming's development company Nicaragua Developments (which also owned land), and the parent company of Seaside Mariana (Grupo

Mariana), via some of these other deals, the Plaintiff would have the power and ability to ensure that his and the Crowe Group's expectations were met.

49. The Crowe Group had information on Seaside Mariana going back to 2006, and thus was able to build maps of all the Seaside Mariana land, including the list of parcels they would get transferred at the Plaintiff's close of the purchase of the Seaside Mariana company. (Because a massive subdivision had occurred, this was important).

## NDA (NONDISCLOSURE AGREEMENT) BREACHES UPON INFORMATION & BELIEF

50. Upon information and belief, David Crowe and Mike Lyonette violated the terms of the NDA and shared deal information with other parties that had not signed the NDA.

51. Upon information and belief, other individual Defendants violated the terms of their NDA and shared deal information with other parties.

52. Because the Plaintiff was purchasing the development for US $500,000 (plus capped deferred payments) and selling the land to the investors backing him for US $834,000, the Plaintiff was going to make US $334,000 in short-term cash profit in closing his purchase of SM and flipping the land to his investors.

53. In addition, as referenced above, and as shall be fully proven at jury trial, the Plaintiff expected to make a much larger sum monetizing the intangible assets he was acquiring as part of this deal.

54. The Crowe Group performed its due diligence on the deal and agreed to move forward to a close.

55. As part of due diligence, the Crowe Group had its attorney go to the local municipal office and ensure that Seaside Mariana still owned all of the relevant land fee simple, and that there was no

secured debt mortgage obligation on the land, and no unexpected liens nor unexpected notations in the property registry.

56. After the Crowe Group's due diligence, the Crowe Group agreed that they would fund the $25,000 that the Plaintiff was required to submit to Kevin Fleming after his due diligence.

57. That moment would also kick off a 60-day closing cycle for the Plaintiff to close on his purchase of SM, and for the Litigating Group (the Crowe Group) to fund said purchase.

58. Because the Plaintiff knew that Seaside Mariana had taken in US $ 22 million in sales from purchasers and investors, the Plaintiff insisted that Kevin Fleming and the other owners of Seaside Mariana file taxes up to the present.

59. The Plaintiff negotiated a Closing Contract with Kevin Fleming which the relevant parties signed, in which the parties agreed to close on the Plaintiff's purchase (their sale) of the Seaside Mariana company within 60 days.

60. As part of the Closing Contract, the Plaintiff would pass through US $25,000 to Kevin Fleming, which Mr. Fleming pledged to use in significant part for tax professionals to file all of Seaside Mariana's taxes through the present.  (Some of it would be used by the Seaside Mariana sellers to prepare for closing).

61. David Crowe then remitted a $25,000 cashier's check, which the Plaintiff utilized to satisfy his obligation (in the Closing Contract) to fund the closing process, by depositing the check in to Kevin Fleming's Wells Fargo bank account.

62. (In the Funding Contract, the Twenty-Five Thousand Dollars is on page 1, Article I, paragraph 1, where it is a non-refundable deposit).

63. It is worth noting that early in the Plaintiff's process with the Crowe Group, the Crowe Group had essentially committed to funding the purchase but only if everything was as they expected (due diligence on all files and details), and further details could be worked out.

64. As of August 11th, 2018, when the Crowe Group / Litigating Group agreed to the Funding Contract with the Plaintiff, the Crowe Group still had one contingency to pull out of the deal, if anything about their due diligence did not pass muster, also in the Funding Contract, page 1, Article I, paragraph 1, where the Crowe Group could let the Funding Contract unwind.

65. However, once the Crowe Group / Litigating Group had completed due diligence and remitted the US $25,000 non-refundable deposit towards the US $500,000 purchase price the Plaintiff had to pay to purchase the SM company (US $475,000 more after the US $25,000), the Crowe Group no longer had any contingency to pull out of the deal.

66. At that point, the Crowe Group (including these Defendants) were fully committed to the funding outlined for the Plaintiff's purchase of Seaside Mariana, with no contingency or other way to get out of the Funding Contract.

## DEFENDANTS' INITIAL BREACH

67. The Funding Contract called for a closing date in mid-October-2018, as did the Plaintiff's purchase contract of Seaside Mariana (reinforced in subsequent signed Closing Contracts).

68. The parties retained attorneys to prepare closing documents.

69. The parties worked out the logistics of closing in a "simultaneous close", which is well-understood to mean two successive closings.

70. In the agreed logistics, the Plaintiff would acquire the entity Seaside Mariana Golf and Spa Resorts company, which owned all the land, using another US $475,000 of the Crowe Group's money for said close.

71. Then, the Plaintiff would transfer the lands in the Funding Contract to the entity of the Crowe Group's choice. (The Plaintiff or his designated entity would then get the other US $334,000 promised by these Defendants in a series of quarterly payments in 2019 and early 2020).

72. It is worth noting that one condition of close (in the Closing Contract) was not fulfilled by Kevin Fleming; namely, he did not file the taxes for Seaside Mariana for the missing years.

73. However, this was the Plaintiff's issue and not the Crowe Group's. The Plaintiff would be the owner of the Seaside Mariana company. The Plaintiff worked out with David Crowe, on behalf of the Crowe Group, that he would take responsibility for the taxes and simply file them for Seaside Mariana, as the new owner, after the close of his purchase of the SM company.

