1  CARL A. WESCOTT
2  8210 E. VIA DE LA ESCUELA
   SCOTTSDALE AZ 85258
3  *in propria persona*
   CARLWSOJ@GMAIL.COM
4  +1 936 937 2688

**FILED**

**FEB 17 2021**

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

5
6      **UNITED STATES DISTRICT COURT**
7      **NORTHERN DISTRICT OF CALIFORNIA**

8  CARL A. WESCOTT,                    Civil Action No. 3:20-cv-06456-JD

9            Plaintiff,                **PLAINTIFF'S [AMENDED]**
                                       **LEGAL COMPLAINT IN REDLINE**
10                                     **FORMAT**
      vs.
11
12  DAVID CROWE;
    MIKE LYONETTE;
13  JEFF RAU;
    COLIN ROSS;
14  BRAD MALCOLM;
    MICHAEL JIMENEZ;
15
16

17      On February 9th, 2021, Plaintiff Carl A. Wescott requested leave of this Court to amend his

18  legal complaint under *Fed R. Civ. P. Rule 15(a)(2)*. The Plaintiff now submits his proposed amended

19  legal complaint, in both redline format (hereafter) as well as the actual proposed amended legal

20  complaint (separate document), subject to the Court's approval of his *Motion for Leave to Amend*.

21

22
23  RESPECTFULLY SUBMITTED on February 16th, 2021

24
                                              *[signature]* Cl.Wescott

25                                            CARL A. WESCOTT, *pro se*

26

**PLAINTIFF'S [AMENDED] LEGAL COMPLAINT IN REDLINE FORMAT**

1  CARL A. WESCOTT
2  8210 E. VIA DE LA ESCUELA~~409 N. SCOTTSDALE ROAD #223~~
   SCOTTSDALE AZ 8525~~87~~
3  *in propria persona*
   CARLWSO~~JESCOTT2020~~@GMAIL.COM
4  +1 936 937 2688~~415 335 5000~~

5
6  ~~SUPERIOR COURT OF THE STATE OF ARIZONA~~UNITED STATES
7  DISTRICT COURT
   NORTHERN DISTRICT OF CALIFORNIA~~MARICOPA COUNTY~~
8  ~~SUPERIOR COURT~~
9

10 CARL A. WESCOTT,                    Civil   Action   No.   3:20-cv-06456-
                                        JD~~CV2020-006232~~____
11                Plaintiff,
                                        PLAINTIFF'S
12    vs.                               [AMENDED~~CORRECTED~~]
                                        COMPLAINT FOR BREACH OF
13                                      CONTRACT, PROMISSORY
   DAVID CROWE;                         FRAUD; PROMISSORY
14 MIKE LYONETTE;                       ESTOPPEL; NEGLIGENT
   ~~THOMAS P. MADDEN;~~                MISREPRESENTATION;
15 ~~TAYLOR COLLINS;~~                  TORTIOUS
   JEFF RAU;                            ~~INTENTIONAL~~ INTERFERENCE
16 ~~DARRELL BUSHNELL;~~                WITH CONTRACTUAL
   ~~AMY BUSHNELL;~~                    RELATIONS; NEGLIGENT
17 ~~PETER TIERNEY;~~                   INTERFERENCE WITH
   ~~KATHY FETTKE;~~                    CONTRACTUAL RELATIONS;
18                                      INTENTIONAL
19
                                                                          1
20 PLAINTIFF'S [AMENDED] COMPLAINT FOR BREACH OF CONTRACT;
   PROMISSORY FRAUD; PROMISSORY ESTOPPEL; NEGLIGENT
21 MISREPRESENTATION; TORTIOUS INTERFERENCE WITH
   CONTRACTUAL RELATIONS; NEGLIGENT INTERFERENCE WITH
22 CONTRACTUAL RELATIONS; INTENTIONAL INTERFERENCE WITH
   PROSPECTIVE ECONOMIC ADVANTAGE; NEGLIGENT
23 INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;
   BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; &
24 NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
   ~~COMPLAINT FOR BREACH OF CONTRACT;~~
25 ~~PROMISSORY FRAUD; NEGLIGENT MISREPRESENTATION~~
   ~~INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS;~~
26 ~~NEGLIGENT INTERFERENCE WITH ECONOMNIC ADVANTAGE;~~
   ~~BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING~~

1    ~~SUSIE YEE;~~
     ~~NORMAN DAVIES;~~
2    ~~CLAIRE DAVIES;~~
     ~~SANDRA WINFREY;~~
3    ~~BRIAN PUTZE;~~
4    COLIN ROSS;
     BRAD MALCOLM;
5    MICHAEL JIMENEZ;
6
     ~~GUSTAVO VARELA;~~
7    ~~ROBERT CROWE;~~
     ~~BERNADETTE BROWN;~~
8    ~~FEDERICO GURDIAN;~~
     ~~TERENCIO GARCIA~~
9

