(EXHIBIT A)

**STATE OF WASHINGTON**
**DEPARTMENT OF FINANCIAL INSTITUTIONS**
**SECURITIES DIVISION**

| | |
|---|---|
| IN THE MATTER OF DETERMINING Whether there has been a violation of the Securities Act of Washington by: <br><br> Thomas P. Madden, <br><br> Respondent. | ) Order No.: S-14-1463-15-SC01 <br> ) <br> ) STATEMENT OF CHARGES AND NOTICE OF INTENT <br> ) TO ENTER ORDER TO CEASE AND DESIST, TO <br> ) IMPOSE FINES, AND TO CHARGE COSTS <br> ) <br> ) <br> ) |

**THE STATE OF WASHINGTON TO:**     **Thomas P. Madden**

**STATEMENT OF CHARGES**

Please take notice that the Securities Administrator of the state of Washington has reason to believe that Respondent Thomas Madden has violated the Securities Act of Washington and that his violations justify the entry of an order of the Securities Administrator under RCW 21.20.390 against him to cease and desist from such violations and to charge costs, and, under RCW 21.20.395, to impose a fine. The Securities Administrator finds the following:

**TENTATIVE FINDINGS OF FACT**

**Respondent**

1.     Thomas Madden, a Washington resident, earns income through the sale of stock in companies that he consults for. Thomas Madden lived in Washington, until approximately 2012, when he moved to Arizona for work. Thomas Madden holds a Washington driver's license and maintains a home in Washington, which he frequently visits.

**Related Parties**

2.     Madden Consulting, Inc. was a Washington corporation through which Thomas Madden offered business consulting services, which included helping companies raise capital. The company was formed in 1993 and is no longer active. Thomas Madden acted as the principal of Madden Consulting, Inc.

3.     Investor Relations International, Inc. was a Delaware corporation through which Thomas Madden offered business consulting services, which included helping companies raise capital. The company was formed in 1998 and is no longer active. Thomas Madden acted as the principal of Investor Relations International, Inc.

4.     Madcon Company, Inc. was a Washington corporation through which Thomas Madden offered business consulting services, which included helping companies raise capital. The company was formed in 1999 and is no longer active. Thomas Madden acted as the principal of Madcon Company, Inc.

STATEMENT OF CHARGES AND NOTICE
OF INTENT TO ENTER ORDER TO
CEASE AND DESIST AND TO IMPOSE FINES,
AND TO CHARGE COSTS

1

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia WA  98507-9033
360-902-8760

5.    Nascent Value, LLC was a Delaware limited liability company through which Thomas Madden offered business consulting services, which included helping companies raise capital. The company was formed in 2008 and is no longer active. Thomas Madden acted as the principal of Nascent Value, LLC.

6.    Summit Capital USA, Inc. is an Arizona corporation formed in 2010 for the purpose of providing business consulting services, which include helping companies raise capital. Gregg C. Johnson acts as the principal of Summit Capital USA, and operates a similar Canadian company named, Summit Capital Corp. Thomas Madden served as an officer of the Summit Capital USA until March 2015, when the other officers of the company removed him as a result of the Securities Division's investigation. Thomas Madden continues to work for the company.

## Overview

7.    Since 1993, Thomas Madden has acted as a consultant, either independently or through Summit Capital USA, helping client companies raise capital. Rather than receive money as compensation for these services, Thomas Madden mostly receives shares in his client companies in exchange for his work. To earn income, Thomas Madden has to sell these shares, which he often does, both here in Washington and outside the state, to members of his church and to his acquaintances. The stock is typically penny stock or high-risk stock.

8.    In effecting these sales of stock, Thomas Madden acts as a securities broker-dealer, an activity he is not registered for. And in the course of earning approximately $383,000 from 2011 to 2015 from his securities sales to at least 16 Washington investors, Thomas Madden both misrepresented and omitted material information. To date, most all of these investors have yet to receive a return on their investment.

## Thomas Madden's Unregistered and Fraudulent Broker-Dealer Activity

### Introduction

9.    From approximately 1993 to 2010, Thomas Madden worked as a business consultant, providing his services through four separate companies he owned: Madden Consulting, Inc.; Investor Relations International, Inc.; Madcon Company, Inc.; and Nascent Value , LLC. In approximately 2010, Thomas Madden began working for Summit Capital USA, Inc.

10.    Thomas Madden's work through or at each of these companies mostly involved helping client companies raise capital. He typically consulted for newly publicly registered companies with limited operating or financial history.

### Client Services Rendered

11.    Summit Capital USA's business model includes creating publicly registered shell companies[1] and helping effectuate their merger with private companies, which seek to have their shares of stock publicly traded. Examples of

---

[1] Summit Capital USA often employs Donald Stoecklein to create and register these shell companies. In 1995, the SEC entered into a consent order with Donald Stoecklein to resolve the SEC's allegations of Donald Stoecklein's fraudulent sale of stock. Donald Stoecklein failed to pay the disgorgement provided for in the consent order, and in 2015, the SEC filed a lawsuit against Donald Stoecklein, to require Donald Stoecklein to pay the disgorgement.

STATEMENT OF CHARGES AND NOTICE
OF INTENT TO ENTER ORDER TO
CEASE AND DESIST AND TO IMPOSE FINES,
AND TO CHARGE COSTS

2

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia WA  98507-9033
360-902-8760

1  this strategy include their facilitation of Highland Business Corporation's merger with a private company to form

2  Elevate, Inc., a company that purported to sell home security systems; MyOtherCountryClub.com's merger with a

3  private company to form Star Mountain Resources, Inc., a mining company; and Dignyte, Inc.'s merger with a private
   company to form eWellness Healthcare Corporation, a company that provides telemedicine services.

