EXHIBIT 8

This Settlement Agreement dated as of August 11th, 2018, is entered into by and among:

**"THE SETTLER"**

Carl (aka Kalle) Wescott

And

**"THE LITIGATORS"**

## RECITALS

Between the undersigned, to wit: On one hand, Kalle Wescott (hereafter called the "Settler") and on the other hand, David Crowe and Mike Lyonette (hereafter called "The Litigators"). Mike Lyonette ("the Mortgage Holder") previously provided loans to Seaside Mariana, and has a mortgage (hipoteca) on a subset of the Seaside Mariana land. The Litigators are part of the Litigating Group, which is a group of persons, represented by Federico A. Gurdián Sacasa (attorney-at-law), who bought or invested in lots, condominiums and bungalows at Seaside Mariana (hereafter called the "*Litigating Group*") that have a Nicaraguan lawsuit together have agreed to execute a legally-binding Settlement Agreement, (hereafter called the "**Agreement**").

**WHEREAS**, the Settler is currently purchasing 100% of the shares of Seaside Mariana Spa & Golf Resort S.A. (hereafter "SM" or "Seaside Mariana"), which is all ten thousand (10,000) shares, (hereafter called the "**Stock**"),

**WHEREAS**, the Parties (the Litigators and the Settler) wish to settle all claims of the Litigating Group and have agreed-upon terms to do so;

**WHEREAS**, the Parties (the Litigators and the Settler) hereby define three terms: "SM Closing" shall be when the Settler owns SM and has all the endorsed shares. "Land Closing" shall be when the Settler has transferred the SM land and the Horizontal Property Regime that is the major asset of the settlement to the Litigating Group or to the entity of their choice. "Full Settlement Closing" shall be when this Settlement is fully effectuated, including all items in Article I, sections 4 through 7 having been paid and transferred.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises made by the Parties hereto, covenant and agree as follows: 

### Article I

1. When the Litigators have completed basic due diligence, the Litigators shall pay a non-refundable deposit of **Twenty-Five Thousand United States Dollars 00/100 (USD $25,000.00)** to a party designated by the Settler. This must occur by August 13th, 2018 or else this contract unwinds, with parties still respecting signed NDA agreements.

2. In the next 30 days, the Settler will sign a new agreement with the Litigating Group (as opposed to the Litigators), which will bind members of the group, which will further clarify the power of attorney(s) that Settler shall be providing, breaches of contract, that Settler does not personally owe monies owed to the Mortgage Holder and remedies and/or damages for the breaches.

3. The Parties shall have up to 60 days from now to close the settlement – through October 10th, 2018.

4. The high level terms of the settlement are that the Litigating Group will be providing US $834,000 in 4 tranches to the Settler, as further detailed below, while the Settler will be transferring to the Litigating Group almost all assets owned by Seaside Mariana, including all unencumbered lands, operating assets (including all tangible and almost all intangible assets), domains, web content, equipment, leases, contract rights, intellectual property rights used in the business of Seaside Mariana, together with all documents and entities relating to the HOA. Once all monies and land (along with the assets identified in Article I, section 6) have properly changed hands, the Parties shall indemnify each other by mutual agreement.

5. One of two exceptions to the transfers that are occurring as set out in Article I, section 4, is that Seaside Mariana will retain insurance policies and any other intangible asset that is either not transferable, or for the benefit of SM only, or both.

6. The second of two exceptions concerns customer and mailing lists and mailing campaigns. The Settler shall be transferring to the Litigating Group all customer and prospect mailing lists (including all contact information) and mailing campaigns, both digital and analog (email, web, and snailmail). However, the parties shall co-own these assets. Settler shall assign his part of the co-ownership to a Sociedad Anonima after the close.

7. The $834,000 consists of four parts: (1) the $25,000 by August 10th, 2018; (2) $475,000 within 60 days of the first tranche, to be transferred to the named party of Settler's choice only after SM Closing, with Settler having full ownership of, and authority over, Seaside Mariana; (3) $234,000 as follows, to the Settler: $56,000 at the Land Closing when Litigating Group receive all their expected land as settlement, and 20% of SM land sales achieved by Litigating Group until fully paid, with a minimum of $12,000 per quarter (3 months), paid within a week or so of the end of each quarter, with the first payment beginning at the end of the second quarter after SM Closing, and then a quarterly payment every 3 months from that point onwards until the $234,000 has been paid in full and (4) then, another $100,000 to an entity of the Settler to be formed later. After the $234,000 to Settler has been paid, the Litigating Group shall continue to pay under the same quarterly program (20% of sales, but a minimum of $12,000 per quarter) to the entity until the $100,000 is fully paid.

8. These (Article I, sections 4 through 7) are the only sums and items owed to each other, and when fully transferred and paid the parties shall fully release liability to each other with regard to Seaside Mariana.

9. SM has not filed taxes since 2011, and thus Settler will work with the current owner to get all taxes filed and current through the tax year that ends June 2018. This is a necessity prior to any closing including SM Closing.

10. The Settler has bound the sellers of SM in a contract that ensures that Settler and the Litigating Group will get everything they need by or at closing, including the filed taxes. The Litigators have approved the language of this Closing Contract.

11. The Settler shall pay the costs related to the SM stock transfer. The Litigating Group shall pay the costs of the land transfer including what's necessary on property taxes to do the transfers. The parties shall pay their own attorneys.

12. The one sub-parcel that will not go to the Litigating Group is the parcel with a mortgage provided by one of the Litigating Group (the "Mortgage Holder"), also represented by Federico A. Gurdián Sacasa (attorney-at-law), unless it is most efficient to transfer it in bulk with the other land for the Litigating Group and then to the Mortgage Holder. At or just after the SM Closing, Settler shall work with the Mortgage Holder to transfer that land to the Mortgage Holder at the Mortgage Holder's expense.

13. Both Parties have entered this deal in good faith and with a lot of trust, but the Parties have offered each other mechanisms such that they do not have to rely solely on trust at each step. The Parties will work out the final details of each such step to their mutual satisfaction at each step. For example, because the $475,000 needs to go in to escrow prior to land transfer, the Settler has offered and will continue to offer any mechanism the Litigating Group desire to ensure that they will get the land, including issue by Settler of an irrevocable power of attorney to a Nicaragua attorney of the Litigating Group' choice. For the payments that will come with sales or paid each quarter, Settler does not necessarily require a mortgage on SM, and is open to Personally Guaranteed Promissory Notes.

