## Exhibit A - Facts as Pled Supporting the Breach of Contract

The facts, as pled in the Amended Complaint ("AC") that support a judgment against Mr. Rau (cut and pasted) are:

- Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, David Crowe, Robert Crowe, Mike Lyonette; Thomas Madden; Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Bernadette Brown; Sandra Winfrey; Brian Putze, Colin Ross, Brad Malcolm, Michael Jimenez, Federico Gurdian, Terencio Garcia, and Gustavo Varela, as individuals, in addition to acting for himself/herself and on his/her own behalf individually, as well as for the benefit of his or her marital community (if any), is and was acting as the agent, servant, employee, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the other Defendants (individual and entities) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy. (AC, ¶6)
- Most recently, the Plaintiff entered in to contract to purchase SM (either the Sociedad itself or the real estate, at his option) in 2018, with an anticipated close date (after some revisions, addenda, and extensions) of October 15th, 2018 (AC, ¶19)
- More recently, in August 2018, the Plaintiff entered in to a final version of a contract with investors, after their due diligence, who were familiar with the relevant properties who agreed to fund 100% of the costs of the purchase in exchange for certain land owned by SM (AC, ¶21)
- That contract shall be referred to as the "Sales Contract." (AC, ¶22)
- A group of 22 investors (the named Defendants) all agreed to collectively be bound by the Sales Contract and to fund the payments in the Sales Contract. (AC, ¶24)
- Two of the Defendants, David Crowe and Mike Lyonnette, agreed to manage their group and, for expediency, communications with the Plaintiff. David Crowe named and provided documentation as to the identities of the twenty-two people (including himself) who had agreed to be bound by the Sales Contract. (AC, ¶25)
- In August 2018, David Crowe and Mike Lyonette signed NCNDs with the Plaintiff in August 2018, and pledged not to share any information about the Plaintiff or the Sales Contract with any of the rest of their group of 20+ investors unless an individual group member signed a NDA (Non-Disclosure). (AC, ¶28)
- Approximately 10 of the 20+ investors signed NDAs with the Plaintiff, and thus, if Mr. Crowe, Mr. Lyonette, and others were honoring the Sales Contract and their NDAs, the Plaintiff believes only the dozen or so of them would have gotten information related to the Sales Contract and its progress towards a closing after that point. (AC, ¶29)
- The NDAs granted jurisdiction of the Plaintiff's choice, had a non-disclosure provision, and in the majority of the NDAs signed, specifically acknowledged that violating the non-disclosure provision, given the Plaintiff's deals, would like cost him over US $10 million, with the Defendants signing up for damages in that amount for that scenario. (AC, ¶30)

- Because the Plaintiff was purchasing the development for US $500,000 (plus capped deferred payments) and selling the land to the investors backing him for US $834,000, the Plaintiff was going to make US $334,000 in short-term cash profit in closing his purchase of SM and flipping the land to his investors. (AC, ¶35)
- For stylistic purposes and economy of phrase, the above Defendants, who acted in concert to fund the Plaintiff's purchase of SM, will be described as "the Crowe Group" unless the context requires otherwise. (AC, ¶37)
- The Crowe Group performed its due diligence on the deal and agreed to move forward to a close. (AC, ¶38)
- After the Crowe Group's due diligence, those investors agreed in August 2018 to close on the purchase within 60 days.  The parties signed a new definitive contract in August 2018 for a closing in October 2018. (AC, ¶39)
- There was no contingency or liquidated damages in the contract, as the Crowe Group was quite familiar with the assets being purchased, their current state, and had done their due diligence. (AC, ¶40)
- The Sales Contract called for a closing date in mid-October-2018, as did the Plaintiff's purchase contract of Seaside Mariana. (AC, ¶42)
- The parties retained attorneys to prepare closing documents. (AC, ¶43)
- The parties worked out the logistics of closing in a "simultaneous close", which is well-understood to mean two successive closings. (AC, ¶44)
- In the agreed logistics, the Plaintiff would acquire the entity Seaside Mariana Golf and Spa Resorts, SA, which owned all the land, using another US $475,000 of the Crowe Group's money for said close.  Then, the Plaintiff would transfer the lands in the Sales Contract to the entity of the Crowe Group's choice.  Then, the Plaintiff or his designees would get the other US $334,000 in a series of payments. (AC, ¶45)
- However, with the Plaintiff about to fly to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group, informed the Plaintiff that he and the rest of his investor group refused to close and would not be closing, breaching the Sales Contract. (AC, ¶46)

### Further Facts as Pled Supporting the Breach of Contract based on Repudiation

- David Crowe assured the Plaintiff that SM was no longer attractive to any of his investment group. (This is not a valid reason to breach a contract but is interesting in light of his and the group's further actions, below). (AC, ¶47)
- In March 2019, Defendant Thomas P. Madden contacted Kevin Fleming, with the following email (AC, Exhibit B).  (AC, ¶48, and AC, Exhibit B)
- In April 2019, Defendant David Crowe contacted Kevin Fleming, following up on communications from Thomas Madden and David Crowe, in email.  (AC, ¶49)
- In doing so, it is clear Crowe and all Defendants fully ratified the first Crowe breach as well as the Madden breaches and repudiation of the Sales Contract.  (AC, ¶50)

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

16



This Settlement Agreement dated as of August 11ᵗʰ, 2018, is entered into by and among:

**"THE SETTLER"**

Carl (aka Kalle) Wescott

And

**"THE LITIGATORS"**

## RECITALS

Between the undersigned, to wit: On one hand, Kalle Wescott (hereafter called the "Settler") and on the other hand, David Crowe and Mike Lyonette (hereafter called "The Litigators"). Mike Lyonette ("the Mortgage Holder") previously provided loans to Seaside Mariana, and has a mortgage (hipoteca) on a subset of the Seaside Mariana land. The Litigators are part of the Litigating Group, which is a group of persons, represented by Federico A. Gurdián Sacasa (attorney-at-law), who bought or invested in lots, condominiums and bungalows at Seaside Mariana (hereafter called the "*Litigating Group*") that have a Nicaraguan lawsuit together have agreed to execute a legally-binding Settlement Agreement, (hereafter called the "Agreement").

