CARL A. WESCOTT
8210 E. VIA LA ESCUELA
SCOTTSDALE AZ 85258
*in propria persona*
CARLWSOJ@GMAIL.COM
+1 936 937 2688

**FILED**

FEB 24 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARL A. WESCOTT, | Civil Action No. 3:20-cv-06456-JD |
| Plaintiff, | **PLAINTIFF'S THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT, PROMISSORY FRAUD; PROMISSORY ESTOPPEL; NEGLIGENT MISREPRESENTATION; TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS; NEGLIGENT INTERFERENCE WITH CONTRACTUAL RELATIONS; INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; & NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS** |
| vs. | |
| DAVID CROWE;<br>MIKE LYONETTE;<br>JEFF RAU;<br>BRAD MALCOLM;<br>MICHAEL JIMENEZ; | |
| Defendants. | |
| + DOES 1 through 50 | |
| | JURY TRIAL REQUESTED |

1

**PLAINTIFF'S THIRD COMPLAINT FOR BREACH OF CONTRACT; PROMISSORY FRAUD; PROMISSORY ESTOPPEL; NEGLIGENT MISREPRESENTATION; TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS; NEGLIGENT INTERFERENCE WITH CONTRACTUAL RELATIONS; INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; & NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

1    Plaintiff Carl A. Wescott, proceeding *pro se,* complains of Defendants David Crowe, Mike

2    Lyonette; Jeff Rau; Brad Malcolm, and Michael Jimenez, and in support of his Complaint, the

3    Plaintiff states as follows.

4

5

6    **PARTIES**

7    1.  The Plaintiff is a resident of Scottsdale, Arizona.

8    2.  The Defendants are a set of individuals (David Crowe, Mike Lyonette; Jeff Rau; Brad Malcolm,

9        Michael Jimenez) who are a subset of the twenty-two positively identified and confirmed

10       individuals (partners) who entered in to a contract with the Plaintiff to fund his US $500,000

11       purchase of a company ("Seaside Mariana") and pay him an additional $334,000 in exchange

12       for the Plaintiff transferring the 1000 acres of beach land owned by that company to them.  (The

13       full name of the company was and is Seaside Mariana Spa and Golf Resort, but in this legal

14       complaint the company and the development project shall be referred to the same way the

15       parties refer to it, as "Seaside Mariana" or "SM")

16   3.  Thomas Madden is an investment banker who is apparently unlicensed, who is one of the group

17       of twenty-two (22) individuals.

18   4.  Mr. Madden, a former Washington resident, was censured by the State of Washington

19       Department of Financial Institutions Securities Division in 2016 (Exhibit A), for violations of

20       the Securities Act of Washington RCW 21.20.010 and RCW 21.20.040, including through

21       Madden's company Madcon Company, Inc.  The name "Mad Con" is telling.  Mr. Madden

22       moved from Washington to Chandler, Arizona.  Mr. Madden and his wife Leslie then were

23       charged with fraud and further securities fraud violations in 2018 (violations of the Securities

Act of Arizona A.R.S. §§ 44-1801 through 44-2126) by the Arizona Corporation Commission (Exhibit B).

5. On December 18th, 2020, the Commission ordered Mr. Madden to pay $3,284,792 in restitution and a $75,000 administrative penalty for defrauding at least 79 people in connection with selling them stock in start-up companies (Order S-21042A-18-0059.)

6. Mr. Madden played a key role in a further repudiation of the Plaintiff's contract after the group of partners breached the contract by pulling out of the deal relatively last-minute, just a few days before the scheduled closing. Just five months after Defendants pulled out of the deal with Plaintiff, breaching their contract, stating they were not interested in the Seaside Mariana land, Mr. Madden secretly contacted Kevin Fleming, one of the sellers of Seaside Mariana, wishing to purchase the Seaside Mariana company and the land, attempting to circumvent the Plaintiff despite the contracts and agreements with the Plaintiff, including a non-circumvent.

7. Mr. Madden has settled with the Plaintiff and was dismissed from this legal complaint with prejudice.

**VENUE**

8. Venue is appropriate in this Court as the relevant contract had a forum selection clause naming San Francisco as the venue for litigation. Furthermore, the Defendants requested a change of venue to this Court. This Court can therefore assert personal jurisdiction over these Defendants.

**FURTHER ALLEGATIONS REGARDING CONSPIRACY**

9. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, David Crowe, Robert Crowe, Mike Lyonette; Thomas Madden; Taylor Collins; Jeff Rau;

Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Bernadette Brown; Sandra Winfrey; Brian Putze, Colin Ross, Brad Malcolm, Michael Jimenez, Federico Gurdian, Terencio Garcia, and Gustavo Varela, as individuals, in addition to acting for himself/herself and on his/her own behalf individually, as well as for the benefit of his or her marital community (if any), is and was acting as the agent, servant, employee, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the other Defendants (individual and entities) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

10. Plaintiff further alleges on information and belief that the acts and non-acts of each of the Defendants were fully ratified by each and all of the other Defendants.  Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

11. In addition, upon information and belief, there exist one or more nefarious corporate, trust, LLC and/or other entity type Defendants involved in these conspiracies, currently unknown to Plaintiff.   They shall emerge with the benefit of legal discovery.

12. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, any and all such corporate entities, in addition to acting for itself and for its own behalf, was acting as the agent, servant, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants (entity and individual) and

within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

13. Plaintiff further alleges on information and belief that the acts of each of the Defendants were fully ratified by each and all of the Defendants.  Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

## CASE SUMMARY

The Plaintiff has included a brief case summary in plain language as Exhibit C (Sworn to be true in Exhibit F, Sworn Affidavit of Carl A. Wescott).

## BACKGROUND NARRATIVE INCLUDING THE PARTIES' CONTRACT

14. The Plaintiff was an experienced international real estate developer focusing on residential developments in Latin America.  The Plaintiff is now gaining some insight into the distressed asset markets, especially in the cases of projects that had significant economic viability but have foundered for reasons unrelated to that viability, often involving politics, personalities or fraud. (Sworn to be true, as is each successive paragraph, in Exhibit F, Sworn Affidavit of Carl A. Wescott).

15. The Plaintiff was reasonably successful until the global meltdown and credit crunch of 9/2008. With the global impact of said credit crunch and the leverage the Plaintiff had applied to his real

estate holdings, the Plaintiff eventually succumbed to those forces and declared chapter 7 bankruptcy.

16. Post-bankruptcy, the Plaintiff searched for distressed real estate assets that he could acquire and turn around. He was familiar with Seaside Mariana ("SM"), an ambitious development on approximately 1000 acres on the Montelimar coast west of Managua, Nicaragua. Seaside Mariana had at one point featured a Jack Nicklaus designed golf course and a Wyndham hotel in its plans before the wheels fell off Seaside Mariana as well due to the same global pressures.

17. SM was an attractive investment and development opportunity for the original developer, Kevin Fleming, for at least the following reasons:

    (i)     The real estate was prime in terms of location and amenities;

    (ii)    At the time of initial investment, the market was rising faster than linearly;

    (iii)   Costa Rica to the South had already surfed a 20-year wave of real estate equity appreciation, and for some product types there was an order of magnitude difference in pricing;

    (iv)   Nicaragua was attractive for American retirees in particular because of its low cost of living, level of safety, accessibility (including airlift), and desirable climate.

18. Most of those reasons were relevant more recently to the Plaintiff as well for his investment consideration.

19. Further, the intangible assets associated with SM were sound and mostly in place, including plans, permits, designs, and marketing material.

20. There were a few other intangible assets owned by SM that the Plaintiff found particularly interesting and compelling.

21. The value of the project was, to a material degree, artificially depressed by more recent market conditions and bad word of mouth and internet postings concerning the lack of infrastructure put in by the original developer, leading to further relevant issues.

22. The Plaintiff blushes to admit he has entered contract to purchase SM three (3) times. The first time he entered contract, the Plaintiff saw an opportunity to buy SM for a highly attractive price (US $500,000, plus some capped deferred payments), solve the issues, and complete the development, and had a backer who would provide financial support for the project.

23. Most recently, the Plaintiff entered into contract ("the SM Purchase Contract") to purchase SM (either the company itself or the real estate, at his option) in 2018, with an anticipated close date (after some revisions, addenda, and extensions) of October 15th, 2018.

24. The Plaintiff planned to purchase the SM company.

25. Lacking in capital, the Plaintiff entered discussions with several investors to back the purchase.

26. More recently, in August 2018, the Plaintiff entered in to a contract with investors, who were familiar with the relevant properties who agreed to fund 100% of the costs of the purchase in exchange for certain land owned by SM (the Sociedad Anonima).

27. That contract shall be referred to as the "Funding Contract", and is attached hereto as Exhibit D.

28. To dispel any confusion over identities in the contract, the Plaintiff, Carl Wescott, is sometimes referred to by his Finnish name "Kalle", or the combination Carl "Kalle" Wescott.

29. To further dispel any potential confusion over the language of the funding contract or its meaning, the investors who were parties to the Funding Contract had filed litigation against

Seaside Mariana, the company that the Plaintiff was purchasing.  Therefore, the group of twenty-two investors (the same set of people who were the initial twenty-two (22) Defendants in Maricopa County Superior Court case CV2020-006232) who were the parties to that litigation are referred to as the "Litigating Group."

30. The Plaintiff did not want ongoing litigation against the company he was purchasing, and he had worked out a deal with the Litigating Group, and thus the thought was that he (aka "the Settler") would immediately settle with the Litigating Group upon closing the purchase of the Seaside Mariana company, by transferring all of its land to them.

31. They, in turn, had already agreed to fund all US $500,000 the Plaintiff (and "Settler") needed to purchase the SM company, plus most of the closing costs.

32. Once the Plaintiff effectuated the transfer of the SM land (via the Seaside Mariana company, which he would then own and control) to the Litigating Group, they would then pay the Plaintiff/Settler, and his company, another US $334,000 in quarterly payments.

33. That group of twenty-two (22) investors (the named Defendants in CV2020-006232, aka "the Litigating Group) all agreed to collectively be bound by the Funding Contract and to fund the payments in the Funding Contract.

## FEBRUARY 2022 ADDITIONS RELATED TO LITIGATING GROUP PARTNERSHIP

34. More specifically and technically correct from a legal standpoint:  Mr. David Crowe and Mr. Mike Lyonette, as agents for the Crowe Group partnership, bound the partners and the partnership into a contract with the Plaintiff (aka the "Funding Contract").

35. The Crowe Group partnership is also known as the "Litigating Group" in the key contract in this instant case (Exhibit D).

36. The Litigating Group partnership is bound together by an Operating Agreement in which the members, that include Mr. Rau, Mr. Jimenez, and Mr. Malcolm, agree to share profits and losses. (References to the Operating Agreement are in the Exhibit G Sub-Exhibits).

37. Mr. Crowe and Mr. Lyonette are liable for the breaches of contract discussed below as well as the repudiations of contract, as well as various tortious acts and non-acts, both as signatories and parties to the contract, as agents for the partners and partnership, and as partners in the Litigating Group partnership. (They are also individually liable, and liable via conspiracy and by ratification, among other ways of confirming and proving their liability at jury trial).

38. Mr. Rau, Mr. Jimenez, and Mr. Malcolm are liable for the breaches of contract discussed below as well the repudiations of contract, as well as various tortious acts and non-acts, as partners in the Litigating Group partnership, via agency. (They are also individually liable, and liable via conspiracy and by ratification, among other ways of confirming and proving their liability at jury trial).

39. The final two ways Mr. Rau, Mr. Jimenez, and Mr. Malcolm are liable are that principals are liable for the tortious acts of their agents, and partners in a partnership are liable to each other for relevant acts and non-acts related to the partnership.

40. Two of the Defendants, David Crowe and Mike Lyonette, agreed to manage their group and, for expediency, communications with the Plaintiff.

41. David Crowe named and provided documentation as to the identities of the twenty-two people (including himself) who agreed to be bound by the Funding Contract: David Crowe; Mike

Lyonette; Thomas P. Madden; Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Sandra Winfrey; Brian Putze; Colin Ross; Brad Malcolm; Michael Jimenez; Gustavo Varela; Robert Crowe; Bernadette Brown; Federico Gurdian; and Terencio Garcia.

42. For a variety of reasons, David Crowe was usually the sole communicator and conduit on behalf of the group of twenty-two (22) investors.

43. Mr. Crowe also played this role in the litigation with Kevin Fleming and Seaside Mariana that has been ongoing for about a decade at this point.

44. For stylistic purposes and economy of phrase, the above twenty-two (22) Defendants, who acted in concert to fund the Plaintiff's purchase of SM, will also be described as "the Crowe Group" – this is the descriptive phrase that the parties all used colloquially for their partnership, before the need for the litigation in the case at bar.

45. The Crowe Group partnership is referred to as the Litigating Group in the Funding Contract (Exhibit D).

## NDAs & NCNDs ALSO SIGNED BY THE CROWE GROUP PARTNERS

46. In August 2018, David Crowe and Mike Lyonette signed NCNDs with the Plaintiff.

47. Mr. Crowe and Mr. Lyonette also pledged not to share any information about the Plaintiff or the Funding Contract with any of the rest of their group of 20+ investors unless an individual group member signed a NDA (Non-Disclosure).

48. Approximately 10 of the 20+ investors signed NDAs with the Plaintiff, and thus, if Mr. Crowe, Mr. Lyonette, and others were honoring the Funding Contract and their NDAs, the Plaintiff

believes only the dozen or so of them would have gotten information related to the Funding Contract and its progress towards a closing after that point.

49. The NDAs granted jurisdiction of the Plaintiff's choice, had a non-disclosure provision, and in the majority of the NDAs signed, specifically acknowledged that violating the non-disclosure provision, given the Plaintiff's deals, would likely cost the Plaintiff over US $10 million in damages.

50. The Plaintiff shared information with Mr. David Crowe in strict confidence on how he expected to monetize the intangible assets of the Seaside Mariana company, with an expected US $8 million post-tax profit.

**PLAINTIFF'S OTHER DEALS WITH KEVIN FLEMING**

51. After the Funding Contract was signed, the Plaintiff signed more contracts with Kevin Fleming, to purchase Isla Mariana (another real estate development) and to purchase seven more Panamanian and Nicaraguan companies.

52. The Plaintiff also purchased all of the legal claims of Kevin Fleming, Maria Rueda, and the relevant entities.

53. Outside of Seaside Mariana, and as shall be proven in court, the Plaintiff expected to possibly make as much as on the order of US $4,000,000 to US $5,000,000 more with the completion of the other deals.

54. The Plaintiff disclosed the existence of his other deals with Kevin Fleming to the Crowe Group via Mr. David Crowe (and another deal he was working on in Jamaica).

55. One particular reason the Plaintiff and Mr. Crowe shared information on the Plaintiff's other contracts with Kevin Fleming et al. was to ensure that both purchasing parties (the Plaintiff,

buying another residential development called Isla Mariana from its owners; and the Crowe Group, essentially purchasing ~1000 acres of Seaside Mariana via the Plaintiff) were getting the land that they expected to get.

56. Because the Plaintiff was also purchasing Mr. Fleming's development company Nicaragua Developments (which also owned land), and the parent company of Seaside Mariana (Grupo Mariana), via some of these other deals, the Plaintiff would have the power and ability to ensure that his and the Crowe Group's expectations were met.

57. The Crowe Group had information on Seaside Mariana going back to 2006, and thus was able to build maps of all the Seaside Mariana land, including the list of parcels they would get transferred at the Plaintiff's close of the purchase of the Seaside Mariana company. (Because a massive subdivision had occurred, this was important).

## NDA (NONDISCLOSURE AGREEMENT) BREACHES UPON INFORMATION & BELIEF

58. Upon information and belief, David Crowe and Mike Lyonette violated the terms of the NDA and shared deal information with other parties that had not signed the NDA.

59. Upon information and belief, other individual Defendants violated the terms of their NDA and shared deal information with other parties.

60. Because the Plaintiff was purchasing the development for US $500,000 (plus capped deferred payments) and selling the land to the investors backing him for US $834,000, the Plaintiff was going to make US $334,000 in short-term cash profit in closing his purchase of SM and flipping the land to his investors.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

61. In addition, as referenced above, and as shall be fully proven at jury trial, the Plaintiff expected to make a much larger sum monetizing the intangible assets he was acquiring as part of this deal.

62. The Crowe Group performed its due diligence on the deal and agreed to move forward to a close.

63. As part of due diligence, the Crowe Group had its attorney go to the local municipal office and ensure that Seaside Mariana still owned all of the relevant land fee simple, and that there was no secured debt mortgage obligation on the land, and no unexpected liens nor unexpected notations in the property registry.

64. After the Crowe Group's due diligence, the Crowe Group agreed that they would fund the $25,000 that the Plaintiff was required to submit to Kevin Fleming after his due diligence.

65. That moment would also kick off a 60-day closing cycle for the Plaintiff to close on his purchase of SM, and for the Litigating Group (the Crowe Group) to fund said purchase.

66. Because the Plaintiff knew that Seaside Mariana had taken in US $ 22 million in sales from purchasers and investors, the Plaintiff insisted that Kevin Fleming and the other owners of Seaside Mariana file taxes up to the present.

67. The Plaintiff negotiated a Closing Contract with Kevin Fleming which the relevant parties signed, in which the parties agreed to close on the Plaintiff's purchase (their sale) of the Seaside Mariana company within 60 days.

68. As part of the Closing Contract, the Plaintiff would pass through US $25,000 to Kevin Fleming which Mr. Fleming pledged to use in significant part for tax professionals to file all of Seaside

13

Mariana's taxes through the present. (Some of it would be used by the Seaside Mariana sellers to prepare for closing).

69. David Crowe then remitted a $25,000 cashier's check, which the Plaintiff utilized to satisfy his obligation (in the Closing Contract) to fund the closing process, by depositing the check in to Kevin Fleming's Wells Fargo bank account.

70. (In the Funding Contract, the Twenty-Five Thousand Dollars is on page 1, Article I, paragraph 1, where it is a non-refundable deposit).

71. It is worth noting that early in the Plaintiff's process with the Crowe Group, the Crowe Group had essentially committed to funding the purchase but only if everything was as they expected (due diligence on all files and details), and further details could be worked out.

72. As of August 11th, 2018, when the Crowe Group / Litigating Group partnership agreed to the Funding Contract with the Plaintiff, the Crowe Group still had one contingency to pull out of the deal, if anything about their due diligence did not pass muster, also in the Funding Contract, page 1, Article I, paragraph 1, where the Crowe Group could let the Funding Contract unwind.

73. However, once the Crowe Group / Litigating Group partnership had completed due diligence and remitted the US $25,000 non-refundable deposit towards the US $500,000 purchase price the Plaintiff had to pay to purchase the SM company (US $475,000 more after the US $25,000), the Crowe Group no longer had any contingency to pull out of the deal.

74. At that point, the Crowe Group partners (including these Defendants) and partnership were full committed to the funding outlined for the Plaintiff's purchase of Seaside Mariana, with no contingency or other way to get out of the Funding Contract.

## DEFENDANTS' INITIAL BREACH

75. The Funding Contract called for a closing date in mid-October-2018, as did the Plaintiff's purchase contract of Seaside Mariana (reinforced in subsequent signed Closing Contracts).

76. The parties retained attorneys to prepare closing documents.

77. The parties worked out the logistics of closing in a "simultaneous close", which is well-understood to mean two successive closings.

78. In the agreed logistics, the Plaintiff would acquire the entity Seaside Mariana Golf and Spa Resorts company, which owned all the land, using another US $475,000 of the Crowe Group's money for said close.

79. Then, the Plaintiff would transfer the lands in the Funding Contract to the entity of the Crowe Group's choice.  (The Plaintiff or his designated entity would then get the other US $334,000 promised by these Defendants in a series of quarterly payments in 2019 and early 2020).

80. It is worth noting that one condition of close (in the Closing Contract) was not fulfilled by Kevin Fleming; namely, he did not file the taxes for Seaside Mariana for the missing years.

81. However, this was the Plaintiff's issue and not the Crowe Group's.  The Plaintiff would be the owner of the Seaside Mariana company.  The Plaintiff worked out with David Crowe, on behalf of the Crowe Group, that he would take responsibility for the taxes and simply file them for Seaside Mariana, as the new owner, after the close of his purchase of the SM company.

82. The Crowe Group agreed, via David Crowe, that this was acceptable to them and would not be barrier to the close, nor their funding of it.

83. As part of the logistics for the close, the Plaintiff offered to provide a limited power of attorney in the Plaintiff's name, to David Crowe's wife, that would be valid only to transfer the Seaside Mariana land out of the Seaside Mariana company.

84. At this point, in October 2018, the Plaintiff had fully performed as per the parties' contract, as far as he could without the US $475,000 promised in the Funding Contract. Within a few days, with the help of attorneys, the closing would happen, and using the Crowe Group's US $475,000, the Plaintiff would purchase the Seaside Mariana company, thereby owning its shares.

85. The Plaintiff would then immediately transfer the land to the Crowe Group's designated new entity (or let Mr. Crowe's wife handle this step via the limited power of attorney).

86. It was now time for the Defendants to perform with the rest of the funding promised in the Funding Contract for the Plaintiff's purchase of the Seaside Mariana company; namely, the additional US $475,000.

87. However, with the Plaintiff about to fly to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group, informed the Plaintiff that there was a new issue that could impact the anticipated closing.

88. Mr. Crowe informed the Plaintiff that Mr. Ted Cole had sued Seaside Mariana again. (Mr. Cole had previously sued Seaside Mariana and settled for a significant part of the Seaside Mariana land).

89. At this point, the Litigating Group was already aware of the other contracts the Plaintiff had signed with Kevin Fleming, Maria Rueda, Grupo Mariana, and Nicaragua Developments to purchase another eight of the real estate ownership and real estate development company.

16

90. David Crowe and the Litigating Group were also aware of a deal the Plaintiff was working on with the Jamaican government, as Mr. Crowe kindly lent the Plaintiff $5,000 so he could travel to Jamaica and for related costs. (In a few successive loans, Mr. Crowe kindly lent the Plaintiff approximately US $11,500, which the Plaintiff would like to repay to Mr. Crowe, with interest, when he is able).

91. The Plaintiff then revealed to Mr. Crowe, and thus all of these Defendants, that he had also purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims. The Plaintiff thus had the right, using assigned legal claims, to sue Mr. Cole for his past tortious acts against Mr. Fleming, Ms. Rueda, and the Seaside Mariana company.

92. Mr. Crowe and the Plaintiff obtained a copy of the new Ted Cole legal complaint, and it was frivolous at best.

93. The Plaintiff was therefore unconcerned about the Cole litigation and planned defensive litigation for Seaside Mariana as soon as the Plaintiff owned the Seaside Mariana company in a few days.

94. The Plaintiff proposed to these Defendants, via Mr. Crowe, that the combination of offensive litigation against Mr. Cole (for past tortious acts) and defending the frivolous new legal complaint would be a simple, inexpensive, and effective remedy to solve any concerns about the Cole legal complaint.

95. Further, as the Plaintiff pointed out, the new Cole litigation was the Plaintiff's problem, as the soon-to-be-owner of the Seaside Mariana company, which was the entity getting sued.

96. The Plaintiff pointed out that within days the Seaside Mariana land would be transferred to the Litigating Group's designated new entity. As the entity was about to be formed, it clearly would have no liability to anyone including Mr. Cole.

97. However, the Litigating Group, including these Defendants, refused to fund the Plaintiff's purchase of the Seaside Mariana company (contrary to their promises, representations, obligations, and responsibilities set out in the Funding Contract).

98. David Crowe then assured the Plaintiff that Seaside Mariana was no longer attractive to any of the Litigating Group.

99. The reason stated by Mr. Crowe that the Litigating Group now had zero interest in the SM company and SM land, and that they also had zero interest in honoring the Funding Contract, was the new Ted Cole litigation. (This is not a valid reason to breach a contract but is interesting in light of Mr. Crowe and the Litigating Group's further actions, below)

## THE SECOND BREACH AND REPUDIATION (ON BEHALF OF ALL DEFENDANTS)

100. In March 2019, Defendant Thomas P. Madden contacted Kevin Fleming on behalf of the Crowe Group, with the following email (Exhibit E), attempting to purchase Seaside Mariana, despite:

   a. The non-circumvent these Defendants and the Crowe Group had agreed to.

   b. The Funding Contract they had signed.

   c. The various representations they made in October 2018, just before the parties would have closed, that they were pulling out and were no longer interested in the Seaside Mariana land.

