CARL A. WESCOTT
8210 E. VIA DE LA ESCUELA
SCOTTSDALE AZ 85258
*in propria persona*
CARLWSOJ@GMAIL.COM
+1 936 937 2688

FILED

MAR 11 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARL A. WESCOTT,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID CROWE;<br>MIKE LYONETTE;<br>JEFF RAU;<br>BRAD MALCOLM;<br>MICHAEL JIMENEZ,<br><br>Defendants | Civil Action No. 3:20-cv-06456-JD<br><br>**PLAINTIFF'S RULE 37(d)(2) MOTION FOR ORDERS RELATED TO DEFENDANT MR. JEFFREY RAU'S DISCOVERY ABUSE**<br><br>Suggested Hearing Date: May 12th, 2022<br>Hearing Time: 10 am<br>Courtroom: 11<br><br>…or anytime later at the Court's discretion |

Plaintiff Carl Wescott, proceeding *pro se*, based on Defendant Mr. Jeffrey Rau's discovery abuse, hereby moves this Court pursuant to Federal Rule of Procedure 37(d)(2) for an Order with four components:

- Resetting Mr. Rau's deposition clock to zero

- For Mr. Rau to pay the reasonable expenses for costs expended iu the taking of Mr. Rau's deposition which were almost completely wasted based on Mr. Rau not producing documents he should have produced (and worse yet, lying under oath and penalty of perjury about not having responsive documents when he actually had hundreds of responsive documents).

- Sanctioning Defendant Mr. Rau for his failure to produce those hundreds of documents responsive to the Plaintiff's Requests for Production.
- Warning Mr. Rau about the possibility of final case-dispositive sanctions if he continues to refuse to cooperate with the discovery process.

The Plaintiff met and conferred to try to solve this issue (including Exhibit G), as well as the lack of responsiveness to properly propounded RFPs. In the interests of judicial efficiency, the Plaintiff will be filing a parallel motion within a few weeks with the same suggested hearing date, a Motion to Compel Production of Certain Documents, to handle the latter set of issues. The Plaintiff hates to trouble the Court, but the documents being withheld are central to the case at bar.

In support of this motion, the Plaintiff offers this concise Memorandum of Points & Authorities.

1. Introduction

This case involves a complex real estate transaction related to the much-feted but ill-fated Seaside Mariana development in Nicaragua[1]. The Plaintiff entered into a real estate purchase and financing contract with a partnership of investors headed and led by David Crowe (the "Crowe Group") and Mike Lyonette, but with a significant influential and advisory role played by Defendant Rau, a licensed real estate broker in Washington State (license 85432, Exhibit A, Exhibit D).

---

[1] Seaside Mariana was the most ambitious development in the history of Nicaragua complete with a Jack Nicklaus designed golf course and a promotional visit from Jack Nicklaus. At one point, the real estate assets would have been valued in the tens of millions of dollars. The Plaintiff was effectively stealing a page, or perhaps several pages from the playbook of the "Grave Dancer" Sam Zell and attempting to gain control of potentially valuable real estate at depressed prices. The Crowe Group understood this strategy and was relying on the Plaintiff's expertise and in effect compensating him for that expertise (and non-circumvents in place) in the contractual profit margin.

2

The sum and substance of the contract was that the Plaintiff would purchase the property from the Developer, Kevin Fleming ("Fleming"), primary owner of the company that owned the relevant 923-acre beachfront parcel with two kilometers of beach for $500,000. Mr. Rau and his twenty-one (21) co-investors and partners ("the Crowe Group") would effectively finance the purchase by providing the $500,000 for the purchase and would pay the Plaintiff a guaranteed profit of $334,000 which was essentially a consulting fee for putting the deal together.

The Crowe Group partners shared profits and losses and were encapsulated in an LLC with an Operating Agreement. (Mr. Rau admits he has the Operating Agreement, but refuses to provide it, and refuses to put it on a privilege log, despite citing "confidentiality" as the reason he refuses to provide it, now that he admits he has the document. That will be addressed in the Motion to Compel the Plaintiff is currently drafting and will file soon).

The transaction was negotiated with some professionalism. There was a detailed written contract (Plaintiff's Second Amended Complaint, Exhibit D), NCs (Non-Circumventds) and NDAs (Non-Disclosure Agreements), including a Non-Disclosure Agreement signed by Mr. Rau. Again, the Crowe Group contained twenty-two members. There was and would have been a brisk pace of written communication, principally by email, among the membership.

The Crowe Group partnership breached the parties' contract at well beyond the 11th hour (about three or four days before the anticipated closing), after they had done their due diligence and released their contingency to pull out. As a result, the Plaintiff lost his personal costs and investment of his time and money, his guaranteed profit of $334,000, considerable credibility with Fleming, who he had done other deals with, to purchase Fleming's other corporate and real estate assets at distressed prices. As a result of the Seaside Mariana deal not closing, the Plaintiff was not able to close the purchase of another Fleming Development, Isla Mariana, for which he only needed to put

3

$100,000 down, but which had a value, in the Plaintiff's eyes, of over US $1 million. There were other significant consequences of not closing, which the Plaintiff had given constructive notice to Mr. David Crowe about – Mr. Crowe served as the head of the Crowe Group partnership, and also its agent. Thus, Mr. Rau's breach of contract not only cost the Plaintiff the US $334,000 owed, but a large sum of forseeable consequential damages.