74. The Crowe Group agreed, via David Crowe, that this was acceptable to them and would not be a barrier to the close, nor their funding of it.

75. As part of the logistics for the close, the Plaintiff offered to provide a limited power of attorney in the Plaintiff's name, to David Crowe's wife, that would be valid only to transfer the Seaside Mariana land out of the Seaside Mariana company.

76. At this point, in October 2018, the Plaintiff had fully performed as per the parties' contract, as far as he could without the US $475,000 promised in the Funding Contract. Within a few days, with the help of attorneys, the closing would happen, and using the Crowe Group's US $475,000, the Plaintiff would purchase the Seaside Mariana company, thereby owning its shares.

77. The Plaintiff would then immediately transfer the land to the Crowe Group's designated new entity (or let Mr. Crowe's wife handle this step via the limited power of attorney).

78. It was now time for the Defendants to perform with the rest of the funding promised in the Funding Contract for the Plaintiff's purchase of the Seaside Mariana company; namely, the additional US $475,000.

79. However, with the Plaintiff about to fly to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group, informed the Plaintiff that there was a new issue that could impact the anticipated closing.

80. Mr. Crowe informed the Plaintiff that Mr. Ted Cole had sued Seaside Mariana again. (Mr. Cole had previously sued Seaside Mariana and settled for a significant part of the Seaside Mariana land).

81. At this point, the Litigating Group was already aware of the other contracts the Plaintiff had signed with Kevin Fleming, Maria Rueda, Grupo Mariana, and Nicaragua Developments to purchase another eight of the real estate ownership and real estate development company.

82. David Crowe and the Litigating Group were also aware of a deal the Plaintiff was working on with the Jamaican government, as Mr. Crowe kindly lent the Plaintiff $5,000 so he could travel to Jamaica and for related costs. (In a few successive loans, Mr. Crowe kindly lent the Plaintiff approximately US $11,500, which the Plaintiff would like to repay to Mr. Crowe, with interest, when he is able).

83. The Plaintiff then revealed to Mr. Crowe, and thus all of these Defendants, that he had also purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims. The Plaintiff thus had

the right, using assigned legal claims, to sue Mr. Cole for his past tortious acts against Mr. Fleming, Ms. Rueda, and the Seaside Mariana company.

84. Mr. Crowe and the Plaintiff obtained a copy of the new Ted Cole legal complaint, and it was frivolous at best.

85. The Plaintiff was therefore unconcerned about the Cole litigation and planned defensive litigation for Seaside Mariana as soon as the Plaintiff owned the Seaside Mariana company in a few days.

86. The Plaintiff proposed to these Defendants, via Mr. Crowe, that the combination of offensive litigation against Mr. Cole (for past tortious acts) and defending the frivolous new legal complaint would be a simple, inexpensive, and effective remedy to solve any concerns about the Cole legal complaint.

87. Further, as the Plaintiff pointed out, the new Cole litigation was the Plaintiff's problem, as the soon-to-be-owner of the Seaside Mariana company, which was the entity getting sued.

88. The Plaintiff pointed out that within days the Seaside Mariana land would be transferred to the Litigating Group's designated new entity. As the entity was about to be formed, it clearly would have no liability to anyone including Mr. Cole.

89. However, the Litigating Group, including these Defendants, refused to fund the Plaintiff's purchase of the Seaside Mariana company (contrary to their promises, representations, obligations, and responsibilities set out in the Funding Contract).

90. David Crowe then assured the Plaintiff that Seaside Mariana was no longer attractive to any of the Litigating Group.

91. The reason stated by Mr. Crowe that the Litigating Group now had zero interest in the SM company and SM land, and that they also had zero interest in honoring the Funding Contract,

was the new Ted Cole litigation.  (This is not a valid reason to breach a contract but is interesting in light of Mr. Crowe and the Litigating Group's further actions, below)

**THE SECOND BREACH AND REPUDIATION (ON BEHALF OF ALL DEFENDANTS)**

92. In March 2019, Defendant Thomas P. Madden contacted Kevin Fleming on behalf of the Crowe Group, with the following email (Exhibit E), attempting to purchase Seaside Mariana, despite:

    a.   The non-circumvent these Defendants and the Crowe Group had agreed to.

    b.   The Funding Contract they had signed.

    c.   The various representations they made in October 2018, just before the parties would have closed, that they were pulling out and were no longer interested in the Seaside Mariana land.

**THE THIRD CROWE BREACH/REPUDIATION (ON BEHALF OF ALL DEFENDANTS)**

93. In April 2019, Defendant David Crowe contacted Kevin Fleming, following up on communications from Thomas Madden and David Crowe, in email, attempting to negotiate a direct purchase of the SM company and land (without involving the Plaintiff).

94.  In doing so, it is clear Crowe and all Defendants fully ratified the first Crowe Group breach as well as the second breach and repudiation (Madden contact of Fleming to try to buy direct) of the Funding Contract.

**FURTHER RAMIFICATIONS OF THE CROWE GROUP BREACHES**

95. In and after March 2019, once Thomas Madden contacted Kevin Fleming to negotiate with him directly, on behalf of the Crowe Group, and once David Crowe followed through and continued those negotiations on behalf of all Crowe Group members and all Defendants, Kevin Fleming stopped returning the Plaintiff's phone calls.