10                    Defendants.

11    + DOES 1 through 50

12

---

**~~NEGLIGENT~~ INTERFERENCE WITH PROSPECTIVE ECONOM~~N~~IC ADVANTAGE; NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; & NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**~~& BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING~~**

_____

JURY TRIAL REQUESTED

---

13

14    Plaintiff Carl A. Wescott, proceeding *pro se,* complains of Defendants David Crowe, ~~Robert~~

15    ~~Crowe,~~ Mike Lyonette; ~~Thomas P Madden ("Thomas Madden"); Taylor Collins; J~~Jeff Rau; ~~Darrell~~

16    ~~Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies;~~

17    ~~Bernadette Brown; Sandra Winfrey; Brian Putze~~ Colin Ross, Brad Malcolm, and Michael Jimenez~~,~~

18    ~~Federico Gurdian, Terencio Garcia, and Gustavo Varela~~, and in support of his Complaint, the Plaintiff

19    states as follows.

20

21

22    **P~~ARTIES~~ARTIES**

23    1.   The Plaintiff is a resident of Scottsdale, Arizona.

24    2.   ~~The Plaintiff is currently unaware of the exact location and legal domicile of each of the~~

25    ~~individual Defendants, except for Thomas P Madden. The rest of t~~The Defendants are a set of

26

individuals , with unknown residences and legal domiciles, are (David Crowe, Robert Crowe,

Mike Lyonette Taylor Collins; Jeff Rau; Colin Ross; Darrell Bushnell; Amy Bushnell; Peter

Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Bernadette Brown; Sandra

Winfrey; Brian Putze, Colin Ross, Brad Malcolm, Michael Jimenez) who are a subset of the

twenty-two positively identified and confirmed individuals (partners) who entered in to a

contract with the Plaintiff to fund his US $500,000 purchase of a company ("Seaside Mariana")

and pay him an additional $334,000 in exchange for the Plaintiff transferring the ,1000 acres of

beach land owned by that company to them. (The full name of the company was and is Seaside

Mariana Spa and Golf Resort, but in this legal complaint the company and the development

project shall be referred to the same way the parties refer to it, as "Seaside Mariana" or "SM")

Federico Gurdian, Terencio Garcia, and Gustavo Varela

3.  Thomas Madden is an "investment banker " who is apparently unlicensed, who is one of the
group of twenty-two (22) individuals..

4.  Mr. Madden, a former Washington resident, was censured by the State of Washington
Department of Financial Institutions Securities Division in 2016 (Exhibit A), for violations of
the Securities Act of Washington RCW 21.20.010 and RCW 21.20.040, including through
Madden's company Madcon Company, Inc.  The name "Mad Con" is telling.  Mr. Madden
moved from Washington to Chandler, Arizona.  Mr. Madden and his wife Leslie then were
charged with fraud and further securities fraud violations in 2018 (violations of the Securities
Act of Arizona A.R.S. §§ 44-1801 through 44-2126) by the Arizona Corporation Commission
(Exhibit B).

3.

3

5.   ~~Mr. Madden was censured by the State of Washington Department of Financial Institutions Securities Division in 2016 (Exhibit A) and then, upon information and belief, moved to St. George, Utah.  Mr. Madden now sells securities in Utah, Arizona, Nevada, and Col~~On December 18th, 2020, the Commission ordered Mr. Madden to pay $3,284,792 in restitution and a $75,000 administrative penalty for defrauding at least 79 people in connection with selling them stock in start-up companies (Order S-21042A-18-0059.)

6.   Mr. Madden played a key role in a further repudiation of the Plaintiff's contract after the group of partners breached the contract by pulling out of the deal relatively last-minute, just a few days before the scheduled closing.  Just five months after Defendants pulled out of the deal with Plaintiff, breaching their contract, stating they were not interested in the Seaside Mariana land, Mr. Madden secretly contacted Kevin Fleming, one of the sellers of Seaside Mariana, wishing to purchase the Seaside Mariana company and the land, attempting to circumvent the Plaintiff despite the contracts and agreements with the Plaintiff, including a non-circumvent.

~~4.~~7. Mr. Madden has settled with the Plaintiff and was dismissed from this legal complaint with prejudice.~~orado.~~

**VENUE**

8.   Venue is appropriate in this Court as the relevant contract had a forum selection clause naming San Francisco as the venue for litigation.  Furthermore, the Defendants requested a change of venue to this Court.  ~~provisions of the relevant contract were orally agreed in Maricopa County, and the initial signed version of the relevant contract was written, formed, and signed in Maricopa County.~~This Court can therefore assert personal jurisdiction over these Defendants.

~~5.~~

1
2

**FURTHER ALLEGATIONS REGARDING CONSPIRACY**

3

4    6.9.Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint,

5    David Crowe, Robert Crowe, Mike Lyonette; Thomas Madden; Taylor Collins; Jeff Rau;

6    Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies;

7    Claire Davies; Bernadette Brown; Sandra Winfrey; Brian Putze, Colin Ross, Brad Malcolm,

8    Michael Jimenez, Federico Gurdian, Terencio Garcia, and Gustavo Varela, as individuals, in

9
10   addition to acting for himself/herself and on his/her own behalf individually, as well as for the

11   benefit of his or her marital community (if any), is and was acting as the agent, servant,

12   employee, and/or representative of, and with the knowledge, consent, and permission of, and in

13   conspiracy with, each and all of the other Defendants (individual and entities) and within the

14   course, scope, and authority of that agency, service, employment, representation, and

15   conspiracy.