4  12.    Summit Capital USA also helps client companies maintain their registration status with the Securities and

5  Exchange Commission and works with client companies to have shares of the client companies' stock traded on the
   over-the-counter market. Stock traded on the over-the-counter market is commonly called penny stock. The price per

6  share of this stock is typically less than $5.00. These stocks are usually thinly-traded and have a low market-
   capitalization.

7  13.    Summit Capital USA relies on Thomas Madden to help these client companies raise capital.

8                              *Compensation from Client Companies*

9  14.    As compensation for their work, Thomas Madden and the principals of Summit Capital USA, receive shares in
   their client companies. Additionally, the shares that they owned in the publicly registered shell companies that they

10 formed are often converted into stock in the surviving company of the merger. Thus, Thomas Madden typically has

11 two sources of shares in his client companies.

12 15.    To earn income from his work, Thomas Madden personally sells the shares that he owns or claims to own in
   client companies, rather than selling the shares through a registered broker-dealer. The money that he earns from these

13 sales has been the sole source of Thomas Madden's income.

14                              *Method and Solicitation of Sales*

15 16.    Thomas Madden has solicited his shares of stock to members of his church, his acquaintances, and friends of

16 his acquaintances.[2] He typically meets with prospective investors in person or speaks with them over the phone. As
   part of his sales pitch, Thomas Madden explains that he consults for the company, briefly describes the company's

17 business, and provides investors with instructions on how to purchase his shares.

18                              *Stock Purchase Agreements*

19 17.    To effectuate these secondary sales of stock, Thomas Madden enters into stock purchase agreements with

20 investors. In these stock purchase agreements, Thomas Madden represents that he owns the shares of stock to be sold,
   that the shares of stock are unrestricted, and that he will transfer the stock to the investor upon receiving the investor's

21 payment. Thomas Madden instructs investors to make their payments for the stock to him.

22 _____
   [2] Summit Capital USA's business model creates a conflict of interest between its principals and its client company: Summit

23 Capital USA's principals have an incentive to sell the shares of stock they own in a client company, rather than a client company's
   new issue shares. Summit Capital USA's principals can also sell their shares in a client company at a lower price per-share than

24 the subscription price per-share of a client company's new issue stock. Both of these factors limit a client company's ability to

25 raise capital through the public sale of its stock.

STATEMENT OF CHARGES AND NOTICE                     3              DEPARTMENT OF FINANCIAL INSTITUTIONS
OF INTENT TO ENTER ORDER TO                                                     Securities Division
CEASE AND DESIST AND TO IMPOSE FINES,                                                   PO Box 9033
AND TO CHARGE COSTS                                                          Olympia WA   98507-9033
                                                                                     360-902-8760

18.    From approximately 2011 to 2015, Thomas Madden sold stock in this fashion to 16 known Washington residents. Most all of the Washington residents to whom Thomas Madden sold stock had never directly purchased stock that was either privately held or that was traded on the over-the-counter market.

19.    At least two investors were eighty years old at the time they purchased stock from Thomas Madden and another maxed out his home equity line of credit and took out a personal loan to help finance the purchase of stock from Thomas Madden. Thomas Madden raised approximately $383,000 from his sale of stock to these Washington residents, and the course of doing so, engaged in the following fraudulent conduct:

### False Representations About Ownership of Client Company Stock

20.    Although Thomas Madden received shares of stock in client companies, at times, he often did not own any or enough of the stock he purported to sell.

21.    Corporate records indicate that Thomas Madden never owned shares in Elevate, Inc., Dignyte, Inc., and eWellness Healthcare Corporation at the time that he entered into stock purchase agreements and received payment from at least five Elevate, Inc. investors, two Dignyte, Inc. investors, and four eWellness Healthcare Corporation investors.

22.    Thomas Madden took money from these investors, but did not have any stock to transfer to them.

### Failure to Execute Orders in Timely Fashion

23.    Registered broker-dealers are required to promptly deliver purchased securities. Thomas Madden entered into most all of the Dignyte, Inc. and eWellness Healthcare Corporation stock purchase agreements in 2014, but did not submit the Dignyte, Inc. and eWellness Healthcare Corporation stock purchase agreements to the companies' transfer agent until May 2015, days before his testimony before the Securities Division.

24.    For over a year, Dignyte, Inc. and eWellness Healthcare Corporation did not have record that these investors were shareholders in the company. During this period, these investors did not have legal title to shares of stock in either company and did not have the ability to resell any shares they may have owned.

25.    Thomas Madden falsely represented to Washington investors that he would transfer their stock upon receiving their payment, and he failed to disclose to these investors the risks associated with significant delays in executing their transactions.

### Restricted Status of Stock Sold

26.    In the stock purchase agreements that Thomas Madden enters into, he represents that the stock he will transfer to investors is "free trading," or clear of any restrictions on resale.

27.    However, the transfer agent for Dignyte, Inc. and eWellness Healthcare Corporation listed all of the shares that Thomas Madden owned in both companies as restricted at the time he entered into stock purchase agreements with the Washington residents described above. Owners of restricted stock have limitations on their ability to resell their stock.

STATEMENT OF CHARGES AND NOTICE
OF INTENT TO ENTER ORDER TO
CEASE AND DESIST AND TO IMPOSE FINES,
AND TO CHARGE COSTS

4

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia WA  98507-9033
360-902-8760

28.     Thomas Madden falsely represented to these Washington investors that the shares he would sell them were unrestricted.