14. Settler will continue to provide all due diligence information requested by Litigating Group, and can provide a complete package of written documents at or just after the close. 

15. Confidentiality is extremely important to complete this settlement, including the purchase aspect. The Settler has already executed NDAs (Non-Disclosure Agreements) with the Litigators. The Litigators plan to solicit funding from several more members of the group of Litigating Group. The Litigators shall ensure that those several members, as well as Federico A. Gurdián Sacasa, all sign NDAs with the Settler similar to the one provided by the Settler on Saturday August 4th, 2018, prior to disclosing information related to this settlement or other confidential information. Subsequently, all confidential information and all information relating to this deal shall be shared ONLY with the Settler, the Litigators, Senor Gurdián, and the members of the Litigating Group that have signed NDAs in the past week or that shall sign NDAs shortly.

16. Settler already has digital files of the following categories and these will be provided to Litigating Group prior to closing:  Legal, Financials, Sales, Vendors, Marketing, Engineering and Design, Permits, Employees, HOA documentation and entities, Communication, Maps, Cash Liabilities, Contractual Liabilities, Pictures and Digital Collateral. Settler shall transfer all of these to the Litigating Group prior to SM Closing.

17. Ownership of the land: Except for the registered mortgage lien held by Mortgage Holder on the lots identified, Settler represents and warrants (a) that Seaside Mariana Spa & Golf Resort S.A. has clear and unencumbered title[1] to all of the aforementioned lands and (b) that, once Settler's acquisition of Seaside Mariana has been finalized (aka SM Closing), Settler will be in a position to fully execute and deliver on all of the agreements and obligations set out in this Settlement Agreement. The Parties attach the most recent Libertad de Gravamen for the lands as Exhibit A. The Libertad de Gravamen shows property that is formally Registered and thus not able to be transferred to Litigating Group.

18. Liabilities of Seaside Mariana: Settler represents and warrants that, except for the liabilities to the Litigation Group members settled by this Agreement, all existing liabilities of Seaside Mariana, including Seaside Mariana's obligation to deliver 10 Beach Front lots to a previous shareholder of Seaside Mariana, remain with the Seaside Mariana entities owned by Settler and shall not pass to Claimants or to the Litigation Group. Settler shall indemnify the Litigation Group and its members against any such claims that may arise from these obligations.

19. Settler shall ensure

   (1) that the current beneficial owners of Seaside Mariana (Kevin Fleming and Maria Rueda) disclose to the buyer of the shares (i.e. the Settler) any and all transactions that have been made, specially land transactions made, and that are pending registration in public record, and the Settler shall ensure that this information is passed on to the Litigating Group in its entirety; and

   (2) that the current owners of Seaside Mariana are prohibited from taking any further action relating to these transactions and pending transactions on behalf of any of the Seaside Mariana entities and that all Powers of Attorney issued by the current owners of Seaside Mariana are revoked with effect immediately upon SM Closing.

### Article II

1. Notices. All notices, demands and payments required or permitted to be given hereunder shall be in writing and may be delivered personally, by e-mail to the addresses of the Parties as set out and agreed separately between the parties. Any notice personally delivered or sent by e-mail shall be deemed to have been given and received at the time of delivery, unless otherwise proven. All Parties shall be entitled to designate new contact information by giving notice thereof to the other Parties in accordance with the terms hereof.

2. Assignment/Successors. This Agreement shall be binding upon all successor, assigns, heirs, agents and representatives of each of the Parties.

3. Governing Law: This Agreement shall be governed by and construed in accordance with the laws of San Francisco, California in the United States of America, and thus that shall be the jurisdiction and venue for this contract. (Spanish documents, which will follow Nicaraguan law, will be utilized to effectuate the land transfer).

---

[1] "clear and unencumbered" from a mortgage standpoint, in other words, there is no mortgage debt on the lands. Property taxes are owed, and there are various liens on the lands as per the most recent Libertad de Gravamen, dated April 2018, which is an Exhibit to this contract.

4.  <u>Entire Agreement.</u> This Agreement may not be amended or modified, and no provisions hereof may be waived, without the written consent of the Parties.

5.  <u>Severability.</u> If any provision of this Agreement shall be declared void or unenforceable by any judicial or administrative authority, the validity of any other provision and of the entire Agreement shall not be affected thereby.

6.  <u>Titles and Subtitles.</u> The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting any term or provision of this Agreement.

7.  <u>Execution.</u> This Agreement may be executed in counterparts and all of such counterparts taken together shall be deemed to constitute one and the same Agreement. The Parties may execute this Agreement via facsimile transmission or electronic communication and such execution and delivery shall be full, binding and proper execution and delivery without the need for the exchange of originally executed copies of this Agreement between the Parties.

8.  The parties agree they are sophisticated in business matters and have access to counsel. They also have collaborated on the drafting and editing of this contract. Accordingly this contract will not be construed in favor or against either party including the original drafter.

[Signature page follows]

IN WITNESS WHEREOF, the Parties hereby state that they are fully empowered to act and agree to the obligations contained in this Agreement and that consequently, each one accepts each and every clause contained herein in the terms and under the conditions hereby stated.

IN WITNESS WHEREOF CARL (KALLE) WESCOTT has executed this Agreement on this (Day) 11 of August 2018 in the city of San Francisco, California; United States of America.

**PRINT NAME(S):**

_____Carl (Kalle) Wescott_____          _____Carl K Wescott_____
(Settler Print Name)                          (Settler Signature)

.IN WITNESS WHEREOF David Crowe has executed this Agreement on this (Day) 11 of August 2018.

_____          _____
(Print Name)                              (Signature)

IN WITNESS WHEREOF Mike Lyonette has executed this Agreement on this (Day) 11 of August 2018.