**WHEREAS**, the Settler is currently purchasing 100% of the shares of Seaside Mariana Spa & Golf Resort S.A. (hereafter "SM" or "Seaside Mariana"), which is all ten thousand (10,000) shares, (hereafter called the "Stock"),

**WHEREAS**, the Parties (the Litigators and the Settler) wish to settle all claims of the Litigating Group and have agreed-upon terms to do so;

**WHEREAS**, the Parties (the Litigators and the Settler) hereby define three terms: "SM Closing" shall be when the Settler owns SM and has all the endorsed shares. "Land Closing" shall be when the Settler has transferred the SM land and the Horizontal Property Regime that is the major asset of the settlement to the Litigating Group or to the entity of their choice. "Full Settlement Closing" shall be when this Settlement is fully effectuated, including all items in Article I, sections 4 through 7 having been paid and transferred.



**NOW, THEREFORE**, in consideration of the mutual covenants and promises made by the Parties hereto, covenant and agree as follows:

### Article I

1. When the Litigators have completed basic due diligence, the Litigators shall pay a non-refundable deposit of **Twenty-Five Thousand United States Dollars 00/100 (USD $25,000.00)** to a party designated by the Settler. This must occur by August 13ᵗʰ, 2018 or else this contract unwinds, with parties still respecting signed NDA agreements.

2. In the next 30 days, the Settler will sign a new agreement with the Litigating Group (as opposed to the Litigators), which will bind members of the group, which will further clarify the power of attorney(s) that Settler shall be providing, breaches of contract, that Settler does not personally owe monies owed to the Mortgage Holder and remedies and/or damages for the breaches.

3.  The Parties shall have up to 60 days from now to close the settlement – through October 10th, 2018.

4.  The high level terms of the settlement are that the Litigating Group will be providing US $834,000 in 4 tranches to the Settler, as further detailed below, while the Settler will be transferring to the Litigating Group almost all assets owned by Seaside Mariana, including all unencumbered lands, operating assets (including all tangible and almost all intangible assets), domains, web content, equipment, leases, contract rights, intellectual property rights used in the business of Seaside Mariana, together with all documents and entities relating to the HOA. Once all monies and land (along with the assets identified in Article I, section 6) have properly changed hands, the Parties shall indemnify each other by mutual agreement.

5.  One of two exceptions to the transfers that are occurring as set out in Article I, section 4, is that Seaside Mariana will retain insurance policies and any other intangible asset that is either not transferrable, or for the benefit of SM only, or both.

6.  The second of two exceptions concerns customer and mailing lists and mailing campaigns. The Settler shall be transferring to the Litigating Group all customer and prospect mailing lists (including all contact information) and mailing campaigns, both digital and analog (email, web, and snailmail). However, the parties shall co-own these assets. Settler shall assign his part of the co-ownership to a Sociedad Anonima after the close.

7.  The $834,000 consists of four parts: (1) the $25,000 by August 10th, 2018; (2) $475,000 within 60 days of the first tranche, to be transferred to the named party of Settler's choice only after SM Closing, with Settler having full ownership of, and authority over, Seaside Mariana; (3) $234,000 as follows, to the Settler: $56,000 at the Land Closing when Litigating Group receive all their expected land as settlement, and 20% of SM land sales achieved by Litigating Group until fully paid, with a minimum of $12,000 per quarter (3 months), paid within a week or so of the end of each quarter, with the first payment beginning at the end of the second quarter after SM Closing, and then a quarterly payment every 3 months from that point onwards until the $234,000 has been paid in full and (4) then, another $100,000 to an entity of the Settler to be formed later. After the $234,000 to Settler has been paid, the Litigating Group shall continue to pay under the same quarterly program (20% of sales, but a minimum of $12,000 per quarter) to the entity until the $100,000 is fully paid.

8.  These (Article I, sections 4 through 7) are the only sums and items owed to each other, and when fully transferred and paid the parties shall fully release liability to each other with regard to Seaside Mariana.

9.  SM has not filed taxes since 2011, and thus Settler will work with the current owner to get all taxes filed and current through the tax year that ends June 2018. This is a necessity prior to any closing including SM Closing.

10. The Settler has bound the sellers of SM in a contract that ensures that Settler and the Litigating Group will get everything they need by or at closing, including the filed taxes. The Litigators have approved the language of this Closing Contract.

11. The Settler shall pay the costs related to the SM stock transfer. The Litigating Group shall pay the costs of the land transfer including what's necessary on property taxes to do the transfers. The parties shall pay their own attorneys.

12. The one sub-parcel that will not go to the Litigating Group is the parcel with a mortgage provided by one of the Litigating Group (the "Mortgage Holder"), also represented by Federico A. Gurdián Sacasa (attorney-at-law), unless it is most efficient to transfer it in bulk with the other land for the Litigating Group and then to the Mortgage Holder. At or just after the SM Closing, Settler shall work with the Mortgage Holder to transfer that land to the Mortgage Holder at the Mortgage Holder's expense.

13. Both Parties have entered this deal in good faith and with a lot of trust, but the Parties have offered each other mechanisms such that they do not have to rely solely on trust at each step. The Parties will work out the final details of each such step to their mutual satisfaction at each step. For example, because the $475,000 needs to go in to escrow prior to land transfer, the Settler has offered and will continue to offer any mechanism the Litigating Group desire to ensure that they will get the land, including issue by Settler of an irrevocable power of attorney to a Nicaragua attorney of the Litigating Group' choice. For the payments that will come with sales or paid each quarter, Settler does not necessarily require a mortgage on SM, and is open to Personally Guaranteed Promissory Notes.