1

2

**THE THIRD CROWE BREACH/REPUDIATION (ON BEHALF OF ALL DEFENDANTS)**

3    101.    In April 2019, Defendant David Crowe contacted Kevin Fleming, following up on

4    communications from Thomas Madden and David Crowe, in email, attempting to negotiate a

5    direct purchase of the SM company and land (without involving the Plaintiff).

6    102.    In doing so, it is clear Crowe and all Defendants fully ratified the first Crowe Group breach

7    as well as the second breach and repudiation (Madden contact of Fleming to try to buy direct) of

8

9    the Funding Contract.

10

11   **FURTHER RAMIFICATIONS OF THE CROWE GROUP BREACHES**

12   103.    In and after March 2019, once Thomas Madden contacted Kevin Fleming to negotiate with

13   him directly, on behalf of the Crowe Group, and once David Crowe followed through and

14   continued those negotiations on behalf of all Crowe Group members and all Defendants, Kevin

15

16   Fleming stopped returning the Plaintiff's phone calls.

17   104.    (In December 2019, Kevin Fleming emailed the Plaintiff to say he was terminating the

18   Purchase Contract.  However, Mr. Fleming did not have the legal right to do so).

19   105.    Fleming refused to honor any of the rest of the Plaintiff's contracts with him or his entities.

20   106.    As a result, the Plaintiff has potentially lost another US $4 million or more, as shall be furthe

21   proven at trial (with US ~$3 million of profits expected to come from the Isla Mariana / Nicaragu

22   Developments deals).  (The Plaintiff admits that these profits were speculative, and that from

23   legal standpoint, each expected potential profit must be multiplied by the percentage chance th

24

25

26

the Plaintiff would have realized that particular profit. This, too, will occur at a jury trial expected in 2023).

107.    The Plaintiff is doing what he can to mitigate the damages.

## CONCLUSION

108.    The Defendants' breaches, repudiations, false promises, representations, and assurances, not to mention their tortious acts and non-acts, and their negligence have caused significant damages to Plaintiff, in an amount to be proven at trial.

109.    The Plaintiff has worked to try to remedy the Defendants' breaches and to mitigate damages, but to no avail thus far.

110.    The Plaintiff will continue to do his best to mitigate the base damages, especially his hoped-for and expected profits from purchasing the Seaside Mariana company (other than the US $334,000).

111.    The Plaintiff contacted David Crowe of the Crowe Group to see if they could work something out, whether a way to move forward, or a settlement, but Mr. Crowe was not interested.

112.    The Plaintiff has had similar discussions with Mr. Rau, Mr. Madden, and Mr. Jimenez, with no interest by those parties in continuing a discussion about ways the Plaintiff can still close on the Seaside Mariana company (if that is even relevant or possible). Mr. Rau and Mr. Jimenez had no interest in that nor in any settlement discussions.

113.    The Plaintiff was left with no choice but to file this legal complaint so that the scales of justice may balance appropriately.

20

114. (Mr. Thomas Madden, Mr. Brian Putze, and Ms. Sandra Winfrey have all settled with the Plaintiff, and were dismissed with prejudice in this legal complaint).

115. Under the Seventh Amendment to the United States Constitution, the Plaintiff has a right to a jury trial for his Constitutionally-protected petitioning rights. (Also, as per *Fed. R. Civ. P 38(b)*).

116. The Plaintiff hereby respectfully requests a jury trial on all issues raised herein, including all triable facts and issues related to his current causes of action and any facts, issues, requests, and/or causes of action that the Plaintiff or his future attorney may add within the timelines allowed by this Court.

## Count I (A) – First Breach of Contract

117. The Plaintiff realleges paragraphs 1-116 as if fully set out herein.

118. The Plaintiff entered in to contracts with these Defendants including the Funding Contract.

119. The Defendants' refusal to close, and to fund the Plaintiff's purchase of the Seaside Mariana company (in October 2018), breached the Funding Contract.

120. As a direct and proximate result of the Defendants' breach, the Plaintiff lost an asset he would have owned, the Seaside Mariana company.

121. As a direct and proximate result of the Defendants' breach, the Plaintiff lost $334,000 in near term profits.

122. As a direct and proximate result of the Defendants' breach, the Plaintiff avers that he lost u to another US $8 million (post-tax) in the medium term (within approximately nine months of

21

the close) in proceeds that the Seaside Mariana company would have received. (The Plaintiff is attempting to mitigate these damages; these Defendants have rejected any notion of mitigating the Plaintiff's damages, at least through mid-February 2021).

123.    In the alternative, the Defendants' clear and unequivocal refusal to perform and fund the close was an express repudiation of the Funding Contract.

124.    The Plaintiff will fully prove all his base damages at jury trial.

## Count I (B) – Second Breach of Contract

125.    The Plaintiff realleges paragraphs 1-116 as if fully set out herein.

126.    Thomas Madden's contacting Mr. Kevin Fleming in March 2019 to attempt to purchase the Seaside Mariana company and its land without the Plaintiff's involvement constituted a willful breach of the non-circumvent that had been agreed to and an independent willful breach of the Funding Contract, impliedly if not explicitly.

127.    In the alternative, Mr. Madden's acts to contact Mr. Fleming and to circumvent the Plaintiff despite the Funding Contract and other agreements with the Plaintiff constituted a repudiation of the Funding Contract.

128.    Upon information and belief, Mr. Madden contacted Mr. Fleming with the knowledge and support of these Defendants.

129.    In the alternative, since these Defendants were all partners in the Litigating Group, with a partnership agreement governing that partnership, these Defendants (and their partnership) are all civilly responsible (and liable) for Mr. Madden's tortious acts in this context, via agency.

130.   As a direct and proximate result of these Defendants' breach of contract, the Plaintiff lost an asset he would have owned, the Seaside Mariana company.

131.   As a direct and proximate result of the Defendants' breach of contract, the Plaintiff lost US $334,000 in near term profits.

132.   As a direct and proximate result of the Defendants' breach of contract, the Plaintiff avers that he lost up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received. (The Plaintiff is attempting to mitigate these damages; these Defendants have rejected any notion of mitigating the Plaintiff's damages, at least through mid-February 2021).

133.   In the alternative, Madden's and the Defendants' contact of Fleming and attempt to purchase the SM company and land constituted an implied further repudiation of the Funding Contract.

134.   The Plaintiff will fully prove all his base damages in the jury trial.

## Count I (C) – Third Breach of Contract

135.   The Plaintiff realleges paragraphs 1-116 as if fully set out herein.

136.   David Crowe's April 2019 following up on Thomas Madden's contact of Mr. Kevin Fleming to negotiate the direct purchase of the Seaside Mariana company and its land without the Plaintiff's involvement constituted a willful breach of the non-circumvent that had been agreed to and an independent willful breach of the Funding Contract, impliedly if not explicitly.

137.   To the extent that these Defendants were not aware of Mr. Madden's March 2019 contact of Mr. Fleming and/or did not endorse it then, the April 2019 contact and negotiations also served

23

as a ratification of Mr. Madden's contact of Mr. Fleming by these Defendants, to attempt to

circumvent the Plaintiff despite the terms of the Funding Contract.

138.    Mr. Crowe's April 2019 contact with Mr. Fleming and attempt to purchase the SM company

and land directly also constituted another repudiation of the Funding Contract.

139.    Upon information and belief, Mr. Crowe negotiated with Mr. Fleming with the knowledge

and support of the rest of these Defendants.

140.    In the alternative, since these Defendants were all partners in the Litigating Group, with a

partnership agreement governing that partnership, these Defendants (and their partnership) are

all civilly responsible (and liable) for Mr. Crowe's tortious acts in this context, via agency.

141.    Mr. Crowe contacted Mr. Fleming and attempted to negotiate the direct purchase of Seaside

Mariana on behalf of these Defendants and the Litigating Group.

142.    As a direct and proximate result of these Defendants' breach of contract, the Plaintiff lost an

asset he would have owned, the Seaside Mariana company.

143.    As a direct and proximate result of the Defendants' breach of contract, the Plaintiff lost US

$334,000 in near term profits.

144.    As a direct and proximate result of the Defendants' breach, the Plaintiff avers that he lost up

to another US $8 million (post-tax) in the medium term (within approximately nine months of

the close) in proceeds that the Seaside Mariana company would have received.  (The Plaintiff is

attempting to mitigate these damages; these Defendants have rejected any notion of mitigating

the Plaintiff's damages, at least through mid-February 2021).

145.    In the alternative, Crowe's contact with Fleming and attempt to directly purchase the SM

company and land constituted a further repudiation of the Funding Contract.

146.   The Plaintiff will fully prove all his base damages in the jury trial.

## Count II – Promissory Fraud

147.   The Plaintiff realleges paragraphs 1-116 as if fully set out herein.

148.   Pleading alternatively, the Defendants never intended to close on the Funding Contract.

149.   As one plausible explanation for said behavior, the Crowe Group, long-term adversaries of Fleming, planned to use the Plaintiff's efforts to discover valuable strategic information concerning Fleming's resources, price-points, and confidential plans (collectively "Fleming's Trade Secrets").

150.   As another plausible and not mutually exclusive explanation for said behavior, these Defendants were wealthy investors who could afford (as Mr. Jimenez did) to invest US $700,000 for the land alone for a second residence in a foreign country.  However, these Defendants did not have expertise in real estate development and Latin American title issues (though Mr. Rau sells property for a real estate developer).  These Defendants, who had already previously attempted to purchase the SM land, planned to discover valuable strategic information concerning the Plaintiff's strategy to monetize the SM company and/or its land, as well as the deal points of the Plaintiff's deal, which appeared to be at a million dollar plus lower price point than these Defendants had been able to negotiate (collectively "Wescott's Trade Secrets").

151. David Crowe and Mike Lyonette made verbal promises to the Plaintiff, later codified in writing in the Funding Contract, that they would fund Plaintiff's purchase of the SM land (the "Litigators' Promises").

152. Via David Crowe and Mike Lyonette, further verbal promises were made, also later codified in writing, that the Litigating Group would also fund Plaintiff's purchase of the SM land (the "Litigating Group's Promises").

153. The Defendants' promises to close on the Funding Contract and to fund Plaintiff's purchase of the Seaside Mariana company ("the Litigators' Promises" and "the Litigating Group's Promises") were false when made, as part of a scheme. Upon information and belief, one part of the scheme was the attempt to induce the Plaintiff to uncover and communicate Fleming's Trade Secrets which these Defendants in turn planned to misuse in a series of further strategic moves, in and out of Court. Upon information and belief, another part of the scheme was the attempt to induce the Plaintiff to share Plaintiff's Trade Secrets which these Defendants also planned to misuse.

154. These Defendants intended that the Plaintiff rely on "the Litigators' Promises".

155. These Defendants further intended that the Plaintiff rely on "the Litigating Group's Promises".

156. In the non-exclusive alternative, these Defendants intended that the Plaintiff rely on "the Litigating Group's Promises".

157. The Plaintiff did in fact reasonably rely on the Litigators' Promises as well as the Litigating Group's Promises (collectively, "Both Sets of Promises"), as demonstrated by the facts that the

1    Plaintiff signed the Funding Contract and committed to the Litigators and the Litigating Group

2    as his source for the funding for the Plaintiff's purchase of the Seaside Mariana company, pulling

3    158.    The Litigators did not fund the Plaintiff's purchase of the Seaside Mariana company, pulling

4    out of the deal a couple days before the scheduled closing.

5    159.    As a result, the Plaintiff was damaged.

6    160.    These Defendants and the Litigating Group also did not fund the Plaintiff's purchase of the

7    Seaside Mariana company, pulling out of the deal a couple days before the scheduled closing.

8

9    161.    As a result, the Plaintiff was damaged.

10    162.    The Plaintiff was damaged by his reliance on Both Sets of Promises by losing an asset he

11    would have owned, the Seaside Mariana company.

12    163.    The Plaintiff was further damaged by his reliance on Both Sets of Promises by losing

13    $334,00 in near term profits.

14    164.    The Plaintiff was even further damaged by his reliance on Both Sets of Promises by losing

15    up to another US $8 million (post-tax) in the medium term (within approximately nine months

16    of the close) in proceeds that the Seaside Mariana company would have received.  (The Plaintiff

17    is attempting to mitigate these damages; these Defendants have rejected any notion of mitigating

18    these damages thus far).

19    165.    The Plaintiff's reliance on Both Sets of Promises was a substantial factor in the Plaintiff

20    being damaged (as per the three main sets of base damages outlined above).

21    166.    The Plaintiff will fully prove all his base damages at jury trial.

22

23

24

25

26

27

## Count III – Promissory Estoppel

167. The Plaintiff realleges paragraphs 1-116 as if fully set out herein.

168. David Crowe and Mike Lyonette made verbal promises to the Plaintiff, later codified in writing in the Funding Contract, that they would fund Plaintiff's purchase of the SM land (the "Litigators' Promises").

169. Via David Crowe and Mike Lyonette, further verbal promises were made, also later codified in writing, that the Litigating Group would also fund Plaintiff's purchase of the SM land (the "Litigating Group's Promises").

170. The Litigators reasonably expected that their promises would induce action on the part of the Plaintiff, expecting that the Plaintiff would first sign and commit to the Funding Contract, and then that the Plaintiff would do some of the Litigators' due diligence for them, and then that the Plaintiff might reveal to the Litigators Fleming's Trade Secrets and/or Wescott's Trade Secrets.

171. In the non-exclusive alternative, the Litigators reasonably expected that their promises would induce forbearance on the part of the Plaintiff, expecting that the Plaintiff would not source another investor to fund his purchase of the Seaside Mariana company.

172. The Litigating Group reasonably expected that their promises would induce action on the part of the Plaintiff, expecting that the Plaintiff would first sign and commit to the Funding Contract, and then that the Plaintiff would do some of the Litigators' due diligence for them, and then that the Plaintiff might reveal to the Litigators Fleming's Trade Secrets and/or Wescott's Trade Secrets.

173.    In the non-exclusive alternative, the Litigating Group reasonably expected that their promises would induce forbearance on the part of the Plaintiff, expecting that the Plaintiff would not source another investor to fund his purchase of the Seaside Mariana company.

174.    Both Sets of Promises did in fact reasonably induce the expected actions on the part of the Plaintiff, as the Plaintiff relied on those promises to his detriment.

175.    Both Sets of Promises did in fact reasonably induce the expected forbearance on the part of the Plaintiff, too, as the Plaintiff relied on those promises to fund to his detriment.

176.    Injustice could only have been avoided by enforcement of the promises.

177.    The Litigators did not fund the Plaintiff's purchase of the Seaside Mariana company, pulling out of the deal a couple days before the scheduled closing.

178.    As a result, the Plaintiff was damaged.

179.    These Defendants and the Litigating Group also did not fund the Plaintiff's purchase of the Seaside Mariana company, pulling out of the deal a couple days before the scheduled closing.

180.    As a result, the Plaintiff was damaged.

181.    The Plaintiff was damaged by his detrimental reliance on Both Sets of Promises by losing an asset he would have owned, the Seaside Mariana company.

182.    The Plaintiff was further damaged by his detrimental reliance on Both Sets of Promises by losing $334,00 in near term profits.

183.    The Plaintiff was even further damaged by his detrimental reliance on Both Sets of Promises by losing up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received.  (The

1    Plaintiff is attempting to mitigate these damages; these Defendants have rejected any notion of

2    mitigating these damages thus far).

3    184.    The Plaintiff will fully prove all his base damages at jury trial.

4

5                              **Count IV – Negligent Misrepresentation**

6

7

8    185.    The Plaintiff realleges paragraphs 1-116 as if fully set out herein.

9    186.    David Crowe and Mike Lyonette made verbal representations to the Plaintiff, later codified

10    in writing in the Funding Contract, that they would fund Plaintiff's purchase of the SM

11    company (the "Litigators' Representations").

12    187.    Via David Crowe and Mike Lyonette, further verbal representations were made, also later

13    codified in writing, that the Litigating Group would fund Plaintiff's purchase of the SM

14    company (the "Litigating Group's Representations").

15

16    188.    Collectively, both sets of Representations shall be known as Both Sets of Representations.

17    189.    Pleading in the non-exclusive alternative, at the time David Crowe and Mike Lyonette made

18    Both Sets of Representations, Mr. Crowe and Mr. Lyonette were acting in their professional

19    capacities and had pecuniary interests in the underlying transaction.

20    190.    Mr. Crowe failed to exercise due care in making Both Sets of Representations that the

21    Litigators would fund the Plaintiff's purchase of the SM company, and that the Litigating Group

22    would fund the Plaintiff's purchase of the SM company.

23

24

25

26

191.   Mr. Lyonette failed to exercise due care in making Both Sets of Representations that the Litigators would fund the Plaintiff's purchase of the SM company, and that the Litigating Group would fund the Plaintiff's purchase of the SM company.

192.   The Plaintiff justifiably relied on the Litigators' representations.

193.   The Plaintiff justifiably relied on the Litigating Group's representations.

194.   The Litigators did not fund the Plaintiff's purchase of the Seaside Mariana company (as they had represented), pulling out of the deal a couple days before the scheduled closing.  As a result, the Plaintiff was damaged.

195.   These Defendants and the Litigating Group also did not fund the Plaintiff's purchase of the Seaside Mariana company (as they had represented), pulling out of the deal a couple days before the scheduled closing.  As a result, the Plaintiff was damaged.

196.   The Plaintiff was damaged by his reliance on Litigators' representations by losing an asset he would have owned, the Seaside Mariana company.

197.   The Plaintiff was further damaged by his reliance on Litigators' representations by losing $334,00 in near term profits.

198.   The Plaintiff was further damaged by his reliance on Litigators' representations by losing up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received.  (The Plaintiff is attempting to mitigate these damages, whereas the Litigators have rejected any notion of mitigating these damages thus far).

199.   The Plaintiff was damaged by his reliance on the Litigating Group's representations, as well, by losing an asset he would have owned, the Seaside Mariana company.

31

1  200.   The Plaintiff was further damaged by his reliance on the Litigating Group's representations

2        by losing $334,00 in near term profits.

3  201.   The Plaintiff was further damaged by his reliance on the Litigating Group's representations

4        by losing up to another US $8 million (post-tax) in the medium term (within approximately nine

5        months of the close) in proceeds that the Seaside Mariana company would have received.  (The

6        Plaintiff is attempting to mitigate these damages)

7  202.   The Plaintiff will fully prove all his base damages at jury trial.

8

9

10              **Count V – Tortious Interference with Contractual Relations**

11

12  203.   The Plaintiff realleges paragraphs 1-116 as if fully set out herein.

13  204.   At all relevant times, the Plaintiff was in an economically advantageous relationship with

14        Fleming ("the Relationship") that was likely to confer substantial benefits, especially given the

15        parties' complimentary expertise and interest in Central American development.

16  205.   Indeed, the Plaintiff had entered into numerous other contracts ("the Other Related Contracts)

17        to purchase assets, companies, land, and legal claims from Fleming, his wife Maria Rueda, and

18        eight more of their companies.

19

20  206.   The Plaintiff was also working on a deal with the Jamaican government.

21  207.   The Defendants were aware of the Relationship and the Other Related Contracts and the

22        Jamaican government deal both generally and specifically.

23

24  208.   The Plaintiff had made David Crowe, agent and communicator for the other Defendants,

25        specifically aware of the contracts and what he expected to make on them.

26

209.    The Plaintiff also revealed to Mr. Crowe, and thus all of these Defendants, in October 2018 that he had purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims, which had been assigned to him.

128. The Defendants were aware that their refusal to close on the Funding Contract, and these Defendants' refusal to fund the Plaintiff's purchase of the Seaside Mariana company, would burden the Relationship.

129. These Defendants were also aware that their refusal to fund the Plaintiff's purchase of the Seaside Mariana company would interfere with the Plaintiff's other contracts to purchase the rest of the assets of Fleming, Rueda, Grupo Mariana, and Nicaragua Developments, including eight more companies, in two ways: (1) by burdening the Relationship, and (2) by leaving the Plaintiff without the financial wherewithal to close his purchases as outlined in the Other Related Contracts.

130. The Defendants' refusal to honor the Funding Contract foreseeably and substantially interfered with and disrupted the Relationship.

131. The Defendants' refusal to honor the Funding Contract foreseeably and substantially interfered with the Plaintiff's ability to perform on the Other Related Contracts, and thus interfered with the Other Related Contracts, too.

132. The Plaintiff was harmed by the Defendants' intentional acts of interference with the Relationship by the consequential loss of profits in the Other Related Contracts and in future Central American transactions with Fleming and his associates.

133. The Plaintiff was harmed by the Defendants' intentional acts of interference with his ability to perform as outlined in the Other Related Contracts and in future Central American transactions with Fleming and his associates.

134. The Plaintiff was therefore harmed by the Defendants' intentional acts of interference with the Other Related Contracts themselves.

## Count VI – Negligent Interference with Contractual Relations

210. The Plaintiff realleges paragraphs 1-116 as if fully set out herein.

211. Pleading in the non-exclusive alternative, at all relevant times, the Plaintiff was in an economically advantageous relationship with Fleming ("the Relationship") that was likely to confer substantial benefits, especially given the parties' complimentary expertise and interest in Central American development.

212. Indeed, the Plaintiff had executed numerous other contracts ("the Other Related Contracts) to purchase assets, companies, land, and legal claims from Fleming, his wife Maria Rueda, and eight more of their companies.

213. The Plaintiff was also working on a deal with the Jamaican government.

214. The Defendants were aware of the Relationship and the Other Related Contracts and the Jamaican government deal both generally and specifically.

215. The Plaintiff had made David Crowe, agent and communicator for (and partner to) the other Defendants, specifically aware of the contracts and what he expected to make on them.

216. The Plaintiff also revealed to Mr. Crowe, and thus all of these Defendants, in October 2018 that he had purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims, which had been assigned to him.

217. The sum total of all of the Plaintiff's expected or prospective revenue and profits from the Relationship, the Other Related Contracts, and the Jamaican government deal shall be referred to as the "Plaintiff's Contractual Relations."

218. The Defendants were aware or should have been aware of the Relationship both generally and specifically, as well as the Plaintiff's Contractual Relations.

219. The Defendants knew that the Relationship and the Plaintiff's Contractual Relations would be disrupted if they failed to act with due care.

220. The Defendants were aware that their refusal to close on the Funding Contract, and these Defendants' refusal to fund the Plaintiff's purchase of the Seaside Mariana company, would burden the Relationship.

221. These Defendants were also aware that their not funding the Plaintiff's purchase of the Seaside Mariana company would interfere with the Plaintiff's other contracts relations, including his contracts to purchase the rest of the assets of Fleming, Rueda, Grupo Mariana, and Nicaragua Developments, including eight more companies, in two ways: (1) by burdening the Relationship, and (2) by leaving the Plaintiff without the financial wherewithal to close perform for these and other Plaintiff Contractual Relations.

222. By breaching and repudiating the Funding Contract and not funding the Plaintiff's purchase of the Seaside Mariana company, these Defendants failed to act with due care and substantially interfered with and disrupted the Relationship.

223.   By breaching and repudiating the Funding Contract and not funding the Plaintiff's purchase of the Seaside Mariana company, these Defendants further failed to act with due care and substantially interfered with and disrupted the Plaintiff's Contractual Relations.

224.   The Plaintiff was harmed by the Defendants' acts of negligent interference with the Relationship and the Plaintiff's Contractual Relations by the consequential loss of profits in the other transactions and contracts Plaintiff had formed with Fleming, his wife, and his companies, as well as other opportunities that the Plaintiff likely would have benefited from based on the Relationship.