As is fitting for litigation over golf course residences, the Plaintiff has kept his discovery requests down the middle of the fairway. The Plaintiff attaches the RFPs at issue as Exhibit "B" hereto. The Plaintiff requested all documents related to Carl Wescott (the Plaintiff) and Seaside Mariana (the development). The Plaintiff also asked for insurance policies that might be applicable including Mr. Rau's E&O and personal homeowner's policy, and Mr. Rau's recent loans.

Responses to the RFP's were due in advance of the Plaintiff's deposition of Mr. Rau. Under oath and penalty of perjury, Mr. Rau claimed that he possessed no responsive documents in the following categories:

- insurance policies
- loan applications
- documents related to Carl Wescott (Exhibit C, Mr. Rau's RFP Responses)

After the signing and filing of a protective order, Mr. Rau also produced some documents related to Seaside Mariana, but no emails. (Exhibit D, Sworn Affidavit of Carl Wescott). An email is a type of document.

Mr. Rau, in separate documents (RFAs), claimed he did not know who Kevin Fleming was, and claimed he did not know what SM was (Exhibit E, RFA Responses of Mr. Rau)

The Plaintiff thought he may have a case of mistaken identity, as two other members of the Crowe Group (Sandra Winfrey and Brian Putze) claimed when sued and served. As the Plaintiff had never met Jeffrey Rau, though they had corresponded and talked on the phone, the Plaintiff considered the possibility that he had served the wrong Jeffrey Rau. The Plaintiff decided to take Mr. Rau's deposition to figure this out. If Mr. Rau was truly uninvolved, had never bought real estate in Seaside Mariana, was not part of the Crowe Group, and was not part of the Litigating Group that had signed a contract with the Plaintiff and then breached, then the Plaintiff planned to dismiss this Jeffrey Rau from his legal complaint and find the right Jeffrey Rau who had wronged the Plaintiff.

Mr. Rau's deposition took place on October 12th, 2021 in Seattle. In his deposition, also under oath and penalty of perjury, Mr. Rau conceded that he and his wife had recently purchased a home, had applied for a loan for the home, and had recently purchased a homeowner's insurance policy (Exhibit D, Sworn Affidavit of Carl Wescott). Mr. Rau also conceded that he had an insurance policy related to his work as a real estate broker, and indeed, Washington State law requires him to carry such a policy. Mr. Rau is the real estate broker in this group of partners and likely provided significant advice to other members of the group.

Under questioning under oath, contrary to his written responses under penalty of perjury, Mr. Rau admitted that he did know who Kevin Fleming was, after all. Mr. Rau confirmed he had paid $350,000 for land in Seaside Mariana to build a vacation home, his third home. Mr. Rau confirmed that yes, he knew what Seaside Mariana was and who Kevin Fleming was. Yes, he had been in litigation with Fleming and the Seaside Mariana company for nine (9) years now. Yes, he was a member of the Crowe Group partnership. Yes, he had signed some sort of partnership document. No, he couldn't remember the details of that Operating Agreement. Yes, he had his digital and analog files and had no data loss or file loss issues. Yes, Mr. Rau, remembered the deal with the

Plaintiff, Carl Wescott. Yes, he knew who the Plaintiff was (Exhibit D, Sworn Affidavit of Carl Wescott).

Under questioning, Mr. Rau confirmed he had computing equipment, including at his house, and digital and analog files. Again, Mr. Rau testified that he had not had any data loss or other type of loss of documents, and that as far as he knew, he had all of his paper-based files, as well as his digital files going back all the way to his Seaside Mariana purchase in around 2006 or 2007 (Exhibit D, Sworn Affidavit of Carl Wescott).

Despite submitting in his RFP responses under oath that Mr. Rau had no documents or emails concerning Carl Wescott, in his deposition, Mr. Rau admitted that he had dozens of documents related to Carl Wescott. Indeed, the Plaintiff can confirm that he signed a NDA with Mr. Rau, and that he has emailed Mr. Rau upon multiple occasions (Exhibit D, Sworn Affidavit of Carl Wescott).

In his deposition, under oath, Mr. Rau confirmed that there are at least "hundreds" of emails concerning "Seaside Mariana" in his possession, but yet, did not produce a single email out of the hundreds that he had, in his RFP Responses. In his deposition, under oath, Mr. Rau confirmed that there are "dozens" of emails concerning "Carl Wescott" in his possession, but yet, did not produce a single email out of the hundreds that he had, in his RFP Responses.

In a responsive email to the Plaintiff, his counsel (Matthew Coughlan) seems to recall that Mr. Rau may have referenced "dozens" of such emails. However, Mr. Coughlan did not attend the deposition. Mr. Justin Park of Romero Park did. Once we determined that Mr. Rau likely had 500+ responsive documents to the RFPs he had not provided, we stopped the deposition (Exhibit F).