96. (In December 2019, Kevin Fleming emailed the Plaintiff to say he was terminating the Purchase Contract.  However, Mr. Fleming did not have the legal right to do so).

97. Fleming refused to honor any of the rest of the Plaintiff's contracts with him or his entities.

98. As a result, the Plaintiff has potentially lost another US $4 million or more, as shall be further proven at trial (with US ~$3 million of profits expected to come from the Isla Mariana / Nicaragua Developments deals).  (The Plaintiff admits that these profits were speculative, and that from a legal standpoint, each expected potential profit must be multiplied by the percentage chance that the Plaintiff would have realized that particular profit.  This, too, will occur at a jury trial expected in 2023).

99. The Plaintiff is doing what he can to mitigate the damages.


**CONCLUSION**

100.    The Defendants' breaches, repudiations, false promises, representations, and assurances, not to mention their tortious acts and non-acts, and their negligence have caused significant damages to Plaintiff, in an amount to be proven at trial.

101.    The Plaintiff has worked to try to remedy the Defendants' breaches and to mitigate damages, but to no avail thus far.

102.    The Plaintiff will continue to do his best to mitigate the base damages, especially his hoped-for and expected profits from purchasing the Seaside Mariana company (other than the US $334,000).

103.    The Plaintiff contacted David Crowe of the Crowe Group to see if they could work something out, whether a way to move forward, or a settlement, but Mr. Crowe was not interested.

104.    The Plaintiff has had similar discussions with Mr. Rau, Mr. Madden, and Mr. Jimenez, with no interest by those parties in continuing a discussion about ways the Plaintiff can still close on the Seaside Mariana company (if that is even relevant or possible).  Mr. Rau and Mr. Jimenez had no interest in that nor in any settlement discussions.

105.    The Plaintiff was left with no choice but to file this legal complaint so that the scales of justice may balance appropriately.

106.    (Mr. Thomas Madden, Mr. Brian Putze, and Ms. Sandra Winfrey have all settled with the Plaintiff, and were dismissed with prejudice in this legal complaint).

107.    Under the Seventh Amendment to the United States Constitution, the Plaintiff has a right to a jury trial for his Constitutionally-protected petitioning rights.  (Also, as per *Fed. R. Civ. P 38(b)*).

108.    The Plaintiff hereby respectfully requests a jury trial on all issues raised herein, including all triable facts and issues related to his current causes of action and any facts, issues, requests, and/or causes of action that the Plaintiff or his future attorney may add within the timelines allowed by this Court.

**Count I (A) – First Breach of Contract**

109.    The Plaintiff realleges paragraphs 1-108 as if fully set out herein.

110.    The Plaintiff entered in to contracts with these Defendants including the Funding Contract.

111.    The Defendants' refusal to close, and to fund the Plaintiff's purchase of the Seaside Mariana company (in October 2018), breached the Funding Contract.

112.    As a direct and proximate result of the Defendants' breach, the Plaintiff lost an asset he would have owned, the Seaside Mariana company.

113.    As a direct and proximate result of the Defendants' breach, the Plaintiff lost $334,000 in near term profits.

114.    As a direct and proximate result of the Defendants' breach, the Plaintiff avers that he lost up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received.  (The Plaintiff is attempting to mitigate these damages; these Defendants have rejected any notion of mitigating the Plaintiff's damages, at least through mid-February 2021).

115.    In the alternative, the Defendants' clear and unequivocal refusal to perform and fund the close was an express repudiation of the Funding Contract.

116.    The Plaintiff will fully prove all his base damages at jury trial.

## Count I (B) – Second Breach of Contract

117.    The Plaintiff realleges paragraphs 1-108 as if fully set out herein.

118.    Thomas Madden's contacting Mr. Kevin Fleming in March 2019 to attempt to purchase the Seaside Mariana company and its land without the Plaintiff's involvement constituted a willful breach of the non-circumvent that had been agreed to and an independent willful breach of the Funding Contract, impliedly if not explicitly.

119.    In the alternative, Mr. Madden's acts to contact Mr. Fleming and to circumvent the Plaintiff despite the Funding Contract and other agreements with the Plaintiff constituted a repudiation of the Funding Contract.

120.    Upon information and belief, Mr. Madden contacted Mr. Fleming with the knowledge and support of these Defendants.

121.    In the alternative, since these Defendants were all partners in the Litigating Group, with a partnership agreement governing that partnership, these Defendants (and their partnership) are all civilly responsible (and liable) for Mr. Madden's tortious acts in this context, via agency.

122.    As a direct and proximate result of these Defendants' breach of contract, the Plaintiff lost an asset he would have owned, the Seaside Mariana company.

123.    As a direct and proximate result of the Defendants' breach of contract, the Plaintiff lost US $334,000 in near term profits.

124.    As a direct and proximate result of the Defendants' breach of contract, the Plaintiff avers that he lost up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received.

(The Plaintiff is attempting to mitigate these damages; these Defendants have rejected any notion of mitigating the Plaintiff's damages, at least through mid-February 2021).

125.    In the alternative, Madden's and the Defendants' contact of Fleming and attempt to purchase the SM company and land constituted an implied further repudiation of the Funding Contract.