16   7.10.   Plaintiff further alleges on information and belief that the acts and non-acts of each of the

17   Defendants were fully ratified by each and all of the other Defendants.  Specifically, and

18   without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to

19   act, breaches, and negligence alleged herein and attributed to one or more of the specific

20   Defendants were approved, -ratified, and/or done with the cooperation and knowledge of each

21   and in conspiracy with all other Defendants (individual and corporate).

22

23   8.11.   In addition, upon information and belief, there exist one or more nefarious corporate, trust,

24   LLC SAs, SRLs, IBCs, and/or foundations and/or other entity type Defendants involved in these

25
26

1    conspiracies, currently unknown to Plaintiff.    They shall emerge with the benefit of legal

2    discovery.

3    9.12.    Plaintiff is informed and believes and thereon alleges that at all times material to this

4    Complaint, any and all such corporate entities, in addition to acting for itself and for its own

5

6    behalf, was acting as the agent, servant, and/or representative of, and with the knowledge,

7    consent, and permission of, and in conspiracy with, each and all of the Defendants (entity and

8    individual) and within the course, scope, and authority of that agency, service, employment,

9    representation, and conspiracy.

10    10.13.  Plaintiff further alleges on information and belief that the acts of each of the Defendants

11    were fully ratified by each and all of the Defendants.  Specifically, and without limitation,

12    Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and

13

14    negligence alleged herein and attributed to one or more of the specific Defendants were

15    approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy

16    with all other Defendants (individual and corporate).

17

18    **CASE SUMMARY**

19    The Plaintiff has included a brief case summary in plain language as Exhibit C (Sworn to be true in

20    Exhibit F, Sworn Affidavit of Carl A. Wescott).

21

22

23

24

25

26

6

**BACKGROUND NARRATIVE INCLUDING THE PARTIES' CONTRACT**

~~11.~~14.  The Plaintiff was an experienced international real estate developer focusing on residential developments in Latin America.  The Plaintiff is now gaining some insight into the distressed asset markets, especially in the cases of projects that had significant economic viability but have foundered for reasons unrelated to that viability, often involving politics, personalities or fraud.  (Sworn to be true, as is each successive paragraph, in Exhibit F, Sworn Affidavit of Carl A. Wescott).

~~12.~~15.  The Plaintiff was reasonably successful until the global meltdown and credit crunch of 9/2008.  With the global impact of said credit crunch and the leverage the Plaintiff had applied to his real estate holdings, the Plaintiff eventually succumbed to those forces and declared chapter 7 bankruptcy.

~~13.~~16.  Post-bankruptcy, the Plaintiff searched for distressed real estate assets that he could acquire and turn around.  He was familiar with Seaside Mariana ("SM"), an ambitious development on approximately 1000 acres on the Montelimar coast west of Managua, Nicaragua.  Seaside Mariana had at one point featured a Jack Nicklaus designed golf course and a Wyndham hotel in its plans before the wheels fell off Seaside Mariana as well due to the same global pressures.

~~14.~~17.  SM was an attractive investment and development opportunity for the original developer, Kevin Fleming, for at least the following reasons:

       (i)      The real estate was prime in terms of location and amenities;

       (ii)     At the time of initial investment, the market was rising faster than linearly;

(iii)    Costa Rica to the South had already surfed a 20-year wave of real estate

equity appreciation, and for some product types there was an order of

magnitude difference in pricing;

(iv)    Nicaragua was attractive for American retirees in particular because of its

low cost of living, level of safety, accessibility (including airlift), and

desirable climate.

15.18.  Most of those reasons were relevant more recently to the Plaintiff as well for his investment

consideration.

19. Further, the intangible assets associated with SM were sound and mostly in place, including

plans, permits, designs, and marketing material.

16.20.  There were a few other intangible assets owned by SM that the Plaintiff found particularly

interesting and compelling.

17.21.  The value of the project was, to a material degree, artificially depressed by more recent

market conditions and bad word of mouth and internet postings concerning the lack of

infrastructure put in by the original developer, leading to further relevant issues.

18.22.  The Plaintiff blushes to admit he has entered contract to purchase SM three (3) times.  The

first time he entered contract, the Plaintiff saw an opportunity to buy SM for a highly attractive

price (US $500,000, plus some capped deferred payments), solve the issues, and complete the

development, and had a backer who would provide financial support for the project.

23. Most recently, the Plaintiff entered in to contract ("the SM Purchase Contract") to purchase SM

(either the company Sociedad itself or the real estate, at his option) in 2018, with an anticipated

close date (after some revisions, addenda, and extensions) of October 15th, 2018.