*Arbitrary Pricing of Sales*

29.     The Washington investors who signed stock purchase agreements with Thomas Madden did not negotiate the price per share that they paid. Rather, Thomas Madden presented the investors with price per share at which they could purchase the shares.

30.     Registered broker-dealers are required to enter into securities transactions for investors at a price reasonably related to the market price of the security, but Thomas Madden denied investors in the following sales of this protection.

31.     Star Mountain Resource, Inc.'s stock traded on the over-the-counter market during the time period that Thomas Madden sold his shares in Star Mountain Resources, Inc. to Washington investors. Thomas Madden sold his shares in in the company to one Washington investor for $0.90 per share, approximately triple the market price of the stock.

32.     In 2014 and 2015, Dignyte, Inc.'s and eWellness Healthcare Corporation's stock was not traded on any public exchange. Thomas Madden sold his purported shares in the company to Washington investors from anywhere between $0.30 to $1.00 per share, but purchased shares from eWellness Healthcare Corporation at one point during this period, for $0.13 per share. Notably, on the same day in 2014, Thomas Madden sold one investor shares in Dignyte, Inc. for $0.50 per share and sold another investor shares in the same shell company for $1.00 per share.

*Further Misrepresentations and Omissions in Connection with Brokerage Sales*

33.     Thomas Madden sold shares he claimed to own in Elevate, Inc. to a Washington resident. Prior to this sale, Thomas Madden represented that he would be able to double or triple the Washington resident's investment. Thomas Madden explained that 30 days after the Washington resident's purchase of the purported stock, Thomas Madden could then resell the Washington resident's stock for a guaranteed two to three times the price that the Washington resident paid for the stock. Thomas Madden failed to disclose to the Washington resident any details about the market for resale of Elevate, Inc. stock, his ability to resell any Elevate, Inc. stock, and the bases and assumptions underlying his claim that the stock would sell for double or triple the price paid for by the Washington resident. The Washington resident lost the full value of his investment.

34.     In the course of selling shares he owned or claimed to own in Dignyte, Inc., Thomas Madden represented that the company would soon merge with eWellness Healthcare Corporation. Although this later happened, at the time that Thomas Madden entered into stock purchase agreements to sell shares of stock in Dignyte, Inc., Dignyte, Inc. was a blank check shell company with no assets. The company did not sell any products, provide any services, or have any operations. The company, further, had no clear means to provide investors a return on their investment. Thomas

STATEMENT OF CHARGES AND NOTICE
OF INTENT TO ENTER ORDER TO
CEASE AND DESIST AND TO IMPOSE FINES,
AND TO CHARGE COSTS

5

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia WA  98507-9033
360-902-8760

Madden failed to disclose to these Washington investors the risks associated with investing in a blank check shell company and that such investments are high-risk and speculative.

35.    Thomas Madden represented to prospective Dignyte, Inc. and eWellness Healthcare Corporation investors that shares of each company's stock would soon be publicly traded, but he failed to provide investors with any information supporting these representations. Additionally, Thomas Madden failed to disclose that a liquid public market for shares of stock in these companies may never develop.

36.    Thomas Madden further failed to disclose to investors specific risks associated with investing in penny stock or thinly-traded stock, namely that Summit Capital USA owned a beneficial interest in Star Mountain Resources, Inc., Dignyte, Inc., and eWellness Healthcare Corporation, and its sale of stock in either company could dramatically affect shares of the price of the company's stock.

### Omissions About Past Business Failures and Lawsuits

37.    Since Thomas Madden began his consulting work, of his known clients, the stock of six of these companies realized some short-term gains while traded in the over-the-counter market, but their values all ultimately crashed. Two companies that Thomas Madden consulted for were the subject of legal action by the Securities and Exchange Commission, the principals of two other companies misappropriated investor funds, and another company failed.

38.    In 2007, a Washington resident sued Thomas Madden for defaulting on a promissory note for funds loaned to Thomas Madden for his consulting work. Thomas Madden and Nascent Value, LLC were sued in 2009 over money they owed to investors. And, in approximately 2012, Thomas Madden was the subject of another lawsuit for failing to repay an investor. In each of these three cases, the plaintiffs obtained a judgment against Thomas Madden.

39.    Thomas Madden failed to disclose to Washington investors that many of his prior stock sales had failed and that he has been sued in connection with his prior sales of stock.

### Registration Status

40.    Thomas Madden was previously registered to sell securities in Washington as a broker-dealer representative from 1991 to1993, but he has not since been registered to sell securities in any capacity in Washington.

Based on the above Findings of Fact, the following Conclusions of Law are made:

## CONCLUSIONS OF LAW

1.    The entry into the stock purchase agreements and the sale of stock, as described above, constitutes the offer and sale of securities as defined in RCW 21.20.005(14) and (17).

2.    Thomas Madden has violated RCW 21.20.040 by offering and selling securities while not registered as a securities broker-dealer in Washington.

STATEMENT OF CHARGES AND NOTICE
OF INTENT TO ENTER ORDER TO
CEASE AND DESIST AND TO IMPOSE FINES,
AND TO CHARGE COSTS

6

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia WA  98507-9033
360-902-8760

3.    The offer and sale of these securities were in violation of RCW 21.20.010 because Thomas Madden made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

## NOTICE OF INTENT TO ORDER THE RESPONDENT TO CEASE AND DESIST

Pursuant to RCW 21.20.390(1) and based upon the above Tentative Findings of Fact and Conclusions of Law, the Securities Administrator intends to order that Respondent Thomas Madden shall cease and desist from violations of RCW 21.20.010, RCW 21.20.040, and RCW 21.20.040.