_____          _____
(Mortgage Holder Print Name)              (Mortgage Holder Print Name)

**Exhibit:**

The following exhibit is an integral part of this Settlement Agreement

A.    Most recent Libertad de Gravamen



EXHIBIT A

DIEZ CORDOBAS                                    SERIE "P"

SEÑOR (A) REGISTRADOR (A) PUBLICO (A) DE LA PROPIEDAD INMUEBLE Y MERCANTIL

DE LA CIUDAD DE MANAGUA, YO, JAIRO JOSÉ MALTEZ MEDAL, MAYOR DE EDAD,

ABOGADO Y NOTARIO PUBLICO, DE ESTE DOMICILIO, Y PORTADOR DEL CARNE DE

IDENTIDAD DE LA CORTE SUPREMA DE JUSTICIA NUMERO 11516, LE SOLICITO A USTED ME CERTIFIQUE LIBERTAD

DE GRAVAMEN DE PROPIEDAD HORIZONTAL DE LA FINCA NÚMERO CUATRO MIL DOSCIENTOS CINCUENTA Y UNO

(4251) PH, TOMO NÚMERO CUARENTA Y SIETE PLECA CUARENTA Y NUEVE (47/49) PH, FOLIOS NÚMERO TREINTA Y

UNO PLECA TRESCIENTOS GUION UNO PLECA SESENTA Y SEIS (31/300) Y (1/66) ASIENTO PRIMERO (1) DE LA

COLUMNA DE INSCRIPCIONES DE LA SECCION DE DERECHOS REALES

Managua, viernes 21 de julio del 2017

Jairo José Maltez Medal
Abogado y Notario Público
Carné No 11516

LA SUSCRITA REGISTRADORA AUXILIAR DEL DEPARTAMENTO DE MANAGUA CERTIFICA: Que
la finca inscrita bajo el No. 4251-PH; Tomo 47-PH; Folios 31 al 300; Tomo 49-PH; Folios 1 al 66;
Tomo 136-PH, Folios 81 al 104, Asiento 1 y 2. Columna de Inscripciones, sección de Derechos
Reales, Libro de Propiedades Horizontales, de este Registro Publico. Pertenece el resto a: Seaside
Marina Spa & Golf Resort Sociedad Anónima. Y tiene hipoteca a favor de Michael Francis
Lyonette, tan solo por lo que hace a los Módulos Nos. 18, 19, 29, 30, 31, por las siguientes sumas: (1)
Trescientos sesenta y tres mil ochocientos cincuenta y dos dolares equivalente a siete millones
ochocientos noventa y cinco mil   quinientos ochenta y ocho córdobas con cuarenta centavos de
córdobas; (2). Cuatrocientos tres mil setecientos noventa y tres dolares equivalente a ocho millones
setecientos sesenta mil ciento treinta y ocho córdobas con diez centavos de córdobas,  para un monto
total de Dieciseis millones seiscientos cincuenta y cinco mil setecientos veintisiete córdobas equivalente a
setecientos sesenta y siete mil quinientos cuarenta y cinco dolares, posteriormente se amplió dicho
crédito hasta la suma de veintiseis millones setecientos ochenta y nueve mil seiscientos setenta y tres
córdobas con treintiun centavos equivalente a un millón ciento cuarenta y un mil trescientos cuarenta y
seis dolares. En asientos 1 y 2 ***** También tiene inscritas Provisionalmente venta de los

siguientes lotes indivisos: 1) A favor de Thomas Edward Austin, identificado como lote GB, con un área de mil trescientos veinticuatro punto novecientos cinco metros cuadrados; 2) A favor de Trevin Martin Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto novecientos sesenta y dos metros cuadrados; 3) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GQ, con un área de novecientos cincuenta y uno punto ciento veinticuatro metros cuadrados; 4) A favor de Judith Gail Madgett y Robert Daniel Madgett, identificado como lote GBU, con un área de ochocientos cincuenta y siete punto seiscientos ochenta y uno metros cuadrados, inscrito el 22-05-2012, pero se encuentra pendiente la firma del registrador; 5) A favor de Thomas Edward Austin, identificado como lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro metros cuadrados; 6) A favor de Thomas Edward Austin, identificado como lote OVL, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados; 7) A favor de Thomas Edward Austin, identificado como lote RM, con un área de un mil setecientos ochenta y ocho punto cero noventa y cuatro metros cuadrados; 8) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros cuadrados; 9) A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 10) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados; 11) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, inscrita el 22-05-2012, pero se encuentra pendiente de firma del registrador; 12) A favor de Thomas Edward Austin, identificado como lote GAL, con un área de ochocientos veintiún punto setecientos veinticinco metros cuadrados; 13) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVA, con un área de un mil ochocientos sesenta y seis punto setecientos setenta y tres metros cuadrados; 14) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos cincuenta y nueve metros cuadrados; 15) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 16) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GST, con un área de un mil trescientos treinta y ocho punto cuatrocientos trece metros cuadrados; 17) A favor de Anthony David Bowman y Carol Anne Bowman, identificado como lote GCR, con un área de un mil

ciento diecisiete punto quinientos setenta y tres metros cuadrados, inscrita el 22-05-2012, pero se encuentra pendiente de la firma del Registrador;  18) A favor de Anthony David Bowman  y Carol Anne Bowman, identificado como lote GCR, con un área un mil ciento diecisiete punto quinientos setenta y tres metros cuadrados; 19) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, 20) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GBV, con un área de ochocientos cincuenta y siete punto seiscientos ochenta y un metros cuadrados; 21) A favor de Thomas Edward Austin, identificado como Lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro metros cuadrados; 22) A favor de Thomas Edward Austin,  identificado como lote OVL, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados, 23) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GQ,  con un área de novecientos cincuenta y uno punto ciento veinticuatro metros cuadrados; 24) A favor de Thomas Edward Austin, identificado como lote GB, con un área de un mil trescientos veinticuatro punto novecientos cinco metros cuadrados; 25) A favor de Trevin Martin Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto novecientos sesenta y dos metros cuadrados; 26) A favor de Thomas Edward Austin, identificado como lote RM, con un área un mil setecientos ochenta y ocho punto cero noventa y cuatro metros cuadrados; 27) A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 28) A favor de Thomas Edward Austin, identificado como lote GAL, con un área de ochocientos veintiuno punto setecientos veinticinco metros cuadrados;  29) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVA, con un área de un mil ochocientos sesenta y seis punto setecientos setenta y tres metros cuadrados; 30) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos cincuenta y nueve metros cuadrados; 31) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, 32) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados; 33) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros cuadrados; 34) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GST, con un área de un mil trescientos treinta y ocho punto cuatrocientos trece