14. Settler will continue to provide all due diligence information requested by Litigating Group, and can provide a complete package of written documents at or just after the close.

15. Confidentiality is extremely important to complete this settlement, including the purchase aspect. The Settler has already executed NDAs (Non-Disclosure Agreements) with the Litigators. The Litigators plan to solicit funding from several more members of the group of Litigating Group. The Litigators shall ensure that those several members, as well as Federico A. Gurdián Sacasa, all sign NDAs with the Settler similar to the one provided by the Settler on Saturday August 4th, 2018, prior to disclosing information related to this settlement or other confidential information. Subsequently, all confidential information and all information relating to this deal shall be shared ONLY with the Settler, the Litigators, Senor Gurdián, and the members of the Litigating Group that have signed NDAs in the past week or that shall sign NDAs shortly.

16. Settler already has digital files of the following categories and these will be provided to Litigating Group prior to closing: Legal, Financials, Sales, Vendors, Marketing, Engineering and Design, Permits, Employees, HOA documentation and entities, Communication, Maps, Cash Liabilities, Contractual Liabilities, Pictures and Digital Collateral. Settler shall transfer all of these to the Litigating Group prior to SM Closing.

17. Ownership of the land: Except for the registered mortgage lien held by Mortgage Holder on the lots identified, Settler represents and warrants (a) that Seaside Mariana Spa & Golf Resort S.A. has clear and unencumbered title[1] to all of the aforementioned lands and (b) that, once Settler's acquisition of Seaside Mariana has been finalized (aka SM Closing), Settler will be in a position to fully execute and deliver on all of the agreements and obligations set out in this Settlement Agreement. The Parties attach the most recent Libertad de Gravamen for the lands as Exhibit A. The Libertad de Gravamen shows property that is formally Registered and thus not able to be transferred to Litigating Group.

18. Liabilities of Seaside Mariana: Settler represents and warrants that, except for the liabilities to the Litigation Group members settled by this Agreement, all existing liabilities of Seaside Mariana, including Seaside Mariana's obligation to deliver 10 Beach Front lots to a previous shareholder of Seaside Mariana, remain with the Seaside Mariana entities owned by Settler and shall not pass to Claimants or to the Litigation Group. Settler shall indemnify the Litigation Group and its members against any such claims that may arise from these obligations.

19. Settler shall ensure

    (1) that the current beneficial owners of Seaside Mariana (Kevin Fleming and Maria Rueda) disclose to the buyer of the shares (i.e. the Settler) any and all transactions that have been made, specially land transactions made, and that are pending registration in public record, and the Settler shall ensure that this information is passed on to the Litigating Group in its entirety; and

    (2) that the current owners of Seaside Mariana are prohibited from taking any further action relating to these transactions and pending transactions on behalf of any of the Seaside Mariana entities and that all Powers of Attorney issued by the current owners of Seaside Mariana are revoked with effect immediately upon SM Closing.

## Article II

1. Notices. All notices, demands and payments required or permitted to be given hereunder shall be in writing and may be delivered personally, by e-mail to the addresses of the Parties as set out and agreed separately between the parties. Any notice personally delivered or sent by e-mail shall be deemed to have been given and received at the time of delivery, unless otherwise proven. All Parties shall be entitled to designate new contact information by giving notice thereof to the other Parties in accordance with the terms hereof.

2. Assignment/Successors. This Agreement shall be binding upon all successor, assigns, heirs, agents and representatives of each of the Parties.

3. Governing Law: This Agreement shall be governed by and construed in accordance with the laws of San Francisco, California in the United States of America, and thus that shall be the jurisdiction and venue for this contract. (Spanish documents, which will follow Nicaraguan law, will be utilized to effectuate the land transfer).

---

[1] "clear and unencumbered" from a mortgage standpoint, in other words, there is no mortgage debt on the lands. Property taxes are owed, and there are various liens on the lands as per the most recent Libertad de Gravamen, dated April 2018, which is an Exhibit to this contract.

4.  <u>Entire Agreement.</u> This Agreement may not be amended or modified, and no provisions hereof may be waived, without the written consent of the Parties.

5.  <u>Severability.</u> If any provision of this Agreement shall be declared void or unenforceable by any judicial or administrative authority, the validity of any other provision and of the entire Agreement shall not be affected thereby.

6.  <u>Titles and Subtitles.</u> The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting any term or provision of this Agreement.

7.  <u>Execution.</u> This Agreement may be executed in counterparts and all of such counterparts taken together shall be deemed to constitute one and the same Agreement. The Parties may execute this Agreement via facsimile transmission or electronic communication and such execution and delivery shall be full, binding and proper execution and delivery without the need for the exchange of originally executed copies of this Agreement between the Parties.

8.  The parties agree they are sophisticated in business matters and have access to counsel. They also have collaborated on the drafting and editing of this contract. Accordingly this contract will not be construed in favor or against either party including the original drafter.



[Signature page follows]

IN WITNESS WHEREOF, the Parties hereby state that they are fully empowered to act and agree to the obligations contained in this Agreement and that consequently, each one accepts each and every clause contained herein in the terms and under the conditions hereby stated.

IN WITNESS WHEREOF CARL (KALLE) WESCOTT has executed this Agreement on this (Day) 11 of August 2018 in the city of San Francisco, California; United States of America.

**PRINT NAME(S):**

_____Carl (Kalle) Wescott_____          _____CKWescott_____
(Settler Print Name)                                  (Settler Signature)

.IN WITNESS WHEREOF David Crowe has executed this Agreement on this (Day) 11 of August 2018.