225.   The Plaintiff shall prove the amounts of these base damages at jury trial.

## Count VII Intentional Interference with Prospective Economic Advantage

226.   The Plaintiff realleges paragraphs 1-116 as if fully set out herein.

227.   At all relevant times, the Plaintiff was in an economically advantageous relationship with Mr. Kevin Fleming ("the Relationship").  Indeed, the Plaintiff expected specific economic advantages that were already encapsulated in numerous other contracts the Plaintiff had already executed with Fleming and related parties ("the Other Related Contracts")

228.   At all relevant times, the Plaintiff's economically advantageous relationship with Fleming ("the Relationship") was likely to confer further substantial benefits especially given the parties' complementary expertise and interest in Central American development.

229.   The Plaintiff was also working on a deal with the Jamaican government.

230.    The sum total of all of the Plaintiff's expected or prospective economic advantages from the Relationship and from the positive economic force from his purchase of the Seaside Mariana company shall be referred to as the "Plaintiff's Prospective Economic Advantages."

231.    The Defendants were aware or should have been aware of the Relationship both generally and specifically, as well as the Plaintiff's Prospective Economic Advantages.

232.    The Plaintiff had made David Crowe, agent and communicator for the other Defendants, specifically aware of the contracts and what he expected to make on them.

233.    The Plaintiff also revealed to Mr. Crowe, and thus all of these Defendants, in October 2018 that he had purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims, which had been assigned to him.

234.    The Defendants were aware that their refusal to honor the Funding Contract and these Defendants' refusal to fund the Plaintiff's purchase of the Seaside Mariana company, would burden the Relationship.

235.    Indeed, these Defendants' refusal to fund the Plaintiff's purchase of the Seaside Mariana company did burden the Relationship.

236.    These Defendants were also aware that their refusal to fund the Plaintiff's purchase of the Seaside Mariana company would interfere with the Plaintiff's Prospective Economic Advantages: (1) by burdening the Relationship, and (2) by leaving the Plaintiff without the financial wherewithal to close his purchases in the Other Related Contracts, nor finalize and execute his deal in Jamaica.

237.    The Defendants' refusal to honor the Funding Contract foreseeably and substantially interfered with and disrupted the Relationship.

238.   The Defendants' refusal to honor the Funding Contract foreseeably and substantially interfered with the Plaintiff's Prospective Economic Advantages.

239.   The Plaintiff was harmed by the Defendants' intentional acts of interference with the Relationship by the consequential loss of revenue and profits.

240.   The Plaintiff was harmed by the Defendants' intentional acts of interference with his ability to perform in the Other Related Contracts and in his Jamaican deal.

241.   The Plaintiff was harmed by the Defendants' intentionally interfering with the Relationship and with the Plaintiff's Prospective Economic Advantages by the consequential loss of profits in the other transactions and contracts Plaintiff had formed with Fleming, his wife, and his companies, as well as other opportunities that the Plaintiff likely would have benefited from based on the Relationship.

242.   The Plaintiff shall prove all allegations as well as the amounts of these damages at jury trial.

## Count VIII Negligent Interference with Prospective Economic Advantage

243.   The Plaintiff realleges paragraphs 1-116 as if fully set out herein.

244.   At all relevant times, the Plaintiff was in an economically advantageous relationship with Mr. Kevin Fleming ("the Relationship"). Indeed, the Plaintiff expected specific economic advantages that were already encapsulated in numerous other contracts the Plaintiff had already executed with Fleming and related parties ("the Other Related Contracts")

245.    At all relevant times, the Plaintiff's economically advantageous relationship with Fleming ("the Relationship") was likely to confer further substantial benefits especially given the parties' complementary expertise and interest in Central American development.

246.    The sum total of all of the Plaintiff's expected or prospective economic advantages from the Relationship shall be referred to as the "Plaintiff's Prospective Economic Advantages."

247.    The Defendants were aware or should have been aware of the Relationship both generally and specifically, as well as the Plaintiff's Prospective Economic Advantages

248.    The Defendants knew that the Relationship and the Plaintiff's Prospective Economic Advantages would be disrupted if they failed to act with due care.

249.    By breaching and repudiating the Funding Contract and not funding the Plaintiff's purchase of the Seaside Mariana company, these Defendants failed to act with due care and substantially interfered with and disrupted the Relationship.

250.    By breaching and repudiating the Funding Contract and not funding the Plaintiff's purchase of the Seaside Mariana company, these Defendants further failed to act with due care and substantially interfered with and disrupted the Plaintiff's Prospective Economic Advantages.

251.    The Plaintiff was harmed by the Defendants' acts of negligent interference with the Relationship by the consequential loss of profits in the other transactions and contracts Plaintiff had formed with Fleming, his wife, and his companies, as well as other opportunities that the Plaintiff likely would have benefited from based on the Relationship.

252.    The Plaintiff shall fully prove all relevant allegations amounts of these base damages at jury trial.

## Count IX – Breach of the Covenant of Good Faith and Fair Dealing

253. The Plaintiff realleges paragraphs 1-116 as if fully set out herein.

254. The Plaintiff entered in to contracts with these Defendants including the Funding Contract.

255. The Plaintiff performed all conditions required of him by the contract.

256. The Defendants interfered with the Plaintiff's right to receive the benefits of the contract.

257. As a direct and proximate result of the Defendants' breach of the covenant of good faith and fair dealing, implied in law in every contract including the Funding Contract, the Plaintiff lost an asset he would have owned, the Seaside Mariana company.

258. As a further direct and proximate result of the Defendants' breach of the covenant of good faith and fair dealing, implied in law in every contract including the Funding Contract, the Plaintiff lost $334,000 in near term profits.

259. As a direct and proximate result of the Defendants' breach of the covenant of good faith and fair dealing, implied in law in every contract including the Funding Contract, the Plaintiff lost up to another US $8 million (post-tax) in the medium term (within approximately nine months of the close) in proceeds that the Seaside Mariana company would have received. (The Plaintiff is attempting to mitigate these damages; these Defendants have rejected any notion of mitigating the Plaintiff's damages, at least through mid-February 2021).

260. The Plaintiff will fully prove all his base damages at jury trial.

**Count X – Negligent Infliction of Emotional Distress**

261.    The Plaintiff realleges paragraphs 1-116 as if fully set out herein.

262.    These Defendants owed the Plaintiff contractual duties as well as a fiduciary duty to honor the contract and fund the Plaintiff's purchase of the Seaside Mariana.

263.    These Defendants breached their duties, resulting in enormous damages to the Plaintiff.

264.    The situation was especially traumatic to the Plaintiff as he had been mired in abject poverty for years, and thus, closing on his purchase of the Seaside Mariana company represented the solution to most of the Plaintiff's major life issues.

265.    As one example of the ramifications, the Plaintiff had not paid substantial Child Support since 2014 and had not seen his children.

266.    The Plaintiff planned to make significant Child Support payments and also hire an attorney So he could see his children, once these Defendants honored their obligations.

267.    For these Defendants to pull out of the funding and closing almost at the closing table was especially emotionally devastating to the Plaintiff, given his hopes and dreams.

268.    These Defendants' breaches of duty therefore foreseeably inflicted extreme emotional distress on the Plaintiff.

269.    These Defendant's breaches of duty were the proximate cause of the Plaintiff's emotional distress.

WHEREFORE, Plaintiff prays

(a) As to Count I for all direct and consequential damages the Plaintiff incurred as a proximate result of the Defendants' breach of contract;

(b) As to Count II for all direct and consequential damages the Plaintiff incurred as a proximate result of David Crowe's (and these Defendants') promissory fraud along with the imposition of exemplary damages to deter the Defendants from committing such acts of fraud in the future;

(c) As to Count III for all direct and consequential damages the Plaintiff incurred as a proximate result of David Crowe's (and these Defendants') promissory estoppel along with the imposition of exemplary damages to deter the Defendants from committing such acts in the future;

(d) As to Count IV for all direct and consequential damages the Plaintiff incurred as a proximate result of Crowe's negligent misrepresentations along with the imposition of exemplary damages to deter Defendants from committing such acts in the future.

(e) As to Count V for an award of damages sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' tortious interference with the Plaintiff's contractual relations as well as the imposition of exemplary damages in an amount sufficient to punish and deter the Defendants from committing similar acts of interference in the future.

(f) As to Count VI for an award of damages sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' negligent interference with the Plaintiff's contractual relations.

(g) As to Count VII for an award of damages sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' intentional interference with the Plaintiff's prospective economic advantages as well as the imposition of exemplary damages in an amount sufficient to punish and deter the Defendants from committing similar acts of interference in the future.

(h) As to Count VIII for an award of damages sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' negligent interference with the Plaintiff's prospective economic advantages.

(i) As to Count IX for an award of damages, in an amount sufficient to compensate the Plaintiff for all direct and consequential damages caused by the Defendants' breach of the covenant of good faith and fair dealing and for the imposition of exemplary damages in an amount sufficient to punish and deter the Defendants from engaging in acts of bad faith in the future.

(j) As to Count X, for an award of all damages proximately caused by the Defendant's negligent infliction of emotional distress.

(k) For all costs of suit, including fees, paralegal costs, costs of travel, future attorneys' fees, and reasonable compensation for the Plaintiff's time while representing himself.

(l) For such other and further relief as the Court deems just.

RESPECTFULLY SUBMITTED on February 18th, 2022

CARL A. WESCOTT, *pro se*

EXHIBIT A

**STATE OF WASHINGTON**
**DEPARTMENT OF FINANCIAL INSTITUTIONS**
**SECURITIES DIVISION**

| | |
|---|---|
| IN THE MATTER OF DETERMINING<br>Whether there has been a violation of the<br>Securities Act of Washington by:<br><br>Thomas P. Madden,<br><br>                    **Respondent.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Order No.: S-14-1463-15-SC01<br><br>STATEMENT OF CHARGES AND NOTICE OF INTENT<br>TO ENTER ORDER TO CEASE AND DESIST, TO<br>IMPOSE FINES, AND TO CHARGE COSTS |

**Thomas P. Madden**

**THE STATE OF WASHINGTON TO:**

## STATEMENT OF CHARGES

Please take notice that the Securities Administrator of the state of Washington has reason to believe that Respondent Thomas Madden has violated the Securities Act of Washington and that his violations justify the entry of an order of the Securities Administrator under RCW 21.20.390 against him to cease and desist from such violations and to charge costs, and, under RCW 21.20.395, to impose a fine. The Securities Administrator finds the following:

## TENTATIVE FINDINGS OF FACT

### Respondent

1.     Thomas Madden, a Washington resident, earns income through the sale of stock in companies that he consults for. Thomas Madden lived in Washington, until approximately 2012, when he moved to Arizona for work. Thomas Madden holds a Washington driver's license and maintains a home in Washington, which he frequently visits.

### Related Parties

2.     Madden Consulting, Inc. was a Washington corporation through which Thomas Madden offered business consulting services, which included helping companies raise capital. The company was formed in 1993 and is no longer active. Thomas Madden acted as the principal of Madden Consulting, Inc.

3.     Investor Relations International, Inc. was a Delaware corporation through which Thomas Madden offered business consulting services, which included helping companies raise capital. The company was formed in 1998 and is no longer active. Thomas Madden acted as the principal of Investor Relations International, Inc.

4.     Madcon Company, Inc. was a Washington corporation through which Thomas Madden offered business consulting services, which included helping companies raise capital. The company was formed in 1999 and is no longer active. Thomas Madden acted as the principal of Madcon Company, Inc.

STATEMENT OF CHARGES AND NOTICE
OF INTENT TO ENTER ORDER TO
CEASE AND DESIST AND TO IMPOSE FINES,
AND TO CHARGE COSTS

1

DEPARTMENT OF FINANCIAL INSTITUTIO[N]
Securities Divisi[on]
PO Box 9[0]
Olympia WA  98507-90[ ]
360-902-87[ ]

5.      Nascent Value, LLC was a Delaware limited liability company through which Thomas Madden offered business consulting services, which included helping companies raise capital. The company was formed in 2008 and is no longer active. Thomas Madden acted as the principal of Nascent Value, LLC.

6.      Summit Capital USA, Inc. is an Arizona corporation formed in 2010 for the purpose of providing business consulting services, which include helping companies raise capital. Gregg C. Johnson acts as the principal of Summit Capital USA, and operates a similar Canadian company named, Summit Capital Corp. Thomas Madden served as an officer of the Summit Capital USA until March 2015, when the other officers of the company removed him as a result of the Securities Division's investigation. Thomas Madden continues to work for the company.

<u>Overview</u>

7.      Since 1993, Thomas Madden has acted as a consultant, either independently or through Summit Capital USA, helping client companies raise capital. Rather than receive money as compensation for these services, Thomas Madden mostly receives shares in his client companies in exchange for his work. To earn income, Thomas Madden has to sell these shares, which he often does, both here in Washington and outside the state, to members of his church and to his acquaintances. The stock is typically penny stock or high-risk stock.

8.      In effecting these sales of stock, Thomas Madden acts as a securities broker-dealer, an activity he is not registered for. And in the course of earning approximately $383,000 from 2011 to 2015 from his securities sales to at least 16 Washington investors, Thomas Madden both misrepresented and omitted material information. To date, most all of these investors have yet to receive a return on their investment.

<u>Thomas Madden's Unregistered and Fraudulent Broker-Dealer Activity</u>

*Introduction*

9.      From approximately 1993 to 2010, Thomas Madden worked as a business consultant, providing his services through four separate companies he owned: Madden Consulting, Inc.; Investor Relations International, Inc.; Madcon Company, Inc.; and Nascent Value , LLC. In approximately 2010, Thomas Madden began working for Summit Capital USA, Inc.

10.     Thomas Madden's work through or at each of these companies mostly involved helping client companies raise capital. He typically consulted for newly publicly registered companies with limited operating or financial history.

*Client Services Rendered*

11.     Summit Capital USA's business model includes creating publicly registered shell companies[1] and helping effectuate their merger with private companies, which seek to have their shares of stock publicly traded. Examples of

---

[1] Summit Capital USA often employs Donald Stoecklein to create and register these shell companies. In 1995, the SEC entered into a consent order with Donald Stoecklein to resolve the SEC's allegations of Donald Stoecklein's fraudulent sale of stock. Donald Stoecklein failed to pay the disgorgement provided for in the consent order, and in 2015, the SEC filed a lawsuit against Donald Stoecklein, to require Donald Stoecklein to pay the disgorgement.

STATEMENT OF CHARGES AND NOTICE
OF INTENT TO ENTER ORDER TO
CEASE AND DESIST AND TO IMPOSE FINES,
AND TO CHARGE COSTS

2

DEPARTMENT OF FINANCIAL INSTITUTIO...
Securities Divisi...
PO Box 90...
Olympia WA  98507-90...
360-902-87...

1  this strategy include their facilitation of Highland Business Corporation's merger with a private company to form

2  Elevate, Inc., a company that purported to sell home security systems; MyOtherCountryClub.com's merger with a

3  private company to form Star Mountain Resources, Inc., a mining company; and Dignyte, Inc.'s merger with a private

company to form eWellness Healthcare Corporation, a company that provides telemedicine services.

4  12.     Summit Capital USA also helps client companies maintain their registration status with the Securities and

5  Exchange Commission and works with client companies to have shares of the client companies' stock traded on the

over-the-counter market. Stock traded on the over-the-counter market is commonly called penny stock. The price per

6  share of this stock is typically less than $5.00. These stocks are usually thinly-traded and have a low market-

capitalization.

7  13.     Summit Capital USA relies on Thomas Madden to help these client companies raise capital.

8                                    *Compensation from Client Companies*

9  14.     As compensation for their work, Thomas Madden and the principals of Summit Capital USA, receive shares in

their client companies. Additionally, the shares that they owned in the publicly registered shell companies that they

10  formed are often converted into stock in the surviving company of the merger. Thus, Thomas Madden typically has

11  two sources of shares in his client companies.

12  15.     To earn income from his work, Thomas Madden personally sells the shares that he owns or claims to own in

client companies, rather than selling the shares through a registered broker-dealer. The money that he earns from these

13  sales has been the sole source of Thomas Madden's income.

14                                    *Method and Solicitation of Sales*

15  16.     Thomas Madden has solicited his shares of stock to members of his church, his acquaintances, and friends of

his acquaintances.[2] He typically meets with prospective investors in person or speaks with them over the phone. As

16  part of his sales pitch, Thomas Madden explains that he consults for the company, briefly describes the company's

17  business, and provides investors with instructions on how to purchase his shares.

                                     *Stock Purchase Agreements*

18  17.     To effectuate these secondary sales of stock, Thomas Madden enters into stock purchase agreements with

19  investors. In these stock purchase agreements, Thomas Madden represents that he owns the shares of stock to be sold,

that the shares of stock are unrestricted, and that he will transfer the stock to the investor upon receiving the investor's

20  payment. Thomas Madden instructs investors to make their payments for the stock to him.

21

22  [2] Summit Capital USA's business model creates a conflict of interest between its principals and its client company: Summit

23  Capital USA's principals have an incentive to sell the shares of stock they own in a client company, rather than a client company

new issue shares. Summit Capital USA's principals can also sell their shares in a client company at a lower price per-share than

24  the subscription price per-share of a client company's new issue stock. Both of these factors limit a client company's ability to

25  raise capital through the public sale of its stock.                                    3

18.     From approximately 2011 to 2015, Thomas Madden sold stock in this fashion to 16 known Washington residents. Most all of the Washington residents to whom Thomas Madden sold stock had never directly purchased stock that was either privately held or that was traded on the over-the-counter market.

19.     At least two investors were eighty years old at the time they purchased stock from Thomas Madden and another maxed out his home equity line of credit and took out a personal loan to help finance the purchase of stock from Thomas Madden. Thomas Madden raised approximately $383,000 from his sale of stock to these Washington residents, and the course of doing so, engaged in the following fraudulent conduct:

*False Representations About Ownership of Client Company Stock*

20.     Although Thomas Madden received shares of stock in client companies, at times, he often did not own any or enough of the stock he purported to sell.

21.     Corporate records indicate that Thomas Madden never owned shares in Elevate, Inc., Dignyte, Inc., and eWellness Healthcare Corporation at the time that he entered into stock purchase agreements and received payment from at least five Elevate, Inc. investors, two Dignyte, Inc. investors, and four eWellness Healthcare Corporation investors.

22.     Thomas Madden took money from these investors, but did not have any stock to transfer to them.

*Failure to Execute Orders in Timely Fashion*

23.     Registered broker-dealers are required to promptly deliver purchased securities. Thomas Madden entered into most all of the Dignyte, Inc. and eWellness Healthcare Corporation stock purchase agreements in 2014, but did not submit the Dignyte, Inc. and eWellness Healthcare Corporation stock purchase agreements to the companies' transfer agent until May 2015, days before his testimony before the Securities Division.

24.     For over a year, Dignyte, Inc. and eWellness Healthcare Corporation did not have record that these investors were shareholders in the company. During this period, these investors did not have legal title to shares of stock in either company and did not have the ability to resell any shares they may have owned.

25.     Thomas Madden falsely represented to Washington investors that he would transfer their stock upon receiving their payment, and he failed to disclose to these investors the risks associated with significant delays in executing their transactions.

*Restricted Status of Stock Sold*

26.     In the stock purchase agreements that Thomas Madden enters into, he represents that the stock he will transfer to investors is "free trading," or clear of any restrictions on resale.

27.     However, the transfer agent for Dignyte, Inc. and eWellness Healthcare Corporation listed all of the shares that Thomas Madden owned in both companies as restricted at the time he entered into stock purchase agreements with the Washington residents described above. Owners of restricted stock have limitations on their ability to resell their stock.

STATEMENT OF CHARGES AND NOTICE
OF INTENT TO ENTER ORDER TO
CEASE AND DESIST AND TO IMPOSE FINES,
AND TO CHARGE COSTS

4

DEPARTMENT OF FINANCIAL INSTITUTION
Securities Divisio
PO Box 903
Olympia WA  98507-903
360-902-876

28.    Thomas Madden falsely represented to these Washington investors that the shares he would sell them were unrestricted.

### Arbitrary Pricing of Sales

29.    The Washington investors who signed stock purchase agreements with Thomas Madden did not negotiate the price per share that they paid. Rather, Thomas Madden presented the investors with price per share at which they could purchase the shares.

30.    Registered broker-dealers are required to enter into securities transactions for investors at a price reasonably related to the market price of the security, but Thomas Madden denied investors in the following sales of this protection.

31.    Star Mountain Resource, Inc.'s stock traded on the over-the-counter market during the time period that Thomas Madden sold his shares in Star Mountain Resources, Inc. to Washington investors. Thomas Madden sold his shares in in the company to one Washington investor for $0.90 per share, approximately triple the market price of the stock.

32.    In 2014 and 2015, Dignyte, Inc.'s and eWellness Healthcare Corporation's stock was not traded on any public exchange. Thomas Madden sold his purported shares in the company to Washington investors from anywhere between $0.30 to $1.00 per share, but purchased shares from eWellness Healthcare Corporation at one point during this period, for $0.13 per share. Notably, on the same day in 2014, Thomas Madden sold one investor shares in Dignyte, Inc. for $0.50 per share and sold another investor shares in the same shell company for $1.00 per share.

### Further Misrepresentations and Omissions in Connection with Brokerage Sales

33.    Thomas Madden sold shares he claimed to own in Elevate, Inc. to a Washington resident. Prior to this sale, Thomas Madden represented that he would be able to double or triple the Washington resident's investment. Thomas Madden explained that 30 days after the Washington resident's purchase of the purported stock, Thomas Madden could then resell the Washington resident's stock for a guaranteed two to three times the price that the Washington resident paid for the stock. Thomas Madden failed to disclose to the Washington resident any details about the market for resale of Elevate, Inc. stock, his ability to resell any Elevate, Inc. stock, and the bases and assumptions underlying his claim that the stock would sell for double or triple the price paid for by the Washington resident. The Washington resident lost the full value of his investment.

34.    In the course of selling shares he owned or claimed to own in Dignyte, Inc., Thomas Madden represented that the company would soon merge with eWellness Healthcare Corporation. Although this later happened, at the time that Thomas Madden entered into stock purchase agreements to sell shares of stock in Dignyte, Inc., Dignyte, Inc. was a blank check shell company with no assets. The company did not sell any products, provide any services, or have any operations. The company, further, had no clear means to provide investors a return on their investment. Thomas

DEPARTMENT OF FINANCIAL INSTITUTIO
Securities Divisi
PO Box 90
Olympia WA  98507-90
360-902-87

STATEMENT OF CHARGES AND NOTICE
OF INTENT TO ENTER ORDER TO
CEASE AND DESIST AND TO IMPOSE FINES,
AND TO CHARGE COSTS

Madden failed to disclose to these Washington investors the risks associated with investing in a blank check shell company and that such investments are high-risk and speculative.

35.    Thomas Madden represented to prospective Dignyte, Inc. and eWellness Healthcare Corporation investors that shares of each company's stock would soon be publicly traded, but he failed to provide investors with any information supporting these representations. Additionally, Thomas Madden failed to disclose that a liquid public market for shares of stock in these companies may never develop.

36.    Thomas Madden further failed to disclose to investors specific risks associated with investing in penny stock or thinly-traded stock, namely that Summit Capital USA owned a beneficial interest in Star Mountain Resources, Inc., Dignyte, Inc., and eWellness Healthcare Corporation, and its sale of stock in either company could dramatically affect shares of the price of the company's stock.

### Omissions About Past Business Failures and Lawsuits

37.    Since Thomas Madden began his consulting work, of his known clients, the stock of six of these companies realized some short-term gains while traded in the over-the-counter market, but their values all ultimately crashed. Two companies that Thomas Madden consulted for where the subject of legal action by the Securities and Exchange Commission, the principals of two other companies misappropriated investor funds, and another company failed.

38.    In 2007, a Washington resident sued Thomas Madden for defaulting on a promissory note for funds loaned to Thomas Madden for his consulting work. Thomas Madden and Nascent Value, LLC were sued in 2009 over money they owed to investors. And, in approximately 2012, Thomas Madden was the subject of another lawsuit for failing to repay an investor. In each of these three cases, the plaintiffs obtained a judgment against Thomas Madden.