After the deposition, the Plaintiff met with Mr. Rau's counsel Mr. Justin Park of Romero Park, P.S. The Plaintiff sent a letter following up with Mr. Park, summarizing what he believed was going to happen, namely that Mr. Rau would follow up with the hundreds of missing documents and

emails. The Plaintiff also met and conferred with Mr. Park, counsel to Mr. Rau, to try and resolve the discovery abuse, suggesting a re-setting of the deposition clock and Mr. Rau paying his reasonable wasted expenses of the deposition (Exhibit G).

In either case, there was a substantial trove of documents that was not produced, rendering Mr. Rau's deposition, taken in Seattle by agreement of the parties, almost entirely useless to the Plaintiff. Yes, the Plaintiff confirmed that this Jeffrey Rau was the right, guilty, liable Mr. Rau, but had Mr. Rau been honest in his discovery responses, that would not have been necessary. Had Mr. Rau produced the hundreds of documents he admitted he had not produced in discovery, the Plaintiff would have reviewed them prior and then invested the majority of his deposition time reviewing those documents with Mr. Rau and asking him questions about the documents.

The Plaintiff also would have reviewed the Operating Agreement with Mr. Rau. If the Plaintiff had had those documents many months ago, he could have filed a Motion for Summary Judgment as to Mr. Rau, with some chance that it would have been successful.

2. Rau Should Be Sanctioned & Warned of Terminating Sanctions

In the 9th Circuit, the test for terminating sanctions is as follows:

> We have constructed a five-part test, with three subparts to the fifth part, to determine whether a case-dispositive sanction under Rule 37(b)(2) is just: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."[10] **The sub-parts of the fifth factor are whether the court has considered lesser sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of case-dispositive sanctions.**[11] This "test" is not mechanical. It provides the district court with a way to think about what to do, not a set of conditions precedent for sanctions or a script that the district court must follow. *Connecticut General Life Insurance Company v. New Images of Beverly Hills* 482 F.3rd 1091 (9th Cir. 2006).

In light of the 9th Circuit's approach, it would obviously be premature for this Plaintiff to request terminating sanctions. But, given the cavalier attitude that Mr. Rau and his counsel have exhibited to date, it is not premature to ask this Court to issue a warning about case-dispositive sanctions if Mr. Rau continues to play games and show disrespect for the rules.

As for a lesser appropriate sanction at this point, the Plaintiff suggests that Mr. Rau or his counsel reimburse him for his hard expenses in traveling to Seattle and arranging Mr. Rau's videotaped deposition which was rendered worthless by Mr. Rau's refusal to meaningfully respond to the Plaintiff's Requests for Production. A summary of those hard expenses will be filed as an exhibit with the Plaintiff's Reply, and including flights, hotel, and videographer, is in the range of $2000. The Plaintiff leaves it to the discretion of the Court as to whether to offer an award for his time, but the Plaintiff respectfully suggests that a flat additional amount of $1,000 would be reasonable given that Mr. Rau's attorneys probably charged much more.

The Plaintiff also asks, that the Court specifically hold, consistent with Rule 34 (b) (2) (C) that Mr. Rau has waived any RFP and discovery Objections, though the Plaintiff will not request attorney-client privileged documents or attorney work product. The Plaintiff will insist on a proper privilege log in the Motion to Compel he will file soon.

The Plaintiff appreciates that this Court would prefer a determination on the merits and the Plaintiff is anxious to prevail on the merits. However, the total disregard for the Federal Rules and the authority of this Court demonstrated by team Rau to date merits, in the Plaintiff's view, a warning that terminating sanctions may follow absent remorse and reform.

3. Conclusion

The Plaintiff is serious about this litigation and does not take it lightly. The Plaintiff respects this Court, and though a legal layperson, he is doing his best to follow all Court orders, all Court procedures, and to meet all deadlines as best he can. He brought this case with some reluctance, only because he was wrongfully deprived of a carefully negotiated contractual profit and Mr. Rau and his twenty-two investor partners was contemptuously dismissive of his claim. Mr. Rau continues to show his contempt in his conduct of this litigation.

The Plaintiff did not seek oppressive discovery in this instance. He wanted documents and emails that referred to him and to the transaction at issue. Of course, properly logged privileged documents could be withheld; of course, proper and *timely* Objections could be discussed and possibly accommodated.

What actually happened is that Mr. Rau pretended documents didn't exist and, later, testifying under oath, conceded that at least dozens and probably hundreds such documents in fact existed. Mr. Rau's counsel then sought to limit the scope of production to documents that the Plaintiff already possessed by demanding that he add time, date, recipient and subject "parameters" and counsel peremptorily overruled Rule 26 in concluding that insurance is not relevant to our case. (Justin Park email on November 21st, 2021: "You are welcome to explain to the Court why you think this completely unrelated policy is being requested").

This is sharp practice if not dishonest practice. The Court should order a resetting of Mr. Rau's deposition clock to zero, order payment, sanction the Defendant and/or counsel appropriately and warn of more severe sanctions to come if these problems persist.   RESPECTFULLY SUBMITTED on March 10th, 2022

_____
Carl A. Wescott, *pro se*