126.    The Plaintiff will fully prove all his base damages in the jury trial.

## Count I (C) – Third Breach of Contract

127.    The Plaintiff realleges paragraphs 1-108 as if fully set out herein.

128.    David Crowe's April 2019 following up on Thomas Madden's contact of Mr. Kevin Fleming to negotiate the direct purchase of the Seaside Mariana company and its land without the Plaintiff's involvement constituted a willful breach of the non-circumvent that had been agreed to and an independent willful breach of the Funding Contract, impliedly if not explicitly.

129.    To the extent that these Defendants were not aware of Mr. Madden's March 2019 contact of Mr. Fleming and/or did not endorse it then, the April 2019 contact and negotiations also served as a ratification of Mr. Madden's contact of Mr. Fleming by these Defendants, to attempt to circumvent the Plaintiff despite the terms of the Funding Contract.

130.    Mr. Crowe's April 2019 contact with Mr. Fleming and attempt to purchase the SM company and land directly also constituted another repudiation of the Funding Contract.

131.    Upon information and belief, Mr. Crowe negotiated with Mr. Fleming with the knowledge and support of the rest of these Defendants.

132. In the alternative, since these Defendants were all partners in the Litigating Group, with a partnership agreement governing that partnership, these Defendants (and their partnership) are all civilly responsible (and liable) for Mr. Crowe's tortious acts in this context, via agency.

133. Mr. Crowe contacted Mr. Fleming and attempted to negotiate the direct purchase of Seaside Mariana on behalf of these Defendants and the Litigating Group.

134. As a direct and proximate result of these Defendants' breach of contract, the Plaintiff lost an asset he would have owned, the Seaside Mariana company.

135. As a direct and proximate result of the Defendants' breach of contract, the Plaintiff lost US $334,000 in near term profits.

136. As a direct and proximate result of the Defendants' breach, the Plaintiff avers that he lost up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received. (The Plaintiff is attempting to mitigate these damages; these Defendants have rejected any notion of mitigating the Plaintiff's damages, at least through mid-February 2021).

137. In the alternative, Crowe's contact with Fleming and attempt to directly purchase the SM company and land constituted a further repudiation of the Funding Contract.

138. The Plaintiff will fully prove all his base damages in the jury trial.

**Count II – Promissory Fraud**

139.    The Plaintiff realleges paragraphs 1-108 as if fully set out herein.

140.    Pleading alternatively, the Defendants never intended to close on the Funding Contract.

141.    As one plausible explanation for said behavior, the Crowe Group, long-term adversaries of Fleming, planned to use the Plaintiff's efforts to discover valuable strategic information concerning Fleming's resources, price-points, and confidential plans (collectively "Fleming's Trade Secrets").

142.    As another plausible and not mutually exclusive explanation for said behavior, these Defendants were wealthy investors who could afford (as Mr. Jimenez did) to invest US $700,000 for the land alone for a second residence in a foreign country.  However, these Defendants did not have expertise in real estate development and Latin American title issues (though Mr. Rau sells property for a real estate developer).  These Defendants, who had already previously attempted to purchase the SM land, planned to discover valuable strategic information concerning the Plaintiff's strategy to monetize the SM company and/or its land, as well as the deal points of the Plaintiff's deal, which appeared to be at a million dollar plus lower price point than these Defendants had been able to negotiate (collectively "Wescott's Trade Secrets").

143.    David Crowe and Mike Lyonette made verbal promises to the Plaintiff, later codified in writing in the Funding Contract, that they would fund Plaintiff's purchase of the SM land (the "Litigators' Promises").

144.    Via David Crowe and Mike Lyonette, further verbal promises were made, also later codified in writing, that the Litigating Group would also fund Plaintiff's purchase of the SM land (the "Litigating Group's Promises").

145.    The Defendants' promises to close on the Funding Contract and to fund Plaintiff's purchase of the Seaside Mariana company ("the Litigators' Promises" and "the Litigating Group's Promises") were false when made, as part of a scheme. Upon information and belief, one part of the scheme was the attempt to induce the Plaintiff to uncover and communicate Fleming's Trade Secrets which these Defendants in turn planned to misuse in a series of further strategic moves, in and out of Court. Upon information and belief, another part of the scheme was the attempt to induce the Plaintiff to share Plaintiff's Trade Secrets which these Defendants also planned to misuse.

146.    These Defendants intended that the Plaintiff rely on "the Litigators' Promises".

147.    These Defendants further intended that the Plaintiff rely on "the Litigating Group's Promises".

148.    In the non-exclusive alternative, these Defendants intended that the Plaintiff rely on "the Litigating Group's Promises".

149.    The Plaintiff did in fact reasonably rely on the Litigators' Promises as well as the Litigating Group's Promises (collectively, "Both Sets of Promises"), as demonstrated by the facts that the Plaintiff signed the Funding Contract and committed to the Litigators and the Litigating Group as his source for the funding for the Plaintiff's purchase of the Seaside Mariana company.

150.    The Litigators did not fund the Plaintiff's purchase of the Seaside Mariana company, pulling out of the deal a couple days before the scheduled closing.

151.    As a result, the Plaintiff was damaged.

152.    These Defendants and the Litigating Group also did not fund the Plaintiff's purchase of the Seaside Mariana company, pulling out of the deal a couple days before the scheduled closing.