8

1    ~~19.~~24.  The Plaintiff planned to purchase the SM company.

2    ~~20.~~25.  Lacking in capital, the Plaintiff entered discussions with several investors to back the

3    purchase.

4    ~~21.~~26.  More recently, in August 2018, the Plaintiff entered in ~~a final version~~to a ~~of a~~ contract with

5    investors~~, after their due diligence~~, who were familiar with the relevant properties who agreed to

6    fund 100% of the costs of the purchase in exchange for certain land owned by SM (the Sociedad

7    Anonima).

8    

9    ~~22.~~27.  That contract shall be referred to as the "~~Sales Contract~~Funding Contract", and is attached

10   hereto as Exhibit D.~~.~~

11   28. To dispel any confusion over identities in the contract, the Plaintiff, Carl Wescott, is sometimes

12   referred to by his Finnish name "Kalle", or the combination Carl "Kalle" Wescott.

13   29. To further dispel any potential confusion over the language of the funding contract or its

14   meaning, the investors who were parties to the Funding Contract had filed litigation against

15   Seaside Mariana, the company that the Plaintiff was purchasing.  Therefore, the group of

16   

17   twenty-two investors (the same set of people who were the initial twenty-two (22) Defendants in

18   Maricopa County Superior Court case CV2020-006232) who were the parties to that litigation

19   are referred to as the "Litigating Group."

20   30. The Plaintiff did not want ongoing litigation against the company he was purchasing, and he had

21   

22   worked out a deal with the Litigating Group, and thus the thought was that he (aka "the Settler")

23   would immediately settle with the Litigating Group upon closing the purchase of the Seaside

24   Mariana company, by transferring all of its land to them.

25   

26

31. They, in turn, had already agreed to fund all US $500,000 the Plaintiff (and "Settler") needed to purchase the SM company, plus most of the closing costs.

23.32.  Once the Plaintiff effectuated the transfer of the SM land (via the Seaside Mariana company, which he would then own and control) to the Litigating Group, they would then pay the Plaintiff/Settler, and his company, another US $334,000 in quarterly payments.

24. ~~That~~A group of twenty-two (22) investors (the named Defendants in CV2020-006232, aka "the Litigating Group) all agreed to collectively be bound by the ~~Sales Contract~~Funding Contract and to fund the payments in the ~~Sales Contract~~Funding Contract.

33.

34. Two of the Defendants, David Crowe and Mike ~~Lyonnette~~Lyonette, agreed to manage their group and, for expediency, communications with the Plaintiff.

25. David Crowe named and provided documentation as to the identities of the twenty-two people (including himself) who ~~had~~ agreed to be bound by the ~~Sales Contract~~Funding Contract: David Crowe; Mike Lyonette; Thomas P. Madden; Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Sandra Winfrey; Brian Putze; Colin Ross; Brad Malcolm; Michael Jimenez; Gustavo Varela; Robert Crowe; Bernadette Brown; Federico Gurdian; and Terencio Garcia.  ~~.~~

26.35.  ~~The Sales Contract contained provisions that that group would also drop its litigation in Nicaragua against Kevin Fleming, which would be unnecessary once the Crowe Group owned the SM land.~~

36. For a variety of reasons, David Crowe was usually the sole communicator and conduit on behalf of the group of twenty-two (22) investors.

37. For stylistic purposes and economy of phrase, the above twenty-two (22) Defendants, who acted in concert to fund the Plaintiff's purchase of SM, will also be described as "the Crowe Group" – this is the descriptive phrase that the parties all used colloquially, before the need for the litigation in the case at bar.unless the context requires otherwise.

27.

38. In August 2018, David Crowe and Mike Lyonette signed NCNDs with the Plaintiff.

28.39.  in August 2018,Mr. Crowe and Mr. Lyonette also  and pledged not to share any information about the Plaintiff or the Sales ContractFunding Contract with any of the rest of their group of 20+ investors unless an individual group member signed a NDA (Non-Disclosure).

40. Approximately 10 of the 20+ investors signed NDAs with the Plaintiff, and thus, if Mr. Crowe, Mr. Lyonette, and others were honoring the Sales ContractFunding Contract and their NDAs, the Plaintiff believes only the dozen or so of them would have gotten information related to the Sales ContractFunding Contract and its progress towards a closing after that point.

29.

41. The NDAs granted jurisdiction of the Plaintiff's choice, had a non-disclosure provision, and in the majority of the NDAs signed, specifically acknowledged that violating the non-disclosure provision, given the Plaintiff's deals, would likely cost the Plaintiffhim over US $10 million in damages, with the Defendants signing up for damages in that amount for that scenario.

42. The Plaintiff shared information with Mr. David Crowe in strict confidence on how he expected to monetize the intangible assets of the Seaside Mariana company, with an expected US $8 million post-tax profit.

30.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**PLAINTIFF'S OTHER DEALS WITH KEVIN FLEMING**

43. After the ~~Sales Contract~~Funding Contract was signed, the Plaintiff signed more contracts with Kevin Fleming, to purchase Isla Mariana (another real estate development) and~~,~~ to purchase seven more Panamanian and Nicaraguan companies.