## NOTICE OF INTENT TO IMPOSE A FINE

Pursuant to RCW 21.20.395, and based upon the above Tentative Findings of Fact and Conclusions of Law, the Securities Administrator intends to order that Respondent Thomas Madden shall be liable for and shall pay a fine of $50,000.

## NOTICE OF INTENT TO CHARGE COSTS

Pursuant to RCW 21.20.390, and based upon the Tentative Findings of Fact and Conclusions of Law, the Securities Administrator intends to order that Respondent Thomas Madden shall be liable for and shall pay costs, fees, and expenses incurred in the administrative investigation and hearing of no less than $25,000.

## AUTHORITY AND PROCEDURE

This Statement of Charges is entered pursuant to the provisions of Chapter 21.20 RCW and is subject to the provisions of Chapter 34.05 RCW. Thomas Madden make a written request for a hearing as set forth in the NOTICE OF OPPORTUNITY TO DEFEND AND OPPORTUNITY FOR HEARING accompanying this Order. If a respondent does not make a hearing request in the time allowed, the Securities Administrator intends to adopt the above Tentative Findings of Fact and Conclusions of Law as final and to enter a permanent order to cease and desist, to impose any fines sought, and to charge any costs sought against Thomas Madden.

Signed and Entered this 23rd day of May 2016.

William M. Beatty
Securities Administrator

STATEMENT OF CHARGES AND NOTICE
OF INTENT TO ENTER ORDER TO
CEASE AND DESIST AND TO IMPOSE FINES,
AND TO CHARGE COSTS

7

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia WA  98507-9033
360-902-8760

1

2    Approved by:                          Presented by:

3    *[signature]*                         *[signature]*

4

5    Suzanne Sarason                       Eric Palosaari
     Chief of Enforcement                  Financial Legal Examiner

6

7    Reviewed by:

8    *[signature]*

9

10   Jack McClellan
     Financial Legal Examiner Supervisor

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATEMENT OF CHARGES AND NOTICE        8    DEPARTMENT OF FINANCIAL INSTITUTIONS
OF INTENT TO ENTER ORDER TO                              Securities Division
CEASE AND DESIST AND TO IMPOSE FINES,                         PO Box 9033
AND TO CHARGE COSTS                              Olympia WA   98507-9033
                                                             360-902-8760

NEW APPLICATION

0000186720

BEFORE THE ARIZONA CORPORATION COMMISSION

RECEIVED
DOCKET CONTROL

COMMISSIONERS

Arizona Corporation Commission
DOCKETED

2018 MAR 12 P 12: 47

TOM FORESE - Chairman
   BOB BURNS          MAR 1 2 2018
   ANDY TOBIN
   BOYD DUNN          DOCKETED BY:
   JUSTIN OLSON                 _____



EXHIBIT B

| | |
|---|---|
| In the matter of: | DOCKET NO. S-21042A-18-0059 |
| THOMAS P. MADDEN and Leslie Madden, husband and wife, | NOTICE OF OPPORTUNITY FOR HEARING REGARDING PROPOSED ORDER TO CEASE AND DESIST, ORDER FOR RESTITUTION, ORDER FOR ADMINISTRATIVE PENALTIES, AND ORDER FOR OTHER AFFIRMATIVE ACTION |
| Respondents. | |

**NOTICE:    EACH RESPONDENT HAS 10 DAYS TO REQUEST A HEARING**

**EACH RESPONDENT HAS 30 DAYS TO FILE AN ANSWER**

The Securities Division ("Division") of the Arizona Corporation Commission ("Commission") alleges that respondent Thomas P. Madden has engaged in acts, practices, and transactions that constitute violations of the Securities Act of Arizona, A.R.S. § 44-1801 *et seq.* ("Securities Act").

**I.**

**INTRODUCTION**

1.    Madden's livelihood consists of offering and selling stock in start-up companies and blank-check companies.[1] From October 2012 through July 2016, Madden offered or sold stock to at least 88 investors in over 180 transactions.

2.    Madden's securities offers and sales make him a dealer under A.R.S. § 44-1801(9), i.e. a person who engages part- or full-time as an agent, broker or principal in the business of offering, buying, selling or otherwise dealing in securities.

---

[1] The Securities and Exchange Commission describes blank-check companies as follows: "A blank check company is a development stage company that has no specific business plan or purpose or has indicated its business plan is to engage in a merger or acquisition with an unidentified company or companies, other entity, or person. These companies typically involve speculative investments and often fall within the SEC's definition of 'penny stocks' or are considered 'microcap stocks.'"

Docket No. S-21042A-18-0059

3.      While Madden received nearly $4 million from his stock transactions, his purchasers received shares in startup companies with almost no operations or revenues, no profits, and years of significant net losses. The stock ultimately became worth next to nothing.

4.      Madden failed to disclose the risks of these stocks to his purchasers. He also failed to disclose other information that would have been material to a person purchasing stock from a dealer such as Madden, namely that he'd been sued by investors in previous stock transactions where the stock turned out to be complete losses for the purchasers and borrowed money from clients that he was unable to pay back. These omissions constitute fraud under A.R.S. § 44-1991.

## II.

## JURISDICTION

5.      The Commission has jurisdiction over this matter pursuant to Article XV of the Arizona Constitution and the Securities Act.