metros cuadrados; 35) Tiene inscrito provisionalmente Dacion en pago a favor Desarrollos Inmobiliarios Tejas, Sociedad Anónima sobre los siguientes lotes indivisos: 1) Lote Nº 20, con un área de diecinueve mil doscientos setenta y cinco punto novecientos veintitrés metros cuadrados;  2) Lote Nº 28, con un área de ciento noventa y dos mil novecientos sesenta y cuatro punto ciento, ochenta y cinco metros cuadrados;  3) Lote Nº 21, con un área de treinta y nueve mil quinientos ochenta punto cero noventa y seis metros cuadrados; 4) Lote Nº 22 , con un área de nueve mil cincuenta y seis punto seiscientos setenta y nueve metros cuadrados; 5) Lote Nº 23, con un área de cuatro mil setecientos sesenta y uno punto doscientos cuarenta y tres metros cuadrados; 6) Lote Nº 25, con un  área de sesenta y un mil quinientos treinta punto setecientos setenta y cinco metros cuadrados, inscrita con fecha veinte de junio del año dos mil trece, pero se encuentra pendiente la firma y sello del registrador. 36) Tiene anotada demanda en la vía ordinaria con acción de pago de daños y perjuicios, a solicitud de Edward Albert Cole por la suma de cuarenta y ocho millones ochocientos treinta y tres mil setenta y nueve córdobas con catorce centavos equivalente a dos millones setenta y tres mil diez dólares con cincuenta centavos. 37) Tiene anotada Dacion en Pago a favor de los señores: Edward Albert Cole, los siguientes lotes. 1) Lote GSA, con un área de: un mil ciento treinta y siete punto setecientos noventa y tres metros cuadrados, 2) Lote GSB, con un área de: un mil ochenta y siete punto diecisiete metros cuadrados, 3) Lote GSC, con un área de:  un mil ciento cincuenta y seis punto ochocientos un metros cuadrados, 4) Lote GSD, con un área de: un mil ciento setenta y siete punto doscientos noventa y seis metros cuadrados, 5) Lote GSE, con un área de un mil ciento cincuenta y tres punto seiscientos diez metros cuadrados, 6) Lote GSF, con un área de un mil ciento veinticinco punto setecientos cinco metros cuadrados, 7) Lote GSG, con un área de un mil noventa y siete punto ochocientos metros cuadrados, 8) Lote GSH, con un área de un mil setenta y uno punto trescientos setenta y tres metros cuadrados, 9) Lote GSI, con un área de un mil ciento cuarenta y un punto noventa y tres metros cuadrados, 10) Lote GSI, con un área de un mil trescientos setenta y dos punto cero cero seis metros cuadrados, 11) lote GSK, con área de un mil ochocientos treinta y uno punto cuatrocientos cincuenta y uno metros cuadrados, 12) Lote GSL, con un área de un mil ochocientos veintidós punto novecientos setenta y ocho metros cuadrados, 13) Lote GSM, con un área de un mil trescientos sesenta y ocho punto novecientos treinta y uno metros cuadrados, 14) Lote GSN, con un área de un mil ciento diez punto novecientos cincuenta y ocho metros cuadrados, 15) Lote GSO, con un área de un mil ciento cuarenta y nueve punto cuatrocientos cinco metros cuadrados, 16) Lote GSP, con un área de un mil doscientos cincuenta y nueve punto setecientos noventa y cinco

metros cuadrados; 17) Lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados, 18) Lote GSV, con un área de un mil trescientos veintiséis punto sesenta y seis metros cuadrados, 19) Lote SSW, con un área de un mil trescientos setenta punto quinientos dieciocho metros cuadrados, 20) Lote GSX, con un área de un mil cuatrocientos cuarenta y uno punto cuatrocientos seis metros cuadrados, 21) Lote GSY, con un área de un mil seiscientos noventa y dos punto ciento cincuenta y uno metros cuadrados, 22) Lote GS2, con un área de un mil novecientos sesenta y cinco punto cuatrocientos dieciocho metros cuadrados, 23) Lote GSAA, con un área de dos mil doscientos veintisiete punto setecientos cincuenta y cinco metros cuadrados, 24) Lote GSAB, con un área de dos mil quinientos dieciocho punto doscientos noventa y uno metros cuadrados, 25) Lote GSAC, con un área de cuatro mil doscientos treinta punto trescientos cincuenta y dos metros cuadrados, 26) Lote GSDA, con un área de cuatro mil cuatrocientos treinta y seis punto ciento treinta y un metros cuadrados, 27) Lote GSAE, con un área de tres mil novecientos setenta y cuatro punto novecientos veinticinco metros cuadrados, 28) Lote GSAF, con un área de cuatro mil ciento cuarenta punto ciento cuarenta y dos metros cuadrados, 29) Lote GSAG, con un área de cuatro mil seiscientos cuarenta y dos punto trescientos sesenta y cinco metros cuadrados, 30) Lote GCA, con un área de tres mil sesenta y ocho punto ciento doce metros cuadrados, 31) Lote GCB, con un área de tres mil novecientos cincuenta y nueve punto doscientos ochenta y tres metros cuadrados, 32) Lote GCC, con un área de cuatro mil seiscientos veintiséis punto setecientos veinte metros cuadrados, 33) Lote GCD, con un área de cuatro mil doscientos veintiún punto setecientos treinta y dos metros cuadrados, 34) Lote GCS, con un área de tres mil setecientos veintiséis punto seiscientos cincuenta y cinco metros cuadrados, 35) Lote GCF, con un área de tres mil ciento cincuenta y seis punto doscientos cuarenta y tres metros cuadrados, 36) Lote GCG, con un área de dos mil seiscientos ochenta y cuatro punto setecientos cuarenta y siete metros cuadrados, 37) Lote GCH, con un área de dos mil cuatrocientos noventa y nueve punto quinientos treinta metros cuadrados, 38) Lote GCI, con un área de dos mil seiscientos treinta y siete punto trescientos ochenta metros cuadrados, 39) Lote GCI, con un área de dos mil quinientos noventa y dos punto novecientos veinte metros cuadrados, 40) Lote GCK, con un área de dos mil cuatrocientos dieciséis punto ochocientos cuarenta y dos metros cuadrados, 41) Lote GCL, con un área de dos mil seiscientos cincuenta y dos punto cuatrocientos setenta y cuatro metros cuadrados, 42) Lote GCM, con un área de dos mil cuatrocientos treinta y seis punto novecientos veinte metros cuadrados, 43) Lote GCN, con un área de dos mil nueve punto quinientos setenta y un metros cuadrados, 44) Lote No.27, con un área de