_____          _____
(Print Name)                                  (Signature)

IN WITNESS WHEREOF Mike Lyonette has executed this Agreement on this (Day) 11 of August 2018.

_____          _____
(Mortgage Holder Print Name)                 (Mortgage Holder Print Name)

**Exhibit:**

The following exhibit is an integral part of this Settlement Agreement

A.       Most recent Libertad de Gravamen



EXHIBIT A

SERIE "T"

DIEZ CORDOBAS

1  SEÑOR (A) REGISTRADOR (A) PUBLICO DE LA PROPIEDAD INMUEBLE Y MERCANTIL

2  DE LA CIUDAD DE MANAGUA, YO, JAIRO JOSÉ MALTEZ MEDAL, MAYOR DE EDAD,

3  ABOGADO Y NOTARIO PUBLICO, DE ESTE DOMICILIO, Y PORTADOR DEL CARNE DE

4  IDENTIDAD DE LA CORTE SUPREMA DE JUSTICIA NUMERO 11516, LE SOLICITO A USTED ME CERTIFIQUE LIBERTAD

5  DE GRAVAMEN DE PROPIEDAD HORIZONTAL DE LA FINCA NÚMERO CUATRO MIL DOSCIENTOS CINCUENTA Y UNO

6  (4251) PH, TOMO NÚMERO CUARENTA Y SIETE PLECA CUARENTA Y NUEVE (47/49) PH, FOLIOS NÚMERO TREINTA Y

7  UNO PLECA TRESCIENTOS GUIÓN UNO PLECA SESENTA Y SEIS (31/300) Y (1/66) ASIENTO PRIMERO (1) DE LA

8  COLUMNA DE INSCRIPCIONES DE LA SECCION DE DERECHOS REALES

9  Managua, viernes 21 de julio del 2017

10

11

12                                   Abogado y Notario Público

13                                   Carné No 11516

14

15

16  LA SUSCRITA REGISTRADORA AUXILIAR DEL DEPARTAMENTO DE MANAGUA CERTIFICA: Que

17  la finca Inscrita bajo el No. 4251-PH; Tomo 47-PH; Folios 31 al 300; Tomo 49-PH; Folios 1 al 66;

18  Tomo 136-PH, Folios 91 al 104, Asiento 1 y 2. Columna de Inscripciones, sección de Derechos

19  Reales, Libro de Propiedades Horizontales, de este Registro Publico. Pertenece el resto a: Seaside

20  Marina Spa & Golf Resort Sociedad Anónima. Y tiene hipoteca a favor de Michael Francis

21  Lyonette, tan solo por lo que hace a los Módulos Nos. 18, 19, 29, 30, 31, por las siguientes sumas: (1)

22  Trescientos sesenta y tres mil ochocientos cincuenta y dos dólares equivalente a siete millones

23  ochocientos noventa y cinco mil quinientos ochenta y ocho córdobas con cuarenta centavos de

24  córdobas; (2), Cuatrocientos tres mil seiscientos noventa y tres dólares equivalente a ocho millones

25  setecientos sesenta mil ciento treinta y ocho córdobas con diez centavos de córdobas, para un monto

26  total de Dieciséis millones seiscientos cincuenta y cinco mil setecientos veintiséis córdobas equivalente a

27  setecientos sesenta y siete mil quinientos cuarenta y cinco dólares, posteriormente se amplia dicho

28  crédito hasta la suma de veintiséis millones setecientos ochenta y nueve mil setecientos setenta y tres

29  córdobas con treintiun centavos equivalente a un millón ciento cuarenta y un mil trescientos cuarenta

30  seis dólares. En asientos 1 y 2 **** También tiene Inscritas Provisionalmente venta de los

siguientes lotes indivisos: 1) A favor de Thomas Edward Austin, identificado como lote GB, con un área de mil trescientos veinticuatro punto novecientos cinco metros cuadrados; 2) A favor de Trevin Martin Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto novecientos sesenta y dos metros cuadrados; 3) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GQ, con un área de novecientos cincuenta y uno punto ciento veinticuatro metros cuadrados; 4) A favor de Judith Gail Madgett y Robert Daniel Madgett, identificado como lote GBU, con un área de ochocientos cincuenta y siete punto seiscientos ochenta y uno metros cuadrados, inscrito el 22-05-2012, pero se encuentra pendiente la firma del registrador; 5) A favor de Thomas Edward Austin, identificado como lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro metros cuadrados; 6) A favor de Thomas Edward Austin, identificado como lote OVL, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados; 7) A favor de Thomas Edward Austin, identificado como lote RM, con un área de un mil setecientos ochenta y ocho punto cero noventa y cuatro metros cuadrados; 8) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros cuadrados; 9) A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 10) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados; 11) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, inscrita el 22-05-2012, pero se encuentra pendiente de firma del registrador; 12) A favor de Thomas Edward Austin, identificado como lote GAL, con un área de ochocientos veintiún punto setecientos veinticinco metros cuadrados; 13) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote DVA, con un área de un mil ochocientos sesenta y seis punto setecientos setenta y tres metros cuadrados; 14) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos cincuenta y nueve metros cuadrados; 15) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 16) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GST, con un área de un mil trescientos treinta y ocho punto cuatrocientos trece metros cuadrados; 17) A favor de Anthony David Bowman y Carol Anne Bowman, identificado como lote GCR, con un área de un mil