39.    Thomas Madden failed to disclose to Washington investors that many of his prior stock sales had failed and that he has been sued in connection with his prior sales of stock.

### Registration Status

40.    Thomas Madden was previously registered to sell securities in Washington as a broker-dealer representative from 1991 to1993, but he has not since been registered to sell securities in any capacity in Washington.

Based on the above Findings of Fact, the following Conclusions of Law are made:

## CONCLUSIONS OF LAW

1.    The entry into the stock purchase agreements and the sale of stock, as described above, constitutes the offer and sale of securities as defined in RCW 21.20.005(14) and (17).

2.    Thomas Madden has violated RCW 21.20.040 by offering and selling securities while not registered as a securities broker-dealer in Washington.

6

DEPARTMENT OF FINANCIAL INSTITUTIO
Securities Divisi
PO Box 90
Olympia WA  98507-90
360-902-87

3.    The offer and sale of these securities were in violation of RCW 21.20.010 because Thomas Madden made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

## NOTICE OF INTENT TO ORDER THE RESPONDENT TO CEASE AND DESIST

Pursuant to RCW 21.20.390(1) and based upon the above Tentative Findings of Fact and Conclusions of Law, the Securities Administrator intends to order that Respondent Thomas Madden shall cease and desist from violations of RCW 21.20.010, RCW 21.20.040, and RCW 21.20.040.

## NOTICE OF INTENT TO IMPOSE A FINE

Pursuant to RCW 21.20.395, and based upon the above Tentative Findings of Fact and Conclusions of Law, the Securities Administrator intends to order that Respondent Thomas Madden shall be liable for and shall pay a fine of $50,000.

## NOTICE OF INTENT TO CHARGE COSTS

Pursuant to RCW 21.20.390, and based upon the Tentative Findings of Fact and Conclusions of Law, the Securities Administrator intends to order that Respondent Thomas Madden shall be liable for and shall pay costs, fees, and expenses incurred in the administrative investigation and hearing of no less than $25,000.

## AUTHORITY AND PROCEDURE

This Statement of Charges is entered pursuant to the provisions of Chapter 21.20 RCW and is subject to the provisions of Chapter 34.05 RCW. Thomas Madden make a written request for a hearing as set forth in the NOTICE OF OPPORTUNITY TO DEFEND AND OPPORTUNITY FOR HEARING accompanying this Order. If a respondent does not make a hearing request in the time allowed, the Securities Administrator intends to adopt the above Tentative Findings of Fact and Conclusions of Law as final and to enter a permanent order to cease and desist, to impose any fines sought, and to charge any costs sought against Thomas Madden.

Signed and Entered this 23rd day of May 2016.

William M. Beatty
Securities Administrator

STATEMENT OF CHARGES AND NOTICE
OF INTENT TO ENTER ORDER TO
CEASE AND DESIST AND TO IMPOSE FINES,
AND TO CHARGE COSTS

7

DEPARTMENT OF FINANCIAL INSTITUTI
Securities Divis
PO Box 9
Olympia WA    98507-9
360-902-8

1

2    Approved by:

3

4
     Suzanne Sarason
5    Chief of Enforcement

6

7    Reviewed by:

8

9

10   Jack McClellan
     Financial Legal Examiner Supervisor

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   STATEMENT OF CHARGES AND NOTICE
     OF INTENT TO ENTER ORDER TO
     CEASE AND DESIST AND TO IMPOSE FINES,
     AND TO CHARGE COSTS

Presented by:

Eric Palosaari
Financial Legal Examiner

8

DEPARTMENT OF FINANCIAL INSTITUTION
                    Securities Division
                         PO Box 90
             Olympia WA  98507-90
                      360-902-87

NEW APPLICATION

0000186720

BEFORE THE ARIZONA CORPORATION COMMISSION

1

COMMISSIONERS    DOCKETED    2019 MAR 12 P 12: 47

2

3    TOM FORESE - Chairman    MAR 12 2018
     BOB BURNS

4    ANDY TOBIN    DOCKETED BY:
     BOYD DUNN

5    JUSTIN OLSON

*EXHIBIT B*

6    In the matter of:    )    DOCKET NO. S-21042A-18-0059
                          )
7    THOMAS P. MADDEN and Leslie Madden,    )    NOTICE OF OPPORTUNITY FOR HEARING
     husband and wife,    )    REGARDING PROPOSED ORDER TO CEASE
8                          )    AND DESIST, ORDER FOR RESTITUTION,
         Respondents.    )    ORDER    FOR    ADMINISTRATIVE
9                          )    PENALTIES, AND ORDER FOR OTHER
                          )    AFFIRMATIVE ACTION

10

11    **NOTICE:**    EACH RESPONDENT HAS 10 DAYS TO REQUEST A HEARING

12                EACH RESPONDENT HAS 30 DAYS TO FILE AN ANSWER

13    The Securities Division ("Division") of the Arizona Corporation Commission ("Commission")

14    alleges that respondent Thomas P. Madden has engaged in acts, practices, and transactions that constitute

15    violations of the Securities Act of Arizona, A.R.S. § 44-1801 *et seq.* ("Securities Act").

16                                    I.

17                            **INTRODUCTION**

18        1.    Madden's livelihood consists of offering and selling stock in start-up companies and

19    blank-check companies.[1] From October 2012 through July 2016, Madden offered or sold stock to a

20    least 88 investors in over 180 transactions.

21        2.    Madden's securities offers and sales make him a dealer under A.R.S. § 44-1801(9), i

22    a person who engages part- or full-time as an agent, broker or principal in the business of offerin

23    buying, selling or otherwise dealing in securities.

24    _____

25    [1] The Securities and Exchange Commission describes blank-check companies as follows: "A blank check company
      development stage company that has no specific business plan or purpose or has indicated its business plan is to en
26    in a merger or acquisition with an unidentified company or companies, other entity, or person. These companies
      typically involve speculative investments and often fall within the SEC's definition of 'penny stocks' or are consi
      'microcap stocks.'"

Docket No. S-21042A-18-0059

3.    While Madden received nearly $4 million from his stock transactions, his purchasers received shares in startup companies with almost no operations or revenues, no profits, and years of significant net losses. The stock ultimately became worth next to nothing.

4.    Madden failed to disclose the risks of these stocks to his purchasers. He also failed to disclose other information that would have been material to a person purchasing stock from a dealer such as Madden, namely that he'd been sued by investors in previous stock transactions where the stock turned out to be complete losses for the purchasers and borrowed money from clients that he was unable to pay back. These omissions constitute fraud under A.R.S. § 44-1991.

## II.

## JURISDICTION

5.    The Commission has jurisdiction over this matter pursuant to Article XV of the Arizona Constitution and the Securities Act.

## III.

## RESPONDENTS

6.    Thomas P. Madden is a married man who resided in Chandler, Arizona from 2011 through 2016. Madden may be referred to as "Respondent."

7.    Leslie Madden ("Respondent Spouse") was at all relevant times the spouse of Respondent. Respondent Spouse is joined in this action under A.R.S. § 44-2031(C) solely for purposes of determining the liability of the marital community.

8.    At all times relevant, Madden was acting for his own benefit and for the benefit or in furtherance of his and Respondent Spouse's marital community.

## IV.

## FACTS

9.    Beginning in late 2011 and continuing through 2016, Madden worked for Summit Capital USA, Inc. a financial-services firm based in Tempe, Arizona. Summit was not registered a securities dealer in Arizona.

2

Docket No. S-21042A-18-0059

10.    In its filings with the Securities and Exchange Commission, Summit describes its business as "merchant banking and strategic business advisory services."

11.    Summit's financial services included helping companies raise capital and assisting companies in becoming publicly-traded. In exchange for its services, Summit would receive an equity position in its clients.

12.    Summit frequently formed blank-check, shell corporations to merge with existing companies. Summit would own all or most of the equity in the shell company. After merging the shell company to the existing company, Summit would receive equity in the existing company.

13.    From late 2011 through 2014, Madden was Summit's general manager/senior manager and a 25% owner. His work involved, among other things, helping clients prepare to go public and assisting clients in raising capital by introducing them to investors and brokers. In early 2015, Summit changed Madden's title to "Of Counsel" when the State of Washington began investigating Madden; while his title changed, Madden continued to work for Summit in the same capacity. (Washington's investigation resulted in Washington issuing a consent order against Madden on October 18, 2016, that found Madden in violation of the state's securities registration and anti-fraud provisions.)

14.    For approximately his first year of employment at Summit, Madden received compensation in the form of a monthly salary and stock of the corporations that Summit formed for mergers, the entity that survived the merger, and other client companies. After working at Summit for a time, Madden's compensation consisted solely of stock from Summit's clients, shell companies, and merger entities.

15.    In April 2011, Summit formed, Dignyte, Inc., a blank-check, shell corporation with no operations.

16.    In 2014, Dignyte merged with eWellness Healthcare Corporation, a start-up company formed in Nevada in 2013. eWellness describes itself as "a Los Angeles based medical technolog

3

1    company that combines digital physical therapy with progressive in-home exercise programs that

2    includes active real-time monitoring and assessment by physical therapists."

3         17.    For its entire existence, eWellness had no revenue and no profits. eWellness's annual

4    SEC filings report net losses of $466,636 in 2013, $1,325,010 in 2014, $1,554,908 in 2015, and

5    $12,460,694 in 2016.

6         18.    eWellness was a client of Summit and Summit received eWellness stock in exchange

7    for financial services.

8         19.    As a Summit employee, Madden provided several services for Dignyte and eWellness

9    including introducing potential investors to eWellness and Summit executives, doing mini roadshows

10    for broker-dealers, and forwarding email from eWellness's manager to potential investors.

11    Additionally, Madden introduced eWellness to Summit.

12         20.    Madden received stock in Dignyte and eWellness in exchange for his services. He

13    also purchased 350,000 Dignyte shares for $.10/share.

14         21.    Another company for which Summit provided services was Jameson Stanford Mining

15    Corp. In 2012, Jameson described itself as follows: "Through our wholly owned subsidiary, Bolcán

16    Mining, we are a minerals exploration company focused on acquiring and consolidating mining

17    claims and mineral leases with potential production and future growth through exploration

18    discoveries."

19         22.    Effective December 15, 2014, Jameson changed its name to Star Mountain Resources,

20    Inc. to reflect its focus on a mining district in Utah.

21         23.    Jameson/Star Mountain filed Form 10-Ks with the SEC from 2013 through 2016.

22    These reports disclose several risks inherent to a mining company, including regulatory, market

23    fluctuation, and environmental risks. The 10-Ks also disclose that Jameson/Star Mountain

24    operations included several risks, including dependence on a single executive, lack of capital, lack

25    of operations, lack of income, and litigation. The 10-Ks also disclose risks related to Jameson/Star

26    Mountain's common stock, including that the shares are illiquid, may never meet the listing

Docket No. S-21042A-18-0059

1    requirements of a national exchange, are subject to the SEC's rules for "penny stocks" which include

2    assessing the buyer's suitability and disclosing risk.

3        24.    The 10-Ks also showed that Jameson/Star Mountain generated less than $90,000 of

4    revenue in 2011 and no revenue after that. It has not generated any profits. Rather, it incurred net

5    losses since its inception, including net losses of $54,258 in 2011, $648,271 in 2012, $2,978,706 in

6    2013, $4,156,596 in 2014, and $6,696,000 in 2015.

7        25.    As a Summit employee, Madden performed services for Jameson/Star Mountain that

8    were similar to those he performed for Dignyte/eWellness, including introducing potential investors

9    to Star Mountain executives and doing mini roadshows for broker-dealers.

10        26.    In exchange for his services, Madden received stock in Jameson/Star Mountain.

11    Madden also purchased some shares from Jameson.

12        27.    From October 2012 through July 2016, Madden offered and sold, within and from

13    Arizona, his Dignyte/eWellness, Jameson/Star Mountain stock to, and entered stock-backed loans

14    (i.e. loans where Madden could repay the loan with stock) with, at least 88 persons in 180 transactions

15    for a total of $3,988,417. He repaid a total of $639,310 to these purchasers.

16        28.    The purchasers were persons that Madden knew from his church, friends, and

17    acquaintances of these persons.

### Omissions and Misrepresentations

18

19        29.    In connection with the offer and sale of his stock, Madden failed to disclose or

20    misrepresented several items to investors.

21        30.    Based on Madden's representations, several investors expected a return on their

22    Jameson/Star Mountain investment in a short timeframe. Madden told at least one investor that

23    Jameson/Star Mountain stock was a "bargain" and would soon increase in value. Madden told another

24    investor that the stock could be purchased for $.75 and that they "will be opening it near $2.00."

25        31.    In fact, the company's value consisted of ownership of mineral rights; it had no mining

26    operations, had only earned a small revenue in one year of its existence, and had never had profits

5

Docket No. S-21042A-18-0059

32.    Madden failed to disclose to Jameson/Star Mountain investors the risks relevant to the mining industry and to Jameson/Star Mountain's operations.

33.    Madden also failed to disclose to investors risks connected Jameson/Star Mountain's common stock, including that the stock was sold in private transactions and listed on over-the-counter stock markets and bulletin boards resulting in limited liquidity, difficulty in determining market price due to infrequent trading and potential additional disclosure requirements for "penny stocks" under SEC rules.

34.    Madden told some investors that Dignyte/eWellness's value would soon rise significantly, led other investors to believe that they would soon realize a gain on their investment, and told at least one investor that eWellness shares would soon "go public."

35.    Dignyte, in fact, was a blank-check, shell company with no operations that existed to merge with eWellness. Before and after the merger, Dignyte/eWellness had no revenue or profits. To the contrary, it had throughout its existence incurred significant, annual net losses.

36.    Madden failed to discuss the risks involved with purchasing Dignyte/eWellness stocks, which were restricted shares and sold only in private transactions and on over-the-counter markets. These risks include limited liquidity, difficulty in determining market price due to infrequent trading, steps and costs required to sell restricted shares, and potential additional disclosure requirements for "penny stocks" under SEC rules.

37.    Madden represented to investors that he had experience in evaluating stock, was a consultant in the securities industry, a venture capitalist, or that he was in the business of investing. Madden failed to disclose to offerees information that would have been material in assessing Madden's business acumen and competence with finances, including two lawsuits against him based on stock offers and sales, and three loans that he was unable to timely pay back, two of which were never paid back and one that resulted in a civil judgment:

    a)    A May 17, 2012, civil judgment of $26,373 in principal plus attorney's fees from King County Superior Court, State of Washington, later domiciled in Arizona CV2012-0129

6

Docket No. S-21042A-18-0059

1    The judgment stemmed from $65,000 of stock sales where Madden sold stock to investors and the

2    stock lost almost all of its value.

3            b)      A March 19, 2008, civil judgment of $497,561 in King Superior Court –

4    Seattle, against Madden and Madden Consulting Inc. are the debtors. The lawsuit involved Madden

5    offering to sell stock to a potential investor. When the investor insisted that he receive promissory

6    notes instead, Madden sold him promissory notes that could be paid by cash or by stock.

7            c)      An October 14, 2009, judgment creditors received a judgment of $157,500 in

8    Utah County District Court, against Madden and his entity, Nascent Value, LLC, for a loan that

9    Madden received from the judgment creditors.

10           d)      On several occasions, Madden also borrowed money from an Arizona resident

11   that had purchased $300,000 in stock from Madden, including one loan for $75,000. Madden gave

12   the investor two $37,500 post-dated checks when she gave him the money. Then, apparently unable

13   to cover the checks when the date arrived, Madden asked her to hold on to the checks. On a later

14   date, Madden gave the investor two new post-dated checks, and asked her to tear up the old ones;

15   both checks cleared when she cashed them.

16           e)      In January, February and July 2015, Madden received loans totaling at least

17   $150,000 from another Arizona resident that had purchased over $300,000 in stock from Madden.

18   Madden paid back $30,000 of the loans. He also wrote two other checks to pay back the loans, both

19   of these checks bounced.

20           38.    The risks associated with Madden's choosing and selling stock in these startup

21   companies has played out in a worst-case scenario. Dignyte/eWellness and Jameson/Star Mountain

22   have failed to operate as viable businesses, they have only incurred losses, and their stock is currently

23   worth only a few pennies a share, representing almost a total loss for people who purchased stock

24   from Madden.

25

26

7

Docket No. S-21042A-18-0059

V.

## VIOLATION OF A.R.S. § 44-1842

### (Transactions by Unregistered Dealers or Salesmen)

39.    Respondent offered or sold securities in the form of stocks within or from Arizona while not registered as a dealer or salesman pursuant to Article 9 of the Securities Act.

40.    This conduct violates A.R.S. § 44-1842.

VI.

## VIOLATION OF A.R.S. § 44-1991

### (Fraud in Connection with the Offer or Sale of Securities)

41.    In connection with the offer or sale of securities within or from Arizona, Respondent directly or indirectly: (i) employed a device, scheme, or artifice to defraud; (ii) made untrue statements of material fact or omitted to state material facts that were necessary in order to make the statements made not misleading in light of the circumstances under which they were made; or (iii) engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon offerees and investors. Respondent's conduct includes, but is not limited to, the following:

a)    Representing to several investors that stock in Dignyte/eWellness and Jameson/Star Mountain would soon rise in value without disclosing, among other things, the risks associated with purchasing stock in startup companies and non-publicly-traded companies, these companies' failure to generate revenue or have any significant operations, risks associated with a mining company.

b)    Failing to disclose that previous clients had sued and obtained judgments against Respondent for money they lost when purchasing investments from or lending money to Respondent and that Respondent borrowed money from other clients that he was unable to timely or complete repay.

42.    This conduct violates A.R.S. § 44-1991.

8

Docket No. S-21042A-18-0059

## VII.

## REQUESTED RELIEF

The Division requests that the Commission grant the following relief:

1.      Order Respondent to permanently cease and desist from violating the Securities Act pursuant to A.R.S. § 44-2032;

2.      Order Respondent to take affirmative action to correct the conditions resulting from Respondent's acts, practices, or transactions, including a requirement to make restitution pursuant to A.R.S. § 44-2032;

3.      Order Respondent to pay the state of Arizona administrative penalties of up to $5,000 for each violation of the Securities Act, pursuant to A.R.S. § 44-2036;

4.      Order that the marital community of Respondent and Respondent Spouse be subject to any order of restitution, rescission, administrative penalties, or other appropriate affirmative action pursuant to A.R.S. § 25-215; and

5.      Order any other relief that the Commission deems appropriate.

## VIII.

## HEARING OPPORTUNITY

Respondent and Respondent Spouse may request a hearing pursuant to A.R.S. § 44-1972 and A.A.C. R14-4-306. **If Respondent or Respondent Spouse requests a hearing, the requesting respondent must also answer this Notice.** A request for hearing must be in writing and received by the Commission within 10 business days after service of this Notice of Opportunity for Hearing. The requesting respondent must deliver or mail the request to Docket Control, Arizona Corporation Commission, 1200 W. Washington, Phoenix, Arizona 85007. Filing instructions may be obtained from Docket Control by calling (602) 542-3477 or on the Commission's website at http://www.azcc.gov/divisions/hearings/docket.asp.

If a request for a hearing is timely made, the Commission shall schedule the hearing to begin 20 to 60 days from the receipt of the request unless otherwise provided by law, stipulated by the parties, or

9

Docket No. S-21042A-18-0059

1  ordered by the Commission. If a request for a hearing is not timely made the Commission may, without

2  a hearing, enter an order granting the relief requested by the Division in this Notice of Opportunity for

3  Hearing.

4      Persons with a disability may request a reasonable accommodation such as a sign language

5  interpreter, as well as request this document in an alternative format, by contacting Kacie Cannon,

6  ADA Coordinator, voice phone number (602) 542-3931, e-mail kcannon@azcc.gov. Requests should

7  be made as early as possible to allow time to arrange the accommodation. Additional information

8  about    the    administrative    action    procedure    may    be    found    at

9  http://www.azcc.gov/divisions/securities/enforcement/AdministrativeProcedure.asp

## IX.

## ANSWER REQUIREMENT

12      Pursuant to A.A.C. R14-4-305, if Respondent or Respondent Spouse requests a hearing, the

13  requesting respondent must deliver or mail an Answer to this Notice of Opportunity for Hearing to

14  Docket Control, Arizona Corporation Commission, 1200 W. Washington, Phoenix, Arizona 85007,

15  within 30 calendar days after the date of service of this Notice. Filing instructions may be obtained

16  from Docket Control by calling (602) 542-3477 or on the Commission's website at

17  http://www.azcc.gov/divisions/hearings/docket.asp.

18      Additionally, Respondent or Respondent Spouse must serve the answer upon the Division.

19  Pursuant to A.A.C. R14-4-303, service upon the Division may be made by mailing or by hand-

20  delivering a copy of the Answer to the Division at 1300 West Washington, 3rd Floor, Phoenix,

21  Arizona, 85007, addressed to Ryan Millecam.

22      The answer shall contain an admission or denial of each allegation in this Notice and the

23  original signature of the answering respondent or respondent's attorney. A statement of a lack of

24  sufficient knowledge or information shall be considered a denial of an allegation. An allegation not

25  denied shall be considered admitted.

26

10

Docket No. S-21042A-18-0059

1       When the answering respondent intends in good faith to deny only a part or a qualification of

2  an allegation, the respondent shall specify that part or qualification of the allegation and shall admit

3  the remainder. Respondent waives any affirmative defense not raised in the Answer.

4       The officer presiding over the hearing may grant relief from the requirement to file an Answer

5  for good cause shown.

6       Dated this 12th day of March, 2018.

7

8                                    Matthew J. Neubert

9                                    Director of Securities

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## Case Summary

(Exhibit C)

By way of background and factual narrative, the case at bar arises from a breach of a contract in which a group of 20 investors and two associated parties had agreed to purchase approximately 923 acres of beach land from the Plaintiff.  In 2018, the Plaintiff had locked up the purchase of a failed residential development called Seaside Mariana that had originally paid US $4 million for the same land, raw, years ago.  The Plaintiff's contract called for payments of US $500,000 total to purchase the company that owned the Seaside Mariana land, with US $25,000 to be paid after the Plaintiff had completed his due diligence, and the other US $475,000 to be paid at the closing, within 60 days of the completion of due diligence.

The Plaintiff, however, did not have the cash to make the purchase, but he also did not want the land owned by the company, valuable though it may be in the right hands.  (With the permits in place for a residential subdivision with more than 1000 residential lots on the 923 acres, and a completed subdivision, the land, in the hands of a developer with capital to put in the infrastructure for that residential subdivision, would likely appraise for over US $10,000,000 and could generate tens of millions in residential lot sales).  The Plaintiff was purchasing the company that owned the failed development for other intangible assets that it owned.  That company had and still has title insurance policies that could be monetized to the tune of US $8 million, tax-free (as the company had already lost over US $8 million due to title fraud and other issues covered by the title insurance policies).  Like most of the population, the owners of the Seaside Mariana company did not fully understand the title insurance policies that they held, nor how to monetize them.  The company also had over US $ million in liabilities, all unsecured (because it had sold a small portion of the residential lots to

**CASE SUMMARY**

people and collected US $22 million from them, but then never put in the infrastructure nor delivered fee simple title to the great majority of those 50+ people).

Lacking the $500,000 needed at the closing to purchase the company that owned the failed development, and frankly, lacking even the $25k due after his completed due diligence, the Plaintiff approached a group of investors that he knew were familiar with the land and wanted it. A group of 20 individuals (a subset of the 50+ people that had purchased within Seaside Mariana) had banded together to sue Kevin Fleming and his Seaside Mariana company, because they had paid millions of dollars to Kevin's company with promises of roads, electricity, security, septic, lights, and other infrastructure for the residential development. Those investors were also promised a Jack Nicklaus-designed golf course, a Wyndham hotel, condos, and other significant amenities, as well as title to the beach lots, residential lots on the golf course, and, in some cases, condominiums.