153.    As a result, the Plaintiff was damaged.

154.    The Plaintiff was damaged by his reliance on Both Sets of Promises by losing an asset he would have owned, the Seaside Mariana company.

155.    The Plaintiff was further damaged by his reliance on Both Sets of Promises by losing $334,00 in near term profits.

156.    The Plaintiff was even further damaged by his reliance on Both Sets of Promises by losing up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received.  (The Plaintiff is attempting to mitigate these damages; these Defendants have rejected any notion of mitigating these damages thus far).

157.    The Plaintiff's reliance on Both Sets of Promises was a substantial factor in the Plaintiff being damaged (as per the three main sets of base damages outlined above).

158.    The Plaintiff will fully prove all his base damages at jury trial.

**Count III – Promissory Estoppel**

159.    The Plaintiff realleges paragraphs 1-108 as if fully set out herein.

160.    David Crowe and Mike Lyonette made verbal promises to the Plaintiff, later codified in writing in the Funding Contract, that they would fund Plaintiff's purchase of the SM land (the "Litigators' Promises").

161.    Via David Crowe and Mike Lyonette, further verbal promises were made, also later codified in writing, that the Litigating Group would also fund Plaintiff's purchase of the SM land (the "Litigating Group's Promises").

162.    The Litigators reasonably expected that their promises would induce action on the part of the Plaintiff, expecting that the Plaintiff would first sign and commit to the Funding Contract, and then that the Plaintiff would do some of the Litigators' due diligence for them, and then that the Plaintiff might reveal to the Litigators Fleming's Trade Secrets and/or Wescott's Trade Secrets.

163.    In the non-exclusive alternative, the Litigators reasonably expected that their promises would induce forbearance on the part of the Plaintiff, expecting that the Plaintiff would not source another investor to fund his purchase of the Seaside Mariana company.

164.    The Litigating Group reasonably expected that their promises would induce action on the part of the Plaintiff, expecting that the Plaintiff would first sign and commit to the Funding Contract, and then that the Plaintiff would do some of the Litigators' due diligence for them, and then that the Plaintiff might reveal to the Litigators Fleming's Trade Secrets and/or Wescott's Trade Secrets.

165.    In the non-exclusive alternative, the Litigating Group reasonably expected that their promises would induce forbearance on the part of the Plaintiff, expecting that the Plaintiff would not source another investor to fund his purchase of the Seaside Mariana company.

166.    Both Sets of Promises did in fact reasonably induce the expected actions on the part of the Plaintiff, as the Plaintiff relied on those promises to his detriment.

167.    Both Sets of Promises did in fact reasonably induce the expected forbearance on the part of the Plaintiff, too, as the Plaintiff relied on those promises to fund to his detriment.

168.    Injustice could only have been avoided by enforcement of the promises.

169.    The Litigators did not fund the Plaintiff's purchase of the Seaside Mariana company, pulling out of the deal a couple days before the scheduled closing.

170.    As a result, the Plaintiff was damaged.

171.    These Defendants and the Litigating Group also did not fund the Plaintiff's purchase of the Seaside Mariana company, pulling out of the deal a couple days before the scheduled closing.

172.    As a result, the Plaintiff was damaged.

173.    The Plaintiff was damaged by his detrimental reliance on Both Sets of Promises by losing an asset he would have owned, the Seaside Mariana company.

174.    The Plaintiff was further damaged by his detrimental reliance on Both Sets of Promises by losing $334,00 in near term profits.

175.    The Plaintiff was even further damaged by his detrimental reliance on Both Sets of Promises by losing up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received.  (The

Plaintiff is attempting to mitigate these damages; these Defendants have rejected any notion of mitigating these damages thus far).

176.    The Plaintiff will fully prove all his base damages at jury trial.

### Count IV – Negligent Misrepresentation

177.    The Plaintiff realleges paragraphs 1-108 as if fully set out herein.

178.    David Crowe and Mike Lyonette made verbal representations to the Plaintiff, later codified in writing in the Funding Contract, that they would fund Plaintiff's purchase of the SM company (the "Litigators' Representations").

179.    Via David Crowe and Mike Lyonette, further verbal representations were made, also later codified in writing, that the Litigating Group would fund Plaintiff's purchase of the SM company (the "Litigating Group's Representations").

180.    Collectively, both sets of Representations shall be known as Both Sets of Representations.

181.    Pleading in the non-exclusive alternative, at the time David Crowe and Mike Lyonette made Both Sets of Representations, Mr. Crowe and Mr. Lyonette were acting in their professional capacities and had pecuniary interests in the underlying transaction.

182.    Mr. Crowe failed to exercise due care in making Both Sets of Representations that the Litigators would fund the Plaintiff's purchase of the SM company, and that the Litigating Group would fund the Plaintiff's purchase of the SM company.

183.    Mr. Lyonette failed to exercise due care in making Both Sets of Representations that the Litigators would fund the Plaintiff's purchase of the SM company, and that the Litigating Group would fund the Plaintiff's purchase of the SM company.

184.    The Plaintiff justifiably relied on the Litigators' representations.

185.    The Plaintiff justifiably relied on the Litigating Group's representations.

186.    The Litigators did not fund the Plaintiff's purchase of the Seaside Mariana company (as they had represented), pulling out of the deal a couple days before the scheduled closing.  As a result, the Plaintiff was damaged.