~~31.~~44.  The Plaintiff also purchased ~~, and to purchase th~~all of the~~e~~ legal claims of Kevin Fleming, Maria Rueda, and the relevant entities.

45. Outside of Seaside Mariana, and as shall be proven in court, the Plaintiff expected to possibly make as much as ~~make~~ on the order of US $4,000,000 to US $5,000,000 more with the completion of the other deals.

46. ~~, and would have made that much more, minimum, with the completion of the other related Fleming deals.~~The Plaintiff disclosed the existence of his other deals with Kevin Fleming to the Crowe Group via Mr. David Crowe (and another deal he was working on in Jamaica).

47. One particular reason the Plaintiff and Mr. Crowe shared information on the Plaintiff's other contracts with Kevin Fleming et al. was to ensure that both purchasing parties (the Plaintiff, buying another residential development called Isla Mariana from its owners; and the Crowe Group, essentially purchasing ~1000 acres of Seaside Mariana via the Plaintiff) were getting the land that they expected to get.

48. Because the Plaintiff was also purchasing Mr. Fleming's development company Nicaragua Developments (which also owned land), and the parent company of Seaside Mariana (Grupo Mariana), via some of these other deals, the Plaintiff would have the power and ability to ensure that his and the Crowe Group's expectations were met.

49. The Crowe Group had information on Seaside Mariana going back to 2006, and thus was able to build maps of all the Seaside Mariana land, including the list of parcels they would get transferred at the Plaintiff's close of the purchase of the Seaside Mariana company. (Because a massive subdivision had occurred, this was important).

32.

**NDA (NONDISCLOSURE AGREEMENT) BREACHES UPON INFORMATION AND&**
**BELIEF**

33.50. Upon information and belief, David Crowe and Mike Lyonette violated the terms of the NDA and shared deal information with other parties that had not signed the NDA.

34.51. Upon information and belief, many other individual Defendants violated the terms of their NDA and shared deal information with other parties.

35.52. Because the Plaintiff was purchasing the development for US $500,000 (plus capped deferred payments) and selling the land to the investors backing him for US $834,000, the Plaintiff was going to make US $334,000 in short-term cash profit in closing his purchase of SM and flipping the land to his investors.

36.53. In addition, as referenced above, and as shall be fully proven at jury trial, the Plaintiff expected to make a much larger sum monetizing the intangible assets he was acquiring as part of this deal.

37.1. For stylistic purposes and economy of phrase, the above Defendants, who acted in concert to fund the Plaintiff's purchase of SM, will be described as "the Crowe Group" unless the context requires otherwise.

13

54. The Crowe Group performed its due diligence on the deal and agreed to move forward to a close.

38.55.  As part of due diligence, the Crowe Group had its attorney go to the local municipal office and ensure that Seaside Mariana still owned all of the relevant land fee simple, and that there was no secured debt mortgage obligation on the land, and no unexpected liens nor unexpected notations in the property registry.

56. After the Crowe Group's due diligence, the Crowe Group ose investors agreed in August 2018 that they would fund the $25,000 that the Plaintiff was required to submit to Kevin Fleming after his due diligence.

57. That moment would also kick off a 60-day closing cycle for the Plaintiff to close on his purchase of SM, and for the Litigating Group (the Crowe Group) to fund said purchase. to close on the purchase within 60 days.

58. Because the Plaintiff knew that Seaside Mariana had taken in US $ 22 million in sales from purchasers and investors, the Plaintiff insisted that Kevin Fleming and the other owners of Seaside Mariana file taxes up to the present.

59. The Plaintiff negotiated a Closing Contract with Kevin Fleming which the relevant parties signed, in which the parties agreed to close on the Plaintiff's purchase (their sale) of the Seaside Mariana company within 60 days.

60. As part of the Closing Contract, the Plaintiff would pass through US $25,000 to Kevin Fleming, which Mr. Fleming pledged to use in significant part for tax professionals to file all of Seaside Mariana's taxes through the present.  (Some of it would be used by the Seaside Mariana sellers to prepare for closing).

61. ~~The Crowe Group~~David Crowe then remitted a ~~-~~$25,000 cashier's check, which the Plaintiff utilized to satisfy his obligation (in the Closing Contract) to fund the closing process, by depositing the check in to Kevin Fleming's Wells Fargo bank account.

62. (In the Funding Contract, the Twenty-Five Thousand Dollars is on page 1, Article I, paragraph 1, where it is a non-refundable deposit).~~to finance the closing process.~~

63. It is worth noting that early in the Plaintiff's process with the Crowe Group, the Crowe Group had essentially committed to funding the purchase but only if everything was as they expected (due diligence on all files and details), and further details could be worked out.

64. As of August 11th, 2018, when the Crowe Group / Litigating Group agreed to the Funding Contract with the Plaintiff, the Crowe Group still had one contingency to pull out of the deal, if anything about their due diligence did not pass muster, also in the Funding Contract, page 1, Article I, paragraph 1, where the Crowe Group could let the Funding Contract unwind.