## III.

## RESPONDENTS

6.      Thomas P. Madden is a married man who resided in Chandler, Arizona from 2011 through 2016. Madden may be referred to as "Respondent."

7.      Leslie Madden ("Respondent Spouse") was at all relevant times the spouse of Respondent. Respondent Spouse is joined in this action under A.R.S. § 44-2031(C) solely for purposes of determining the liability of the marital community.

8.      At all times relevant, Madden was acting for his own benefit and for the benefit or in furtherance of his and Respondent Spouse's marital community.

## IV.

## FACTS

9.      Beginning in late 2011 and continuing through 2016, Madden worked for Summit Capital USA, Inc. a financial-services firm based in Tempe, Arizona. Summit was not registered as a securities dealer in Arizona.

2

Docket No. S-21042A-18-0059

10.    In its filings with the Securities and Exchange Commission, Summit describes its business as "merchant banking and strategic business advisory services."

11.    Summit's financial services included helping companies raise capital and assisting companies in becoming publicly-traded. In exchange for its services, Summit would receive an equity position in its clients.

12.    Summit frequently formed blank-check, shell corporations to merge with existing companies. Summit would own all or most of the equity in the shell company. After merging the shell company to the existing company, Summit would receive equity in the existing company.

13.    From late 2011 through 2014, Madden was Summit's general manager/senior manager and a 25% owner. His work involved, among other things, helping clients prepare to go public and assisting clients in raising capital by introducing them to investors and brokers. In early 2015, Summit changed Madden's title to "Of Counsel" when the State of Washington began investigating Madden; while his title changed, Madden continued to work for Summit in the same capacity. (Washington's investigation resulted in Washington issuing a consent order against Madden on October 18, 2016, that found Madden in violation of the state's securities registration and anti-fraud provisions.)

14.    For approximately his first year of employment at Summit, Madden received compensation in the form of a monthly salary and stock of the corporations that Summit formed for mergers, the entity that survived the merger, and other client companies. After working at Summit for a time, Madden's compensation consisted solely of stock from Summit's clients, shell companies, and merger entities.

15.    In April 2011, Summit formed, Dignyte, Inc., a blank-check, shell corporation with no operations.

16.    In 2014, Dignyte merged with eWellness Healthcare Corporation, a start-up company formed in Nevada in 2013. eWellness describes itself as "a Los Angeles based medical technology

3

1  company that combines digital physical therapy with progressive in-home exercise programs that
2  includes active real-time monitoring and assessment by physical therapists."

3       17.     For its entire existence, eWellness had no revenue and no profits. eWellness's annual
4  SEC filings report net losses of $466,636 in 2013, $1,325,010 in 2014, $1,554,908 in 2015, and
5  $12,460,694 in 2016.

6       18.     eWellness was a client of Summit and Summit received eWellness stock in exchange
7  for financial services.

8       19.     As a Summit employee, Madden provided several services for Dignyte and eWellness
9  including introducing potential investors to eWellness and Summit executives, doing mini roadshows
10  for broker-dealers, and forwarding email from eWellness's manager to potential investors.
11  Additionally, Madden introduced eWellness to Summit.

12       20.     Madden received stock in Dignyte and eWellness in exchange for his services. He
13  also purchased 350,000 Dignyte shares for $.10/share.

14       21.     Another company for which Summit provided services was Jameson Stanford Mining
15  Corp. In 2012, Jameson described itself as follows: "Through our wholly owned subsidiary, Bolcán
16  Mining, we are a minerals exploration company focused on acquiring and consolidating mining
17  claims and mineral leases with potential production and future growth through exploration
18  discoveries."

19       22.     Effective December 15, 2014, Jameson changed its name to Star Mountain Resources,
20  Inc. to reflect its focus on a mining district in Utah.

21       23.     Jameson/Star Mountain filed Form 10-Ks with the SEC from 2013 through 2016.
22  These reports disclose several risks inherent to a mining company, including regulatory, market
23  fluctuation, and environmental risks. The 10-Ks also disclose that Jameson/Star Mountain's
24  operations included several risks, including dependence on a single executive, lack of capital, lack
25  of operations, lack of income, and litigation. The 10-Ks also disclose risks related to Jameson/Star
26  Mountain's common stock, including that the shares are illiquid, may never meet the listing

1  requirements of a national exchange, are subject to the SEC's rules for "penny stocks" which include

2  assessing the buyer's suitability and disclosing risk.

3      24.    The 10-Ks also showed that Jameson/Star Mountain generated less than $90,000 of

4  revenue in 2011 and no revenue after that. It has not generated any profits. Rather, it incurred net

5  losses since its inception, including net losses of $54,258 in 2011, $648,271 in 2012, $2,978,706 in

6  2013, $4,156,596 in 2014, and $6,696,000 in 2015.

7      25.    As a Summit employee, Madden performed services for Jameson/Star Mountain that

8  were similar to those he performed for Dignyte/eWellness, including introducing potential investors

9  to Star Mountain executives and doing mini roadshows for broker-dealers.

10     26.    In exchange for his services, Madden received stock in Jameson/Star Mountain.

11  Madden also purchased some shares from Jameson.

12     27.    From October 2012 through July 2016, Madden offered and sold, within and from

13  Arizona, his Dignyte/eWellness, Jameson/Star Mountain stock to, and entered stock-backed loans

14  (i.e. loans where Madden could repay the loan with stock) with, at least 88 persons in 180 transactions

15  for a total of $3,988,417. He repaid a total of $639,310 to these purchasers.