doscientos cuarenta y dos mil ochocientos setenta y cinco punto seiscientos ochenta y seis metros cuadrados, 45) Lote No.24; con un área de doce mil ochocientos cuarenta y dos punto doscientos veintiuno metros cuadrados, 46) Lote No. 26, con un área de cincuenta y siete mil seiscientos diecinueve punto seiscientos sesenta y ocho metros cuadrados, *** 38) Promesa de venta, a favor de PKR Holding, Sociedad Anonima, sobre los siguientes lotes, a) lote OVK, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados, b) lote GAY, con un área de un mil cuatrocientos treinta punto setecientos treinta y siete metros cuadrados, c) lote GAX, con u na rea de un mil cuatrocientos ventinueve punto seiscientos sesenta y tres metros cuadrados, por la suma de tres millones seiscientos treinta y un mil seiscientos ochenta y cinco córdobas con sesenta centavos de córdobas, *** 39) promesa de venta, a favor de Advantage Ventures LLC, un lote con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, por la suma de dos millones ochocientos noventa y nueve mil setecientos dos córdobas con treinta y cinco centavos, equivalente a ciento nueve mil quinientos dolares, *** 40) Promesa de venta a favor de Paul Brian Ciceri, un lote de terreno identificado como GAV, con un área de un mil cuatrocientos siete punto ochocientos setenta y ocho metros cuadrados, por la suma de setecientos ochenta y dos mil treinta y cuatro córdobas equivalente a veintinueve mil trescientos ochenta y dos dolares, *** 41) Demanda, ordinaria con acción de resolución de contrato, para que por sentencia firme y declare, lo siguiente: a) que se deje sin efecto el contrato de oferta de compra sobre el lote OVGG, b) que se deje sin efecto el contrato de oferta de compra sobre el lote NGJ, c) devolución de precio mas intereses, d) pago de los costos daños y perjuicios ocasionados por el incumplimiento, *** 42) Demanda en la via ordinaria con acción de resolución de contrato por incumplimiento para que por sentencia se declare lo siguiente: a) disuelto el contrato de promesa de venta , b) devolución de precio mas intereses, c) pago de los costos daños y perjuicios ocasionados por el incumplimiento. ***43) Demanda ordinaria con acción de resolución de contrato por incumplimineto, promovida por Darrell Lee y Bushnell y Amy Bushnell, *** 44) Demanda ordinaria con acción de resolución de contrato en consecuencia de conformidad al articulo 1061 y 1083 Pr. Declareseles rebeldes para todos los efectos de la presente demanda. En asientos 1 al 42, 41 y 43 A solicitud de parte interesada extiendo el presente certificación en la ciudad de Managua a veintisiete dia del mes de Julio del dos mil diecisiete.


EXHIBIT E

From: thomaspmadden@gmail.com
Subject: Fwd: lawsuit settlement
Date: March 17, 2019 at 1:32:52 AM PDT
To: editorial@kevinifleming.com

Subject: lawsuit settlement

This is a compilation of much thought and possibly the only solution Kevin that I have gathered in hours of discussion w those in a position financially to conclude a very complicated situation-here goes ...

To defeat Cole's attempt to seize all the remaining SM lands from SM/Fleming, we think a settlement of the Lyonette claims and our LG claims could be made on the following terms. This settlement would take legal precedence over Cole's lawsuit annotation on the Public Registry. So, we would receive certain SM lands consisting of :  1)  all remaining  unregistered oceanfront land extending to a distance of 1,000 feet inland parallel to the SM oceanfront boundary line.   2)  all remaining unregistered land laying within a line parallel to, and at a distance of 1,000 feet,  from the North boundary line, with one end of such line beginning at the public road, and ending 1,000 feet from the oceanfront boundary line. The settlement parcel(s) must include the water well site.
Together with receiving  this land and us tendering a payment of $ 250,000 cash to SM, we would agree to settle all our legal claims against SM and Flemings, and we would remove all related encumbrances from the Public Registry.

In addition, we would agree to buy all SM lands remaining in Managua province after the above settlement, and after the Cole lawsuit annotation has been removed from the Public Registry.  For this land we would pay 150,000 cash to SM.

Lastly, we would agree to fund the purchase of all SM stock shares by a 3rd party not part of the present litigation between SM and the Crowe/Lyonette groups  for the sum of  100,000 upon the settlement of all legal claims and enforcement actions which may be in place against SM by the various Nicaragua government agencies, to include filing of all overdue tax reports.

Adding ...

It may be that Carl Wescott is still interested in buying the stock shares, even though Fleming informed him that he has terminated their Stock Purchase Agreement.

I understand  Wescott disputes the validity of Flemings termination effort.

With that Kevin -I'll be available to discuss w you by tomorrow ... this could move quickly -

Thomas

CARL A. WESCOTT
8210 E. VIA DE LA ESCUELA
SCOTTSDALE AZ 85258
*in propria persona*
CARLWSOJ@GMAIL.COM
+1 936 937 2688

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARL A. WESCOTT, | Civil Action No. 3:20-cv-06456-JD |
| Plaintiff, | **EXHIBIT F:** |
| vs. | **SWORN AFFIDAVIT OF CARL WESCOTT** |
| DAVID CROWE;<br>MIKE LYONETTE;<br>JEFF RAU;<br>COLIN ROSS;<br>BRAD MALCOLM;<br>MICHAEL JIMENEZ, | |
| Defendants | |

I, Carl Wescott, hereby swear under penalty of perjury of the laws of California and of the United States of America, that the following facts are true, to the best of my memory, recollection, and belief:

1. I am 53 years old, and a resident of Scottsdale, Arizona.

2. I am competent to testify. Were I to be called to testify in this matter, my testimony would be as follows, and until that point, my written testimony is as such:

# SWORN AFFIDAVIT OF CARL WESCOTT

1

a. First, I hereby verify all of the facts in my original (state court) legal complaint as being true.

b. I further verify all of the facts in my Case Summary (Exhibit C) as being true.

c. I further verify that the other exhibits I have attached are true and correct copies of the actual emails (Exhibit E) or documents (Exhibit A and Exhibit B)

d. In the case of the attached contract (Exhibit D), I hereby verify it as the authentic contract, but I attached one only executed by me. Mr. Crowe and Mr. Lyonette also executed this contract, as will be further verified by my and their copies of the fully-executed contract in discovery.

## BACKGROUND NARRATIVE INCLUDING THE PARTIES' CONTRACT

3. I was an experienced international real estate developer focusing on residential developments in Latin America.

4. I was reasonably successful until the global meltdown and credit crunch of 9/2008. With the global impact of said credit crunch and the leverage I had applied to my real estate holdings, I eventually succumbed to those forces and declared chapter 7 bankruptcy in early 2012.