ciento diecisiete punto quinientos setenta y tres metros cuadrados, inscrita el 22-05-2012, pero se encuentra pendiente de la firma del Registrador; 18) A favor de Anthony David Bowman y Carol Anne Bowman, identificado como lote GCR, con una área un mil ciento diecisiete punto quinientos setenta y tres metros cuadrados; 19) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, 20) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GBV, con un área de ochocientos cincuenta y siete punto seiscientos ochenta y un metros cuadrados; 21) A favor de Thomas Edward Austin, identificado como Lota GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro metros cuadrados; 22) A favor de Thomas Edward Austin, identificado como lote OVL, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados, 23) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GQ, con un área de novecientos cincuenta y uno punto ciento veinticuatro metros cuadrados; 24) A favor de Thomas Edward Austin, identificado como lote GB, con un área de un mil trescientos veinticuatro punto novecientos cinco metros cuadrados; 25) A favor de Trevin Martin Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto novecientos sesenta y dos metros cuadrados; 26) A favor de Thomas Edward Austin, identificado como lote RM, con un área un mil setecientos ochenta y ocho punto cero noventa y cuatro metros cuadrados; 27) A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 28) A favor de Thomas Edward Austin, identificado como lote GAL, con un área de ochocientos veintiuno punto setecientos veinticinco metros cuadrados; 29) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVA, con un área de un mil ochocientos sesenta y seis punto setecientos setenta y tres metros cuadrados; 30) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos cincuenta y nueve metros cuadrados; 31) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, 32) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados; 33) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros cuadrados; 34) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GST, con un área de un mil trescientos treinta y ocho punto cuatrocientos trece

metros cuadrados; 35) Tiene inscrito provisionalmente Dacion en pago a favor Desarrollos Inmobiliarios Tejas, Sociedad Anónima sobre los siguientes lotes indivisos: 1) Lote Nº 20, con un área de diecinueve mil doscientos setenta y cinco punto novecientos veintitrés metros cuadrados; 2) Lote Nº 28, con un área de ciento noventa y dos mil novecientos sesenta y cuatro punto ciento ochenta y cinco metros cuadrados; 3) Lote Nº 21, con un área de treinta y nueve mil quinientos ochenta punto cero noventa y seis metros cuadrados; 4) Lote Nº 22, con un área de nueve mil cincuenta y seis punto seiscientos setenta y nueve metros cuadrados; 5) Lote Nº 23, con un área de cuatro mil setecientos sesenta y uno punto doscientos cuarenta y tres metros cuadrados; 6) Lote Nº 25, con un área de sesenta y un mil quinientos treinta punto setecientos setenta y cinco metros cuadrados, inscrita con fecha veinte de junio del año dos mil trece, pero se encuentra pendiente la firma y sello del registrador. 36) Tiene anotada demanda en la vía ordinaria con acción de pago de daños y perjuicios, a solicitud de Edward Albert Cole por la suma de cuarenta y ocho millones ochocientos treinta y tres mil setenta y nueve córdobas con catorce centavos equivalente a dos millones setenta y tres mil diez dólares con cincuenta centavos. 37) Tiene anotada Dacion en Pago a favor de los señores: Edward Albert Cole, los siguientes lotes. 1) Lote GSA, con un área de: un mil ciento treinta y siete punto setecientos noventa y tres metros cuadrados, 2) Lote GSB, con un área de: un mil ochenta y siete punto diecisiete metros cuadrados, 3) Lote GSC, con un área de: un mil ciento cincuenta y seis punto ochocientos un metros cuadrados, 4) Lote GSD, con un área de: un mil ciento setenta y siete punto doscientos noventa y seis metros cuadrados, 5) Lote GSE, con un área de un mil ciento cincuenta y tres punto seiscientos diez metros cuadrados, 6) Lote GSF, con un área de un mil ciento veinticinco punto setecientos cinco metros cuadrados, 7) Lote GSG, con un área de un mil noventa y siete punto ochocientos metros cuadrados, 8) Lote GSH, con un área de un mil setenta y uno punto trescientos setenta y tres metros cuadrados, 9) Lote GSI, con un área de un mil ciento cuarenta y un punto noventa y tres metros cuadrados, 10) Lote GSJ, con un área de un mil trescientos setenta y dos punto cero cero seis metros cuadrados, 11) lote GSK, con área de un mil ochocientos treinta y uno punto cuatrocientos cincuenta y uno metros cuadrados, 12) Lote GSL, con un área de un mil ochocientos veintidós punto novecientos setenta y ocho metros cuadrados, 13) Lote GSM, con un área de un mil trescientos sesenta y ocho punto novecientos treinta y uno metros cuadrados, 14) Lote GSN, con un área de un mil ciento diez punto novecientos cincuenta y ocho metros cuadrados, 15) Lote GSO, con un área de un mil ciento cuarenta y nueve punto cuatrocientos cinco metros cuadrados, 16) Lote GSP, con un área de un mil doscientos cincuenta y nueve punto setecientos noventa y cinco