The promised infrastructure never materialized, and the investors, many of whom thought of retiring on that very same beach, did not get their lots. The Plaintiff had approached the leader of this group of investors, Mr. David Crowe, who had organized the investors together for the litigation. The group was informally known as the "Crowe Group", and the Plaintiff has adopted that vernacular. Another leader of the group of 20+ investors who had banded together was and is Mr. Micha Lyonette, who had loaned seven-digit amounts to Mr. Fleming and the Seaside Mariana company. Mr. Lyonette's case, his loans were secured by first mortgages on neighboring land that had be carved out for the loans, but Mr. Lyonette had also paid for lots from Seaside Mariana and not recei them.

**CASE SUMMARY**

The Plaintiff approached Mr. David Crowe and they worked out a deal, where Mr. Crowe and his group of investors would fund the US $500,000 for the Plaintiff's purchase of the Seaside Mariana company, including the US $25,000 that the Plaintiff would need to send to Kevin Fleming (the main original owner of Seaside Mariana). Those same investors had previously worked out a deal (that later fell apart) to pay $1.5 million for the same land, and the Plaintiff offered them a much better deal that they accepted, where the investors would essentially be paying US $834,000 for the same land – the US $500,000 the Plaintiff needed for the purchase, plus another US $334,000 for the Plaintiff and one of his entities. Mr. Crowe agreed to a NCND (including a non-circumvent) on behalf of the group, given that the Plaintiff had the purchase of the Seaside Mariana company and land locked up in an enforceable contract.

Mr. Crowe and Mr. Lyonette, as agents for the Litigating Group partnership, bound the twenty-two members of the partnership in contract with the Plaintiff. Mr. Rau, Mr. Jimenez, and Mr. Malcolm are some of the other Litigating Group partners that share profits and losses with Mr. Crowe, Mr. Lyonette, and others, and signed an Operating Agreement that governs their partnership (that i encapsulated in a Limited Liability Company).

That was the original contract between the Plaintiff and the Crowe Group, the group of twen investors and two associates. After the Plaintiff and the Crowe Group had completed their d diligence (in August 2018) to confirm everything about Seaside Mariana was as expected (ownersh fee simple title, no secured debt on the land), the Crowe Group provided the US $25,000 for the Plain to pass through to Mr. Fleming, as per the Plaintiff's contract with Mr. Fleming and the other own of the Seaside Mariana company (Grupo Mariana and Maria Rueda).

**CASE SUMMARY**

At that point, in August 2018, the Plaintiff signed a new contract with the Crowe Group, in which the Crowe Group committed to closing within sixty (60) days and funding the other $475,000 that the Plaintiff needed to purchase the Seaside Mariana company. Notably, as the Crowe Group had completed its due diligence, there were no contingencies for the Crowe Group to pull out for any reasons. Thus, the twenty-two members of the Crowe Group partnership were committed to funding the US $475,000 for the Plaintiff to purchase the Seaside Mariana company, and then after the Plaintiff transferred the land to the Crowe Group (intended for immediately after closing in a "simultaneous close"), then US $334,000 more to the Plaintiff and his entity in quarterly payments during 2019 and part of 2020. (The contract was included in the original legal complaint filing).

Everything was progressing smoothly towards the close, with the parties agreeing on various details, hiring attorneys, and setting a close date in mid-October 2018. However, just a couple days before the close, just before the Plaintiff was going to fly in for the closing, David Crowe informed the Plaintiff, on behalf of the Crowe Group, that they were pulling out of the deal and would not fund o close. Later, in mid-March 2019, despite the contractual agreement with the Plaintiff, and despite th non-circumvent agreed to, one of the members of the Crowe Group contacted Kevin Fleming and tri to purchase (on behalf of the group) the Seaside Mariana land directly, as a further repudiation of t contract with the Plaintiff.

In May 2020, the Plaintiff sued the twenty-two members of the Crowe Group partnership Maricopa County (as the original contract had a forum selection clause of Phoenix, Arizona), various causes of action including breach of contract. The Plaintiff served all of the Crowe G members that he could track down, and ten (10) of them that had been served and/or appeared fi Notice of Removal to United States District Court in the District of Arizona. The Plaintiff then s

**CASE SUMMARY**

1    with a few of the Defendants. Because the final August 2018 contract had a forum selection clause of

2    San Francisco, California, the remaining Defendants requested a change of venue to this Court.

3    The Plaintiff considered his monetization of the title insurance policies a trade secret. At least

4    seven of the Crowe Group defendants – the ones who were most committed to funding the Plaintiff's

5    purchase within the greater group – signed Non-Disclosure Agreements with the Plaintiff, in which

6    they agreed not to disclose any aspects of the Plaintiff's contract and plans to third parties, and also

7    agreed that a breach could cause over US $10 million of base damages.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                                    **CASE SUMMARY**

EXHIBIT D

This Settlement Agreement dated as of August 11th, 2018, is entered into by and among:

**"THE SETTLER"**

Carl (aka Kalle) Wescott

And

**"THE LITIGATORS"**

## RECITALS

Between the undersigned, to wit: On one hand, Kalle Wescott (hereafter called the "Settler") and on the other hand, David Crowe and Mike Lyonette (hereafter called "The Litigators"). Mike Lyonette ("the Mortgage Holder") previously provided loans to Seaside Mariana, and has a mortgage (hipoteca) on a subset of the Seaside Mariana land. The Litigators are part of the Litigating Group, which is a group of persons, represented by Federico A. Gurdián Sacasa (attorney-at-law), who bought or invested in lots, condominiums and bungalows at Seaside Mariana (hereafter called the "*Litigating Group*") that have a Nicaraguan lawsuit together have agreed to execute a legally-binding Settlement Agreement, (hereafter called the "Agreement").

**WHEREAS,** the Settler is currently purchasing 100% of the shares of Seaside Mariana Spa & Golf Resort S.A. (hereafter "SM" or "Seaside Mariana"), which is all ten thousand (10,000) shares, (hereafter called the "Stock"),

**WHEREAS,** the Parties (the Litigators and the Settler) wish to settle all claims of the Litigating Group and have agreed-upon terms to do so;

**WHEREAS,** the Parties (the Litigators and the Settler) hereby define three terms: "SM Closing" shall be when the Settler owns SM and has all the endorsed shares. "Land Closing" shall be when the Settler has transferred the SM land and the Horizontal Property Regime that is the major asset of the settlement to the Litigating Group or to the entity of their choice. "Full Settlement Closing" shall be when this Settlement is fully effectuated, including all items in Article I, sections 4 through 7 having been paid and transferred.

**NOW, THEREFORE,** in consideration of the mutual covenants and promises made by the Parties hereto, covenant and agree as follows:

### Article I

1. When the Litigators have completed basic due diligence, the Litigators shall pay a non-refundable deposit of **Twenty-Five Thousand United States Dollars 00/100 (USD $25,000.00)** to a party designated by the Settler. This must occur by August 13th, 2018 or else this contract unwinds, with parties still respecting signed NDA agreements.

2. In the next 30 days, the Settler will sign a new agreement with the Litigating Group (as opposed to the Litigators), which will bind members of the group, which will further clarify the power of attorney(s) that Settler shall be providing, breaches of contract, that Settler does not personally owe monies owed to the Mortgage Holder and remedies and/or damages for the breaches.



3.  The Parties shall have up to 60 days from now to close the settlement – through October 10th, 2018.

4.  The high level terms of the settlement are that the Litigating Group will be providing US $834,000 in 4 tranches to the Settler, as further detailed below, while the Settler will be transferring to the Litigating Group almost all assets owned by Seaside Mariana, including all unencumbered lands, operating assets (including all tangible and almost all intangible assets), domains, web content, equipment, leases, contract rights, intellectual property rights used in the business of Seaside Mariana, together with all documents and entities relating to the HOA.  Once all monies and land (along with the assets identified in Article I, section 6) have properly changed hands, the Parties shall indemnify each other by mutual agreement.

5.  One of two exceptions to the transfers that are occurring as set out in Article I, section 4, is that Seaside Mariana will retain insurance policies and any other intangible asset that is either not transferrable, or for the benefit of SM only, or both.

6.  The second of two exceptions concerns customer and mailing lists and mailing campaigns.  The Settler shall be transferring to the Litigating Group all customer and prospect mailing lists (including all contact information) and mailing campaigns, both digital and analog (email, web, and snailmail).  However, the parties shall co-own these assets.  Settler shall assign his part of the co-ownership to a Sociedad Anonima after the close.

7.  The $834,000 consists of four parts: (1) the $25,000 by August 10th, 2018; (2) $475,000 within 60 days of the first tranche, to be transferred to the named party of Settler's choice only after SM Closing, with Settler having full ownership of, and authority over, Seaside Mariana; (3) $234,000 as follows, to the Settler: $56,000 at the Land Closing when Litigating Group receive all their expected land as settlement, and 20% of SM land sales achieved by Litigating Group until fully paid, with a minimum of $12,000 per quarter (3 months), paid within a week or so of the end of each quarter, with the first payment beginning at the end of the second quarter after SM Closing, and then a quarterly payment every 3 months from that point onwards until the $234,000 has been paid in full and (4) then, another $100,000 to an entity of the Settler to be formed later.  After the $234,000 to Settler has been paid, the Litigating Group shall continue to pay under the same quarterly program (20% of sales, but a minimum of $12,000 per quarter) to the entity until the $100,000 is fully paid.

8.  These (Article I, sections 4 through 7) are the only sums and items owed to each other, and when fully transferred and paid the parties shall fully release liability to each other with regard to Seaside Mariana.

9.  SM has not filed taxes since 2011, and thus Settler will work with the current owner to get all taxes filed and current through the tax year that ends June 2018.  This is a necessity prior to any closing including SM Closing.

10.  The Settler has bound the sellers of SM in a contract that ensures that Settler and the Litigating Group will get everything they need by or at closing, including the filed taxes.  The Litigators have approved the language of this Closing Contract.

11.  The Settler shall pay the costs related to the SM stock transfer.  The Litigating Group shall pay the costs of the land transfer including what's necessary on property taxes to do the transfers.  The parties shall pay their own attorneys.

12. The one sub-parcel that will not go to the Litigating Group is the parcel with a mortgage provided by one of the Litigating Group (the "Mortgage Holder"), also represented by Federico A. Gurdián Sacasa (attorney-at-law), unless it is most efficient to transfer it in bulk with the other land for the Litigating Group and then to the Mortgage Holder. At or just after the SM Closing, Settler shall work with the Mortgage Holder to transfer that land to the Mortgage Holder at the Mortgage Holder's expense.

13. Both Parties have entered this deal in good faith and with a lot of trust, but the Parties have offered each other mechanisms such that they do not have to rely solely on trust at each step. The Parties will work out the final details of each such step to their mutual satisfaction at each step. For example, because the $475,000 needs to go in to escrow prior to land transfer, the Settler has offered and will continue to offer any mechanism the Litigating Group desire to ensure that they will get the land, including issue by Settler of an irrevocable power of attorney to a Nicaragua attorney of the Litigating Group' choice. For the payments that will come with sales or paid each quarter, Settler does not necessarily require a mortgage on SM, and is open to Personally Guaranteed Promissory Notes.

14. Settler will continue to provide all due diligence information requested by Litigating Group, and can provide a complete package of written documents at or just after the close.

15. Confidentiality is extremely important to complete this settlement, including the purchase aspect. The Settler has already executed NDAs (Non-Disclosure Agreements) with the Litigators. The Litigators plan to solicit funding from several more members of the group of Litigating Group. The Litigators shall ensure that those several members, as well as Federico A. Gurdián Sacasa, all sign NDAs with the Settler similar to the one provided by the Settler on Saturday August 4th, 2018, prior to disclosing information related to this settlement or other confidential information. Subsequently, all confidential information and all information relating to this deal shall be shared ONLY with the Settler, the Litigators, Senor Gurdián, and the members of the Litigating Group that have signed NDAs in the past week or that shall sign NDAs shortly.

16. Settler already has digital files of the following categories and these will be provided to Litigating Group prior to closing: Legal, Financials, Sales, Vendors, Marketing, Engineering and Design, Permits, Employees, HOA documentation and entities, Communication, Maps, Cash Liabilities, Contractual Liabilities, Pictures and Digital Collateral. Settler shall transfer all of these to the Litigating Group prior to SM Closing.

17. Ownership of the land: Except for the registered mortgage lien held by Mortgage Holder on the lots identified, Settler represents and warrants (a) that Seaside Mariana Spa & Golf Resort S.A. has clear and unencumbered title[1] to all of the aforementioned lands and (b) that, once Settler's acquisition of Seaside Mariana has been finalized (aka SM Closing), Settler will be in a position to fully execute and deliver on all of the agreements and obligations set out in this Settlement Agreement. The Parties attach the most recent Libertad de Gravamen for the lands as Exhibit A. The Libertad de Gravamen shows property that is formally Registered and thus not able to be transferred to Litigating Group.

18. Liabilities of Seaside Mariana: Settler represents and warrants that, except for the liabilities to the Litigation Group members settled by this Agreement, all existing liabilities of Seaside Mariana, including Seaside Mariana's obligation to deliver 10 Beach Front lots to a previous shareholder of Seaside Mariana, remain with the Seaside Mariana entities owned by Settler and shall not pass to Claimants or to the Litigation Group. Settler shall indemnify the Litigation Group and its members against any such claims that may arise from these obligations.

19. Settler shall ensure

    (1) that the current beneficial owners of Seaside Mariana (Kevin Fleming and Maria Rueda) disclose to the buyer of the shares (i.e. the Settler) any and all transactions that have been made, specially land transactions made, and that are pending registration in public record, and the Settler shall ensure that this information is passed on to the Litigating Group in its entirety; and 

    (2) that the current owners of Seaside Mariana are prohibited from taking any further action relating to these transactions and pending transactions on behalf of any of the Seaside Mariana entities and that all Powers of Attorney issued by the current owners of Seaside Mariana are revoked with effect immediately upon SM Closing.

## Article II

1. <u>Notices</u>. All notices, demands and payments required or permitted to be given hereunder shall be in writing and may be delivered personally, by e-mail to the addresses of the Parties as set out and agreed separately between the parties. Any notice personally delivered or sent by e-mail shall be deemed to have been given and received at the time of delivery, unless otherwise proven. All Parties shall be entitled to designate new contact information by giving notice thereof to the other Parties in accordance with the terms hereof.

2. <u>Assignment/Successors.</u> This Agreement shall be binding upon all successor, assigns, heirs, agents and representatives of each of the Parties.

3. <u>Governing Law.</u> This Agreement shall be governed by and construed in accordance with the laws of San Francisco, California in the United States of America, and thus that shall be the jurisdiction and venue for this contract. (Spanish documents, which will follow Nicaraguan law, will be utilized to effectuate the land transfer).

---

[1] "clear and unencumbered" from a mortgage standpoint, in other words, there is no mortgage debt on the lands. Property taxes are owed, and there are various liens on the lands as per the most recent Libertad de Gravamen, dated April 2018, which is an Exhibit to this contract.

Page 4 of 6

4. <u>Entire Agreement.</u> This Agreement may not be amended or modified, and no provisions hereof may be waived, without the written consent of the Parties.

5. <u>Severability.</u> If any provision of this Agreement shall be declared void or unenforceable by any judicial or administrative authority, the validity of any other provision and of the entire Agreement shall not be affected thereby.

6. <u>Titles and Subtitles.</u> The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting any term or provision of this Agreement.

7. <u>Execution.</u> This Agreement may be executed in counterparts and all of such counterparts taken together shall be deemed to constitute one and the same Agreement. The Parties may execute this Agreement via facsimile transmission or electronic communication and such execution and delivery shall be full, binding and proper execution and delivery without the need for the exchange of originally executed copies of this Agreement between the Parties.



8. The parties agree they are sophisticated in business matters and have access to counsel. They also have collaborated on the drafting and editing of this contract. Accordingly this contract will not be construed in favor or against either party including the original drafter.

[Signature page follows]

IN WITNESS WHEREOF, the Parties hereby state that they are fully empowered to act and agree to the obligations contained in this Agreement and that consequently, each one accepts each and every clause contained herein in the terms and under the conditions hereby stated.

IN WITNESS WHEREOF **CARL (KALLE) WESCOTT** has executed this Agreement on this (Day) 11 of August 2018 in the city of San Francisco, California; United States of America.

**PRINT NAME(S):**

_Carl (Kalle) Wescott_                _CKWescott_

(Settler Print Name)                  (Settler Signature)

IN WITNESS WHEREOF David Crowe has executed this Agreement on this (Day) 11 of August 2018.

_____            _____

(Print Name)                          (Signature)

IN WITNESS WHEREOF Mike Lyonette has executed this Agreement on this (Day) 11 of August 2018.

_____            _____

(Mortgage Holder Print Name)          (Mortgage Holder Print Name)

**Exhibit:**

The following exhibit is an integral part of this Settlement Agreement

A.    Most recent Libertad de Gravamen



EXHIBIT A

SERIE "P"

DIEZ CORDOBAS

SEÑOR (A) REGISTRADOR (A) PUBLICO DE LA PROPIEDAD INMUEBLE Y MERCANTIL

DE LA CIUDAD DE MANAGUA, YO, JAIRO JOSE MALTEZ MEGAL, MAYOR DE EDAD,

ABOGADO Y NOTARIO PUBLICO, DE ESTE DOMICILIO, Y PORTADOR DEL CARNE DE

IDENTIDAD DE LA CORTE SUPREMA DE JUSTICIA NUMERO 11516, LE SOLICITO A USTED ME CERTIFIQUE LIBERTAD

DE GRAVAMEN DE PROPIEDAD HORIZONTAL DE LA FINCA NUMERO CUATRO MIL DOSCIENTOS CINCUENTA Y UNO

(4251) PH, TOMO NUMERO CUARENTA Y SIETE PLECA CUARENTA Y NUEVE (47/49) PH FOLIOS NUMERO TREINTA Y

UNO PLECA TRESCIENTOS GUION UNO PLECA SESENTA Y SEIS (31/300) Y (1/66) ASIENTO PRIMERO (1) DE LA

COLUMNA DE INSCRIPCIONES DE LA SECCION DE DERECHOS REALES.

Managua, viernes 21 de julio del 2017

Abogado y Notario Publico

Carné No 11516

LA SUSCRITA REGISTRADORA AUXILIAR DEL DEPARTAMENTO DE MANAGUA CERTIFICA: Que

la finca inscrita bajo el No. 4251-PH; Tomo 47-PH; Folios 31 al 300; Tomo 49-PH; Folios 1 al 66;

Tomo 136-PH, Folios 91 al 104, Asiento 1 y 2. Columna de Inscripciones, sección de Derechos

Reales, Libro de Propiedades Horizontales, de este Registro Publico. Pertenece el resto a: Seaside

Marina Spa & Golf Resort Sociedad Anónima. Y tiene hipoteca a favor de Michael Francis

Lyonette, tan solo por lo que hace a los Módulos Nos. 18, 19, 29, 30, 31, por las siguientes sumas: (1)

Trescientos sesenta y tres mil ochocientos cincuenta y dos dolares equivalente a siete millones

ochocientos noventa y cinco mil     quinientos ochenta y ocho córdobas con cuarenta centavos de

córdobas; (2), Cuatrocientos tres mil seiscientos noventa y tres dolares equivalente a ocho millones

setecientos sesenta mil ciento treinta y ocho córdobas con diez centavos de córdobas,  para un monto

total de Dieciséis millones seiscientos cincuenta y cinco mil setecientos veintiséis córdobas equivalente a

setecientos sesenta y siete mil quinientos cuarenta y cinco dolares, posteriormente se amplia dicho

crédito hasta la suma de veintiséis millones setecientos ochenta y nueve mil seiscientos setenta y tres

córdobas con treintiun centavos equivalente a un millón ciento cuarenta y un mil trescientos cuarenta

seis dolares. En asientos 1 y 2 ***** También tiene inscritas Provisionalmente venta de los

siguientes lotes indivisos: 1) A favor de Thomas Edward Austin, identificado como lote GB, con un área de mil trescientos veinticuatro punto novecientos cinco metros cuadrados; 2) A favor de Trevin Martín Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto novecientos sesenta y dos metros cuadrados; 3) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GQ, con un área de novecientos cincuenta y uno punto ciento veinticuatro metros cuadrados; 4) A favor de Judith Gail Madgett y Robert Daniel Madgett, identificado como lote GBU, con un área de ochocientos cincuenta y siete punto seiscientos ochenta y uno metros cuadrados, inscrito el 22-05-2012, pero se encuentra pendiente la firma del registrador; 5) A favor de Thomas Edward Austin, identificado como lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro metros cuadrados; 6) A favor de Thomas Edward Austin, identificado como lote OVL, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados; 7) A favor de Thomas Edward Austin, identificado como lote RM, con un área de un mil setecientos ochenta y ocho punto cero noventa y cuatro metros cuadrados; 8) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros cuadrados; 9) A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 10) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados; 11) A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, inscrita el 22-05-2012, pero se encuentra pendiente de firma del registrador; 12) A favor de Thomas Edward Austin, identificado como lote GAL, con un área de ochocientos veintiún punto setecientos veinticinco metros cuadrados; 13) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVA, con un área de un mil ochocientos sesenta y seis punto setecientos setenta y tres metros cuadrados; 14) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos cincuenta y nueve metros cuadrados; 15) A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; 16) A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GST, con un área de un mil trescientos treinta y ocho punto cuatrocientos trece metros cuadrados; 17) A favor de Anthony David Bowman y Carol Anne Bowman, identificado como lote GCR, con un área de un mil

ciento diecisiete punto quinientos setenta y tres metros cuadrados, inscrita el 22-05-2012, pero se encuentra pendiente de la firma del Registrador; **18)** A favor de Anthony David Bowman y Carol Anne Bowman, identificado como lote GCR, con un área un mil ciento diecisiete punto quinientos setenta y tres metros cuadrados; **19)** A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote BT, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, **20)** A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GBV, con un área de ochocientos cincuenta y siete punto seiscientos ochenta y un metros cuadrados; **21)** A favor de Thomas Edward Austin, identificado como Lote GM, con un área de un mil ochenta y ocho punto trescientos treinta y cuatro metros cuadrados; **22)** A favor de Thomas Edward Austin, identificado como lote OVL, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados, **23)** A favor de Robert Daniel Madgett y Judith Gail Madgett, identificado como lote GQ, con un área de novecientos cincuenta y uno punto ciento veinticuatro metros cuadrados; **24)** A favor de Thomas Edward Austin, identificado como lote GB, con un área de un mil trescientos veinticuatro punto novecientos cinco metros cuadrados; **25)** A favor de Trevin Martin Chow, identificado como lote GBB, con un área de un mil cuatrocientos treinta y tres punto novecientos sesenta y dos metros cuadrados; **26)** A favor de Thomas Edward Austin, identificado como lote RM, con un área un mil setecientos ochenta y ocho punto cero noventa y cuatro metros cuadrados; **27)** A favor de Thomas Edward Austin, identificado como lote BY, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados; **28)** A favor de Thomas Edward Austin, identificado como lote GAL, con un área de ochocientos veintiuno punto setecientos veinticinco metros cuadrados; **29)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVA, con un área de un mil ochocientos sesenta y seis punto seiscientos setenta y tres metros cuadrados; **30)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote OVF, con un área de un mil trescientos noventa y dos punto novecientos cincuenta y nueve metros cuadrados; **31)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BF, con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, **32)** A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados; **33)** A favor de Zachary Taylor Collings y Taylor Collings, identificado como lote BD, con un área de un mil ochocientos setenta y cuatro punto doscientos catorce metros cuadrados; **34)** A favor de James Phillips Clayton y Julie Melinda Clayton, identificado como lote GST, con un área de un mil trescientos treinta y ocho punto cuatrocientos trece