187.    These Defendants and the Litigating Group also did not fund the Plaintiff's purchase of the Seaside Mariana company (as they had represented), pulling out of the deal a couple days before the scheduled closing.  As a result, the Plaintiff was damaged.

188.    The Plaintiff was damaged by his reliance on Litigators' representations by losing an asset he would have owned, the Seaside Mariana company.

189.    The Plaintiff was further damaged by his reliance on Litigators' representations by losing $334,00 in near term profits.

190.    The Plaintiff was further damaged by his reliance on Litigators' representations by losing up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received.  (The Plaintiff is attempting to mitigate these damages, whereas the Litigators have rejected any notion of mitigating these damages thus far).

191.    The Plaintiff was damaged by his reliance on the Litigating Group's representations, as well, by losing an asset he would have owned, the Seaside Mariana company.

192.    The Plaintiff was further damaged by his reliance on the Litigating Group's representations by losing $334,00 in near term profits.

193.    The Plaintiff was further damaged by his reliance on the Litigating Group's representations by losing up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received.  (The Plaintiff is attempting to mitigate these damages)

194.    The Plaintiff will fully prove all his base damages at jury trial.

**Count V – Tortious Interference with Contractual Relations**

195.    The Plaintiff realleges paragraphs 1-108 as if fully set out herein.

196.    At all relevant times, the Plaintiff was in an economically advantageous relationship with Fleming ("the Relationship") that was likely to confer substantial benefits, especially given the parties' complimentary expertise and interest in Central American development.

197.    Indeed, the Plaintiff had entered into numerous other contracts ("the Other Related Contracts) to purchase assets, companies, land, and legal claims from Fleming, his wife Maria Rueda, and eight more of their companies.

198.    The Plaintiff was also working on a deal with the Jamaican government.

199.    The Defendants were aware of the Relationship and the Other Related Contracts and the Jamaican government deal both generally and specifically.

200.    The Plaintiff had made David Crowe, agent and communicator for the other Defendants, specifically aware of the contracts and what he expected to make on them.

201.   The Plaintiff also revealed to Mr. Crowe, and thus all of these Defendants, in October 2018 that he had purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims, which had been assigned to him.

128.   The Defendants were aware that their refusal to close on the Funding Contract, and these Defendants' refusal to fund the Plaintiff's purchase of the Seaside Mariana company, would burden the Relationship.

129.   These Defendants were also aware that their refusal to fund the Plaintiff's purchase of the Seaside Mariana company would interfere with the Plaintiff's other contracts to purchase the rest of the assets of Fleming, Rueda, Grupo Mariana, and Nicaragua Developments, including eight more companies, in two ways: (1) by burdening the Relationship, and (2) by leaving the Plaintiff without the financial wherewithal to close his purchases as outlined in the Other Related Contracts.

130.   The Defendants' refusal to honor the Funding Contract foreseeably and substantially interfered with and disrupted the Relationship.

131.   The Defendants' refusal to honor the Funding Contract foreseeably and substantially interfered with the Plaintiff's ability to perform on the Other Related Contracts, and thus interfered with the Other Related Contracts, too.

132.   The Plaintiff was harmed by the Defendants' intentional acts of interference with the Relationship by the consequential loss of profits in the Other Related Contracts and in future Central American transactions with Fleming and his associates.

133. The Plaintiff was harmed by the Defendants' intentional acts of interference with his ability to perform as outlined in the Other Related Contracts and in future Central American transactions with Fleming and his associates.

134. The Plaintiff was therefore harmed by the Defendants' intentional acts of interference with the Other Related Contracts themselves.

### Count VI – Negligent Interference with Contractual Relations

202.    The Plaintiff realleges paragraphs 1-108 as if fully set out herein.

203.    Pleading in the non-exclusive alternative, at all relevant times, the Plaintiff was in an economically advantageous relationship with Fleming ("the Relationship") that was likely to confer substantial benefits, especially given the parties' complimentary expertise and interest in Central American development.

204.    Indeed, the Plaintiff had executed numerous other contracts ("the Other Related Contracts) to purchase assets, companies, land, and legal claims from Fleming, his wife Maria Rueda, and eight more of their companies.

205.    The Plaintiff was also working on a deal with the Jamaican government.

206.    The Defendants were aware of the Relationship and the Other Related Contracts and the Jamaican government deal both generally and specifically.

207.    The Plaintiff had made David Crowe, agent and communicator for (and partner to) the other Defendants, specifically aware of the contracts and what he expected to make on them.

208.   The Plaintiff also revealed to Mr. Crowe, and thus all of these Defendants, in October 2018 that he had purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims, which had been assigned to him.

209.   The sum total of all of the Plaintiff's expected or prospective revenue and profits from the Relationship, the Other Related Contracts, and the Jamaican government deal shall be referred to as the "Plaintiff's Contractual Relations."

210.   The Defendants were aware or should have been aware of the Relationship both generally and specifically, as well as the Plaintiff's Contractual Relations.

211.   The Defendants knew that the Relationship and the Plaintiff's Contractual Relations would be disrupted if they failed to act with due care.

212.   The Defendants were aware that their refusal to close on the Funding Contract, and these Defendants' refusal to fund the Plaintiff's purchase of the Seaside Mariana company, would burden the Relationship.