65. However, once the Crowe Group / Litigating Group had completed due diligence and remitted the US $25,000 non-refundable deposit towards the US $500,000 purchase price the Plaintiff had to pay to purchase the SM company (US $475,000 more after the US $25,000), the Crowe Group no longer had any contingency to pull out of the deal.

66. At that point, the Crowe Group (including these Defendants) were fully committed to the funding outlined for the Plaintiff's purchase of Seaside Mariana, with no contingency or other way to get out of the Funding Contract.

~~39. The parties signed a new definitive contract in August 2018 for a closing in October 2018.~~

~~40. There was no contingency or liquidated damages in the contract, as the Crowe Group was quite familiar with the assets being purchased, their current state, and had done their due diligence.~~

1    41.1.    The Crowe Group then remitted $25,000 to finance the closing process.

2

3

4

5    **DEFENDANTS' INITIAL BREACH**

6    42.67.  The Sales ContractFunding Contract called for a closing date in mid-October-2018, as did

7    the Plaintiff's purchase contract of Seaside Mariana (reinforced in subsequent signed Closing

8    Contracts)..

9    43.68.  The parties retained attorneys to prepare closing documents.

10   44.69.  The parties worked out the logistics of closing in a "simultaneous close", which is well-

11   understood to mean two- successive closings.

12   70. In the agreed logistics, the Plaintiff would acquire the entity Seaside Mariana Golf and Spa

13   Resorts company,, SA, which owned all the land, using another US $475,000 of the Crowe

14   Group's money for said close.

15

16   71. Then, the Plaintiff would transfer the lands in the Sales ContractFunding Contract to the entity

17   of the Crowe Group's choice.  (Then, tThe Plaintiff or his designated entityees would then get

18   the other US $334,000 promised by these Defendants in a series of quarterly payments in 2019

19   and early 2020)..

20   72. It is worth noting that one condition of close (in the Closing Contract) was not fulfilled by

21   Kevin Fleming; namely, he did not file the taxes for Seaside Mariana for the missing years.

22

23   73. However, this was the Plaintiff's issue and not the Crowe Group's.  The Plaintiff would be the

24   owner of the Seaside Mariana company.  The Plaintiff worked out with David Crowe, on behalf

25

26

of the Crowe Group, that he would take responsibility for the taxes and simply file them for Seaside Mariana, as the new owner, after the close of his purchase of the SM company.

74. The Crowe Group agreed, via David Crowe, that this was acceptable to them and would not be a barrier to the close, nor their funding of it.

75. As part of the logistics for the close, the Plaintiff offered to provide a limited power of attorney in the Plaintiff's name, to David Crowe's wife, that would be valid only to transfer the Seaside Mariana land out of the Seaside Mariana company.

76. At this point, in October 2018, the Plaintiff had fully performed as per the parties' contract, as far as he could without the US $475,000 promised in the Funding Contract.  Within a few days, with the help of attorneys, the closing would happen, and using the Crowe Group's US $475,000, the Plaintiff would purchase the Seaside Mariana company, thereby owning its shares.

77. The Plaintiff would then immediately transfer the land to the Crowe Group's designated new entity (or let Mr. Crowe's wife handle this step via the limited power of attorney).

78. It was now time for the Defendants to perform with the rest of the funding promised in the Funding Contract for the Plaintiff's purchase of the Seaside Mariana company; namely, the additional US $475,000.

45.

79. However, with the Plaintiff about to fly to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group, informed the Plaintiff that there was a new issue that could impact the anticipated closing.

80. Mr. Crowe informed the Plaintiff that Mr. Ted Cole had sued Seaside Mariana again. (Mr. Cole had previously sued Seaside Mariana and settled for a significant part of the Seaside Mariana land).

81. At this point, the Litigating Group was already aware of the other contracts the Plaintiff had signed with Kevin Fleming, Maria Rueda, Grupo Mariana, and Nicaragua Developments to purchase another eight of the real estate ownership and real estate development company.

82. David Crowe and the Litigating Group were also aware of a deal the Plaintiff was working on with the Jamaican government, as Mr. Crowe kindly lent the Plaintiff $5,000 so he could travel to Jamaica and for related costs. (In a few successive loans, Mr. Crowe kindly lent the Plaintiff approximately US $11,500, which the Plaintiff would like to repay to Mr. Crowe, with interest, when he is able).

83. ~~he and the rest of his investor group refused to close and would not be closing, breaching the Sales Contract.~~The Plaintiff then revealed to Mr. Crowe, and thus all of these Defendants, that he had also purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims. The Plaintiff thus had the right, using assigned legal claims, to sue Mr. Cole for his past tortious acts against Mr. Fleming, Ms. Rueda, and the Seaside Mariana company.

84. Mr. Crowe and the Plaintiff obtained a copy of the new Ted Cole legal complaint, and it was frivolous at best.

85. The Plaintiff was therefore unconcerned about the Cole litigation and planned defensive litigation for Seaside Mariana as soon as the Plaintiff owned the Seaside Mariana company in a few days.