16     28.    The purchasers were persons that Madden knew from his church, friends, and

17  acquaintances of these persons.

18                         **Omissions and Misrepresentations**

19     29.    In connection with the offer and sale of his stock, Madden failed to disclose or

20  misrepresented several items to investors.

21     30.    Based on Madden's representations, several investors expected a return on their

22  Jameson/Star Mountain investment in a short timeframe. Madden told at least one investor that

23  Jameson/Star Mountain stock was a "bargain" and would soon increase in value. Madden told another

24  investor that the stock could be purchased for $.75 and that they "will be opening it near $2.00."

25     31.    In fact, the company's value consisted of ownership of mineral rights; it had no mining

26  operations, had only earned a small revenue in one year of its existence, and had never had profits.

5

32.    Madden failed to disclose to Jameson/Star Mountain investors the risks relevant to the mining industry and to Jameson/Star Mountain's operations.

33.    Madden also failed to disclose to investors risks connected Jameson/Star Mountain's common stock, including that the stock was sold in private transactions and listed on over-the-counter stock markets and bulletin boards resulting in limited liquidity, difficulty in determining market price due to infrequent trading and potential additional disclosure requirements for "penny stocks" under SEC rules.

34.    Madden told some investors that Dignyte/eWellness's value would soon rise significantly, led other investors to believe that they would soon realize a gain on their investment, and told at least one investor that eWellness shares would soon "go public."

35.    Dignyte, in fact, was a blank-check, shell company with no operations that existed to merge with eWellness. Before and after the merger, Dignyte/eWellness had no revenue or profits. To the contrary, it had throughout its existence incurred significant, annual net losses.

36.    Madden failed to discuss the risks involved with purchasing Dignyte/eWellness stocks, which were restricted shares and sold only in private transactions and on over-the-counter markets. These risks include limited liquidity, difficulty in determining market price due to infrequent trading, steps and costs required to sell restricted shares, and potential additional disclosure requirements for "penny stocks" under SEC rules.

37.    Madden represented to investors that he had experience in evaluating stock, was a consultant in the securities industry, a venture capitalist, or that he was in the business of investing. Madden failed to disclose to offerees information that would have been material in assessing Madden's business acumen and competence with finances, including two lawsuits against him based on stock offers and sales, and three loans that he was unable to timely pay back, two of which were never paid back and one that resulted in a civil judgment:

a)    A May 17, 2012, civil judgment of $26,373 in principal plus attorney's fees from King County Superior Court, State of Washington, later domiciled in Arizona CV2012-012952.

1    The judgment stemmed from $65,000 of stock sales where Madden sold stock to investors and the
2    stock lost almost all of its value.

3            b)     A March 19, 2008, civil judgment of $497,561 in King Superior Court –
4    Seattle, against Madden and Madden Consulting Inc. are the debtors. The lawsuit involved Madden
5    offering to sell stock to a potential investor. When the investor insisted that he receive promissory
6    notes instead, Madden sold him promissory notes that could be paid by cash or by stock.

7            c)     An October 14, 2009, judgment creditors received a judgment of $157,500 in
8    Utah County District Court, against Madden and his entity, Nascent Value, LLC, for a loan that
9    Madden received from the judgment creditors.

10            d)     On several occasions, Madden also borrowed money from an Arizona resident
11    that had purchased $300,000 in stock from Madden, including one loan for $75,000. Madden gave
12    the investor two $37,500 post-dated checks when she gave him the money. Then, apparently unable
13    to cover the checks when the date arrived, Madden asked her to hold on to the checks. On a later
14    date, Madden gave the investor two new post-dated checks, and asked her to tear up the old ones;
15    both checks cleared when she cashed them.

16            e)     In January, February and July 2015, Madden received loans totaling at least
17    $150,000 from another Arizona resident that had purchased over $300,000 in stock from Madden.
18    Madden paid back $30,000 of the loans. He also wrote two other checks to pay back the loans, both
19    of these checks bounced.

20        38.     The risks associated with Madden's choosing and selling stock in these startup
21    companies has played out in a worst-case scenario. Dignyte/eWellness and Jameson/Star Mountain
22    have failed to operate as viable businesses, they have only incurred losses, and their stock is currently
23    worth only a few pennies a share, representing almost a total loss for people who purchased stock
24    from Madden.

25

26

Docket No. S-21042A-18-0059

**V.**

**VIOLATION OF A.R.S. § 44-1842**

**(Transactions by Unregistered Dealers or Salesmen)**

39.    Respondent offered or sold securities in the form of stocks within or from Arizona while not registered as a dealer or salesman pursuant to Article 9 of the Securities Act.

40.    This conduct violates A.R.S. § 44-1842.

**VI.**

**VIOLATION OF A.R.S. § 44-1991**

**(Fraud in Connection with the Offer or Sale of Securities)**

41.    In connection with the offer or sale of securities within or from Arizona, Respondent directly or indirectly: (i) employed a device, scheme, or artifice to defraud; (ii) made untrue statements of material fact or omitted to state material facts that were necessary in order to make the statements made not misleading in light of the circumstances under which they were made; or (iii) engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon offerees and investors. Respondent's conduct includes, but is not limited to, the following:

    a)    Representing to several investors that stock in Dignyte/eWellness and Jameson/Star Mountain would soon rise in value without disclosing, among other things, the risks associated with purchasing stock in startup companies and non-publicly-traded companies, these companies' failure to generate revenue or have any significant operations, risks associated with a mining company.

    b)    Failing to disclose that previous clients had sued and obtained judgments against Respondent for money they lost when purchasing investments from or lending money to Respondent and that Respondent borrowed money from other clients that he was unable to timely or completely repay.