5. Post-bankruptcy, I searched for distressed real estate assets that I could acquire and turn around. I was familiar with Seaside Mariana ("SM"), an ambitious development on approximately 1000 acres on the Montelimar coast west of Managua, Nicaragua.

6. Seaside Mariana had at one point featured a Jack Nicklaus designed golf course and a Wyndham hotel in its plans before the wheels fell off Seaside Mariana as well due to the same global pressures.

7. SM was an attractive investment and development opportunity for the original developer, Kevin Fleming, for at least the following reasons:

    (i)    The real estate was prime in terms of location and amenities;

    (ii)   At the time of initial investment, the market was rising faster than linearly;

    (iii)  Costa Rica to the South had already surfed a 20-year wave of real estate equity appreciation, and for some product types there was an order of magnitude difference in pricing;

    (iv)  Nicaragua was attractive for American retirees in particular because of its low cost of living, level of safety, accessibility (including airlift), and desirable climate.

8. Most of those reasons were relevant more recently to me as well for my investment consideration.

9. Further, the intangible assets associated with SM were sound and mostly in place, including plans, permits, designs, and marketing material.

10. There was one intangible asset of SM that made it particularly interesting to me.

11. The value of the project was, to a material degree, artificially depressed by more recent market conditions and bad word of mouth and internet postings concerning the lack of infrastructure put in by the original developer, leading to further relevant issues.

12. In my period of abject poverty after my chapter 7 noted above, I've entered contract to purchase SM three (3) times. The first time I entered contract, I saw an opportunity to buy SM for a highly attractive price (US $500,000, plus some capped deferred payments), solve the issues,

and complete the development, and had a backer who would provide financial support for the project.

13. Most recently, I entered into contract ("the SM Purchase Contract") to purchase SM (either the company itself or the real estate, at my option) in 2018, with an anticipated close date (after some revisions, addenda, and extensions) of October 15th, 2018.

14. My plan was to acquire the SM company.

15. Lacking in capital, I entered discussions with several investors to back the purchase.

16. More recently, in August 2018, I entered into a contract with investors, who were familiar with the relevant properties who agreed to fund 100% of the costs of the purchase in exchange for certain land owned by the SM company.

17. That contract shall be referred to as the "Funding Contract", and is attached hereto as Exhibit D.

18. To dispel any confusion over identities in the contract, I, Carl Wescott, am sometimes referred to by my Finnish name "Kalle", or the combination Carl "Kalle" Wescott. (My mother is from Finland; Finnish was my first language; I strongly identify with my Finnish family and Finnish roots).

19. To further dispel any potential confusion over the language of the funding contract or its meaning, the investors who were parties to the Funding Contract had filed litigation against Seaside Mariana, the company that I was purchasing.

20. Therefore, the group of twenty-two investors (the same set of people who were the initial twenty-two (22) Defendants in Maricopa County Superior Court case CV2020-006232) who were the parties to that litigation are referred to as the "Litigating Group."

21. I did not want ongoing litigation against the company I was purchasing, and I had worked out a deal with the Litigating Group, and thus the thought was that I (aka "the Settler" in the Funding Contract) would immediately settle with the Litigating Group upon closing the purchase of the Seaside Mariana company, by transferring all its land to them. They, in turn, had already agreed to fund all US $500,000 that I (the "Settler") needed to purchase the SM company, plus most of the closing costs.

22. Once I effectuated the transfer of the SM land (via the Seaside Mariana company, which I would then own and control) to the Litigating Group, they would then pay me and my company, another US $334,000 in quarterly payments.

23. That group of twenty-two (22) investors (the named Defendants in CV2020-006232, aka "the Litigating Group) all agreed to collectively be bound by the Funding Contract and to fund the payments in the Funding Contract.

24. Two of the Defendants, David Crowe and Mike Lyonette, agreed to manage their group and, for expediency, communications with me.

25. David Crowe named and provided documentation as to the identities of the twenty-two people (including himself) who agreed to be bound by the Funding Contract: David Crowe; Mike Lyonette; Thomas P. Madden; Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Sandra Winfrey; Brian Putze; Colin Ross; Brad Malcolm; Michael Jimenez; Gustavo Varela; Robert Crowe; Bernadette Brown; Federico Gurdian; and Terencio Garcia.

26. For a variety of reasons, David Crowe was usually the sole communicator and conduit on behalf of the group of twenty-two (22) investors.

27. For stylistic purposes and economy of phrase, the above twenty-two (22) Defendants, who acted in concert to fund my purchase of SM, will also be described as "the Crowe Group" – this is the descriptive phrase that the parties all used colloquially, before the need for the litigation in the case at bar.

28. In August 2018, David Crowe and Mike Lyonette signed NCNDs with me.

29. Mr. Crowe and Mr. Lyonette pledged not to share any information about me or the Funding Contract with any of the rest of their group of 20+ investors unless an individual group member signed a NDA (Non-Disclosure).

30. Approximately 10 of the 20+ investors signed NDAs with me, and thus, if Mr. Crowe, Mr. Lyonette, and others were honoring the Funding Contract and their NDAs, I believes only the dozen or so of them would have gotten information related to the Funding Contract and its progress towards a closing after that point.

31. The NDAs granted jurisdiction of my choice, had a non-disclosure provision, and in the majority of the NDAs signed, specifically acknowledged that violating the non-disclosure provision could very well cost me over US $10 million in damages.

32. I shared information with Mr. David Crowe in strict confidence on how I expected to monetize the intangible assets of the Seaside Mariana company, with an expected US $8 million post-tax profit from two of those intangible assets.

6

**PLAINTIFF'S OTHER DEALS WITH KEVIN FLEMING**

33. After the Funding Contract was signed, I signed more contracts with Kevin Fleming, to purchase Isla Mariana (another real estate development) and to purchase seven more Panamanian and Nicaraguan companies.

34. I subsequently purchased the legal claims of Kevin Fleming, Maria Rueda, and the relevant entities.

35. Outside of Seaside Mariana, and as shall be proven in court, I expected to possibly make on the order of US $4,000,000 to US $5,000,000 with the completion of the other related deals.

36. I disclosed the existence of my other deals with Kevin Fleming to the Crowe Group via Mr. David Crowe (as well as another deal I was working on in Jamaica).

37. One particular reason I shared information with Mr. Crowe on my other contracts with Kevin Fleming et al. was to ensure that both purchasing parties (me, for example, buying another residential development called Isla Mariana from its owners; and the Crowe Group, essentially purchasing ~1000 acres of Seaside Mariana via me) were getting the land that they expected to get.