metros cuadrados, 17) Lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados, 18) Lote GSV, con un área de un mil trescientos veintiséis punto sesenta y seis metros cuadrados, 19) Lote SSW, con un área de un mil trescientos setenta punto quinientos dieciocho metros cuadrados, 20) Lote. GSX, con un área de un mil cuatrocientos cuarenta y uno punto cuatrocientos seis metros cuadrados, 21) Lote GSY, con un área de un mil seiscientos noventa y dos punto ciento cincuenta y uno metros cuadrados, 22) Lote GS2, con un área de un mil novecientos sesenta y cinco punto cuatrocientos dieciocho metros cuadrados, 23) Lote GSAA, con un área de dos mil doscientos veintisiete punto setecientos cincuenta y cinco metros cuadrados, 24) Lote GSAB, con un área de dos mil quinientos dieciocho punto doscientos noventa y uno metros cuadrados, 25) Lote GSAC, con un área de cuatro mil doscientos treinta punto trescientos cincuenta y dos metros cuadrados, 26) Lote GSDA, con un área de cuatro mil cuatrocientos treinta y seis punto ciento treinta y un metros cuadrados, 27) Lote GSAE, con un área de tres mil novecientos setenta y cuatro punto novecientos veinticinco metros cuadrados, 28) Lote GSAF, con un área de cuatro mil ciento cuarenta punto ciento cuarenta y dos metros cuadrados, 29) Lote GSAG, con un área de cuatro mil seiscientos cuarenta y dos punto trescientos sesenta y cinco metros cuadrados, 30) Lote GCA, con un área de tres mil sesenta y ocho punto ciento doce metros cuadrados, 31) Lote GCB, con un área de tres mil novecientos cincuenta y nueve punto doscientos ochenta y tres metros cuadrados, 32) Lote GCC, con un área de cuatro mil seiscientos veintiséis punto setecientos veinte metros cuadrados, 33) Lote GCD, con un área de cuatro mil doscientos veintiún punto seiscientos treinta y dos metros cuadrados, 34) Lote GCS, con un área de tres mil setecientos veintiséis punto seiscientos cincuenta y cinco metros cuadrados, 35) Lote GCF, con un área de tres mil ciento cincuenta y seis punto doscientos cuarenta y tres metros cuadrados, 36) Lote GCG, con un área de dos mil seiscientos ochenta y cuatro punto setecientos cuarenta y siete metros cuadrados, 37) Lote GCH, con un área de dos mil cuatrocientos noventa y nueve punto quinientos treinta metros cuadrados, 38) Lote GCI, con un área de dos mil seiscientos treinta y siete punto trescientos ochenta metros cuadrados, 39) Lote GCI, con un área de dos mil quinientos noventa y dos punto novecientos veinte metros cuadrados, 40) Lote GCK, con un área de dos mil cuatrocientos dieciséis punto ochocientos cuarenta y dos metros cuadrados, 41) Lote GCL, con un área de dos mil seiscientos cincuenta y dos punto cuatrocientos setenta y dos metros cuadrados, 42) Lote GCM, con un área de dos mil cuatrocientos treinta y seis punto novecientos veinte metros cuadrados, 43) Lote GCN, con un área de dos mil nueve punto quinientos setenta y uno metros cuadrados, 44) Lote No.27, con un área de

doscientos cuarenta y dos mil ochocientos setenta y cinco punto seiscientos ochenta y seis metros cuadrados, 45) Lote No.24, con un área de doce mil ochocientos cuarenta y dos  punto doscientos veintiuno metros cuadrados, 46) Lote No. 26, con un área de cincuenta y siete mil seiscientos diecinueve punto seiscientos sesenta y ocho metros cuadrados. *** 38)  Promesa de venta, a favor de PKR Holding, Sociedad Anonima, sobre los siguientes lotes, a) lote OVK, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados, b) lote GAY, con un área de un mil cuatrocientos treinta punto setecientos treinta y siete metros cuadrados, c) lote GAX, con u na rea de un mil cuatrocientos veintinueve punto seiscientos sesenta y tres metros cuadrados, por la suma de tres millones seiscientos treinta y un mil seiscientos ochenta y cinco córdobas con sesenta centavos de córdobas. *** 39) promesa de venta, a favor de Advantage Ventures LLC, un lote con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, por la suma de dos millones ochocientos noventa y nueve mil setecientos dos córdobas con treinta y cinco centavos, equivalente a ciento nueve mil quinientos dolares. *** 40) Promesa de venta a favor de Paul Brian Ciceri, un lote de terreno identificado como GAV, con un área de un mil cuatrocientos siete punto ochocientos setenta y ocho metros cuadrados, por la suma de setecientos ochenta y dos mil treinta y cuatro córdobas equivalente a veintinueve mil trescientos ochenta y dos dolares. *** 41) . Demanda, ordinaria con acción de resolución de contrato, para que por sentencia firme y declare, lo siguiente: a) que  se deje sin efecto el contrato de oferta de compra sobre el lote OVGG, b) que  se deje sin efecto el contrato de oferta de compra sobre el lote NGJ, c) devolución de precio mas intereses, d) pago de los costos daños y perjuicios ocasionados por el incumplimiento. *** 42) Demanda en la via ordinaria con acción de resolución de contrato por incumplimiento para que por sentencia se declare lo siguiente: a) disuelto el contrato de promesa de venta , b) devolución de precio mas intereses, c) pago de los costos daños y perjuicios ocasionados por el incumplimiento. ***43) Demanda ordinaria con acción de resolución de contrato por incumplimineto,  promovida por Darrell Lee y Bushnell y Amy Bushnell, *** 44) Demanda ordinaria con acción de resolución de contrato en consecuencia de conformidad al articulo 1061 y 1083 Pr. Declareseles rebeldes para todos los efectos de la presente demanda.  En asientos 1 al 42, 41 y 43 A solicitud de parte interesada extiendo el presente testimonio en la ciudad de Managua a veintisiete dia del mes de Julio del dos mil diecisiete.

CARL A. WESCOTT
8210 E. Via de la Escuela
Scottsdale, AZ 85258
*in propria persona*
CARLWSOJ@GMAIL.COM
+1 936 937 2688

# UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF CALIFORNIA
## NORTHERN DISTRICT

| | |
|---|---|
| CARL A. WESCOTT,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID CROWE, JEFF RAU,<br>MIKE LYONETTE, et al.<br><br>Defendants | Case No. 3:20-cv-06456-JD<br><br>**EXHIBIT C: SWORN DECLARATION OF CARL A. WESCOTT** |

I, Carl A. Wescott, hereby swear under penalty of perjury of the laws of California and of the United States of America, that the following facts are true, to the best of my memory, recollection, and belief:

1. I am the Plaintiff in the above-captioned case at Bar.

2. I am quite familiar with all of the circumstances of this case from my own viewpoint (obviously, I do not yet know what internal communications occurred between the Defendants).