metros cuadrados; 35) Tiene inscrito provisionalmente Dacion en pago a favor Desarrollos Inmobiliarios Tejas, Sociedad Anónima sobre los siguientes lotes indivisos: 1) Lote N° 20, con un área de diecinueve mil doscientos setenta y cinco punto novecientos veintitrés metros cuadrados; 2) Lote N° 28, con un área de ciento noventa y dos mil novecientos sesenta y cuatro punto ciento ochenta y cinco metros cuadrados; 3) Lote N° 21, con un área de treinta y nueve mil quinientos ochenta punto cero noventa y seis metros cuadrados; 4) Lote N° 22 , con un área de nueve mil cincuenta y seis punto seiscientos setenta y nueve metros cuadrados; 5) Lote N° 23, con un área de cuatro mil setecientos sesenta y uno punto doscientos cuarenta y tres metros cuadrados; 6) Lote N° 25, con un área de sesenta y un mil quinientos treinta punto setecientos setenta y cinco metros cuadrados, inscrita con fecha veinte de junio del año dos mil trece, pero se encuentra pendiente la firma y sello del registrador. 36) Tiene anotada demanda en la vía ordinaria con acción de pago de daños y perjuicios, a solicitud de Edward Albert Cole por la suma de cuarenta y ocho millones ochocientos treinta y tres mil setenta y nueve córdobas con catorce centavos equivalente a dos millones setenta y tres mil diez dólares con cincuenta centavos. 37) Tiene anotada Dacion en Pago a favor de los señores: Edward Albert Cole, los siguientes lotes. 1) Lote GSA, con un área de: un mil ciento treinta y siete punto setecientos noventa y tres metros cuadrados, 2) Lote GSB, con un área de: un mil ochenta y siete punto diecisiete metros cuadrados, 3) Lote GSC, con un área de: un mil ciento cincuenta y seis punto ochocientos un metros cuadrados, 4) Lote GSD, con un área de: un mil ciento setenta y siete punto doscientos noventa y seis metros cuadrados, 5) Lote GSE, con un área de un mil ciento cincuenta y tres punto seiscientos diez metros cuadrados, 6) Lote GSF, con un área de un mil ciento veinticinco punto setecientos cinco metros cuadrados, 7) Lote GSG, con un área de un mil noventa y siete punto ochocientos metros cuadrados, 8) Lote GSH, con un área de un mil setenta y uno punto trescientos setenta y tres metros cuadrados, 9) Lote GSI, con un área de un mil ciento cuarenta y un punto noventa y tres metros cuadrados, 10) Lote GSI, con un área de un mil trescientos setenta y dos punto cero cero seis metros cuadrados, 11) lote GSK, con área de un mil ochocientos treinta y uno punto cuatrocientos cincuenta y uno metros cuadrados, 12) Lote GSL, con un área de un mil ochocientos veintidós punto novecientos setenta y ocho metros cuadrados, 13) Lote GSM, con un área de un mil trescientos sesenta y ocho punto novecientos treinta y uno metros cuadrados, 14) Lote GSN, con un área de un mil ciento diez punto novecientos cincuenta y ocho metros cuadrados, 15) Lote GSO, con un área de un mil ciento cuarenta y nueve punto cuatrocientos cinco metros cuadrados, 16) Lote GSP, con un área de un mil doscientos cincuenta y nueve punto setecientos noventa y cinco

metros cuadrados; 17) Lote GSU, con un área de un mil trescientos once punto quinientos veinticuatro metros cuadrados, 18) Lote GSV, con un área de un mil trescientos veintiséis punto sesenta y seis metros cuadrados, 19) Lote SSW, con un área de un mil trescientos setenta punto quinientos dieciocho metros cuadrados, 20) Lote GSX, con un área de un mil cuatrocientos cuarenta y uno punto cuatrocientos seis metros cuadrados, 21) Lote GSY, con un área de un mil seiscientos noventa y dos punto ciento cincuenta y uno metros cuadrados, 22) Lote GS2, con un área de un mil novecientos sesenta y cinco punto cuatrocientos dieciocho metros cuadrados, 23) Lote GSAA, con un área de dos mil doscientos veintisiete punto setecientos cincuenta y cinco metros cuadrados, 24) Lote GSAB, con un área de dos mil quinientos dieciocho punto doscientos noventa y uno metros cuadrados, 25) Lote GSAC, con un área de cuatro mil doscientos treinta punto trescientos cincuenta y dos metros cuadrados, 26) Lote GSDA, con un área de cuatro mil cuatrocientos treinta y seis punto ciento treinta y un metros cuadrados, 27) Lote GSAE, con un área de tres mil novecientos setenta y cuatro punto novecientos veinticinco metros cuadrados, 28) Lote GSAF, con un área de cuatro mil ciento cuarenta punto ciento cuarenta y dos metros cuadrados, 29) Lote GSAG, con un área de cuatro mil seiscientos cuarenta y dos punto trescientos sesenta y cinco metros cuadrados, 30) Lote GCA, con un área de tres mil sesenta y ocho punto ciento doce metros cuadrados, 31) Lote GCB, con un área de tres mil novecientos cincuenta y nueve punto doscientos ochenta y tres metros cuadrados, 32) Lote GCC, con un área de cuatro mil seiscientos veintiséis punto setecientos veinte metros cuadrados, 33) Lote GCD, con un área de cuatro mil doscientos veintiún punto seiscientos treinta y dos metros cuadrados, 34) Lote GCS, con un área de tres mil setecientos veintiséis punto seiscientos cincuenta y cinco metros cuadrados, 35) Lote GCF, con un área de tres mil ciento cincuenta y seis punto doscientos cuarenta y tres metros cuadrados, 36) Lote GCG, con un área de dos mil seiscientos ochenta y cuatro punto setecientos cuarenta y siete metros cuadrados, 37) Lote GCH, con un área de dos mil cuatrocientos noventa y nueve punto quinientos treinta metros cuadrados, 38) Lote GCI, con un área de dos mil seiscientos treinta y siete punto trescientos ochenta metros cuadrados, 39) Lote GCI, con un área de dos mil quinientos noventa y dos punto novecientos veinte metros cuadrados, 40) Lote GCK, con un área de dos mil cuatrocientos dieciséis punto ochocientos cuarenta y dos metros cuadrados, 41) Lote GCL, con un área de dos mil seiscientos cincuenta y dos punto cuatrocientos setenta y cuatro metros cuadrados, 42) Lote GCM, con un área de dos mil cuatrocientos treinta y seis punto novecientos veinte metros cuadrados, 43) Lote GCN, con un área de dos mil nueve punto quinientos setenta y uno metros cuadrados, 44) Lote No.27, con un área de

doscientos cuarenta y dos mil ochocientos setenta y cinco punto seiscientos ochenta y seis metros cuadrados, 45) Lote No.24, con un área de doce mil ochocientos cuarenta y dos punto doscientos veintiuno metros cuadrados, 46) Lote No. 26, con un área de cincuenta y siete mil seiscientos diecinueve punto seiscientos sesenta y ocho metros cuadrados, *** 38) **Promesa de venta**, a favor de PKR Holding, Sociedad Anonima, sobre los siguientes lotes, a) lote OVK, con un área de un mil trescientos noventa y dos punto novecientos ochenta y un metros cuadrados, b) lote GAY, con un área de un mil cuatrocientos treinta punto setecientos treinta y siete metros cuadrados, c) lote GAX, con u na rea de un mil cuatrocientos veintinueve punto seiscientos sesenta y tres metros cuadrados, por la suma de tres millones seiscientos treinta y un mil seiscientos ochenta y cinco córdobas con sesenta centavos de córdobas. *** 39) **promesa de venta**, a favor de Advantage Ventures LLC, un lote con un área de un mil trescientos noventa y tres punto cuatrocientos setenta y un metros cuadrados, por la suma de dos millones ochocientos noventa y nueve mil setecientos dos córdobas con treinta y cinco centavos, equivalente a ciento nueve mil quinientos dolares,*** 40) **Promesa de venta** a favor de Paul Brian Ciceri, un lote de terreno identificado como GAV, con un área de un mil cuatrocientos siete punto ochocientos setenta y ocho metros cuadrados, por la suma de setecientos ochenta y dos mil treinta y cuatro córdobas equivalente a veintinueve mil trescientos ochenta y dos dolares, *** 41) **Demanda**, ordinaria con acción de resolución de contrato, para que por sentencia firme y declare, lo siguiente: a) que se deje sin efecto el contrato de oferta de compra sobre el lote OVGG, b) que se deje sin efecto el contrato de oferta de compra sobre el lote NGJ, c) devolución de precio mas intereses, d) pago de los costos daños y perjuicios ocasionados por el incumplimiento, *** 42) **Demanda** en la via ordinaria con acción de resolución de contrato por incumplimiento para que por sentencia se declare lo siguiente: a) disuelto el contrato de promesa de venta , b) devolución de precio mas intereses, c) pago de los costos daños y perjuicios ocasionados por el incumplimiento. ***43) **Demanda** ordinaria con acción de resolución de contrato por incumplimineto, promovida por Darrell Lee y Bushnell y Amy Bushnell, *** 44) **Demanda** ordinaria con acción de resolución de contrato en consecuencia de conformidad al articulo 1061 y 1083 Pr. Declareseles rebeldes para todos los efectos de la presente demanda. **En asientos 1 al 42, 41 y 43** A solicitud de parte interesada extiendo el presente certificacion en la ciudad de Managua a **veintisiete** dia del mes de Julio del dos mil diecisiete.



**EXHIBIT E**

From: thomaspmadden@gmail.com
Subject: Fwd: lawsuit settlement
Date: March 17, 2019 at 1:32:52 AM PDT
To: editorial@keviniflfeming.com

Subject: lawsuit settlement

This is a compilation of much thought and possibly the only solution Kevin that I have gathered in hours of discussion w those in a position financially to conclude a very complicated situation-here goes ...

To defeat Cole's attempt to seize all the remaining SM lands from SM/Fleming, we think a settlement of the Lyonette claims and our LG claims could be made on the following terms. This settlement would take legal precedence over Cole's lawsuit annotation on the Public Registry. So, we would receive certain SM lands consisting of : 1) all remaining unregistered oceanfront land extending to a distance of 1,000 feet inland parallel to the SM oceanfront boundary line. 2) all remaining unregistered land laying within a line parallel to, and at a distance of 1,000 feet, from the North boundary line, with one end of such line beginning at the public road, and ending 1,000 feet from the oceanfront boundary line. The settlement parcel(s) must include the water well site.
Together with receiving this land and us tendering a payment of $ 250,000 cash to SM, we would agree to settle all our legal claims against SM and Flemings, and we would remove all related encumbrances from the Public Registry.

In addition, we would agree to buy all SM lands remaining in Managua province after the above settlement, and after the Cole lawsuit annotation has been removed from the Public Registry. For this land we would pay 150,000 cash to SM.

Lastly, we would agree to fund the purchase of all SM stock shares by a 3rd party not part of the present litigation between SM and the Crowe/Lyonette groups for the sum of 100,000 upon the settlement of all legal claims and enforcement actions which may be in place against SM by the various Nicaragua government agencies, to include filing of all overdue tax reports.

Adding ...

It may be that Carl Wescott is still interested in buying the stock shares, even though Fleming informed him that he has terminated their Stock Purchase Agreement.
I understand  Wescott disputes the validity of Flemings termination effort.

With that Kevin -I'll be available to discuss w you by tomorrow ... this could move quickly -

Thomas

1  CARL A. WESCOTT
   8210 E. VIA DE LA ESCUELA
2  SCOTTSDALE AZ 85258
   *in propria persona*
3  CARLWSOJ@GMAIL.COM
   +1 936 937 2688
4

5           UNITED STATES DISTRICT COURT

6          NORTHERN DISTRICT OF CALIFORNIA

7                                    Civil Action No. 3:20-cv-06456-JD
8  CARL A. WESCOTT,
                                     EXHIBIT F:
9              Plaintiff,
                                     SWORN AFFIDAVIT OF
10       vs.                         CARL WESCOTT

11 DAVID CROWE;
12 MIKE LYONETTE;
   JEFF RAU;
13 BRAD MALCOLM;
   MICHAEL JIMENEZ,
14
15             Defendants

16

17      I, Carl Wescott, hereby swear under penalty of perjury of the laws of California and of the

18 United States of America, that the following facts are true, to the best of my memory, recollection,

19 and belief:

20

21 1. I am 54 years old, and a resident of Scottsdale, Arizona.

22 2. I am competent to testify. Were I to be called to testify in this matter, my testimony would be as

23 follows, and until that point, my written testimony is as such:

24    a. First, I hereby verify all of the facts in my original (state court) legal complaint as being

25       true.

26          SWORN AFFIDAVIT OF CARL WESCOTT

1

b.  I further verify all of the facts in my Case Summary (Exhibit C) as being true.

c.  I further verify that the other exhibits I have attached are true and correct copies of the actual emails (Exhibit E) or documents (Exhibit A and Exhibit B)

d.  In the case of the attached contract (Exhibit D), I hereby verify it as the authentic contract, but I attached one only executed by me.  Mr. Crowe and Mr. Lyonette also executed this contract, as will be further verified by my and their copies of the fully-executed contract in discovery.

## BACKGROUND NARRATIVE INCLUDING THE PARTIES' CONTRACT

3.  I was an experienced international real estate developer focusing on residential developments in Latin America.

4.  I was reasonably successful until the global meltdown and credit crunch of 9/2008.  With the global impact of said credit crunch and the leverage I had applied to my real estate holdings, I eventually succumbed to those forces and declared chapter 7 bankruptcy in early 2012.

5.  Post-bankruptcy, I searched for distressed real estate assets that I could acquire and turn around.  I was familiar with Seaside Mariana ("SM"), an ambitious development on approximately 1000 acres on the Montelimar coast west of Managua, Nicaragua.

6.  Seaside Mariana had at one point featured a Jack Nicklaus designed golf course and a Wyndham hotel in its plans before the wheels fell off Seaside Mariana as well due to the same global pressures.

7.  SM was an attractive investment and development opportunity for the original developer, Kevin Fleming, for at least the following reasons:

2

(i)    The real estate was prime in terms of location and amenities;

(ii)   At the time of initial investment, the market was rising faster than linearly;

(iii)  Costa Rica to the South had already surfed a 20-year wave of real estate equity appreciation, and for some product types there was an order of magnitude difference in pricing;

(iv)   Nicaragua was attractive for American retirees in particular because of its low cost of living, level of safety, accessibility (including airlift), and desirable climate.

8.  Most of those reasons were relevant more recently to me as well for my investment consideration.

9.  Further, the intangible assets associated with SM were sound and mostly in place, including plans, permits, designs, and marketing material.

10. There was one intangible asset of SM that made it particularly interesting to me.

11. The value of the project was, to a material degree, artificially depressed by more recent market conditions and bad word of mouth and internet postings concerning the lack of infrastructure put in by the original developer, leading to further relevant issues.

12. In my period of abject poverty after my chapter 7 noted above, I've entered contract to purchase SM three (3) times.  The first time I entered contract, I saw an opportunity to buy SM for a highly attractive price (US $500,000, plus some capped deferred payments), solve the issues, and complete the development, and had a backer who would provide financial support for the project.

13. Most recently, I entered into contract ("the SM Purchase Contract") to purchase SM (either the company itself or the real estate, at my option) in 2018, with an anticipated close date (after some revisions, addenda, and extensions) of October 15th, 2018.

14. My plan was to acquire the SM company.

15. Lacking in capital, I entered discussions with several investors to back the purchase.

16. More recently, in August 2018, I entered into a contract with investors, who were familiar with the relevant properties who agreed to fund 100% of the costs of the purchase in exchange for certain land owned by the SM company.

17. That contract shall be referred to as the "Funding Contract", and is attached hereto as Exhibit D.

18. To dispel any confusion over identities in the contract, I, Carl Wescott, am sometimes referred to by my Finnish name "Kalle", or the combination Carl "Kalle" Wescott. (My mother is from Finland; Finnish was my first language; I strongly identify with my Finnish family and Finnish roots).

19. To further dispel any potential confusion over the language of the funding contract or its meaning, the investors who were parties to the Funding Contract had filed litigation against Seaside Mariana, the company that I was purchasing.

20. Therefore, the group of twenty-two investors (the same set of people who were the initial twenty-two (22) Defendants in Maricopa County Superior Court case CV2020-006232) who were the parties to that litigation are referred to as the "Litigating Group."

21. I did not want ongoing litigation against the company I was purchasing, and I had worked out a deal with the Litigating Group, and thus the thought was that I (aka "the Settler" in the Funding Contract) would immediately settle with the Litigating Group upon closing the purchase of the

1    Seaside Mariana company, by transferring all its land to them. They, in turn, had already agreed

2    to fund all US $500,000 that I (the "Settler") needed to purchase the SM company, plus most of

3    the closing costs.

4    22. Once I effectuated the transfer of the SM land (via the Seaside Mariana company, which I

5    would then own and control) to the Litigating Group, they would then pay me and my company,

6    another US $334,000 in quarterly payments.

7    23. That group of twenty-two (22) investors (the named Defendants in CV2020-006232, aka "the

8    Litigating Group) all agreed to collectively be bound by the Funding Contract and to fund the

9    payments in the Funding Contract.

10   24. Two of the Defendants, David Crowe and Mike Lyonette, agreed to manage their group and, for

11   expediency, communications with me.

12   25. David Crowe named and provided documentation as to the identities of the twenty-two people

13   (including himself) who agreed to be bound by the Funding Contract: David Crowe; Mike

14   Lyonette; Thomas P. Madden; Taylor Collins; Jeff Rau; Darrell Bushnell; Amy Bushnell; Peter

15   Tierney; Kathy Fettke; Susie Yee; Norman Davies; Claire Davies; Sandra Winfrey; Brian Putze;

16   Colin Ross; Brad Malcolm; Michael Jimenez; Gustavo Varela; Robert Crowe; Bernadette

17   Brown; Federico Gurdian; and Terencio Garcia.

18

19   **FEBRUARY 2022 AFFIDAVIT ADDITIONS ADDRESSING DEFENDANTS' LIABILITY**

20   26. Mr. Crowe disclosed to me that the twenty-two investors had formed a partnership for their

21   litigation with Kevin Fleming and Seaside Mariana in which those investors shared profits and

22   losses.

5

27. Mr. Crowe told me that for the litigation he essentially acted as the main agent, dealing with attorneys and reporting back to the group of twenty-two (22) investors, who would do conference calls to discuss important issues. (Email was also a tool of significant communication).

28. Mr. Crowe told me that the Litigating Group (also known as the Crowe Group) were bound together in an LLC.

29. Mr. Crowe also shared with me that the Litigating Group had all signed an Operating Agreement setting forth how the group of investors would manage the LLC and how the partnership would share profits and losses.

30. While I am a legal layperson, I had completed two years of law school at the time that Mr. Crowe and I negotiated our contract.

31. Hence, when Mr. Crowe stated that the Litigating Group in the contract had formed a partnership, that Mr. Crowe acted as agent for his partners in the litigation, and that Mr. Crowe and Mr. Lyonette were acting as agents for their partnership in negotiating and signing a contract with me, I was comfortable with the way the contract was drafted, with Mr. Crowe and Mr. Lyonette signing a contract with me on behalf of the twenty-two members of the partnership.

32. In other words, they had the authority and ability, as agents, to bind the Litigating Group partners and the partnership itself in the contract with me.

33. Further, via basic agency, each one of those partners would be responsible. I didn't think too much about the possibility of a breach at that point, but when briefly considering it I was

comfortable that each partner, including Mr. Malcolm, Mr. Rau, and Mr. Jimenez, would be liable to me in case of a breach.

## CONTINUING ON WITH ORIGINAL AFFIDAVIT

34. For a variety of reasons, David Crowe was usually the sole communicator and conduit on behalf of the group of twenty-two (22) investors.

35. For stylistic purposes and economy of phrase, the above twenty-two (22) Defendants, who acted in concert to fund my purchase of SM, will also be described as "the Crowe Group" – this is the descriptive phrase that the parties all used colloquially, before the need for the litigation in the case at bar.

36. In August 2018, David Crowe and Mike Lyonette signed NCNDs with me.

37. Mr. Crowe and Mr. Lyonette pledged not to share any information about me or the Funding Contract with any of the rest of their group of 20+ investors unless an individual group member signed a NDA (Non-Disclosure).

38. Approximately 10 of the 20+ investors signed NDAs with me, and thus, if Mr. Crowe, Mr. Lyonette, and others were honoring the Funding Contract and their NDAs, I believe only the dozen or so of them would have gotten information related to the Funding Contract and its progress towards a closing after that point.

39. The NDAs granted jurisdiction of my choice, had a non-disclosure provision, and in the majority of the NDAs signed, specifically acknowledged that violating the non-disclosure provision could very well cost me over US $10 million in damages.

40. I shared information with Mr. David Crowe in strict confidence on how I expected to monetize the intangible assets of the Seaside Mariana company, with an expected US $8 million post-tax profit from two of those intangible assets. (February 2022 update: I've since learned that this theory of how I could profit from the intangible assets is likely wrong)

## PLAINTIFF'S OTHER DEALS WITH KEVIN FLEMING

41. After the Funding Contract was signed, I signed more contracts with Kevin Fleming, to purchase Isla Mariana (another real estate development) and to purchase seven more Panamanian and Nicaraguan companies.

42. I subsequently purchased the legal claims of Kevin Fleming, Maria Rueda, and the relevant entities.

43. Outside of Seaside Mariana, and as shall be proven in court, I expected to possibly make on the order of US $4,000,000 to US $5,000,000 with the completion of the other related deals.

44. I disclosed the existence of my other deals with Kevin Fleming to the Crowe Group via Mr. David Crowe (as well as another deal I was working on in Jamaica).

45. One particular reason I shared information with Mr. Crowe on my other contracts with Kevin Fleming et al. was to ensure that both purchasing parties (me, for example, buying another residential development called Isla Mariana from its owners; and the Crowe Group, essentially purchasing ~1000 acres of Seaside Mariana via me) were getting the land that they expected to get.

46. Because I was also purchasing Mr. Fleming's development company Nicaragua Developments (which also owned land), and the parent company of Seaside Mariana (Grupo Mariana), via

8

1    some of these other deals, I would have the power and ability to ensure that my and the Crowe

2    Group's expectations were met.

3    47. The Crowe Group had information on Seaside Mariana going back to 2006, and thus was able to

4    build maps of all the Seaside Mariana land, including the list of parcels they should get

5    transferred to their new entity at my close of the purchase of the Seaside Mariana company.

6    (Because a massive subdivision had occurred, this was important).

7    48. Because I was purchasing the development for US $500,000 (plus capped deferred payments)

8    and selling the land to the investors backing me for US $834,000, I was going to make US

9    $334,000 in short-term cash profit in closing my purchase of SM and flipping the land to the

10    Crowe Group (aka the Litigating Group).

11    49. In addition, as referenced above, and as shall be fully proven at jury trial, I expected to make a

12    much larger sum monetizing the intangible assets I was acquiring as part of this deal.

13    50. The Crowe Group performed its due diligence on the deal and agreed to move forward to a

14    close.

15    51. As part of due diligence, the Crowe Group had its attorney go to the local municipal office and

16    ensure that Seaside Mariana still owned all of the relevant land fee simple, and that there was no

17    secured debt mortgage obligation on the land, and no unexpected liens nor unexpected notations

18    in the property registry.

19    52. After the Crowe Group's due diligence, the Crowe Group agreed that they would fund the

20    $25,000 that I was required to submit to Kevin Fleming after his due diligence.

21    53. That moment would also kick off a 60-day closing cycle for me to close on my purchase of SM,

22    and for the Litigating Group (the Crowe Group) to fund said purchase.

9

54. Because I knew that Seaside Mariana had taken in US $ 22 million in sales from purchasers and investors, I insisted that Kevin Fleming and the other owners of Seaside Mariana file taxes up to the present.

55. I negotiated a Closing Contract with Kevin Fleming which the relevant parties signed, in which the parties agreed to close my purchase (their sale) of the Seaside Mariana company within 60 days.

56. As part of the Closing Contract, I would pass through US $25,000 to Kevin Fleming, which Mr. Fleming pledged to use in significant part for tax professionals to file all of Seaside Mariana's taxes through the present. (Some of it would be used by the Seaside Mariana sellers to prepare for closing).

57. David Crowe then remitted a $25,000 cashier's check, which I utilized to satisfy my obligation to fund the closing process in the Closing Contract (by depositing it in Kevin Fleming's Wells Fargo bank account).

58. (In the Funding Contract, the Twenty-Five Thousand Dollars is on page 1, Article I, paragraph 1, where it is a non-refundable deposit).