213.   These Defendants were also aware that their not funding the Plaintiff's purchase of the Seaside Mariana company would interfere with the Plaintiff's other contracts relations, including his contracts to purchase the rest of the assets of Fleming, Rueda, Grupo Mariana, and Nicaragua Developments, including eight more companies, in two ways:  (1) by burdening the Relationship, and (2) by leaving the Plaintiff without the financial wherewithal to close perform for these and other Plaintiff Contractual Relations.

214.   By breaching and repudiating the Funding Contract and not funding the Plaintiff's purchase of the Seaside Mariana company, these Defendants failed to act with due care and substantially interfered with and disrupted the Relationship.

215.   By breaching and repudiating the Funding Contract and not funding the Plaintiff's purchase of the Seaside Mariana company, these Defendants further failed to act with due care and substantially interfered with and disrupted the Plaintiff's Contractual Relations.

216.   The Plaintiff was harmed by the Defendants' acts of negligent interference with the Relationship and the Plaintiff's Contractual Relations by the consequential loss of profits in the other transactions and contracts Plaintiff had formed with Fleming, his wife, and his companies, as well as other opportunities that the Plaintiff likely would have benefited from based on the Relationship.

217.   The Plaintiff shall prove the amounts of these base damages at jury trial.


**Count VII Intentional Interference with Prospective Economic Advantage**


218.   The Plaintiff realleges paragraphs 1-108 as if fully set out herein.

219.   At all relevant times, the Plaintiff was in an economically advantageous relationship with Mr. Kevin Fleming ("the Relationship").  Indeed, the Plaintiff expected specific economic advantages that were already encapsulated in numerous other contracts the Plaintiff had already executed with Fleming and related parties ("the Other Related Contracts")

220.   At all relevant times, the Plaintiff's economically advantageous relationship with Fleming ("the Relationship") was likely to confer further substantial benefits especially given the parties' complementary expertise and interest in Central American development.

221.   The Plaintiff was also working on a deal with the Jamaican government.

222.    The sum total of all of the Plaintiff's expected or prospective economic advantages from the Relationship and from the positive economic force from his purchase of the Seaside Mariana company shall be referred to as the "Plaintiff's Prospective Economic Advantages."

223.    The Defendants were aware or should have been aware of the Relationship both generally and specifically, as well as the Plaintiff's Prospective Economic Advantages.

224.    The Plaintiff had made David Crowe, agent and communicator for the other Defendants, specifically aware of the contracts and what he expected to make on them.

225.    The Plaintiff also revealed to Mr. Crowe, and thus all of these Defendants, in October 2018 that he had purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims, which had been assigned to him.

226.    The Defendants were aware that their refusal to honor the Funding Contract and these Defendants' refusal to fund the Plaintiff's purchase of the Seaside Mariana company, would burden the Relationship.

227.    Indeed, these Defendants' refusal to fund the Plaintiff's purchase of the Seaside Mariana company did burden the Relationship.

228.    These Defendants were also aware that their refusal to fund the Plaintiff's purchase of the Seaside Mariana company would interfere with the Plaintiff's Prospective Economic Advantages: (1) by burdening the Relationship, and (2) by leaving the Plaintiff without the financial wherewithal to close his purchases in the Other Related Contracts, nor finalize and execute his deal in Jamaica.

229.    The Defendants' refusal to honor the Funding Contract foreseeably and substantially interfered with and disrupted the Relationship.

36

230.    The Defendants' refusal to honor the Funding Contract foreseeably and substantially interfered with the Plaintiff's Prospective Economic Advantages.

231.    The Plaintiff was harmed by the Defendants' intentional acts of interference with the Relationship by the consequential loss of revenue and profits.

232.    The Plaintiff was harmed by the Defendants' intentional acts of interference with his ability to perform in the Other Related Contracts and in his Jamaican deal.

233.    The Plaintiff was harmed by the Defendants' intentionally interfering with the Relationship and with the Plaintiff's Prospective Economic Advantages by the consequential loss of profits in the other transactions and contracts Plaintiff had formed with Fleming, his wife, and his companies, as well as other opportunities that the Plaintiff likely would have benefited from based on the Relationship.

234.    The Plaintiff shall prove the amounts of these base damages at jury trial.

### Count VIII Negligent Interference with Prospective Economic Advantage

235.    The Plaintiff realleges paragraphs 1-108 as if fully set out herein.

236.    At all relevant times, the Plaintiff was in an economically advantageous relationship with Mr. Kevin Fleming ("the Relationship"). Indeed, the Plaintiff expected specific economic advantages that were already encapsulated in numerous other contracts the Plaintiff had already executed with Fleming and related parties ("the Other Related Contracts")

237.    At all relevant times, the Plaintiff's economically advantageous relationship with Fleming ("the Relationship") was likely to confer further substantial benefits especially given the parties' complementary expertise and interest in Central American development.

238.    The sum total of all of the Plaintiff's expected or prospective economic advantages from the Relationship shall be referred to as the "Plaintiff's Prospective Economic Advantages."

239.    The Defendants were aware or should have been aware of the Relationship both generally and specifically, as well as the Plaintiff's Prospective Economic Advantages

240.    The Defendants knew that the Relationship and the Plaintiff's Prospective Economic Advantages would be disrupted if they failed to act with due care.