86. The Plaintiff proposed to these Defendants, via Mr. Crowe, that the combination of offensive litigation against Mr. Cole (for past tortious acts) and defending the frivolous new legal complaint

would be a simple, inexpensive, and effective remedy to solve any concerns about the Cole legal complaint.

87. Further, as the Plaintiff pointed out, the new Cole litigation was the Plaintiff's problem, as the soon-to-be-owner of the Seaside Mariana company, which was the entity getting sued.

88. The Plaintiff pointed out that within days the Seaside Mariana land would be transferred to the Litigating Group's designated new entity. As the entity was about to be formed, it clearly would have no liability to anyone including Mr. Cole.

89. However, the Litigating Group, including these Defendants, refused to fund the Plaintiff's purchase of the Seaside Mariana company (contrary to their promises, representations, obligations, and responsibilities set out in the Funding Contract).

46.

90. David Crowe then assured the Plaintiff that Seaside Mariana M was no longer attractive to any of the Litigating Group his investment group.

91. The reason stated by Mr. Crowe that the Litigating Group now had zero interest in the SM company and SM land, and that they also had zero interest in honoring the Funding Contract, was the new Ted Cole litigation. (This is not a valid reason to breach a contract but is interesting in light of Mr. Crowe and the Litigating Group's his and the group's further actions, below) further actions, below).

47.

19

**THE SECOND ~~MADDEN~~ BREACH AND REPUDIATION (ON BEHALF OF ALL DEFENDANTS)**

92. In March 2019, Defendant Thomas P. Madden contacted Kevin Fleming on behalf of the Crowe Group, with the following email (Exhibit E~~B~~), attempting to purchase Seaside Mariana, despite:~~.~~

    a.   The non-circumvent these Defendants and the Crowe Group had agreed to.

    b.   The Funding Contract they had signed.

    ~~48.~~c.    The various representations they made in October 2018, just before the parties would have closed, that they were pulling out and were no longer interested in the Seaside Mariana land.

**THE ~~THIRD~~~~SECOND~~ CROWE BREACH/REPUDIATION (ON BEHALF OF ALL DEFENDANTS)**

~~49.~~93.  In April 2019, Defendant David Crowe contacted Kevin Fleming, following up on communications from Thomas Madden and David Crowe, in email, attempting to negotiate a direct purchase of the SM company and land (without involving the Plaintiff).~~.~~

~~50.~~94.  In doing so, it is clear Crowe and all Defendants fully ratified the first Crowe Group breach as well as the second ~~Madden~~ breach~~es~~ and repudiation (Madden contact of Fleming to try to buy direct) of the ~~Sales Contract~~Funding Contract.

20

**FURTHER RAMIFICATIONS OF THE CROWE GROUP BREACHES**

95. In and after March 2019, once Thomas Madden contacted Kevin Fleming to negotiate with him directly, on behalf of the Crowe Group, and once David Crowe followed through and continued those negotiations on behalf of all Crowe Group members and all Defendants, Kevin Fleming stopped returning the Plaintiff's phone calls.

96. (In December 2019, Kevin Fleming emailed the Plaintiff to say he was terminating the Purchase Contract.  However, Mr. Fleming did not have the legal right to do so).

51.

52.97.  Fleming refused to honor any of the rest of the Plaintiff's contracts with him or his entities.

98. As a result, the Plaintiff has potentiallylost lost another US $4 million or more, as shall be further proven at trial (with US ~$3 million of profits expected to come from the Isla Mariana / Nicaragua Developments deals).  (The Plaintiff admits that these profits were speculative, and that from a legal standpoint, each expected potential profit must be multiplied by the percentage chance that the Plaintiff would have realized that particular profit.  This, too, will occur at a jury trial expected in 2023)..

53.99.  The Plaintiff is doing what he can to mitigate the damages.

**CONCLUSION**

54.100.        The Defendants' breaches, repudiations, false promises, representations, and assurances, not to mention their tortious acts and non-acts, and their negligence  and false promises and assurances have caused significant damages to Plaintiff, in an amount to be proven at trial.

21

1    101.    The Plaintiff has worked to try to remedy the Defendants' breaches and to mitigate damages,

2        but to no avail thus far.

3    102.    The Plaintiff will continue to do his best to mitigate the base damages, especially his hoped-

4

5        for and expected profits from purchasing the Seaside Mariana company (other than the US

6        $334,000).

7    103.    The Plaintiff contacted David Crowe of the Crowe Group to see if they could work

8        something out, whether a way to move forward, or a settlement, but Mr. Crowe was not

9        interested.

10   104.    The Plaintiff has had similar discussions with Mr. Rau, Mr. Madden, and Mr. Jimenez, with

11

12       no interest by those parties in continuing a discussion about ways the Plaintiff can still close on

13       the Seaside Mariana company (if that is even relevant or possible).  Mr. Rau and Mr. Jimenez

14       had no interest in that nor in any settlement discussions.