42.    This conduct violates A.R.S. § 44-1991.

8

Docket No. S-21042A-18-0059

## VII.

## REQUESTED RELIEF

The Division requests that the Commission grant the following relief:

1.    Order Respondent to permanently cease and desist from violating the Securities Act pursuant to A.R.S. § 44-2032;

2.    Order Respondent to take affirmative action to correct the conditions resulting from Respondent's acts, practices, or transactions, including a requirement to make restitution pursuant to A.R.S. § 44-2032;

3.    Order Respondent to pay the state of Arizona administrative penalties of up to $5,000 for each violation of the Securities Act, pursuant to A.R.S. § 44-2036;

4.    Order that the marital community of Respondent and Respondent Spouse be subject to any order of restitution, rescission, administrative penalties, or other appropriate affirmative action pursuant to A.R.S. § 25-215; and

5.    Order any other relief that the Commission deems appropriate.

## VIII.

## HEARING OPPORTUNITY

Respondent and Respondent Spouse may request a hearing pursuant to A.R.S. § 44-1972 and A.A.C. R14-4-306. **If Respondent or Respondent Spouse requests a hearing, the requesting respondent must also answer this Notice.** A request for hearing must be in writing and received by the Commission within 10 business days after service of this Notice of Opportunity for Hearing. The requesting respondent must deliver or mail the request to Docket Control, Arizona Corporation Commission, 1200 W. Washington, Phoenix, Arizona 85007. Filing instructions may be obtained from Docket Control by calling (602) 542-3477 or on the Commission's website at http://www.azcc.gov/divisions/hearings/docket.asp.

If a request for a hearing is timely made, the Commission shall schedule the hearing to begin 20 to 60 days from the receipt of the request unless otherwise provided by law, stipulated by the parties, or

9

Docket No.  S-21042A-18-0059

1  ordered by the Commission. If a request for a hearing is not timely made the Commission may, without

2  a hearing, enter an order granting the relief requested by the Division in this Notice of Opportunity for

3  Hearing.

4       Persons with a disability may request a reasonable accommodation such as a sign language

5  interpreter, as well as request this document in an alternative format, by contacting Kacie Cannon,

6  ADA Coordinator, voice phone number (602) 542-3931, e-mail kcannon@azcc.gov. Requests should

7  be made as early as possible to allow time to arrange the accommodation. Additional information

8  about    the    administrative    action    procedure    may    be    found    at

9  http://www.azcc.gov/divisions/securities/enforcement/AdministrativeProcedure.asp

10                                IX.

11                   ANSWER REQUIREMENT

12       Pursuant to A.A.C. R14-4-305, if Respondent or Respondent Spouse requests a hearing, the

13  requesting respondent must deliver or mail an Answer to this Notice of Opportunity for Hearing to

14  Docket Control, Arizona Corporation Commission, 1200 W. Washington, Phoenix, Arizona 85007,

15  within 30 calendar days after the date of service of this Notice. Filing instructions may be obtained

16  from  Docket  Control  by  calling  (602) 542-3477  or  on  the  Commission's  website  at

17  http://www.azcc.gov/divisions/hearings/docket.asp.

18       Additionally, Respondent or Respondent Spouse must serve the answer upon the Division.

19  Pursuant to A.A.C. R14-4-303, service upon the Division may be made by mailing or by hand-

20  delivering a copy of the Answer to the Division at 1300 West Washington, 3rd Floor, Phoenix,

21  Arizona, 85007, addressed to Ryan Millecam.

22       The answer shall contain an admission or denial of each allegation in this Notice and the

23  original signature of the answering respondent or respondent's attorney. A statement of a lack of

24  sufficient knowledge or information shall be considered a denial of an allegation. An allegation not

25  denied shall be considered admitted.

26

10

Docket No. S-21042A-18-0059

1      When the answering respondent intends in good faith to deny only a part or a qualification of

2   an allegation, the respondent shall specify that part or qualification of the allegation and shall admit

3   the remainder. Respondent waives any affirmative defense not raised in the Answer.

4      The officer presiding over the hearing may grant relief from the requirement to file an Answer

5   for good cause shown.

6      Dated this 12th day of March, 2018.

7

8

9   Matthew J. Neubert
    Director of Securities

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

11

## Case Summary

### (Exhibit C)

By way of background and factual narrative, the case at bar arises from a breach of a contract in which a group of 20 investors and two associated parties had agreed to purchase approximately 923 acres of beach land from the Plaintiff. In 2018, the Plaintiff had locked up the purchase of a failed residential development called Seaside Mariana that had originally paid US $4 million for the same land, raw, years ago. The Plaintiff's contract called for payments of US $500,000 total to purchase the company that owned the Seaside Mariana land, with US $25,000 to be paid after the Plaintiff had completed his due diligence, and the other US $475,000 to be paid at the closing, within 60 days of the completion of due diligence.

The Plaintiff, however, did not have the cash to make the purchase, but he also did not want the land owned by the company, valuable though it may be in the right hands. (With the permits in place for a residential subdivision with more than 1000 residential lots on the 923 acres, and a completed subdivision, the land, in the hands of a developer with capital to put in the infrastructure for that residential subdivision, would likely appraise for over US $10,000,000 and could generate tens of millions in residential lot sales). The Plaintiff was purchasing the company that owned the failed development for other intangible assets that it owned. That company had and still has title insurance policies that could be monetized to the tune of US $8 million, tax-free (as the company had already lost over US $8 million due to title fraud and other issues covered by the title insurance policies). Like most of the population, the owners of the Seaside Mariana company did not fully understand the title insurance policies that they held, nor how to monetize them. The company also had over US $22 million in liabilities, all unsecured (because it had sold a small portion of the

residential lots to 50+ people and collected US $22 million from them, but then never put in the infrastructure nor delivered fee simple title to the great majority of those 50+ people).