38. Because I was also purchasing Mr. Fleming's development company Nicaragua Developments (which also owned land), and the parent company of Seaside Mariana (Grupo Mariana), via some of these other deals, I would have the power and ability to ensure that my and the Crowe Group's expectations were met.

39. The Crowe Group had information on Seaside Mariana going back to 2006, and thus was able to build maps of all the Seaside Mariana land, including the list of parcels they should get

transferred to their new entity at my close of the purchase of the Seaside Mariana company. (Because a massive subdivision had occurred, this was important).

40. Because I was purchasing the development for US $500,000 (plus capped deferred payments) and selling the land to the investors backing me for US $834,000, I was going to make US $334,000 in short-term cash profit in closing my purchase of SM and flipping the land to the Crowe Group (aka the Litigating Group).

41. In addition, as referenced above, and as shall be fully proven at jury trial, I expected to make a much larger sum monetizing the intangible assets I was acquiring as part of this deal.

42. The Crowe Group performed its due diligence on the deal and agreed to move forward to a close.

43. As part of due diligence, the Crowe Group had its attorney go to the local municipal office and ensure that Seaside Mariana still owned all of the relevant land fee simple, and that there was no secured debt mortgage obligation on the land, and no unexpected liens nor unexpected notations in the property registry.

44. After the Crowe Group's due diligence, the Crowe Group agreed that they would fund the $25,000 that I was required to submit to Kevin Fleming after his due diligence.

45. That moment would also kick off a 60-day closing cycle for me to close on my purchase of SM, and for the Litigating Group (the Crowe Group) to fund said purchase.

46. Because I knew that Seaside Mariana had taken in US $ 22 million in sales from purchasers and investors, I insisted that Kevin Fleming and the other owners of Seaside Mariana file taxes up to the present.

47. I negotiated a Closing Contract with Kevin Fleming which the relevant parties signed, in which the parties agreed to close my purchase (their sale) of the Seaside Mariana company within 60 days.

48. As part of the Closing Contract, I would pass through US $25,000 to Kevin Fleming, which Mr. Fleming pledged to use in significant part for tax professionals to file all of Seaside Mariana's taxes through the present. (Some of it would be used by the Seaside Mariana sellers to prepare for closing).

49. David Crowe then remitted a $25,000 cashier's check, which I utilized to satisfy my obligation to fund the closing process in the Closing Contract (by depositing it in Kevin Fleming's Wells Fargo bank account).

50. (In the Funding Contract, the Twenty-Five Thousand Dollars is on page 1, Article I, paragraph 1, where it is a non-refundable deposit).

51. It is worth noting that early in my process with the Crowe Group, the Crowe Group had essentially committed to funding the purchase but only if everything was as they expected (due diligence on all files and details), and further details could be worked out.

52. As of August 11th, 2018, when the Crowe Group / Litigating Group agreed to the Funding Contract with I, the Crowe Group still had one contingency to pull out of the deal, if anything about their due diligence did not pass muster. (This was also in the Funding Contract, page 1, Article I, paragraph 1, where the Crowe Group could let the Funding Contract unwind)

53. However, once the Crowe Group / Litigating Group had completed due diligence and remitted the US $25,000 non-refundable deposit towards the US $500,000 purchase price I had to pay to

9

1    purchase the SM company (US $475,000 more after the US $25,000), the Crowe Group no

2    longer had any contingency to pull out of the deal.

3  54. At that point, the Crowe Group (including these Defendants) were fully committed to the

4    funding outlined for my purchase of Seaside Mariana, with no contingency to get out of the

5    Funding Contract.

6

7

8  **DEFENDANTS' INITIAL BREACH**

9  55. The Funding Contract called for a closing date in mid-October-2018, as did my purchase

10    contract of Seaside Mariana (reinforced in subsequent signed Closing Contracts).

11  56. The parties retained attorneys to prepare closing documents.

12  57. The parties worked out the logistics of closing in a "simultaneous close", which is well-

13    understood to mean two successive closings.

14  58. In the agreed logistics, I would acquire the entity Seaside Mariana Golf and Spa Resorts

15    company, which owned all the Seaside Mariana land, using another US $475,000 of the Crowe

16    Group's money for said close.

17  59. Then, I would transfer the lands in the Funding Contract to the entity of the Crowe Group's

18    choice. (I would then get the other US $334,000 in a series of payments to me and my entity).

19  60. It is worth noting that one condition of close (in the Closing Contract) was not fulfilled by

20    Kevin Fleming; namely, he did not file the taxes for Seaside Mariana for the missing years.

21  61. However, this was my issue and not the Crowe Group's. I would be the owner of the Seaside

22    Mariana company. I worked out with David Crowe, on behalf of the Crowe Group, that I would

23

24

25

26

take responsibility for the taxes and simply file them for Seaside Mariana, as the new owner, after the close of my purchase of the SM company.

62. The Crowe Group agreed, via David Crowe, that this was acceptable to them and would not be a barrier to the close, nor their funding of it.

63. As part of the logistics for the close, I offered to provide a limited power of attorney in my name, to David Crowe's wife, that would be valid only to transfer the Seaside Mariana land out of the Seaside Mariana company.

64. At this point, in October 2018, I had fully performed as per the parties' contract, as far as I could without the US $475,000 promised in the Funding Contract. Within a few days, with the help of attorneys, the closing would happen, and using the Crowe Group's US $475,000, I would purchase the Seaside Mariana company, thereby owning its shares.

65. I would then immediately transfer the land to the Crowe Group's designated new entity (or let Mr. Crowe's wife handle this step via the limited power of attorney).

66. It was now time for the Defendants to perform with the rest of the funding promised in the Funding Contract for my purchase of the Seaside Mariana company; namely, the additional US $475,000.

67. However, just before I should have flown to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group, informed me that there was a new issue that could impact the anticipated closing.

68. Mr. Crowe informed me that Mr. Ted Cole had sued Seaside Mariana again. (Mr. Cole had previously sued Seaside Mariana and settled for a significant part of the Seaside Mariana land).

69. At this point, the Litigating Group was already aware of the other contracts I had signed with Kevin Fleming, Maria Rueda, Grupo Mariana, and Nicaragua Developments to purchase another eight of the real estate ownership and real estate development company.