3. I am 53 years old, and a U.S. citizen.

4. I am competent to testify. Were I to be called to testify in this matter, my testimony would be as follows, and until that point, my written testimony is as such:

   a. The facts cited in my legal complaint and in my Response to Mr. Rau's Motion for a Judgment on the Pleadings are all true.

b.  I am indeed on the California Vexatious Litigant list.

c.  When I first had to represent myself in my family law case for marital dissolution (as I had no money for an attorney) I made many filings over denied visitations with my children, and didn't make it clear enough that each filing (Orders to Show Cause, for example, because the denied visitations violated a Court order) were for a different denied visitation, and thus it was perceived that I was re-filing Requests for Orders and Orders to Show Cause that I had already lost.

d.  I have great respect for our Courts and follow Court orders to the best of my ability.

e.  Though I am not an attorney, I have learned a lot about the law and civil procedure, which is important as I still cannot afford an attorney.

f.  I used to be a California resident.

g.  I filed 11 cases in California Superior Court under 391.7 in 2017 and 2018 and 2019 and was approved to file the first time 10 of 11 times.

h.  I had many California cases dismissed against me in the past, but those cases were not without merit.

i.  For the relevant California cases (as alluded to above), I've survived 90%+ of the 391.7s as well as 90%+ of the Motions to Dismiss filed against my cases, as one indicator of merit, or at least perceived merit.

j.  I was rendered homeless and my possessions stolen, twice, during the relevant timeframes.

k.  Without a computer or an address, I was unable to receive updates from the Court nor make filings.

l.  That's the main reason my California cases were dismissed in 2018 and 2019; I was simply unable to continue with the cases.

m. I focused on survival instead of the legal cases, as continuing to eat and finding places to work and sleep were more important to me.

n. Just like in Maslow's hierarchy of needs, one needs the basics as the foundation for many activities.

o. I have a laptop now and the ability to print and scan which makes a significant difference in my ability to perform many tasks that are important in my life.

p. I did file 17 cases in Arizona when I resided in Arizona from March through July 2020, including the *Wescott versus Crowe, Rau, Lyonette, et al.* legal complaint that is now before this Court.

q. The reason this legal complaint was originally filed in Arizona is that the there were three signed contracts with these Defendants, and one of them had a choice of venue clause indicating Arizona Courts.

r. The first contract had a forum selection clause of Maricopa County, Arizona; hence the filing in that venue seeking the Court to assert jurisdiction over these Defendants.

s. The second and third relevant contracts had a forum selection clause of San Francisco, California (Exhibit B, second contract of August 11th, 2018).

t. I figured that I could thus file this case in either Arizona or California and filed in Arizona for my convenience at the time.

u. I am not a Vexatious Litigant in any District Court, including this Court

v. This legal complaint was not filed for the purposes of harassment or delay.

w. Rather, these Defendants entered in to binding contracts with me, and then, after six months of working together, a few days before the final close of the deal I had put together, the Defendants breached their contract, costing the me US $334,000 in payments the

Defendants were obligated to make to me and larger sums I would have earned had they closed.

x. The Defendants later repudiated the contract and committed numerous tortious acts that they should be embarrassed by.

y. I seek redress in Court so that these Defendants will be required to pay for the damages they've caused.

z. That will change my financial situation considerably.

aa. My California legal complaints (that were filed in 2017, 2018, and 2019 – I have not filed any in 2020) have not been dismissed due to a lack of merit; quite the contrary.

bb. Mr. Rau was served with the legal complaint on Monday, June 1st, 2020, and then Mr. Rau answered on Tuesday June 30th, 2020), citing four affirmative defenses. Two of those four cited affirmative defenses were alleged lack of personal jurisdiction in Arizona Courts and incorrect venue.

cc. I emailed Mr. Romero previously to give him an opportunity to cite specific examples of my alleged Rule 8 violations in the legal complaint. A true and correct copy of that email is in Exhibit E.

dd. What Mr. Romero is claiming (that Mr. Rau is not a party to the contract) is factually incorrect.

ee. Mr. Rau is a party to all three contracts (the second, which replaced the first, is in Exhibit B; the third contract is the NDA Mr. Rau signed).

ff. The second/final contract clearly states that I am one of the parties to the contract, and that the other party is the group of litigators in the litigating group that purchased lots, condominiums, and bungalows at Seaside Mariana, that "have a Nicaraguan lawsuit together".

gg. The identities of those twenty-two people were provided by David Crowe at the time of the contract signing, and the identities are also a matter of public record.

hh. The twenty-two people are David Crowe, Mike Lyonette, Thomas P. Madden, Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Sandra Winfrey; Brian Putze; Colin Ross; Brad Malcolm; Michael Jimenez; Gustavo Varela, Robert Crowe, Bernadette Brown, Federico Gurdian, and Terencio Garcia.  Mr. Rau is one of them.

ii. The twenty-two are bound together in a partnership for that litigation and for the contract with me in Exhibit B (The NDAs were signed individually)

jj. Mr. Romero is also incorrect about the sequence of events.

kk. Mr. Romero alleges (with no supporting evidence) that the seller terminated the contract prior to the October 2018 breach of Mr. Rau and his co-Defendants.

ll. The Defendants' initial breach was in October when we were at the closing table (figuratively; I was about to fly to the closing).

mm.    The sellers very much needed and wanted the further US $475,000 they would have received.

nn. It is true that later (I believe it was December) the seller sent me an email terminating the contract, though the seller does not have the contractual right to do so, without one other thing the seller is required to do in my Closing Contract with the seller.

oo. In our discussions for closing logistics with Mr. Crowe, I had offered a limited power of attorney, or special power of attorney, in favor of his wife, for her to do the transfer of Seaside Mariana ("SM") land right after the SM purchase/close.

pp. That land, hundreds of acres with 2 kilometers of beachfront, was part of the consideration for the Sales Contract on my side of the set of contractual obligations.