59. It is worth noting that early in my process with the Crowe Group, the Crowe Group had essentially committed to funding the purchase but only if everything was as they expected (due diligence on all files and details), and further details could be worked out.

60. As of August 11th, 2018, when the Crowe Group / Litigating Group agreed to the Funding Contract with I, the Crowe Group still had one contingency to pull out of the deal, if anything about their due diligence did not pass muster. (This was also in the Funding Contract, page 1, Article I, paragraph 1, where the Crowe Group could let the Funding Contract unwind)

61. However, once the Crowe Group / Litigating Group had completed due diligence and remitted the US $25,000 non-refundable deposit towards the US $500,000 purchase price I had to pay to purchase the SM company (US $475,000 more after the US $25,000), the Crowe Group no longer had any contingency to pull out of the deal.

62. At that point, the Crowe Group (including these Defendants) were fully committed to the funding outlined for my purchase of Seaside Mariana, with no contingency to get out of the Funding Contract.

## DEFENDANTS' INITIAL BREACH

63. The Funding Contract called for a closing date in mid-October-2018, as did my purchase contract of Seaside Mariana (reinforced in subsequent signed Closing Contracts).

64. The parties retained attorneys to prepare closing documents.

65. The parties worked out the logistics of closing in a "simultaneous close", which is well-understood to mean two successive closings.

66. In the agreed logistics, I would acquire the entity Seaside Mariana Golf and Spa Resorts company, which owned all the Seaside Mariana land, using another US $475,000 of the Crowe Group's money for said close.

67. Then, I would transfer the lands in the Funding Contract to the entity of the Crowe Group's choice. (I would then get the other US $334,000 in a series of payments to me and my entity).

68. It is worth noting that one condition of close (in the Closing Contract) was not fulfilled by Kevin Fleming; namely, he did not file the taxes for Seaside Mariana for the missing years.

11

69. However, this was my issue and not the Crowe Group's. I would be the owner of the Seaside Mariana company. I worked out with David Crowe, on behalf of the Crowe Group, that I would take responsibility for the taxes and simply file them for Seaside Mariana, as the new owner, after the close of my purchase of the SM company.

70. The Crowe Group agreed, via David Crowe, that this was acceptable to them and would not be a barrier to the close, nor their funding of it.

71. As part of the logistics for the close, I offered to provide a limited power of attorney in my name, to David Crowe's wife, that would be valid only to transfer the Seaside Mariana land out of the Seaside Mariana company.

72. At this point, in October 2018, I had fully performed as per the parties' contract, as far as I could without the US $475,000 promised in the Funding Contract. Within a few days, with the help of attorneys, the closing would happen, and using the Crowe Group's US $475,000, I would purchase the Seaside Mariana company, thereby owning its shares.

73. I would then immediately transfer the land to the Crowe Group's designated new entity (or let Mr. Crowe's wife handle this step via the limited power of attorney).

74. It was now time for the Defendants to perform with the rest of the funding promised in the Funding Contract for my purchase of the Seaside Mariana company; namely, the additional US $475,000.

75. However, just before I should have flown to Nicaragua for the closing, on or around Tuesday October 9th, 2018, David Crowe, on behalf of the Crowe Group, informed me that there was a new issue that could impact the anticipated closing.

76. Mr. Crowe informed me that Mr. Ted Cole had sued Seaside Mariana again. (Mr. Cole had previously sued Seaside Mariana and settled for a significant part of the Seaside Mariana land).

77. At this point, the Litigating Group was already aware of the other contracts I had signed with Kevin Fleming, Maria Rueda, Grupo Mariana, and Nicaragua Developments to purchase another eight of the real estate ownership and real estate development company.

78. David Crowe and the Litigating Group were also aware of a deal I was working on with the Jamaican government, as Mr. Crowe kindly lent me $5,000 so I could travel to Jamaica and for related costs. (In a few successive loans, Mr. Crowe kindly lent me approximately US $11,500, which I would like to repay to Mr. Crowe, with interest, when I am able).

79. I then revealed to Mr. Crowe, and thus all of these Defendants, that I had also purchased Mr. Fleming's, Ms. Rueda's, and their companies' legal claims. I thus had the right, using assigned legal claims, to sue Mr. Cole for his past tortious acts against Mr. Fleming, Ms. Rueda, and the Seaside Mariana company.

80. Mr. Crowe and I obtained a copy of the new Ted Cole legal complaint, and it was frivolous at best.

81. I was therefore unconcerned about the Cole litigation and planned defensive litigation for Seaside Mariana as soon as I owned the Seaside Mariana company in a few days.

82. I proposed to these Defendants, via Mr. Crowe, that the combination of offensive litigation against Mr. Cole (for past tortious acts) and defending the frivolous new legal complaint would be a simple, inexpensive, and effective remedy to solve any concerns about the Cole legal complaint.

83. Further, as I pointed out, the new Cole litigation was my problem, as the soon-to-be-owner of the Seaside Mariana company, which was the entity getting sued.

13

84. I pointed out that within days the Seaside Mariana land would be transferred to the Litigating Group's designated new entity. As that new entity was about to be formed, it clearly would have no liability to anyone including Mr. Cole.

85. However, the Litigating Group, including these Defendants, refused to fund my purchase of the Seaside Mariana company (contrary to their promises, representations, obligations, and responsibilities set out in the Funding Contract).

86. David Crowe then assured me that Seaside Mariana was no longer attractive to any of the Litigating Group.

87. The reason stated by Mr. Crowe that the Litigating Group now had zero interest in the SM company and SM land, and also zero interest in honoring the Funding Contract, was the new Ted Cole litigation.

88. I don't consider this a valid reason to breach a contract, but it is interesting in light of Mr. Crowe and the Litigating Group's further actions, below.

## THE SECOND BREACH AND REPUDIATION (ON BEHALF OF ALL DEFENDANTS)

89. In March 2019, Defendant Thomas P. Madden contacted Kevin Fleming on behalf of the Crowe Group, with the following email (Exhibit E), attempting to purchase Seaside Mariana, despite:

 a. The non-circumvent these Defendants and the Crowe Group had agreed to.

 b. The Funding Contract they had signed.

 c. The various representations they made in October 2018, just before the parties would have closed, that they were pulling out and were no longer interested in the Seaside Mariana land.

## THE THIRD CROWE BREACH/REPUDIATION (ON BEHALF OF ALL DEFENDANTS)

90. In April 2019, Defendant David Crowe contacted Kevin Fleming, following up on communications from Thomas Madden and David Crowe, in email, attempting to negotiate a direct purchase of the SM company and land (without involving me).

91. In doing so, it is clear Crowe and all Defendants fully ratified the first Crowe Group breach as well as the second breach and repudiation (Madden contact of Fleming to try to buy directly) of the Funding Contract.

## FURTHER RAMIFICATIONS OF THE CROWE GROUP BREACHES

92. In and after March 2019, once Thomas Madden contacted Kevin Fleming to negotiate with him directly, on behalf of the Crowe Group, and once David Crowe followed through and continued those negotiations on behalf of all Crowe Group members and all Defendants, Kevin Fleming stopped returning my phone calls.

93. (In December 2019, Kevin Fleming emailed me to say Fleming was terminating the Purchase Contract.  However, Mr. Fleming did not have the legal right to do so).

94. Fleming refused to honor any of the rest of my contracts with him or his entities.

95. As a result, I have potentially lost another US $4 million or more, as shall be further proven at trial (with US ~$3 million of profits expected to come from the Isla Mariana / Nicaragua Developments deals).

96. (I admit that these profits were speculative, and that from a legal standpoint, each expected potential profit must be multiplied by the percentage chance that I would have realized that particular profit.  I will prove these numbers and these more speculative damages at jury trial).

15

97. I am doing what I can to mitigate the damages.

98. To my surprise, these Defendants have thus far (through today) demonstrated zero interest in working with me in any way to mitigate the very significant damages associated with my planned purchase of the Seaside Mariana company.

99. However, as I had stated in email to Mr. Troy Romero, we are all adults and responsible for our own actions and decisions (and also the lack thereof).

100.    The Defendants' breaches, repudiations, false promises, representations, and assurances, not to mention their tortious acts and non-acts, and their negligence have caused significant damages to me, in an amount to be proven at trial.

101.    I will continue to do my best to mitigate the base damages, especially my hoped-for and expected profits from purchasing the Seaside Mariana company (other than the US $334,000).

102.    I contacted David Crowe of the Crowe Group to see if we could work something out, whether a way to move forward, or a settlement, but Mr. Crowe was not interested.

103.    I have had similar discussions with Mr. Rau, Mr. Madden, and Mr. Jimenez, with no interest by those parties in continuing a discussion about ways I can still close on the Seaside Mariana company (if that is even relevant or possible).  Mr. Rau and Mr. Jimenez had no interest in that nor in any settlement discussions.

104.    I was left with no choice but to file a legal complaint so that the scales of justice may be righted and balanced appropriately.

105.    (Mr. Thomas Madden, Mr. Colin Ross, Mr. Brian Putze, and Ms. Sandra Winfrey have all settled with me, and were dismissed with prejudice in this case).

**FEBRUARY 2022 FURTHER AFFIDAVIT ADDITIONS ADDRESSING DISCOVERY**

106. In June 2021, I propounded properly formatted discovery, including Requests for Production, to Mr. Rau.

107. Mr. Rau, having Answered my initial complaint, is the only Defendant that I could serve discovery upon at that point, as the rest of the Defendants in the instant case have been filing Motions to Dismiss for approximately twenty (20) months.

108. Among other requests, I asked for documents concerning "Carl Wescott" and "Seaside Mariana".

109. I also specifically asked for the Operating Agreement that is, along with our contracts, at the heart of this case.

110. Unfortunately, Mr. Rau and his attorneys have chosen to perpetrate various forms of discovery abuse. This is not the place to discuss that at length. By way of example, Mr. Rau, despite investing $350,000 to buy land to build a third home in Nicaragua and being in litigation with Seaside Mariana for over nine (9) years now, pretended he did not know what Seaside Mariana was.

111. The Plaintiff hates to trouble the Court but will need to file Rule 37(d)(2) and Rule 37(a) Motions to partially address these issues and to get the Operating Agreement that he has been requesting for some time. The Plaintiff plans to file those in March.

112. For now, suffice it to say that in Mr. Rau's discovery responses, and in his deposition, Mr. Rau confirmed the existence of the Operating Agreement and that he has it and other documents in his possession.

113. His attorneys, after confirming that they would provide the Operating Agreement and other key documents, now state that it is a confidential document that is on the privilege log (it is not).

114. Despite the Plaintiff's NDAs with Mr. Crowe, Mr. Rau, and other defendants, the NCND, and the Protective Order, Mr. Rau and his attorneys refuse to provide the Operating Agreement in response to discovery.

115. I'll address these issues with various filings over the next month or so, so that I may obtain an Order ordering Defendant Rau to provide the Operating Agreement in response to my Requests for Production.

116. The Operating Agreement, per Mr. Crowe, will show that Mr. Jimenez, Mr. Malcolm, and Mr. Rau are partners in partnership with Mr. Crowe and Mr. Lyonette as part of the Litigating Group partnership, that that group is encapsulated in an LLC in which the Defendants share profits and losses, and that they are governed by the Operating Agreement, which will provide further details.

117. For now, I've provided some documentation (Exhibit G's Sub-Exhibits) proving the existence of the Operating Agreement along with Mr. Rau's reticence to provide it.


AFFIANT FURTHER SAYETH NAUGHT



CARL A. WESCOTT
February 18th, 2022



---------- Forwarded message ----------
From: **Carl Wescott** <carlwsoj@gmail.com>
Date: Fri, Jan 14, 2022 at 7:10 PM
Subject: my continuing requests for key documents in Wescott v. Crowe, Rau, et al.
To: Matthew Coughlan <mcoughlan@romeropark.com>
Cc: Justin Park <jpark@romeropark.com>, Troy Romero <TRomero@romeropark.com>, Kathy Koback <kkoback@romeropark.com>, Kiley Coddington <kcoddington@romeropark.com>


OK, Mr. Coughlan, thank you.

May I suggest that you provide each item possible that you and Mr. Rau are willing to provide (that is responsive to my propounded RFPs) by January 28th, and that list of what Mr. Rau cannot provide or will not provide, too?

If it helps you focus on what I think is important, I don't need SMS/MMS from Mr. Rau at this point.

The point of this exercise is not to waste your time or drive up Mr. Rau's cost to defend.

It's to get key documents that I believe I have a legal right to, that are central to the case.

I believe I do have a right to Mr. Rau's GL and/or E&O policy, and I provided authority for that in my letter to Mr. Park, intended for all of you.  (Separately, I've already demanded that you tender to Mr. Rau's policies)

The five absolutely key documents (at this point) are (1) that policy (2) Litigating Group Operating Agreement (3) MoU (4) App A-1 and (5) Simplified App A-1.

I must respectfully insist on receiving (at a minimum) those five documents as soon as possible, and certainly, by January 28th, 2022 (or a reason or authority on why I may not have them).

I have a right to every version of those documents (as per my propounded RFPs), but if you just provide the final ones (or latest one) of each, that will suffice for now (saving you and Mr. Rau time).

Thank you.

--CAW +1 936 937 2688

On Fri, Jan 14, 2022 at 6:11 PM Matthew Coughlan <mcoughlan@romeropark.com>
wrote:
Good afternoon Mr. Wescott,

Understood. I will respond in full to your request for each item no later than January 28.
Enjoy your weekend and safe travels.

Respectfully,
Matthew Coughlan

**From:** Carl Wescott <carlwsoj@gmail.com>
**Sent:** Thursday, January 13, 2022 8:40 AM
**To:** Matthew Coughlan <mcoughlan@romeropark.com>
**Cc:** Justin Park <jpark@romeropark.com>; Troy Romero
<TRomero@romeropark.com>; Kathy Koback <kkoback@romeropark.com>
**Subject:** Re: draft(s) of and/or final signed version of operating agreement among
Crowe Group members

Great, Mr. Coughlan.

I'd like a delivery of the Operating Agreement, MoU, App A-1 and other documents
(whatever's possible), as well as a delivery date for any you're not producing Friday that
is no later than Friday January 28th, 2002.

Mr. Rau (Mr. Park, on his behalf) has previously made it clear that you will not deliver
Mr. Rau's E&O / GL policy.

If there are any documents that you either cannot or will not deliver, please make that
clear, too.

Thank you

--CAW

On Wed, Jan 12, 2022 at 3:46 PM Matthew Coughlan <mcoughlan@romeropark.com>
wrote:
Good afternoon Mr. Wescott,

I have been in a hearing that has taken up all my time. My apologies. I will have a more
full response to your request by close of business on Friday. Thank you.

Respectfully,
Matt Coughlan

**From:** Carl Wescott <carlwsoj@gmail.com>
**Sent:** Thursday, January 6, 2022 11:15 AM

**To:** Matthew Coughlan <mcoughlan@romeropark.com>
**Cc:** Justin Park <jpark@romeropark.com>; Troy Romero
<TRomero@romeropark.com>; Kathy Koback <kkoback@romeropark.com>; Kiley
Coddington <kcoddington@romeropark.com>
**Subject:** Fwd: draft(s) of and/or final signed version of operating agreement among
Crowe Group members

Mr. Coughlan,

19 more days has passed with no response from you.  I do recognize that many of us
took some holiday time late last year.

Following up again, are you going to facilitate Mr. Rau provide at least one (ideally
the final) version of the Litigating Group (aka Crowe Group) Operating
Agreement?  Multiple drafts are referred to in documents you provided, and in at least
one case the Operating Agreement was an attachment to a document you provided -
but you (and/or Mr. Rau) did not provide the Operating Agreement attachment.

The Operating Agreement is key because it shows Mr. Rau in a partnership with the
rest of the Crowe Group.

While Mr. Rau was in conspiracy with those other members, and may have ratified their
acts, it's the easiest way for me to establish Mr. Rau's culpability and liability in court,
via agency.

I should have had that document almost six (6) months ago in response to my original
RFPs.

Would you please ensure that it is delivered to me no later than Wednesday January
12th?

Or, in the alternative, I'd like to hear from you by then as to why it will not be
delivered/never be delivered.

Thank you for your time and assistance in this matter.

--CAW   +1 936 937 2688

---------- Forwarded message ---------
**From: Carl Wescott** <carlwsoj@gmail.com>
Date: Sun, Dec 19, 2021 at 4:25 PM
Subject: draft(s) of and/or final signed version of operating agreement among Crowe
Group members
To: Kathy Koback <kkoback@romeropark.com>
Cc: Troy Romero <TRomero@romeropark.com>, Matthew Coughlan
<mcoughlan@romeropark.com>, Justin Park <jpark@romeropark.com>, Kiley
Coddington <kcoddington@romeropark.com>

Mr. Coughlan et al.,

Actually, before the verification, it appears an attachment was left out of the document production, one that I specifically requested in one of my propounded RFP requests.

In the new document RAU0649-0692, which has some emails between Crowe Group members and some documents, on the final page, page 44 of 44 (see attached), it refers to the attachment, the draft Operating Agreement.

I asked Mr. Rau about that document in his deposition and he confirmed its existence (though he could not remember the details).

I knew of its existence before because of David Crowe explaining things to me back in 2018.

May I please have that draft Operating Agreement?  (that's in March 2018)

May I please have any updates to that Operating Agreement, especially the final signed version?

No point in doing Mr. Rau's verification until we add those, thanks.

Please advise (and provide)

Thank you.

--CAW  +1 936 937 2688

On Sun, Dec 19, 2021 at 10:07 PM Carl Wescott <carlwsoj@gmail.com> wrote:
Thank you for following up and for Mr. Rau, with your help, producing more documents response to my propounded RFP requests.

I believe this delivery is missing the verification.

May I please have the relevant verification signed by Mr. Rau under penalty of perjury that the documents are true and correct and comprise everything responsive to the propounded requests (minus documents in the privilege log)?

Thank you

--CAW

---------- Forwarded message ---------
From: **Carl Wescott** <carlwsoj@gmail.com>
Date: Fri, Jan 14, 2022 at 7:10 PM
Subject: my continuing requests for key documents in Wescott v. Crowe, Rau, et al.
To: Matthew Coughlan <mcoughlan@romeropark.com>
Cc: Justin Park <jpark@romeropark.com>, Troy Romero
<TRomero@romeropark.com>, Kathy Koback <kkoback@romeropark.com>, Kiley
Coddington <kcoddington@romeropark.com>

OK, Mr. Coughlan, thank you.

May I suggest that you provide each item possible that you and Mr. Rau are willing to
provide (that is responsive to my propounded RFPs) by January 28th, and that list of
what Mr. Rau cannot provide or will not provide, too?

If it helps you focus on what I think is important, I don't need SMS/MMS from Mr. Rau at
this point.

The point of this exercise is not to waste your time or drive up Mr. Rau's cost to
defend.

It's to get key documents that I believe I have a legal right to, that are central to the
case.

I believe I do have a right to Mr. Rau's GL and/or E&O policy, and I provided authority
for that in my letter to Mr. Park, intended for all of you. (Separately, I've already
demanded that you tender to Mr. Rau's policies)

The five absolutely key documents (at this point) are (1) that policy (2) Litigating Group
Operating Agreement (3) MoU (4) App A-1 and (5) Simplified App A-1.

I must respectfully insist on receiving (at a minimum) those five documents as soon as
possible, and certainly, by January 28th, 2022 (or a reason or authority on why I may
not have them).

I have a right to every version of those documents (as per my propounded RFPs), but if
you just provide the final ones (or latest one) of each, that will suffice for now (saving
you and Mr. Rau time).

Thank you.

--CAW +1 936 937 2688

On Fri, Jan 14, 2022 at 6:11 PM Matthew Coughlan <mcoughlan@romeropark.com>
wrote:
Good afternoon Mr. Wescott,

Understood. I will respond in full to your request for each item no later than January 28.
Enjoy your weekend and safe travels.

Respectfully,
Matthew Coughlan

**From:** Carl Wescott <carlwsoj@gmail.com>
**Sent:** Thursday, January 13, 2022 8:40 AM
**To:** Matthew Coughlan <mcoughlan@romeropark.com>
**Cc:** Justin Park <jpark@romeropark.com>; Troy Romero
<TRomero@romeropark.com>; Kathy Koback <kkoback@romeropark.com>
**Subject:** Re: draft(s) of and/or final signed version of operating agreement among
Crowe Group members

Great, Mr. Coughlan.

I'd like a delivery of the Operating Agreement, MoU, App A-1 and other documents
(whatever's possible), as well as a delivery date for any you're not producing Friday that
is no later than Friday January 28th, 2002.

Mr. Rau (Mr. Park, on his behalf) has previously made it clear that you will not deliver
Mr. Rau's E&O / GL policy.

If there are any documents that you either cannot or will not deliver, please make that
clear, too.

Thank you

--CAW

On Wed, Jan 12, 2022 at 3:46 PM Matthew Coughlan <mcoughlan@romeropark.com>
wrote:
Good afternoon Mr. Wescott,

I have been in a hearing that has taken up all my time. My apologies. I will have a more
full response to your request by close of business on Friday. Thank you.

Respectfully,
Matt Coughlan

**From:** Carl Wescott <carlwsoj@gmail.com>
**Sent:** Thursday, January 6, 2022 11:15 AM

**To:** Matthew Coughlan <mcoughlan@romeropark.com>
**Cc:** Justin Park <jpark@romeropark.com>; Troy Romero <TRomero@romeropark.com>; Kathy Koback <kkoback@romeropark.com>; Kiley Coddington <kcoddington@romeropark.com>
**Subject:** Fwd: draft(s) of and/or final signed version of operating agreement among Crowe Group members

Mr. Coughlan,

19 more days has passed with no response from you.  I do recognize that many of us took some holiday time late last year.

Following up again, are you going to facilitate Mr. Rau provide at least one (ideally the final) version of the Litigating Group (aka Crowe Group) Operating Agreement?  Multiple drafts are referred to in documents you provided, and in at least one case the Operating Agreement was an attachment to a document you provided - but you (and/or Mr. Rau) did not provide the Operating Agreement attachment.

The Operating Agreement is key because it shows Mr. Rau in a partnership with the rest of the Crowe Group.

While Mr. Rau was in conspiracy with those other members, and may have ratified their acts, it's the easiest way for me to establish Mr. Rau's culpability and liability in court, via agency.

I should have had that document almost six (6) months ago in response to my original RFPs.

Would you please ensure that it is delivered to me no later than Wednesday January 12th?

Or, in the alternative, I'd like to hear from you by then as to why it will not be delivered/never be delivered.

Thank you for your time and assistance in this matter.

--CAW   +1 936 937 2688

---------- Forwarded message ---------
From: **Carl Wescott** <carlwsoj@gmail.com>
Date: Sun, Dec 19, 2021 at 4:25 PM
Subject: draft(s) of and/or final signed version of operating agreement among Crowe Group members
To: Kathy Koback <kkoback@romeropark.com>
Cc: Troy Romero <TRomero@romeropark.com>, Matthew Coughlan <mcoughlan@romeropark.com>, Justin Park <jpark@romeropark.com>, Kiley Coddington <kcoddington@romeropark.com>

Mr. Coughlan et al.,

Actually, before the verification, it appears an attachment was left out of the document production, one that I specifically requested in one of my propounded RFP requests.

In the new document RAU0649-0692, which has some emails between Crowe Group members and some documents, on the final page, page 44 of 44 (see attached), it refers to the attachment, the draft Operating Agreement.

I asked Mr. Rau about that document in his deposition and he confirmed its existence (though he could not remember the details).

I knew of its existence before because of David Crowe explaining things to me back in 2018.

May I please have that draft Operating Agreement?  (that's in March 2018)

May I please have any updates to that Operating Agreement, especially the final signed version?

No point in doing Mr. Rau's verification until we add those, thanks.

Please advise (and provide)

Thank you.

--CAW  +1 936 937 2688

On Sun, Dec 19, 2021 at 10:07 PM Carl Wescott <carlwsoj@gmail.com> wrote:
Thank you for following up and for Mr. Rau, with your help, producing more documents response to my propounded RFP requests.