241.    By breaching and repudiating the Funding Contract and not funding the Plaintiff's purchase of the Seaside Mariana company, these Defendants failed to act with due care and substantially interfered with and disrupted the Relationship.

242.    By breaching and repudiating the Funding Contract and not funding the Plaintiff's purchase of the Seaside Mariana company, these Defendants further failed to act with due care and substantially interfered with and disrupted the Plaintiff's Prospective Economic Advantages.

243.    The Plaintiff was harmed by the Defendants' acts of negligent interference with the Relationship by the consequential loss of profits in the other transactions and contracts Plaintiff had formed with Fleming, his wife, and his companies, as well as other opportunities that the Plaintiff likely would have benefited from based on the Relationship.

244.    The Plaintiff shall prove the amounts of these base damages at jury trial.

**Count IX – Breach of the Covenant of Good Faith and Fair Dealing**

245.    The Plaintiff realleges paragraphs 1-108 as if fully set out herein.

246.    The Plaintiff entered in to contracts with these Defendants including the Funding Contract.

247.    The Plaintiff performed all conditions required of him by the contract.

248.    The Defendants interfered with the Plaintiff's right to receive the benefits of the contract.

249.    As a direct and proximate result of the Defendants' breach of the covenant of good faith and fair dealing, implied in law in every contract including the Funding Contract, the Plaintiff lost an asset he would have owned, the Seaside Mariana company.

250.    As a further direct and proximate result of the Defendants' breach of the covenant of good faith and fair dealing, implied in law in every contract including the Funding Contract, the Plaintiff lost $334,000 in near term profits.

251.    As a direct and proximate result of the Defendants' breach of the covenant of good faith and fair dealing, implied in law in every contract including the Funding Contract, the Plaintiff lost up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received.  (The Plaintiff is attempting to mitigate these damages; these Defendants have rejected any notion of mitigating the Plaintiff's damages, at least through mid-February 2021).

252.    The Plaintiff will fully prove all his base damages at jury trial.

**Count X – Negligent Infliction of Emotional Distress**

253.    The Plaintiff realleges paragraphs 1-108 as if fully set out herein.

254.    These Defendants owed the Plaintiff contractual duties as well as a fiduciary duty to honor the contract and fund the Plaintiff's purchase of the Seaside Mariana.

255.    These Defendants breached their duties, resulting in enormous damages to the Plaintiff.

256.    The situation was especially traumatic to the Plaintiff as he had been mired in abject poverty for years, and thus, closing on his purchase of the Seaside Mariana company represented the solution to most of the Plaintiff's major life issues.

257.    As one example of the ramifications, the Plaintiff had not paid substantial Child Support since 2014 and had not seen his children.

258.    The Plaintiff planned to make significant Child Support payments and also hire an attorney So he could see his children, once these Defendants honored their obligations.

259.    For these Defendants to pull out of the funding and closing almost at the closing table was especially emotionally devastating to the Plaintiff, given his hopes and dreams.

260.    These Defendants' breaches of duty therefore foreseeably inflicted extreme emotional distress on the Plaintiff.

261.    These Defendant's breaches of duty were the proximate cause of the Plaintiff's emotional distress.

WHEREFORE, Plaintiff prays

(a) As to Count I for all direct and consequential damages the Plaintiff incurred as a proximate result of the Defendants' breach of contract;

(b) As to Count II for all direct and consequential damages the Plaintiff incurred as a proximate result of David Crowe's (and these Defendants') promissory fraud along with the imposition of exemplary damages to deter the Defendants from committing such acts of fraud in the future;

(c) As to Count III for all direct and consequential damages the Plaintiff incurred as a proximate result of David Crowe's (and these Defendants') promissory estoppel along with the imposition of exemplary damages to deter the Defendants from committing such acts in the future;

(d) As to Count IV for all direct and consequential damages the Plaintiff incurred as a proximate result of Crowe's negligent misrepresentations along with the imposition of exemplary damages to deter Defendants from committing such acts in the future.

(e) As to Count V for an award of damages sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' tortious interference with the Plaintiff's contractual relations as well as the imposition of exemplary damages in an amount sufficient to punish and deter the Defendants from committing similar acts of interference in the future.

(f) As to Count VI for an award of damages sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' negligent interference with the Plaintiff's contractual relations.

(g) As to Count VII for an award of damages sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' intentional interference with the Plaintiff's prospective economic advantages as well as the imposition of exemplary damages in an amount sufficient to punish and deter the Defendants from committing similar acts of interference in the future.

(h) As to Count VIII for an award of damages sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' negligent interference with the Plaintiff's prospective economic advantages.

(i) As to Count IX for an award of damages, in an amount sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' breach of the covenant of good faith and fair dealing and for the imposition of exemplary damages in an amount sufficient to punish and deter the Defendants from engaging in acts of bad faith in the future.

(j) As to Count X, for an award of all damages proximately caused by the Defendant's negligent infliction of emotional distress.

(k) For all costs of suit, including fees, paralegal costs, costs of travel, future attorneys' fees, and reasonable compensation for the Plaintiff's time while representing himself.

(l) For such other and further relief as the Court deems just.

RESPECTFULLY SUBMITTED on February 16th, 2021

CARL A. WESCOTT, *pro se*