15   55.

16   105.    The Plaintiff was left with no choice but to file this legal complaint so that the scales of

17       justice may balance appropriately.

18   56.106.        (Mr. Thomas Madden, Mr. Brian Putze, and Ms. Sandra Winfrey have all settled

19       with the Plaintiff, and were dismissed with prejudice in this legal complaint).

20

21

22                          -   —Count I (A) – First Breach of Contract

23

24   57.107.        The Plaintiff realleges paragraphs 1–55 paragraphs 1-92 as if fully set out herein.

25   108.    The Plaintiff entered in to contracts with these Defendants including the Funding Contract.

26

1    58.109.        The Defendants' refusal to close, and to fund the Plaintiff's purchase of the Seaside

2        Mariana company (in October 2018),close breached the Sales ContractFunding Contract.

3    110.    As a direct and proximate result of the Defendants' breach, the Plaintiff lost an asset he

4        would have owned, the Seaside Mariana company.

5

6    111.    As a direct and proximate result of the Defendants' breach, the Plaintiff lost $334,000

7        i$334,000 in near term profits.

8    112.    As a direct and proximate result of the Defendants' breach, the Plaintiff avers that he lost up

9        to another US $8 million (post-tax) in the medium term (within approximately nine months of

10        the close) in proceeds that the Seaside Mariana company would have received.  (The Plaintiff is

11        attempting to mitigate these damages; these Defendants have rejected any notion of mitigating

12        the Plaintiff's damages, at least through mid-February 2021).

13

14    113.    In the alternative, the Defendants' clear and unequivocal refusal to perform and fund the

15        close was an express repudiation of the Funding Contract.

16    59.114.        and (as specifically acknowledged in NDAs signed by members of the Crowe

17        Group) the potential to recover in excess of $10,000,000 (ten million dollars) in other pre-tax

18        value over time, as shall be further proven at trial.The Plaintiff will fully prove all his base

19        damages at jury trial.

20

21

22                        **Count I (B) – Second Breach of Contract**

23

24    115.    The Plaintiff realleges paragraphs 1-92 as if fully set out herein.

25

26

116.    Thomas Madden's contacting Mr. Kevin Fleming in March 2019 to attempt to purchase the Seaside Mariana company and its land without the Plaintiff's involvement constituted a willful breach of the non-circumvent that had been agreed to and an independent willful breach of the Funding Contract, impliedly if not explicitly.

117.    In the alternative, Mr. Madden's acts to contact Mr. Fleming and to circumvent the Plaintiff despite the Funding Contract and other agreements with the Plaintiff constituted a repudiation of the Funding Contract.

118.    Upon information and belief, Mr. Madden contacted Mr. Fleming with the knowledge and support of these Defendants.

119.    In the alternative, since these Defendants were all partners in the Litigating Group, with a partnership agreement governing that partnership, these Defendants (and their partnership) are all civilly responsible (and liable) for Mr. Madden's tortious acts in this context, via agency.

120.    As a direct and proximate result of these Defendants' breach of contract, the Plaintiff lost an asset he would have owned, the Seaside Mariana company.

121.    As a direct and proximate result of the Defendants' breach of contract, the Plaintiff lost US $334,000 in near term profits.

122.    As a direct and proximate result of the Defendants' breach of contract, the Plaintiff avers that he lost up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received. (The Plaintiff is attempting to mitigate these damages; these Defendants have rejected any notion of mitigating the Plaintiff's damages, at least through mid-February 2021).

123.    In the alternative, Madden's and the Defendants' contact of Fleming and attempt to purchase the SM company and land constituted an implied further repudiation of the Funding Contract.

124.    The Plaintiff will fully prove all his base damages in the jury trial.

**Count I (C) – Third Breach of Contract**

125.    The Plaintiff realleges paragraphs 1-92 as if fully set out herein.

126.    David Crowe's April 2019 following up on Thomas Madden's contact of Mr. Kevin Fleming to negotiate the direct purchase of the Seaside Mariana company and its land without the Plaintiff's involvement constituted a willful breach of the non-circumvent that had been agreed to and an independent willful breach of the Funding Contract, impliedly if not explicitly.

127.    To the extent that these Defendants were not aware of Mr. Madden's March 2019 contact of Mr. Fleming and/or did not endorse it then, the April 2019 contact and negotiations also served as a ratification of Mr. Madden's contact of Mr. Fleming by these Defendants, to attempt to circumvent the Plaintiff despite the terms of the Funding Contract.

128.    Mr. Crowe's April 2019 contact with Mr. Fleming and attempt to purchase the SM company and land directly also constituted another repudiation of the Funding Contract.

129.    Upon information and belief, Mr. Crowe negotiated with Mr. Fleming with the knowledge and support of the rest of these Defendants.

130.    In the alternative, since these Defendants were all partners in the Litigating Group, with a partnership agreement governing that partnership, these Defendants (and their partnership) are all civilly responsible (and liable) for Mr. Crowe's tortious acts in this context, via agency.