Lacking the $500,000 needed at the closing to purchase the company that owned the failed development, and frankly, lacking even the $25k due after his completed due diligence, the Plaintiff approached a group of investors that he knew were familiar with the land and wanted it. A group of 20 individuals (a subset of the 50+ people that had purchased within Seaside Mariana) had banded together to sue Kevin Fleming and his Seaside Mariana company, because they had paid millions of dollars to Kevin's company with promises of roads, electricity, security, septic, lights, and other infrastructure for the residential development. Those investors were also promised a Jack Nicklaus-designed golf course, a Wyndham hotel, condos, and other significant amenities, as well as title to the beach lots, residential lots on the golf course, and, in some cases, condominiums.

The promised infrastructure never materialized, and the investors, many of whom thought of retiring on that very same beach, did not get their lots. The Plaintiff had approached the leader of this group of investors, Mr. David Crowe, who had organized the investors together for the litigation. The group was informally known as the "Crowe Group", and the Plaintiff has adopted that vernacular. Another leader of the group of 20+ investors who had banded together was and is Mr. Michael Lyonette, who had loaned seven-digit amounts to Mr. Fleming and the Seaside Mariana company. In Mr. Lyonette's case, his loans were secured by first mortgages on neighboring land that had been carved out for the loans, but Mr. Lyonette had also paid for lots from Seaside Mariana and not received them.

The Plaintiff approached Mr. David Crowe and they worked out a deal, where Mr. Crowe and his group of investors would fund the US $500,000 for the Plaintiff's purchase of the Seaside Mariana company, including the US $25,000 that the Plaintiff would need to send to Kevin Fleming

**CASE SUMMARY**

2

(the main original owner of Seaside Mariana). Those same investors had previously worked out a deal (that later fell apart) to pay $1.5 million for the same land, and the Plaintiff offered them a much better deal that they accepted, where the investors would essentially be paying US $834,000 for the same land – the US $500,000 the Plaintiff needed for the purchase, plus another US $334,000 for the Plaintiff and one of his entities. Mr. Crowe agreed to a NCND (including a non-circumvent) on behalf of the group, given that the Plaintiff had the purchase of the Seaside Mariana company and land locked up in an enforceable contract.

That was the original contract between the Plaintiff and the Crowe Group, the group of twenty investors and two associates. After the Plaintiff and the Crowe Group had completed their due diligence (in August 2018) to confirm everything about Seaside Mariana was as expected (ownership, fee simple title, no secured debt on the land), the Crowe Group provided the US $25,000 for the Plaintiff to pass through to Mr. Fleming, as per the Plaintiff's contract with Mr. Fleming and the other owners of the Seaside Mariana company (Grupo Mariana and Maria Rueda).

At that point, in August 2018, the Plaintiff signed a new contract with the Crowe Group, in which the Crowe Group committed to closing within sixty (60) days and funding the other $475,000 that the Plaintiff needed to purchase the Seaside Mariana company. Notably, as the Crowe Group had completed its due diligence, there were no contingencies for the Crowe Group to pull out for any reasons. Thus, the twenty-two members of the Crowe Group partnership were committed to funding the US $475,000 for the Plaintiff to purchase the Seaside Mariana company, and then after the Plaintiff transferred the land to the Crowe Group (intended for immediately after closing in a "simultaneous close"), then US $334,000 more to the Plaintiff and his entity in quarterly payments during 2019 and part of 2020. (The contract was included in the original legal complaint filing).

**CASE SUMMARY**

3

Everything was progressing smoothly towards the close, with the parties agreeing on various details, hiring attorneys, and setting a close date in mid-October 2018. However, just a couple days before the close, just before the Plaintiff was going to fly in for the closing, David Crowe informed the Plaintiff, on behalf of the Crowe Group, that they were pulling out of the deal and would not fund or close. Later, in mid-March 2019, despite the contractual agreement with the Plaintiff, and despite the non-circumvent agreed to, one of the members of the Crowe Group contacted Kevin Fleming and tried to purchase (on behalf of the group) the Seaside Mariana land directly, as a further repudiation of the contract with the Plaintiff.

In May 2020, the Plaintiff sued the twenty-two members of the Crowe Group in Maricopa County (as the original contract had a forum selection clause of Phoenix, Arizona), for various causes of action including breach of contract. The Plaintiff served all of the Crowe Group members that he could track down, and ten (10) of them that had been served and/or appeared filed a Notice of Removal to United States District Court in the District of Arizona. The Plaintiff then settled with a few of the Defendants. Because the final August 2018 contract had a forum selection clause of San Francisco, California, the remaining Defendants requested a change of venue to this Court.

The Plaintiff considered his monetization of the title insurance policies a trade secret. At least seven of the Crowe Group defendants – the ones who were most committed to funding the Plaintiff's purchase within the greater group – signed Non-Disclosure Agreements with the Plaintiff, in which they agreed not to disclose any aspects of the Plaintiff's contract and plans to third parties, and also agreed that a breach could cause over US $10 million of base damages.

**CASE SUMMARY**