70. David Crowe and the Litigating Group were also aware of a deal I was working on with the Jamaican government, as Mr. Crowe kindly lent me $5,000 so I could travel to Jamaica and for related costs. (In a few successive loans, Mr. Crowe kindly lent me approximately US $11,500, which I would like to repay to Mr. Crowe, with interest, when I am able).

71. I then revealed to Mr. Crowe, and thus all of these Defendants, that I had also purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims. I thus had the right, using assigned legal claims, to sue Mr. Cole for his past tortious acts against Mr. Fleming, Ms. Rueda, and the Seaside Mariana company.

72. Mr. Crowe and I obtained a copy of the new Ted Cole legal complaint, and it was frivolous at best.

73. I was therefore unconcerned about the Cole litigation and planned defensive litigation for Seaside Mariana as soon as I owned the Seaside Mariana company in a few days.

74. I proposed to these Defendants, via Mr. Crowe, that the combination of offensive litigation against Mr. Cole (for past tortious acts) and defending the frivolous new legal complaint would be a simple, inexpensive, and effective remedy to solve any concerns about the Cole legal complaint.

75. Further, as I pointed out, the new Cole litigation was my problem, as the soon-to-be-owner of the Seaside Mariana company, which was the entity getting sued.

76. I pointed out that within days the Seaside Mariana land would be transferred to the Litigating Group's designated new entity. As that new entity was about to be formed, it clearly would have no liability to anyone including Mr. Cole.

77. However, the Litigating Group, including these Defendants, refused to fund my purchase of the Seaside Mariana company (contrary to their promises, representations, obligations, and responsibilities set out in the Funding Contract).

78. David Crowe then assured me that Seaside Mariana was no longer attractive to any of the Litigating Group.

79. The reason stated by Mr. Crowe that the Litigating Group now had zero interest in the SM company and SM land, and also zero interest in honoring the Funding Contract, was the new Ted Cole litigation.

80. I don't consider this a valid reason to breach a contract, but it is interesting in light of Mr. Crowe and the Litigating Group's further actions, below.

## THE SECOND BREACH AND REPUDIATION (ON BEHALF OF ALL DEFENDANTS)

81. In March 2019, Defendant Thomas P. Madden contacted Kevin Fleming on behalf of the Crowe Group, with the following email (Exhibit E), attempting to purchase Seaside Mariana, despite:

   a. The non-circumvent these Defendants and the Crowe Group had agreed to.

   b. The Funding Contract they had signed.

   c. The various representations they made in October 2018, just before the parties would have closed, that they were pulling out and were no longer interested in the Seaside Mariana land.

## THE THIRD CROWE BREACH/REPUDIATION (ON BEHALF OF ALL DEFENDANTS)

82. In April 2019, Defendant David Crowe contacted Kevin Fleming, following up on communications from Thomas Madden and David Crowe, in email, attempting to negotiate a direct purchase of the SM company and land (without involving me).

83. In doing so, it is clear Crowe and all Defendants fully ratified the first Crowe Group breach as well as the second breach and repudiation (Madden contact of Fleming to try to buy directly) of the Funding Contract.

## FURTHER RAMIFICATIONS OF THE CROWE GROUP BREACHES

84. In and after March 2019, once Thomas Madden contacted Kevin Fleming to negotiate with him directly, on behalf of the Crowe Group, and once David Crowe followed through and continued those negotiations on behalf of all Crowe Group members and all Defendants, Kevin Fleming stopped returning my phone calls.

85. (In December 2019, Kevin Fleming emailed me to say Fleming was terminating the Purchase Contract. However, Mr. Fleming did not have the legal right to do so).

86. Fleming refused to honor any of the rest of my contracts with him or his entities.

87. As a result, I have potentially lost another US $4 million or more, as shall be further proven at trial (with US ~$3 million of profits expected to come from the Isla Mariana / Nicaragua Developments deals).

88. (I admit that these profits were speculative, and that from a legal standpoint, each expected potential profit must be multiplied by the percentage chance that I would have realized that particular profit. I will prove these numbers and these more speculative damages at jury trial).

89. I am doing what I can to mitigate the damages.

90. To my surprise, these Defendants have thus far (through today) demonstrated zero interest in working with me in any way to mitigate the very significant damages associated with my planned purchase of the Seaside Mariana company.

91. However, as I had stated in email to Mr. Troy Romero, we are all adults and responsible for our own actions and decisions (and also the lack thereof).

92. The Defendants' breaches, repudiations, false promises, representations, and assurances, not to mention their tortious acts and non-acts, and their negligence have caused significant damages to me, in an amount to be proven at trial.

93. I will continue to do my best to mitigate the base damages, especially my hoped-for and expected profits from purchasing the Seaside Mariana company (other than the US $334,000).

94. I contacted David Crowe of the Crowe Group to see if we could work something out, whether a way to move forward, or a settlement, but Mr. Crowe was not interested.

95. I have had similar discussions with Mr. Rau, Mr. Madden, and Mr. Jimenez, with no interest by those parties in continuing a discussion about ways I can still close on the Seaside Mariana company (if that is even relevant or possible). Mr. Rau and Mr. Jimenez had no interest in that nor in any settlement discussions.

96. I was left with no choice but to file a legal complaint so that the scales of justice may be righted and balanced appropriately.

1    97. (Mr. Thomas Madden, Mr. Brian Putze, and Ms. Sandra Winfrey have all settled with me, and

2         were dismissed with prejudice in this legal complaint).

3

4

5    AFFIANT FURTHER SAYETH NAUGHT.

6

7

8                                                    CARL A. WESCOTT
                                                     February 16th, 2021
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

16

February 16th, 2021


Clerk of the Court
United States District Court
District of California – Northern District
450 Golden Gate Avenue, 16th Floor
San Francisco, CA 94102


Re:  3:20-cv-064546-JD (Wescott versus Crowe et al.)


Dear Clerk of the Court:


On February 9th, 2021, I sent in a *Plaintiff's Motion for Leave to Amend* and a related Proposed Order.

Today I am enclosing two further related documents for filing in the docket:

- *Proposed Amended Legal Complaint in redline format*
- *Plaintiff's [Amended] Complaint for Breach of Contract… (and nine other listed causes of action)*

The documents have already been served upon the attorney for all defendants, Troy Romero, esq.

Please reach out to me if you have any questions or concerns.

Thank you for your kind assistance, as always.



Carl A. Wescott, Plaintiff *pro se*
8210 E. Via de la Escuela
Scottsdale, AZ 85258
+1 936 937 2688
carlwsoj@gmail.com