qq. That land is also worth quite a bit more than US $334,000.

rr. Kevin Fleming had paid US $4 million for the original SM parcel, raw, before getting entitlements, twelve years ago.

ss. The cited reason for the Defendants to breach the contract was that Mr. Ted Cole had filed a lawsuit against Seaside Mariana just before our close of the Seaside Mariana purchase. Mr. Cole's lawsuit was filed in September 2018.

tt. I did not find out about the Cole lawsuit until October 2018 – David Crowe was the person who initially informed me of its existence, in citing his reason, on behalf of Mr. Rau and the other twenty-one (21) defendants, for why they were breaching the contract and closing that they had expressly and contractually committed to.

uu. The first contract we signed had a contingency for the Defendants' due diligence.

vv. When the Defendants completed their due diligence, they passed US $25,000 through (which went to the sellers), and they signed and committed to the new, second contact (in Exhibit B), which committed them to the investment, funding and closing with no contingency.

FURTHER AFFIANT SAYETH NAUGHT

CARL A. WESCOTT
June 12th, 2020

**Exhibit D - Breach of Contract Elements**

(1) <u>The existence of a contract.</u>  It is undisputed that the contract, the "Sales Contract" existed (Amended Complaint or "AC" ¶21, ¶22, ¶24, and Exhibit A to original Complaint).  Mr. Rau only disputes that he was a party to the contract.  However, he was named as one of the parties in the contract, was in conspiracy with the other twenty-one defendants, and agreed to be bound by the terms of the "Sales Contract." (AC ¶6, ¶24, and ¶25).

(2) <u>Plaintiff's performance of the contract.</u>  The Plaintiff got the sellers of SM in to contract, and after more than six (6) months of work, got the parties essentially to the closing table in October 2018, ready to close, just before flights to the actual closing table.  The parties had even hired attorneys to prepare closing documents.  (AC ¶19, ¶38 through ¶45).

(3) <u>Defendant's initial breach of the contract.</u>  "[W]ith the Plaintiff about to fly to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group, informed the Plaintiff that he and the rest of his investor group refused to close and would not be closing, breaching the Sales Contract." (AC, ¶46).  Setting aside the conclusory but true language at the end ("breaching the Sales Contract"), Mr. Rau and his co-Defendants had expressly and contractually promised to close on their purchase and investment.  Mr. Rau and his co-Defendants had also expressly and contractually promised to fund said closing. (AC ¶21, ¶22, ¶24, ¶38 through ¶45, and Sales Contract, Exhibit A to original Complaint).  Mr. Rau and his co-Defendants, through Mr. Crowe, informed the Plaintiff that "he and the rest of his investor group refused to close and would not be closing" (AC, ¶46).  Though they had had a period of due diligence earlier, from June through August, once they signed the final, definitive closing Contract, there were no longer any contingencies, no provision to terminate the contract, and no liquidated damages clause.  (AC ¶39, ¶40, and ¶42).  Thus, Mr. Rau and his co-defendants breached.

**PLAINTIFF'S RESPONSE TO DEFENDANT JEFF RAU'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

(4) <u>The resulting damages to Plaintiff</u>. The contract called for Mr. Rau and his co-Defendants to pay the Plaintiff US $334,000 in a series of payments upon the close. (AC, ¶35 and ¶45). Admittedly, the Plaintiff would have had to transfer the SM land to Mr. Rau and his co-Defendants to get the payments, but it's reasonable to assume that an indigent man who had honored and performed all other aspects of the contract would indeed make that transfer. This level of detail is not pled in the legal complaint, but the Plaintiff had offered to the Defendants, through David Crowe, that he sign a limited power-of-attorney in favor of Mr. Crowe's wife as part of the closing documents for SM, so that Mrs. Crowe could handle that transfer of land (recording signed grant deeds) on behalf of the Plaintiff, as soon as practicable after the SM close. (Exhibit C).  Given that the whole reason Mr. Rau and his co-defendants were funding the purchase of SM was to get the land, it is also reasonable to assume that Mrs. Crowe would indeed have done so.  Given that Mr. Rau and his co-Defendants did not close, and pulled out of the deal (AC, ¶46) the absence of the US $334,000 that the Plaintiff would have received by now are the base damages.  The Plaintiff acknowledges that he has not proved out, nor do the facts as pled support the significantly larger damages he hopes to prove at trial, but the contractually-provided US $334,000 is crystal clear, as is the prejudgment interest to be added, as provided by the law of this district.

 Gmail

(EXHIBIT E)

Carl Wescott <carlwsoj@gmail.com>

---

## alleged Rule 8 issues
1 message

**Carl Wescott** <carlwsoj@gmail.com>                                              Tue, Oct 27, 2020 at 2:57 AM
To: Troy Romero <TRomero@romeropark.com>
Cc: Kathy Koback <kkoback@romeropark.com>
Bcc: Carl Wescott <carlwsoj@gmail.com>, Carl Wescott <carlwescott2020@gmail.com>

Mr. Romero, I'm working on my response to your Motion to Dismiss.

You claim that I make "verbose and redundant allegations" and that I fail to "follow the rules." You also state that my legal complaint should be dismissed due to "immaterial verbiage."

While I'm not an attorney, I re-read the complaint and could not find the redundant allegations nor the "immaterial verbiage", unless that's the background I provided to set the context. I'm also not seeing any places where I've broken any rules that I could find (though of course the complaint was drafted for Superior Court and thus needs some changes to conform to District Court standards).

I do agree that the Complaint could have been more artfully pled to show (as much as possible before discovery) that the elements for each cause of action are indeed there.

Would you be so kind as to point to:

* any particular allegation that is too verbose

* the redundant allegations

* the immaterial verbiage

* any place where a rule is broken, and what that rule is?

Thank you.

--CAW  +971 4 336 6000  x509