I believe this delivery is missing the verification.

May I please have the relevant verification signed by Mr. Rau under penalty of perjury that the documents are true and correct and comprise everything responsive to the propounded requests (minus documents in the privilege log)?

Thank you

--CAW

# SM LAWSUIT/LIEN GROUP – STATUS UPDATE 2018.03.04

SUB-Exhibit G-2

**Action/follow up points:**

1. All members: Ensure you have provided all the information requested earlier by Mike & G&B

2. All members: Confirm (to Mike) agreement up upgrade criminal case to organized crime (at a share collective cost of US$ 5,000)

3. Legis: Follow up and report back on deed issuance enquiry process

4. All members: Those BF/OV owners who have been contacted by Ted Cole please respond urgently

5. Dave/Darrell/Mike: Propose G&B/Legis relationships when the Ted Cole relationship is clearer

6. Dave/Darrell/Mike: If appropriate, consider a final attempt at SM settlement when TC's proposals are clearer

7. All members: Please share any communications received from Kalle Wescott or the Flemings

8. Mike: Coordinate signing of the Operating Agreement (after finalization of signature process)

9. Mike/Dave: Finalize proposals for potential buy-out arrangements (if possible)

10. Dave/Darrell/Mike: Get a clear view of Ted Cole's proposals and move forward the discussions

11. G&B:
    - a. above: Press on with arbitration and report back regularly
    - a. above: Urgently assess the newly provided documentation for possible file annotation
    - a. above: Advise Mike of those where we do not yet have a strong enough case
    - a. Respond to Mike with agreement (or otherwise) to the 2 March call minutes
    - b. above: Immediately upgrade the criminal case to organized crime in the names of those for whom G&B have valid PoAs
    - f. above: Finalize discussion with Mike re the most effective way for members to sign up to the Operating Agreement
    - h. above: Review Mike's suggested text for the lien holder buy-out agreement

12. G&B: Conclude on long-standing outstanding matters (from January and later):
    - Response to Mike's pending questions on the SM agreement (in case it comes up again)
    - Confirmation of lack of restrictions on Managua land (in due course)
    - Contact with municipality regarding the potential amount of back taxes
    - Review of PoAs they have on file for us (for ongoing validity in these various contexts)
    - Advice regarding protection and action needed regarding the threats inherent in KF's 24 January and 14 February communications

## SM LAWSUIT/LIEN GROUP – STATUS UPDATE 2018.03.04

**DETAILED UPDATE from 17 January (with a few additional updates to 4 March in blue font)**

(Retained for background information only)

### A.  **Status update**

1.  **Lien**: The lien process is now completed and the liens have been placed and registered, in two categories: Liens (Davies and Varela) and Preventative annotations (Bushnell and Malcolm).

2.  **Arbitration**: Following the placing of the lien, G&B have now started the next phase of the process, i.e. arbitration to argue our case and quantify damages. SM was served in December with the request to appoint an arbitrator, and did not respond by last week's deadline. It could take about 6 months to get the case set out, delivered, discussed and the amount of the damages eventually agreed by the arbitrator. We have provisionally instructed G&B to move forward as slowly as possible with this process, to buy us the maximum amount of time for negotiations with SM/KF. If things go as we wish them to (see 7 below), we will be able to cease the arbitration process and lift the liens.

3.  **Criminal case**: The file (started in 2014) is open at the Public Ministry, the police investigations are continuing, and G&B are monitoring progress. G&B has seen evidence of police activity in the municipal registries, where sections/entries have been noted/ restricted as under investigation. G&B are in contact with the authorities. The current case is based on fraud (which has a 4-year expiration period, and we are within that period). G&B's criminal lawyer (a) has confirmed that he believes he has evidence that could enable him get an Interpol warrant out against KF/MR and (b) is considering whether to recommend upgrading the case to organized crime/racketeering (on the basis of the multiplicity of corporations, jurisdictions etc. used). There is no expiry date for racketeering. MO will provide a summary of the pros and cons of both routes, after which we can decide whether it is worth the cost and effort of upgrading to increase the pressure on KF/MR in terms of our civil cases.

4.  **Clarification of deed situation**: At the instigation of Legis, we are coordinating with Legis a request to the Supreme Court to provide details of deeds issued on all SM lots, to determine once and for all whether Taboada (or any other notary) is sitting on deeds that we can then request. The cost of this process is about $35 per lot for a zero return and around $50 per lot where a deed is identified and details are provided. This seems to be a modest amount that we have assumed will be acceptable to all members.

5.  **Legis letter of engagement**: Mike sent to all a draft LoE from Legis on 18 December. A few responses received – all accepting of the proposal. Subject to progress with SM/KF, Mike is proceeding to get this issued to all participants and finalized instructing Legis to proceed, make arrangements for all PoAs to be collated by Legis, arrange for KF to provide PoA to act in Nicaragua, and Legis to start the deed issuance and registration process. The advance payment arrangement is 40% of the fees plus the amount indicated for expenses per each lot. Mike will

## SM LAWSUIT/LIEN GROUP – STATUS UPDATE 2018.03.04

work this out and communicate separately as we decide how to proceed with the two law firms.

6. **Draft agreement with SM/KF**: Legis have proposed an agreement we might submit to KF to confirm his intention to facilitate. Dave, Darrell and Mike are working on this formal agreement. <u>Update 2018.03.04</u>: Superseded by events. Dave conducted verbal discussions with KF culminating in the issue of an informal heads of agreement to SM/KF (which SM/KF subsequently rejected). See Mike's summary update emailed 2018.02.14.

7. **Deal options with SM/KF**: KF has indicated that Kalle Wescott has withdrawn, presumably as a result of the liens, although there have been conflicting messages from various sources on this. Irrespective of whether he has withdrawn or not, this has opened the door for a similar approach by us. Our advantage is that we have control over the liens and annotations so we are collectively the only ones that KF can effectively sell to. Negotiations to date have resulted in a 3-option approach, as set out in Attachment 1 for your consideration. In summary the three options are as follows:

   7.1. Continue down the arbitration route and hope that we are successful in being awarded land to the value of our lot and condo entitlements (either to us individually or to a new corporation that we set up)

   7.2. Pay $500k to SM in exchange for all SM lots still available except the 90 lots SM has sold to other investors, some 24 lots at the far end of the Carrazo land and 4 BF lots, with KF staying involved regarding these 118 lots to manage SM's obligations

   7.3. Pay $500k to SM in exchange for all available SM Managua lots, leaving the Carrazo land with SM, with the ownership of the shares of SM passing to an as yet unnamed third party who would deal with these lots and with SM's obligations (i.e. KF/MR wholly out of the picture).

Regarding option 1, we have requested GB to describe and estimate the damages amounts to be put before the arbitrator and provide an assessment based on their experience as to what amount we are most likely to receive.  This should be discussed with the group either by email or by conference call before we decide which approach will be our primary one.

Regarding option 3, KF's indications to Dave in December indicate that this would give us an estimated 1.3 m m2 of land as compensation for lack of condos and lack of infrastructure. As we understand it, SM paid $4m for the full 900 acres (about 3.6m m2), i.e. about $1 per m2. The Managua land, being closer to the ocean, should be more valuable (say $1.5 per m2 vs .60c per m2 for the Carazo land) – i.e. about $2.0m for the 1.3m m2 we would get. Tecnitasa valuation indicates a value of $5m for the Managua land. This is further worked out in the Appendix to the Options Poll document submitted to members along with this Status report. We are still awaiting G&B's valuations to confirm this.

# SM LAWSUIT/LIEN GROUP – STATUS UPDATE 2018.03.04

We believe that the Managua land referred to in options 2 and 3 has full access to public roads and facilities. This will need to be confirmed by counsel in due course.

Options 2 and 3 both involve us agreeing to lift our liens and annotations immediately on title to the negotiated lots being registered in our names or in our corporation's name.

The agreement with SM still needs to be drafted. Legis had earlier submitted some draft wording for an agreement regarding KF's willingness and commitment to assist us in getting title to individual lots. But things have moved on since then, and we are now looking at a more comprehensive deal with SM. Mike and Dave are working on this.

Irrespective of the option selected, we will need to consider how best to structure the acquisition, e.g. (i) individual group members taking direct ownership of lots to which they are entitled or (ii) pooling all lots into one new corporation for re-sale/development, with the corporation's shares being owned by all members in proportion to the amounts invested (or a mixture of both). The latter option would avoid us having to decide right now who receives what from the settlement.

We will also need to see who would be interested in participating in the $500k buy-out and in any further investment need for infrastructure. All members would be offered to opportunity to participate in both on an equal basis, and we see where we end up. Any further investment of cash would need to come with some kind of priority/incentive to reflect the increased risk of further investment. This is further addressed in the suggested Operating Agreement.

8. **Operating agreement amongst ourselves**: Given the formal and legal status of the arbitration stage and the opportunity for an approach to SM from us, G&B have advised that we must formalize our internal arrangements with each other (and preferably in a formal deed). A provisional draft of an "Operating Agreement" is attached for your consideration, including four exhibits. Exhibit A provisionally lists the aggregate amounts we each invested in lot and condo entitlements (based on the listing prepared in 2016 for the legal fee allocation). Exhibits B-D provisionally list our entitlements in the three categories identified: lots still available, lots lost to Cole and Tejas, and condo entitlements. These still need to be finalized on the basis of the payment input Mike requested on 13 January, and B-D then need to be reconciled back to A.

9. **Special situations**: A number of special situations have arisen regarding past deals made with SM/KF. These are set out in Exhibit A-2 to the proposed draft Operating Agreement. If any members have any other specific deals with SM/KF, please send Mike details. These will all need to be discussed/agreed within the group.

10. **Meeting with Ted Cole**: Darrell and Mike met with Ted Cole, who re-stated his desire and interest in joining forces with us, both as we move forward with SM/KF and thereafter. In particular, in the short term he restated his interest in the plan he communicated late last year

## SM LAWSUIT/LIEN GROUP – STATUS UPDATE 2018.03.04

to work with us to develop infrastructure around the BF/OV lots, many of which are owned by members of his and our groups, thereby increasing their saleability.

**B.  ~~Initial deal suggestions~~** *(superseded by A.7, but retained in the notes for info)*

1. ~~Once the A.4 lots have all been fully registered, pay SM (say) $400k cash (a) for all the remaining Managua section lots/parcels owned by SM that have not been encumbered or deeded away (the Managua section being the "front property") and (b) for SM to settle its infrastructural/golf course/spa obligations to us. Then get these registered.~~
2. ~~Receive Managua HOA assets and legal structure in above price – also purchaser lists/contact listings, plans/surveys/permits etc., soft goods. (Need further legal advice).~~
3. ~~Leave Carrazo section (i.e. the "back property") with SM as assets for future SM use.~~
4. ~~Continue the process of getting the lien registered and placed, but agree to drop our lawsuits and liens as and when all of the above has been accomplished.~~

~~If all fifteen lawsuit/lien participants join, this will mean a basic outlay of $30k average per participant (allowing say $50k for costs) for the basic acquisition.~~

**C.  ~~Follow up points to these deal suggestions~~** *(superseded by A.7, retained in the notes for info)*

1. ~~What unsold lots/parcels does SM have left to support the 400k? We estimate that only about 10%-15% of the relevant Managua land has been sold as lots or encumbered.  The remainder was intended for golf course, condo, commercial etc. and is still owned by SM. See D below.~~
2. ~~What happens to SM's obligations (infrastructure, golf course, construction and delivery of condos that have been sold, etc.)? What other baggage comes with the Managua lots/parcels?~~
3. ~~We need to get a very clear inventory of what we are getting for the 400k.~~
4. ~~Many of the Managua lots have been promised by SM to others outside our lawsuit/lien group. To avoid the risk of being drawn into litigation from other investors, we may need to settle with other investors, particularly those who have preventative annotations (even though these have technically expired). Will there be sufficient land to settle with other investors? Having said that, our group (and Ted Cole/Tejas) seem to be the only investors who have taken proactive steps to protect their investments.~~
5. ~~Does there need to be an additional participant commitment to get some infrastructure started (e.g. $20k more per participant would generate a further $300k to kick-start infrastructure)?~~

**D.  Status of the SM development (input from KF in December)** (*Superseded, but retained for info*)

1. The Westcott deal is dead.
2. We lost 5 Estate lots in Carrazo and 8 golf lots in Managua.  Not too hard to select replacements with Crowe, Lyonette, Winfrey, Ross, Davies, Madden, Yee, Malcolm and Brown needing replacements.
3. Looking at prices paid, it was $2 psf for Beachfront/Ocean view and Estate lots and $1 psf for all Golf lots. Condo owners could use condo payments to "buy" into BF/OV as compensation. BF/OV are all 15,000 sf lots.

**SM LAWSUIT/LIEN GROUP – STATUS UPDATE 2018.03.04**

4.  Managua land totaled 2,002,510 sqm, Cole took 395,000 sqm. Purchasers bought about 200,000 sqm, leaving about 1,400,000 sqm still owned by SM and presumably unencumbered except for Lyonette's mortgage lien on about 90,000 sqm.  So about 1,300,000 sqm available. The original farm was 3.8 million sqm and $ 4 million, i.e. about $ 1 psqm. So if we can get it for $ 0.35-.40 sqm it's a good deal.

E.  **Other matters**

1.  A subsequent step (subject to agreement amongst the group as and when we are fully in control of the Managua land) could be to approach Ted Cole to combine our holdings with the land he has (and also Mike Lyonette's 23 acres) - and/or then look for investors/financiers to provide funds for infrastructure step by step.

2.  If there are any lawsuit/lien participants who do not wish to participate in the acquisition of the remainder of SM (i.e. only wish to take title to lots to which they are contractually entitled), then there will need to be some form of differentiation put in place to reward those who are prepared to take on the significant risks inherent in putting up more cash. To widen the catchment and funding, the option to participate in the acquisition proposal could also be extended to other investors outside our lawsuit/lien group – some kind of "B shareholder status". Initial ideas are set out in Exhibit E to the draft Operating Agreement.

3.  Pending matters with G&B (still pending in yellow highlight):
    3.1.  ~~Estimates of damages claim/decision (7.1) – see Dave's email 13 January~~ – Done by G&B
    3.2.  ~~Legal review of operating agreement (including finalization of Exhibits B and C and the jurisdiction and arbitration elements)~~ – Received
    3.3.  ~~Review of agreement with SM (NB still to be drafted)~~ – Currently on hold (superseded)
    3.4.  ~~Key details of the valuations they have on file (for comparison to Attachment 1)~~ – Received 2018.01.30
    3.5.  Confirmation of lack of restrictions on Managua land (in due course) – Still awaited from G&B
    3.6.  ~~Update of the lengthy registry print out~~ – Received 2018.01.30
    3.7.  ~~Pros and cons of upgrading the criminal case~~ - See update to A3 above
    3.8.  ~~Re-sending of the individual February 2017 legal opinions~~ – Received 2018.02.06
    3.9.  Contact with municipality regarding the potential amount of back taxes (Managua) - Still awaiting outcome from G&B
    3.10.  Review of PoAs they have on file for us (for ongoing validity in this context) - Still awaiting outcome from G&B
    3.11.  New 2018.02.17: Advice regarding protection and action needed regarding the threats inherent in KF's 14 February communication – Under consideration by G&B

**Attachments** (for members to review and comment):
1.  ~~The poll of the three options for the deal with SM~~ - Completed
2.  Final draft of an Operating Agreement between ourselves - Attached

**process will in no way impede or delay our present lawsuit with G&B and actually will assist it.**

(JUB-EXHIBIT 6-3)

Regardless of your feelings on this proposal, it must be clear that no contact can be made with Fleming, no emails will be acknowledged if received from Fleming, no conversations verbally or on any social media platform between the members or to any non-participant to the lawsuit groups, all members must not share any information with any 3rd party anywhere over any social media application. Also, there can be no criticism of the Nicaragua government.

Let's hope we are not too late and there is not time for much discussion. I apologize if I missed anyone.

Please respond ASAP.

Regards

Amy and Darrell Bushnell
Granada, Nicaragua 011 (505) 8616-7310 bushamy13@yahoo.com

"Men with courage do not slay dragons, they ride them"

**From:** Mike Lyonette <mike.lyonette@gmail.com>
**To:** Amy Bushnell <painterly.0910@yahoo.com>
**Cc:** Kathy Fettke <kathy@realwealthnetwork.com>; Michael Jimenez <diverre@gmail.com>; Darrell Bushnell <bushamy13@yahoo.com>; Thomas Madden <Thomaspmadden@gmail.com>; Gustavo Varela <surgeryabc@yahoo.com>; Norm Davies <ndavies45@shaw.ca>; Claire Davies <cndavies@shaw.ca>; Taylor Collings <taylorcollings@hotmail.com>; Brad Malcolm <brad@athentech.com>; Bernadette Browne <browneber@eircom.net>; david crowe <expat1935@yahoo.com>; Robert Crowe <cuervo3636@yahoo.com>; Colin Ross <colin.ross@cibc.ca>; Jeff Rau <jrau@suncadia.com>; sbwinfrey <sbwinfrey@aol.com>; Zach Collings <ztcollings@gmail.com>; Peter <tierneypeter@msn.com>
**Sent:** Monday, July 2, 2018, 8:51:26 AM CST
**Subject:** Re: Proposal to Work With Ted Cole's Group

Hi, Darrell

Aplogies for delving back into the nitty gritty, but I'd like to clarify some of the chronology in your email on Sunday. This is how I see the chronology:

On 22 February, you sent us Ted's 2-page Word doc setting out his suggested general principles for a united effort.

On 6 March, the three of us (Dave, you & I) had a con call with Ted to get a better understanding of each other's positions.

As a result of this, the three of us then drafted a 1-page Memorandum of Understanding (general principles not detail). Around the same time, we finalised our "App A-1" (for the LG Operating Agreement) - the spreadsheet that sets our individual LG entitlements vis a vis SM and how the LG shares in any proceeds from our legal action.

You then submitted to Ted the draft of the MoU we had put together plus (at his and/or your request, I'm not sure) a simplified version of our App A-1, to give him insight into what our entitlements are vis a vis SM and within the context of us getting a better understanding of each other's positions. I don't know exactly when you did this - I assume mid-March.

12

RAU0669

 Gmail                                    **Carl Wescott <carlwsoj@gmail.com>**

*SUB-EXHIBIT G-4*

## my continuing requests for key documents in Wescott v. Crowe, Rau, et al.

**Matthew Coughlan** <mcoughlan@romeropark.com>                    Fri, Jan 28, 2022 at 1:24 PM
To: Carl Wescott <carlwsoj@gmail.com>
Cc: Justin Park <jpark@romeropark.com>, Troy Romero <TRomero@romeropark.com>, Kathy Koback
<kkoback@romeropark.com>

Mr. Wescott,

I hope your travels were safe. In response to your supplemental requests:

--As you know, we listed the Operating Agreement on our privilege log. Due to confidentiality and privilege concerns, the Operating Agreement and its appendices logs must remain on the privilege log.

-As for any insurance policies, we have turned over all potentially responsive documents in Mr. Rau's possession. Further, as we have previously stated, your request is not likely to lead to the discovery of admissible information.

-As to all other requests, after a diligent search, no responsive documents exist in Mr. Rau's possession.

Thank you and have a great day.

[Quoted text hidden]

**CARL A. WESCOTT v. DAVID CROWE, et al.**
**U.S. District Court, Northern District of California**
**Case No. 3:20-cv-06456-JD**
**Privilege Log Page 1**

SUB-EXHBT G-5

| Bates Range | Date | Title of Document | Reason Not Produced |
|---|---|---|---|
| RAU0001-0017 | 12/31/2006 | Master Agreement and Offer to Purchase | Confidentiality Provision |
| RAU0018-0019 | 08/13/2018 | Non-Disclosure Agreement | Confidentiality Provision |
| RAU0219-0221 | 06/16/2020 | Private and Confidential Letter re C. Wescott Complaint | Work Product |
| RAU0567 | 08/15/2018 | Email re Gurdian | Attorney/Client Privilege |
| RAU0568-0571 | 08/16/2018 | Email re Gurdian/NDA | Attorney/Client Privilege |
| RAU0572 | 08/04/2018 | Email re Gurdian/ NDA | Attorney/Client Privilege |
| RAU0573-0568 | 09/20/2018 | Email re Gurdian/Operating Agreement and attachments | Attorney/Client Privilege |
| RAU0587-0590 | 08/08/2018 | Email re Gurdian/NDA Settlement Agreement | Attorney/Client Privilege |
| RAU0591-0603 | 09/17/2018 | Email re Gurdian/Operating Agreement and attachments | Attorney/Client Privilege |
| RAU0604-605 | 08/05/2018 | Email re Gurdian/NDA | Attorney/Client Privilege |
| RAU0606-0607 | No date | Pages left intentionally blank | |
| RAU0608-0609 | 01/26/2018 | Email re Gurdian/Draft Documents | Attorney/Client Privilege |

**CARL A. WESCOTT v. DAVID CROWE, et al.**
**U.S. District Court, Northern District of California**
**Case No. 3:20-cv-06456-JD**
**Privilege Log Page 2**

| | | | |
|---|---|---|---|
| RAU610 | No date | Page left intentionally blank | |
| RAU0611-0613 | 01/27/2018 | Email re Gurdian/Draft Documents | Attorney/Client Privilege |
| RAU0614-0616 | 01/27/2018 | Email re Gurdian/Draft Documents | Attorney/Client Privilege |
| RAU0617-0618 | 01/26/2018 | Email re Gurdian/Draft Documents | Attorney/Client Privilege |
| RAU0619 | No date | Page left intentionally blank | |
| RAU0620-0622 | 02/14/2018 | Email re Gurdian/Status Report | Attorney/Client Privilege |
| RAU0623-0648 | 01/18/2018 | Email re Gurdian/Draft Documents | Attorney/Client Privilege |
| RAU0693 | 07/21/2018 | Email re NDA | Confidentiality Provision |
| RAU0694-0697 | 09/26/2018 | Email re Operating Agreement and attachments | Confidentiality Provision |
| RAU0687-0702 | 09/12/2018 | Email re Proposal | Confidentiality Provision |
| RAU0703-0707 | 09/10/2018 | Email re Litigation with attachments | Confidentiality Provision |
| RAU0708 | 09/20/2018 | Email re Operating Agreement | Confidentiality Provision |
| RAU0709-0711 | 09/25/2018 | Email re Operating Agreement and attachment | Confidentiality Provision |
| RAU0712 | 09/13/018 | Email re pledge | Confidentiality Provision |

**CARL A. WESCOTT v. DAVID CROWE, et al.**
**U.S. District Court, Northern District of California**
**Case No. 3:20-cv-06456-JD**
**Privilege Log Page 3**

| | | | |
|---|---|---|---|
| RAU0713-0716 | 10/02/2018 | Email re Operating Agreement with attachments | Confidentiality Provision |
| RAU0717 | 09/11/2018 | Email re pledge | Confidentiality Provision |
| RAU0718-0720 | 11/03/2018 | Email re pledge | Confidentiality Provision |
| RAU0721 | 09/11/2018 | Email re pledge | Confidentiality Provision |
| RAU0722-0725 | 09/10/2018 | Email re response | Confidentiality Provision |
| RAU0726-0729 | 06/15/2020 | Email re Operating Agreement | Confidentiality Provision |
| RAU0730-0733 | 09/10/2018 | Email re response | Confidentiality Provision |
| RAU0734-0735 | 08/07/2020 | Email re Nicaragua attorney | Confidentiality Provision |
| RAU0736-0745 | 09/13/2018 | Email re pledge | Confidentiality Provision |
| RAU746-0771 | 08/04/2018 | Email re Operating Agreement with attachments | Confidentiality Provision |
| RAU0772-0786 | 09/11/218 | Email re Operating Agreement with attachments | Confidentiality Provision |
| RAU0787-0796 | 07/30/2018 | Email re Settlement and Operating Agreement with attachments | Confidentiality Provision |
| RAU0797-0828 | 08/23/2018 | Email re Settlement with attachments | Confidentiality Provision |
| RAU0829-0830 | 09/16/2018 | Email re pledge | Confidentiality Provision |